UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CA, INC.,

               Plaintiff,

- against -

SIMPLE.COM, INC., WIRED
SOLUTIONS, LLC., a revoked Nevada LLC,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM & ORDER**
02 Civ. 2748 (DRH) (MLO)
<u>UNDER SEAL</u>

**APPEARANCES:**

**COVINGTON & BURLING**
Attorneys for Plaintiff
One Front Street
San Francisco, California 94111
By: Samuel F. Ernst, Esq., Robert D. Fram, Esq., Michael M. Markman, Esq., & Leonard Joseph
Martiniak, Esq.,

**FARRELL FRITZ, P.C.**
Attorneys for Defendants
EAB Plaza
West Tower-14th Floor
Uniondale, New York 11556
By: John P. McEntee, Esq. & David A. Scheffel, Esq.,

**FULBRIGHT & JAWORSKI LLP**
Attorneys for Defendants
225 South Sixth Street, Suite 4850
Minneapolis, Minnesota 55402
By: John E. Lynch, Esq. & Joseph P. Zammit, Esq.

**RIVKIN RADLER LLP**
Attorneys for Defendants
EAB Plaza
Uniondale, New York 11556
By: Celeste M. Butera, Esq. & Stephen J. Smirti, Jr., Esq.

**GALE R. PETERSON, ESQ.**
Special Master
112 E. Pecan Street
Suite 1800
San Antonio, Texas 78205

**HURLEY, Senior District Judge**

## INTRODUCTION

Plaintiff CA Inc. ("CA"), formerly known as Computer Associates International Inc. filed this action for declaratory relief claiming that United States Patents Nos. 6,272,493, 6,434,563 and 6,535,882 (the '493, '563, and '882 Patents respectively) are invalid, unenforceable and not infringed. (Pl.'s 2d Am. Compl.(Dkt. No. 46), at 2-3, 5-6; 3d Am. Compl. (Dkt. No. 631), at ¶ 34.) Defendants Simple.com, Inc. and Wired Solutions, L.L.C. (collectively "Simple") counterclaimed, charging CA with infringing the '493, '563, and '882 Patents. (Am. Answer & Countercl. (Dkt. No. 43), at ¶¶ 11-25 & Prayer for Relief ¶ 5.).

By Order dated March 31, 2004, in response to an application by Plaintiff, the Court determined that the appointment of a special master was warranted in the instant case and directed the parties to provide a joint list of three suggested masters. From that list, the Court, pursuant to Rule 53 of the Fed. R. of Civ. Proc., appointed Gale R. Peterson, Esq. as Special Master by Order dated June 2, 2004. That Order provides in relevant part:

> In addition to such non-dispositive matters, any summary judgment motion shall first be presented to the master for a report and recommendation. Moreover, as the instant case involves patent infringement, all hearings consistent with <u>Markamn v. Westview Instruments, Inc.</u>, 517 U.S. 370, 384 (1996), will be held before this master. After such hearing, the master shall issue a report and recommendation regarding all disputed patent claims. In all of these functions, the master shall stand in the stead of the magistrate judge. <u>See</u> Fed. R. Civ. P. 53(g). . . . Review of and appeal from all orders and recommendations, as well as the

> appropriate standard of review shall be governed by Federal Rule of Civil Procedure 72 and the associated case law. <u>See</u> Fed. R. Civ. P. 52(b)(2)(D). The timing of such reviews and appeals shall also be governed by Rule 72 and the associated case law. <u>See</u> <u>id.</u>

(Order dated June 2, 2004 (Dkt. No. 152), at 2-4.)

The purpose of this Memorandum and Order is to address the Special Master's work product from one of his multiple case-related tasks, viz. his March 2, 2006 Report and Recommendation Regarding Claim Construction (Dkt. No. 559) ("R& R"). Some portions of the Claim Construction R & R have not been objected to by the parties. As to those, the Court's review has been for clear error and, having found none, those portions are adopted. *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys.*, 447 F. Supp. 2d 329, 331 (S.D.N.Y. 2006) (citing Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 149 (1985)); *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999) (" If no objection or only partial objection is made, the district court judge reviews those unobjected portions for clear error.") (citing *Goffman v. Gross*, 59 F.3d 668, 671 (7th Cir. 1995); *Campbell v. United States Dist. Court*, 501 F.2d 196, 206 (9th Cir. 1974)).

Before addressing the portions of the R& R which have been objected to, the applicable standard of review and pertinent legal principles will be presented together with an overview of the patents in suit.

# APPLICABLE LAW

## I.    Standard of Review

All portions of the R&R that have been objected to shall be reviewed *de novo*.  Fed. R. Civ. P. 72(b); *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990).

## II.    Claim Construction Standard

The construction of patent terms is a question of law determined by the court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983-84 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 372 (1996).  A court must determine the meaning of disputed claim terms "from the perspective of one of ordinary skill in the pertinent art at the time of filing," and in doing so may rely upon a patent's claim language, specification, prosecution history and extrinsic evidence. *Chamberlain Group, Inc. v. Lear Corp*, 516 F.3d 1331, 1335 (Fed. Cir. 2008); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc).  Due to their enhanced reliability and the fact that they were made in direct contemplation of the invention, the claim language and patent specification are accorded the greatest significance, followed by the prosecution history and extrinsic evidence.  *Id*. at 1318-19.

Claims are the focal point of a patent because they "define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).  The interpretation of disputed terms begins with the claim language itself and its plain meaning to one of ordinary skill in the art.  *Phillips*, 415 F.3d at 1312-13; *see also Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1301 (Fed. Cir. 2006) ("claim construction must begin with the words of the claims themselves").  However, claims do not stand alone; they must be read in light of the accompanying specification and

claim terms should "normally" be used consistently throughout the patent. *Markman*, 52 F.3d at 979; *Phillips*, 415 F.3d at 1314.

Although the specification is "the single best guide to the meaning of a disputed term," a court may not import "limitations into a claim from the written description." *Chamberlain Group, Inc.*, 516 F.3d at 1335; *see also E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) (holding that it is improper to read a limitation "into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim"); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (stating that the specification is usually "dispositive[,] . . . the single best guide to the meaning of a disputed term"). Moreover, although a claim is not necessarily limited to embodiments disclosed in the specification, "repeated and definitive remarks in the written description" can be used to refine claim language. *Computer Docking Sta. Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (citing *Watts v. XL Sys.*, 232 F.3d 877, 882 (Fed. Cir. 2000) which states that "repeated and definitive remarks in the written description could restrict a claim limitation to a particular structure"). In fact, when a patentee gives a "special definition . . . to a claim term . . . that differs from the meaning it would otherwise possess . . . " the patentee's "lexicography governs." *Phillips*, 415 F.3d at 1316; *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("A claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history."); *Vitronics Corp.*, 90 F.3d at 1582 ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.") (citing *Markman*, 52 F.3d at 979); *cf.*

*Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1291 (Fed. Cir. 2008) (stating that if a patent "specification does not reveal any special definition for . . . [a term, it must be construed] according to [its] . . . ordinary meaning"). Moreover, unless an embodiment disclosed in the specification was "clearly" disclaimed or found to be "inconsistent with unambiguous language in the patent's specification or prosecution history," it should usually be included when determining claim scope. *Oatey Co. v. IPS Corp,* 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) (citations omitted); *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1138-39 (Fed. Cir. 2007); *see also id.* at 1138 (eliminating one of twenty-one "preferred" embodiments disclosed among two patent specifications because it was inconsistent with the unambiguous language of the patent specifications) (citations omitted); *see generally PSN Ill., LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1166 (Fed. Cir. 2008) (limiting *Oatey*, stating: "*Oatey* is not a panacea, requiring all claims to cover all embodiments. . . . Likewise, during prosecution, an applicant may have cancelled pending claims but not amended the specification to delete disclosure relevant only to the cancelled claims.").

In addition to the patent claims and the written description, a court may consult the prosecution history while construing disputed claim terms. *See Phillips*, 415 F.3d at 1317. The prosecution history can "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Id.* Moreover, "a statement made by the patentee during [the] prosecution history of a patent in the same family as the patent-in-suit can" further elucidate disputed claim language or "operate as a disclaimer." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007) (citing *Microsoft Corp. v. Multi-tech Sys., Inc.*, 357

F.3d 1340, 1350 (Fed. Cir. 2004)).  However, since the prosecution history merely represents "an ongoing negotiation between the [United States Patent and Trademark Office] . . . and the applicant," it "often lacks the clarity [and probative value ] of the specification."  *Phillips*, 415 F.3d at 1317.

Although a court should attach greater value to intrinsic evidence, which includes the patent's claims, written description and prosecution history, it may also use extrinsic evidence to interpret disputed claim language.  "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  *Markman,* 52 F.3d at 980.  It can be used to inform the court of the technology, background and nuances related to the disputed claim terms.  *Phillips*, 415 F.3d at 1318; *Vitronics*, 90 F.3d at 1644.  However, extrinsic evidence is often flawed because it: (1) is not contemporaneous with the patent; (2) may not reflect the understanding of one skilled in the art; or (3) may be biased or generated for the purpose of litigation.  *See Phillips*, 415 F.3d at 1318. In fact, "expert testimony at odds with the intrinsic evidence must be disregarded."  *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1361 (Fed. Cir. 2005) (citing *Phillips*, 415 F.3d at 1318).

## OVERVIEW OF PATENTS IN SUIT

## I.      Summary of the Technology at Issue

The technology claimed in the '493, '563, and '882 Patents is meant to provide, what the patentees term, a windowed content manifestation environment ("CME") within one web browser session on a personal computer.  In effect, a CME allows multiple window objects (commonly referred to as windows) to be displayed and used at the same time on one web

browser screen.  An exemplary CME is displayed below in Figure 2B,[1] from the '493 and '882

Patents.[2]

A CME is created when a user accesses a web page, which then transfers content,

including data and software, over the Internet to the user's personal computer.  This content is

then processed to create a CME, such as the one shown below in Figure 2B, of the '493 and '882

Patents.  The CME can also be created by loading software onto the personal computer, via a

CD-ROM for example, and then accessing a web page.[3]

---

[1] The Court attempted to ensure that the figures reproduced herein are clear images. Nonetheless, many of the figures contained in this Memorandum are best viewed electronically, *i.e.* on a computer screen, as certain features and colors may not be easily perceptible when reproduced in black and white.

[2] The '493 and '882 Patents contain identical versions of Figure 2B.  In fact, the specifications of the two patents are nearly identical.  Figure 2B is also reproduced below at page 17.

[3] A CD-ROM is a compact disc used to store data such as software files.  Software companies routinely use CD-ROMs to store their large programs.  Customers then purchase these CD-ROMS and download the software onto their computers.



**Figure 2B of the '493 and '882 Patents.**

A CME is everything shown on the web browser screen in Figure 2B above as item 201.[4]
The CME shown in Figure 2B allows a user to have more than one movable or stationary
window within a web browser screen.[5] According to Simple, this is an improvement over the
prior art because the claimed invention lets one open, view, and otherwise use multiple windows

---

[4] A web browser is a program that lets one access web pages over the Internet on a
personal computer, laptop or mobile communication device. Examples of web browsers include
Microsoft's Internet Explorer, Netscape's Navigator and Mozilla's FireFox. Web browsers are
distinguishable from operating systems because web browsers run on top of operating systems,
usually with other software programs like word processors, email programs and even another
web browser. Word Perfect and Microsoft Word are examples of word processing programs and
Lotus Notes is an example of an email package.

[5] The patents in suit refer to windows as window objects. However, to enhance the
clarity of this section, the Court will use the term windows instead of window objects.

on the same web browser screen, without requiring content updates over the Internet and without

having to go back and forth from one web page to another.  For example, a user could

hypothetically open the "NEWS" and "TRAVEL" windows, shown above, in the same web

browser screen as well as another window featuring stock quotes.  According to the patentees,

this would previously have required multiple web browsers and/or content updates over the

Internet.

Windows, appearing within a CME, deliver content and can be manipulated by the user.

Examples of windows include the "NEWS" and "TRAVEL" boxes, items 203 and 204 in Figure

2B, as well as item 208.  Users can also scroll through, close, resize and minimize

windows depending upon which module controls, or "MCs," they select or how they interact

with the window.[6]  Windows can be freely moved within the CME or be tiled.  Tiled windows

are windows that are adjacent to but can not overlap other windows.

Module controls appear within a control section and let users close, minimize or

otherwise operate on windows.  The control section usually appears on the top portion of a

window and is visually analogous to the top bound portion of a legal pad.  In Figure 2B, the

control section of the TRAVEL window is the bar/strip at the top of item 203.  The left portion

of the control section contains the "TRAVEL" title used to identify the window, and the right

section contains module controls.  As its name indicates, the control section would allow a user

to alter window objects using the module controls or move them around by clicking on the

---

[6]For example, one could hypothetically launch another window, entitled "RENT A CAR"
within the CME by clicking on the "RENT A CAR" logo or link in the TRAVEL window, item
203 in Figure 2B.  A user could also scroll up and down a window by clicking on the scroll bar,
such as the one located on the right side of the TRAVEL and NEWS windows in Figure 2B.

control section with a mouse and then dragging the window to a desired location within the CME.  What follows is a detailed analysis of the '493, '563, and '882 Patents.

## II.    The Shared Prosecution History of the Patents in Suit

The '493 Patent, entitled "System And Method For Facilitating A Windows Based Content Manifestation Environment Within A WWW Browser," was filed for on January 21, 1999, and issued on August 7, 2001.  As initially filed, the '493 Patent contained 47 claims.  During prosecution, claims 1 to 13 were granted while the remaining claims were canceled and a "continuation type application" was subsequently directed to the canceled subject matter.  (Dkt. No. 366, Ex. 4, Supplemental Amendment to Application No. 09/234,297, at SIM006199, 006081.)

The '563 Patent, entitled "WWW Browser Configured To Provide A Windowed Content Manifestation Environment," is a continuation-in-part of the '493 Patent.  The '563 Patent was filed for on December 9, 1999, and issued on August 13, 2002.[7]

The '882 Patent is a continuation of the '493 Patent and is also entitled "System And Method For Facilitating A Windows Based Content Manifestation Environment Within A WWW Browser."  The '882 Patent was filed for on April 26, 2001, and issued on March 18, 2003.  All three patents have a related prosecution history and both the '563 and '882 Patents are subject to terminal disclaimers which cause them to expire on the same day as the '493 Patent.  (Dkt. No. 366, Ex. 5, File Wrapper for the '563 Patent, SIM-006395; Dkt. No. 366, Ex. 6, File Wrapper for the '882 Patent, SIM-006950).

---

[7]The '563 Patent incorporates application number 09/252,076 by reference.  Application 09/252,076 matured into United States Patent No. 6,321,209 (the '209 Patent), which incorporates the '493 Patent by reference.

III.    **The Patents in Suit Share Many Similarities**

The patents in suit describe nearly the same subject matter.  All three patents are directed to enabling a windows based content manifestation environment within one screen of a web browser.  In fact, the '493 and '882 Patents have identical specifications apart from their abstracts.  (*See* Markman Tr. 80:10-13.)  Notably, the '493, '563, and '882 Patents differ only somewhat in claim scope.  The '493 Patent claims an entire system, the '563 Patent claims a specially configured network client and the '882 patent claims a network client, a system and an apparatus.  *See* '493 Patent Cl. 1 (claiming a "system"); '563 Patent Cl. 1 (claiming a "network client"); '882 Patent Cl. 1 (claiming a "network client"), Cl. 16 (claiming a "system"), Cl. 17 (claiming an "apparatus").  Notably, the first 15 claims of the '882 Patent are very similar to the claims of the '563 Patent and claims 16 and 17 of the '882 Patent are very similar to claim 1 of the '493 Patent.

Most of the technology described by the patents in suit is similar and stems from the '493 Patent.  Accordingly, the Court will discuss these common elements first and then discuss the distinct components found in the '493, '563, and '882 Patents as necessary, to place the disputed patent claims in context.

IV.    **Content Transfer Processes Utilized by the Patents in Suit**

Figure 1A, reproduced at 14, appears in the '493 and '882 Patents while another almost identical version of Figure 1A appears in the '563 Patent.  In all three patents, Figure 1A illustrates the overall system in which server side personnel create content, which is then transferred over an electronic data network, such as the Internet, to a user.  Once transferred, the content is processed to facilitate a windows based content manifestation environment in

accordance with the patents in suit. The transferred content may include: (1) entire software systems, or portions thereof, used to create windows based content manifestation environments according to the '493, '563, and '882 Patents; (2) software files used to customize "window objects" in accordance with the patents in suit; or (3) data to be delivered to an end user utilizing a windows based content manifestation environment contemplated by the patents in suit. Within the context of the patents in suit, the term window object includes modules, such as draggable modules ("DMODs") and tiled modules ("TMODs"), as well as layers, such as content display layers.

**A.      Window Objects Are a Critical Component of the Content Manifestation Environment Described by the Patents in Suit**

Window objects and their behavior within a windowed content manifestation environment lie at the heart of the subject matter claimed by '493, '563, and '882 Patents. Window objects manifest content and are capable of having "control attributes." *E.g.*, '563 Patent, Cl.1, 6. These control attributes allow a user to, among other things, move, resize, minimize and maximize a window object or act upon the content manifested therein. *See*, *e.g.*, '563 Patent, Cl.1, 6. Window objects can also dynamically "manifest" content and be acted upon without requiring a refresh of the windows based content manifestation environment. *See*, *e.g.*, '563 Patent, Cl.1, 6. In this context, "refresh" means updating "the displayed web page with the newest content." (R&R at 173.)

**B.      How Windows Based Content Manifestation Environments Are Delivered to a User**

The purpose of the system shown below is to produce or facilitate a "windowed content manifestation environment," like the ones shown in Figures 2B and 2A of the '493 and '882

Patents, reproduced *infra* at 17 and 22 respectively, and Figure 2 of the '563 Patent, reproduced

*infra* at 20, in a "CLIENT SYSTEM" ("client system"). *See*, *e.g.*, '493 Patent col. 6, ll. 60-64.

One example of a client system would be a computer used at home or in the office.



## FIG. 1A

**Figure 1A of the '493 and '882 Patents.**

The "SVR SYSTEM" ("server system") in Figure 1A, above, may contain or be associated with

a "DATA STORE" ("data store"). *E.g.*, '493 Patent col. 6  ll. 54-60.  This data store is used to

house **"**HTML documents and other associated files**"** used to facilitate a **"**windows based

content manifestation environment."[8]  *E.g.*, '493 Patent col. 6, ll. 64-67, col. 11, ll. 19-25, 49-67.

Once a particular web site is accessed by a user, certain content files within the data store are transmitted to the client system over the Internet, and then utilized, viewed or executed in a web browser such as Microsoft's Internet Explorer.  *E.g.*, '493 Patent col. 7, ll. 1-25.

　　　The specific content transferred from the data store to the client system depends on the claimed invention.  While the data store in the '493 Patent may house and transfer the entire software system necessary to provide a windows based content manifestation environment, the data store described by the '563 Patent merely stores and transfers HTML files necessary to deliver data content and construct the appearance of certain window objects in a content manifestation environment.  *Compare* '493 Patent col. 7, ll. 1-25 *with* '563 Patent col. 9, ll. 29-53.  This is because the '563 Patent details the use of a customized browser that already has the source code for certain components of a windows based content manifestation environment in place while the '493 Patent requires that an entire software system be downloaded from the server system.  *Compare* '493 Patent fig. 1A, item 106 *with* '563 Patent fig. 1A, item 106; *see also* '563 Patent col. 9, ll. 29-41 ("[T]he present invention provides a complete console solution. . . . Although, some web code may be downloaded at startup of [a] client system . . . to determine the contents of button bars, etc., the same is parsed for relevant data only . . . .").  On the other hand, the content transferred from the server system to the network client will differ on a claim by claim basis for the '882 Patent.  *E.g.*, '882 Patent Cl. 1 (claiming a network client), Cl. 16 (claiming a system).

---

[8]HTML is a programming language used to develop web pages.  In combination with other programs, such as JavaScript and DHTML, HTML can be used to create the windowed content manifestation environment claimed by the patents in suit.

The embodiments shown in Figures 2B and 2A, reproduced *infra* at 17 and 22 respectively, can be facilitated by software which is locally loaded or sent over the Internet. According to the '493 and '882 Patents, a windows based content manifestation environment may also be "operated by loading a local version of a software package" via "CD-ROM." *E.g.*, '493 Patent col. 7, ll. 26-41. The locally loaded software would "include HTML [files] and scripts" capable of enabling "a windows based CME within a WWW browser client" and "configured to cause the WWW browser client to access a network site (e.g., a web site, etc.) to download a windows definition." *E.g.*, '493 Patent col. 7, ll. 26-41. An example of a "windows definition" would be "a file or set of files that initialize a set of modules that are displayed within a windows based CME." *E.g.*, '493 Patent col. 7, ll. 26-41.

**V.    Embodiments of the Claimed Content Manifestation Environment**

Figures 2B and 2A, reproduced *infra* at 17 and 22 respectively, appear in the '493 and '882 Patents while Figure 2, reproduced *infra* at 20, appears in the '563 Patent. All three figures represent "preferred" embodiments of the windows based content manifestation environment claimed by the patents in suit.

**A.    Figure 2B, A Windows Based Content Manifestation Environment Featuring DMODs**

A visual representation of a preferred embodiment of the '493 and '882 Patents is provided below in Figure 2B. *E.g.*, '493 Patent fig. 2B, col. 5, ll.1-5, col. 10, ll. 33-60. Figure 2B is discussed first since it utilizes draggable DMODs, which are preferred over the tile TMODs shown in Figure 2A, reproduced *infra* at 22. *E.g.*, '493 Patent col. 8, ll. 32-34.

16



FIG. 2B

**Figure 2B of the '493 and '882 Patents.**

The numerically labeled items in Figure 2B will be further described below, as necessary. As shown above, the user has accessed a web site with the URL "www.windows-website.com." Once at this web site, the server system housing its content and the software files necessary to implement a windows based content manifestation environment transmits the necessary data over the Internet to the user's web browser client. *See*, *e.g.*, '493 Patent fig. 1A, col 6, ll. 50 - 67; col. 7, ll. 1-26. Immediately thereafter, a user can view, move, resize, maximize or minimize items 203, and 204, the "travel related content" and "dynamic news feed" windows, without requiring a "refresh" of www.windows-website.com. (Simple's Supp. Amendment to Application No. 09/234,927 at SIM-006199; Examiners Reasons For Allowance at SIM-006225; *see also*, *e.g.*, '493 Patent fig. 5A and 5B, col. 57, ll. 24-65 (illustrating and describing "a process

17

to facilitate window type operations within a WWW browser client" )).  Items 203 and 204 are DMODs which can be freely moved within the content manifestation environment of a "WWW browser client."  '493 Patent, col. 6, ll. 21-24, col. 10, ll. 17-32.

Along with travel related content and dynamic news feed windows, Figure 2B also shows "a content display layer" and a "set of web site" control and navigation buttons, items 208 and 210 respectively.  *E.g.*, '493 Patent col. 9, ll. 2-6, col. 10, ll. 21-32.  The content display layer, can be: (1) a "static, always visible window . . . positioned within a WWW browser" content manifestation environment or (2) it can "pop-up," and/or be "draggable."  *E.g.*, '493 Patent col. 10, ll. 34-51.  In any of these embodiments, the content display layer can be utilized "whenever content not destined for manifestation within a particular window module is to be presented."  *E.g.*, '493 Patent col. 10, ll. 34-51.  This pop-up functionality is comparable to: (1) "a dialog box [that] pops up in an operating system screen environment when an error condition is realized" or (2) an advertisement that pops up when a particular web page is accessed.  *See*, *e.g.*, '493 Patent, col. 9, ll. 39-44.

Content display layers can also be scrolled through.  Scrolling is necessary to "allow [for the] management of content that extends beyond a bottom edge of a visible area."  *See*, *e.g.*, '493 Patent col. 9, ll. 7-20 (describing the scroll function in modules).

The control and navigation buttons shown below in item 210 are used "to control the appearance and operation of a web site . . . ."  *E.g.*, '493 Patent col. 9, ll. 57-60.  For example, if one were to click on the "$" symbol shown below, a new window object displaying financial data could emerge within the content manifestation environment, without requiring a refresh of the web site.



**Item 210**

### B. Figure 2, a Preferred Embodiment of the '563 Patent Featuring DMODs

Figure 2, of the '563 Patent, shown below, depicts a content manifestation environment "provided within a customized WWW browser . . . that has been configured to manifest content within DMOD type window modules that may be freely moved within the . . . [content manifestation environment]." '563 Patent col. 9, ll. 54-59. Figure 2 is quite similar to Figure 2B from the '493 and '882 Patents. As shown below, the user has accessed a web site with the URL, "www.simple.com." Once at the web site, the custom configured web browser client loads the relevant data files from the server system and creates the windows based content manifestation environment in Figure 2.

**FIG. 2**



**Figure 2 of the '563 Patent.**

Item 202 above contains DMODs for: (1) accessing email; (2) displaying a "city guide . . . feed"; and (3) displaying a "telephone white pages content source," items 204, 206 and 208 respectively. '563 Patent col. 9, ll. 59-65. These DMODs are taught in almost the same manner as the DMODs in the '493 Patent. *Compare* '563 Patent cols. 6-10 *with* '493 Patent cols. 6-9. For instance, item 210, the "SPONSORS" window, is taught in accordance with the '209 Patent, which incorporates the '493 Patent by reference. '563 Patent col. 9, ll. 65-67, col. 10, ll. 1-12; '209 Patent col. 5, ll. 50-60. As a result, items 204, 206, 208, and 210 have a content display area and a control section. They can also receive dynamic data feeds and be acted upon without requiring a refresh of the content manifestation environment.

**C.    Figure 2A, a Windows Based CME Featuring TMODs**

Figure 2A, shown below, depicts a windows based content manifestation environment featuring TMODs, tiled modules, "arranged in [a] table fashion." *E.g.*, '493 Patent col. 9, ll. 52-56.  The parties have agreed that the term "tiled" means arranged to be adjacent and non-overlapping.  (R&R at 82; Defs.' Mem. of Law in Supp. of Summ. J. on Claim Construction (Dkt. No. 365), at 12; Decl. of Chris Martinak in Supp. of the Claim Construction Br. of Pl. CA (Dkt. No. 326), at Ex. 9, Microsoft Press Computer Dictionary (stating that to tile is to "fill adjacent blocks of pixels on the screen with a design or pattern without allowing any blocks to overlap")).



FIG. 2A

**Figure 2A of the '493 and '882 Patents.**

The TMODs in Figure 2A feature a "content display section," item 242, and a set of "Module Controls." The module controls allow TMODs to be acted upon by the user without requiring a refresh. However, Simple asserts that TMODs cannot be moved freely because they must remain in a tabled structure of rows and columns. The exact behavior of TMODs is in dispute and will be further discussed below. The Court will now describe the modules shown above.

>  **D.    DMOD's and TMOD's Are Used to Embody the Window Objects Critical to Facilitating a CME**

Both DMODS and TMODS have "(1) a control section, and (2) a related content display section." *E.g.*, '493 Patent col. 6, ll. 13-17. However, DMODs represent the "preferred"

22

embodiment of a module because they can "act like any other window such as those within a windows based operating system desktop environment" and can be moved freely throughout a content manifestation environment. *See*, *e.g.*, '493 Patent col. 8, ll.29-34. An exemplary window module is displayed below in Figure 1D of the '493 and '882 Patents.[9]



**FIG. 1D**

**Figure 1D of the '493 and '882 Patents.**

The definition of a "control section" is disputed by the parties and will be discussed in greater detail below. What follows is a brief description of module controls and content display

---

[9]The '563 Patent contains a version of Figure 1D that is almost identical to the one appearing in the '493 and '882 Patents.

sections.

Module controls, as shown below, are found in a control section and appear in both DMODs and TMODs. Module controls, when operated on by "mouse clicks, mouse-overs, double clicks, etc." can cause their associated module to minimize, close, maximize, resize, or launch a help window. *E.g.*, '493 Patent col. 6, ll. 37-44.

 **Module Controls**

For example, if one were to click on the "X" button above, the window object it controlled would close.

Both DMODs and TMODs also have content display sections, as shown above in item 122 of Figure 1D, which can be minimized or restored. In addition, content display sections may also be equipped with "scroll controls," as shown above in item 126 of Figure 1D. Scroll controls may be contained within a "scroll bar," item 128 above. '493 Patent col. 9, ll. 6-21. This scrolling functionality, just as it does in a layer, allows a user to view and manage "content that extends beyond a bottom edge of a visible area." *See*, *e.g.*, '493 Patent col. 9, ll. 7-20.

## VI.   Why the Patents in Suit Are Claimed to be an Improvement Over Prior Art

According to Simple, the claimed subject matter of the '493, '563, and '882 Patents is an improvement over prior art because it allows a user to manipulate window objects displaying dynamic content without causing a web site to refresh or stop running. '493 Patent, col. 3, ll. 64-67, col. 4, ll. 1-7; '563 Patent col. 4, ll. 2-22; '882 Patent col. 3, ll. 58-67 - col. 4, ll. 1-15; Resp. & Amendment to Application No. 09/234,297 at SIM006245. User actions do not trigger a refresh because the patents in suit do not deliver content through the use of static code. Static

code is limited because it merely presents graphically-bordered screen sections within a web browser content manifestation window that display content but must be completely re-drawn each time a user-selectable screen-related operation is selected. *See* Resp. & Amendment to Application No. 09/234,297 at SIM006243-47; *e.g.*, '493 Patent col. 3, ll. 25-40. Instead, the '493, '563, and '882 Patents describe a web browser client equipped with "program objects that continuously execute within a browser content manifestation environment." (Resp. & Amendment to Application No. 09/234,297 at SIM006246). Some of these program objects, specifically window objects, can be configured to display other window objects within their content display sections. *E.g.*, '493 Patent col. 6, ll. 16-21. These program objects and their functionality are facilitated by the use of "technologies provided by . . . DHTML (dynamic HTML) [and the] [J]avascript . . ." programming languages. (Response and Amendment to Application No. 09/234,297 at SIM006243).

## DISCUSSION

The parties have raised various objections to the R&R. CA objects to the Special Master's construction of the following terms: (1) "acts independently"; (2) "content"; (3) "network client"; (4) "executes within"; and (5) "control section." (CA's Objections to Special Master's Report & Recommendation Regarding Claim Construction (Dkt. No. 573) (CA's Claim Construction Objections), at 1-3.) For its part, Simple asserts that the following terms were improperly construed:(1) "window object"; (2) "content"; (3) "continuously manifested"; and (4) "solely contained within." (Defs.' Mem. in Supp. of Their Objections to Special Master's Report & Recommendation Regarding Claim Construction (Dkt. No. 568) ("Simple's Claim Construction Objections"), at 1.) Each disputed term will be addressed below.

In construing the disputed claim terms, the Court will first present the Special Master's construction of the term and then summarize the parties' objections or counter arguments, as necessary. Next, the Court will provide its own analysis of the disputed term. Unless stated otherwise, the Court's analysis will construct the disputed claim term by referring: (1) to the applicable claim language; (2) to the remainder of the specifications and other relevant intrinsic evidence such as the prosecution history of the patents in suit; and (3) if necessary, to the relevant extrinsic evidence.

Unlike the parties and the Special Master, the Court will address the term "content" before construing any other disputed term. The Court finds this sequence to be analytically consistent with the '493, '563, and '882 Patents since one cannot define a "window object" without knowing the meaning of "content." Specifically, a "window object is a Module or a Layer," and a "layer acts independently of other ***content***." *E.g.*, '493 Patent col.5, l. 64, col, 6, ll. 7-8 (emphasis added). Since understanding exactly what "content" means within the context of the patents in suit informs the definition of a "layer," and subsequently, a "window object," the Court finds it advantageous to construe the term "content" first. The Court will address the remaining disputed terms in the order in which they are addressed in the R&R.

I.      **"[C]ontent"**

        A.      **The Special Master's Recommended Construction**

The Special Master recommended that the term "'content' . . . should have the meaning provided in the glossary, namely, 'any form of digital data stream that may be supplied or sent to a computing system such as a personal computer,' ***and may include window object size and position information***." (R&R at 140 (emphasis added to reflect the language added by the

Special Master)); *see also*, *e.g.*, '493 Patent col. 5 ll 46-48. The Special Master also interpreted the intrinsic evidence to exclude, from the scope of "content," data that was not sent from a server to the client computer system. (*See* R&R at 137-38 (stating "the patentees have used the term 'content' to broadly connote most if not all data sent from the server to the client").) Accordingly, under the Special Master's proposed construction of the term, any "size and position information provided by a user via module controls does not appear to be 'content.'" (*Id.*)

## B. The Parties' Objections

The parties object to the Special Master's proposed construction and propose greatly varying interpretations of the term "content." CA "proposes 'content' be construed to mean 'any form of digital data stream that may be supplied or sent to a computing system such as a personal computer, regardless of the source of that data.'" (CA's Claim Construction Objections at 10.) In essence, though CA agrees with the Special Master's adoption of the glossary definition of the term "content," they disagree with the Special Master's additional restriction that "content" does not include "'size and position information provided by a user via module controls.'" (*Id.* at 9-10 (quoting R&R at 138).)

Simple asserts that the meaning attributed to "Content" in its patent glossary should not be applied consistently throughout the entire patent. Instead Simple would have the Court apply the glossary definition of "content" only to instances where the capitalized term "Content" is used and apply "its ordinary and customary meaning in the context of the specification" every time the un-capitalized term "content" is used. (Simple's Claim Construction Objections at 4-5.) Specifically, Simple urges that "content" be limited to "text, graphics, or 'media information

such as news, data, weather, sports, and the like . . . , things that are displayed within a window object.'" (Simple's Claim Construction Objections at 5-6.) Having summarized the Special Master's proposed construction and the parties' corresponding objections, the Court will put forth its own analysis.

## C.   Analysis

The Court's analysis of the term "content" will entail the following steps: (1) constructing the term based upon a review of the claim language and the specifications of the patents in suit; (2) addressing the Special Master's additional language and modification of the term to exclude size and position information provided by a user; and (3) addressing the arguments raised by the parties.

### 1.   According to the Claim Language of the Patents In Suit, the Term "content" Cannot Be Limited to the Information Displayed on Screen

The claim language of the patents in suit clearly establishes that content must include: (1) window object attributes such as size and location; (2) the address of a network client source; and of course, (3) information displayed in a content manifestation environment. According to claim 1 of the '493 Patent, "content" is processed to produce a window object. In this context, "content" includes the attributes of a window object such as size and window position which have been loaded into the host database and then sent to the client side to determine the appearance of the window object itself. *E.g.*, '493 Patent col. 11, l. 48- col. 12, l. 27. Claims 4, 5, and 6 of the '493 Patent, and claims 9, 10, and 11 of the '563 and '882 Patents all indicate that "information . . . manifested within [a] . . . window object" as well as the source address of that information fall within the scope of "content" sent to a network client over an electronic data network. For example, claim 4 of the '493 Patent claims:

28

The system according to claim 1, wherein said associated ***content includes at least one address of a network content source*** that is configured ***to download information*** to said data processing system via said electronic data network, ***said information to be manifested*** within said at least one window within said content manifestation environment.

'493 Patent Cl.4 (emphasis added). The emphasized claim language clearly indicates that "content" is more than the information displayed on screen. A step-by-step analysis of claim 4 indicates that: (1) a user on a network client receives "content" from a remote server system over the Internet, as per claim 1; (2) this "content" includes the "address of a network content source" and other information that may be displayed on screen; (3) the network client accesses said address and downloads information; and finally (4) the received information is then displayed within a window object. Having reviewed the claim language of the patents in suit, the court will supplement its construction of the term "content" by referring to the specifications of the '493, '563, and '882 Patents.

### 2. According to the Specifications of the Patents in Suit, the Term "content" Cannot Be Limited to the Information Displayed on Screen

The specifications of the '493, '563, and '882 Patents indicate that: (1) "content" should not be limited to information "displayed within a window object" and (2) it can be received from any source. The specifications of the patents in suit state that "content" can include "window object instructions, content, data, and content stream data." '493 Patent col.7, ll. 64-67; '563 Patent col. 7, ll. 31-40; '882 Patent col.7, ll. 64-67. The specifications of the '493, '563, and '882 Patents also state that "content" can be "received via an electronic data network, from a local hard disk, etc." '493 Patent col. 8, ll. 57-59; '563 Patent col. 8, ll. 30-32; '882 Patent col. 8, ll. 57-59. The use of the term "etc." is noteworthy because it indicates that the patentees' list

was not meant to be exhaustive. Consequently, content can be received from other sources

besides "an electronic data network . . . [or] a local hard disk." An example of this additional

source would be "a stream of position data coming from a mouse interface while the user moves

the mouse to drag a . . . [window object]" around the claimed content manifestation environment.

(*See* CA's Claim Construction Objections at 10.) Having reviewed the relevant intrinsic

evidence, the Court will define the term "content."

### 3. "[C]ontent" Defined

The intrinsic evidence before the Court, compels the adoption of the glossary definition

of "content," specifically, "any form of digital data stream that may be supplied or sent to a

computing system such as a personal computer." *E.g.*, '493 Patent col. 5 ll 46-48. According to

the patents in suit, "content" includes but is not limited to: (1) information delivered to a user;

(2) window object attributes such as size and location; (3) the address of a network client source;

and (4) window object instructions. In fact, the claim language of the '493, '563, and '882

Patents indicates that information displayed on screen is merely a part of what is considered

"content." Additionally, "content" can be received from various sources including, but not

limited to, an electronic data network and "a local hard disk." *E.g.*, '493 Patent col. 8, ll. 57-59.

Since the foregoing descriptors fall within the glossary definition of "content" found in the '493,

'563, and '882 Patents, the Court will let the patentees' lexicography stand. Having construed

the term "content," the Court will discuss why it disagrees, in part, with the Special Master's

recommended construction and address the parties' objections.

#### 4. The Special Master Unnecessarily Added Language to the Patentees' Glossary Definition of "content" and Then Incorrectly Modified His Definition of "content" to Exclude Data Supplied By a User

The Special Master was correct in adopting the glossary definition of "content" but his use of clarifying language is superfluous and raises the possibility of confusion. The Special Master recommended that the term "'Content' . . . should have the meaning provided in the glossary, namely, 'any form of digital data stream that may be supplied or sent to a computing system such as a personal computer,' *and may include window object size and position information*." (R&R at 140 (emphasis added).) Although the Court agrees that the term "content" should have the meaning provided by the identical glossaries found in the '493, '563, and '882 Patents, the additional phrase "and may include window object size and position information" is counterproductive because it could be misconstrued as limiting the glossary definition of the term "content." Indeed, the phrase "any form of digital data" already includes "window object size and position information."

The Special Master also improperly limited the term "content" to exclude data supplied by a user. (R&R at 137-38; Special Master's Report and Recommendation Regarding Anticipation and Obviousness (Dkt. No. 592) ("Anticipation and Obviousness R&R"), at 76.) According to the Special Master, "the patents-in-suit indicate that size and position information provided by a user, *e.g.*, through minimizing and resizing, is <u>not</u> 'content' . . . [because it's] size and position information from a user is not part of 'a digital data stream that may be supplied or sent to a computing system such as a personal computer.'" (Anticipation and Obviousness R&R at 76 (quoting '493 Patent col.5, ll. 46-48); R&R at 137-38.) The Special Master also seems to narrow his definition of "content" to data sent from a server to a client over an electronic data

network. (R&R at 137 (stating "the foregoing demonstrates that the patentees have used the term 'content' to broadly connote most if not all data sent from the server to the client").) However, the Special Master's focus on an electronic data network as a source of content directly contradicts statements in the specifications of the '493, '563, and '882 Patents, which provide that "content" can be "received via an electronic data network, from a local hard disk, etc." '493 col. 8, ll. 57-59; '563 Patent col. 8, ll. 30-32; '882 Patent col. 8, ll. 57-59.

The use of the phrase "received via an electronic data network, from a local hard disk, etc." is critical because it demonstrates that the patentees did not intend to limit the sources from which "content" could be received by the network client described by the patents in suit. First, the patents in suit clearly state that "content" can be received from "a local hard drive." If "content" originates from a local hard drive, it is already on the host client/computer and need not have been transferred over an electronic data network. Rather, the "content" could have arrived on the local hard drive: (1) as a result of data entry; (2) after being transferred from a CD ROM or other data storage device; or (3) as a result of certain data processing functions performed on the local hard drive.[10] The foregoing list is in no way exhaustive and could include numerous other entries. In short, "content" found on a local hard disk, as used in the context of the patents in suit, need not be transferred over an electronic data network, such as the Internet. In addition, the word "etc." indicates that: (1) the patentees did not list every source from which "content" can be received and (2) it is possible for "content" to be "supplied" by a user action such as dragging a window object across its content manifestation environment or even resizing

---

[10]An example of this data processing could be when calculations are performed, which produce a great deal of coordinates and data points as output. These coordinates and data points could then be displayed on screen as a graph or chart.

it.[11]  As the Court has just shown, explicitly listing every source from which "content" can be received would likely be an exercise in futility.  As such, the Court finds that the Special Master incorrectly limited the scope of "content" by indicating that it must be sent over an electronic data network and that it can not be supplied by a user.

According to the Special Master, "the patents-in-suit indicate that size and position information provided by a user, *e.g.*, through minimizing and resizing, is <u>not</u> 'content' . . . [because] size and position information from a user is not part of 'a digital data stream that may be supplied or sent to a computing system such as a personal computer.'" (Anticipation and Obviousness R&R at 75-76 (citing '493 Patent col.5, ll. 46-48) (emphasis in original); R&R at 137-38.) The Court sees no reason to find that the position and size information attributed to a particular window object is no longer "content" once it is altered by a user.  (Contra Anticipation and Obviousness R&R at 76 (stating that  ". . . [S]ize and position information from a user, such as dragging and resizing based on the window element controls, is <u>not</u> 'content.' However, it appears that window element size and position information not input by a user should be

---

[11]Dragging a window object across its content manifestation environment would produce a string of coordinates, indicating its new position.  The coordinates would change for every new location of the window object.  Accordingly, dragging a window object can produce a stream of "content" in the form of multiple position coordinate values.  For example, a window object can initially be positioned at a value of 100 on the "X" or horizontal axis and 100 on the "Y" or vertical axis.  If the new X and Y coordinates were 50 and 50, the act of dragging a window object across a screen would produce coordinate position values from 100 down to 50 for both the X and Y axises.

In addition, when a user resizes a window object, its size information changes.  For example, if a window object has size values of: (1) length = 10 and (2) width = 10, these values would be altered every time a user adjusted the size of a window object.  However, a user will not likely be able to instantly shrink the size from values of (1) length = 10 and (2) width = 10, to values of (1) length = 5 and (2) width = 5.  Rather the data values will likely change incrementally from 10 to 5.

considered 'content.'").)  Indeed, position and size information is still "supplied" by a user when she drags a window object across its content manifestation environment.  Having assessed the Special Master's construction of the term "content," the Court now turns to the parties' objections and arguments.

### 5.      CA's Arguments and Proposed Construction

The Court agrees, almost entirely, with CA's objections to the Special Master's construction of the term "content," but will not go so far as to stray from the patentees' lexicography.  CA is correct in asserting that "content:" (1) can include any form of digital data stream and (2) can be sent from any source.  (CA's Claim Construction Objections at 9-10.)  However, adding the phrase "regardless of the source of that data" is unnecessary since it is already subsumed within the glossary definition of "any form of digital data stream that may be supplied or sent to a computing system such as a personal computer."  *E.g.*, '493 Patent col. 5, ll. 46-48.

### 6.      Simple's Arguments

Simple's assertion that "content" should be defined differently when it is capitalized is inconsistent with the '493, '563, and '882 Patents.  To wit, the capitalized term "Content" is only used four times in the '493 Patent.  One instance is the glossary entry for "Content" and another instance is the glossary definition of "Content Manifestation Environment."  The other two instances are as the first word of a sentence.  However the un-capitalized term "content" is used hundreds of times throughout the '493 Patent.  This pattern of usage is also consistent with the '563 and '882 Patents.  Were the Court to apply Simple's reasoning, the only time "content" would have the meaning assigned to it would be the entry in the patent glossary which defines it.

34

In other instances, one of ordinary skill in the art would be left to guess whether "content" had its ordinary meaning or the special definition ascribed to it in the patent specification.

In support of their assertion that the term "content" should be treated differently when it is capitalized, Simple cites *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998), for the proposition that "'[w]ithout an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning.'" (Simple's Claim Construction Objections at 5.) However, this reliance is misplaced because *Renishaw* expressly provides that "where there are several common meanings for a claim term, the patent disclosure serves to point away from the improper meanings and toward the proper meaning." 158 F.3d at 1250. Indeed as Simple has acknowledged, *Renishaw* also states that a patentee's own lexicography should govern when she has defined a term "'with reasonable clarity, deliberateness, and precision.'" (Simple's Claim Construction Objections at 5 (citing *Renishaw*, 158 F.3d at 1249)); *see also Phillips*, 415 F.3d at 1316; *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1303-04 (Fed. Cir. 2001); *Sinorgchem*, 511 F.3d at 1136-39; *Abraxis Bioscience, Inc. v. Mayne Pharma Inc.*, 467 F.3d 1370, 1376 (Fed. Cir. 2006); *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005). In this instance, the patentees have clearly defined their terms in a glossary. As such, the Court must look to this definition when faced with the "several common meanings" which can be attributed to "content."

### D.     The Court's Ruling on the Term "content"

CA's objection to the Special Master's construction of "content" is granted in part while Simple's objection is denied. The Court defines "content" exactly as the glossaries of the '493, '563, and '882 Patents do, to wit, "any form of digital data stream that may be supplied or sent to

a computing system such as a personal computer."  *E.g.* '493 Patent col.5, ll.46-48.

## II.    "[W]indow object"

Simple objects to the Special Master's construction of the term "window object," but

only as part of its objection to the Special Master's construction of the term "a layer acts

independently of other content within a particular HTML document."  (Simple's Claim

Construction Objections at 1).  For reasons discussed in the following section dealing with the

phrase "a layer acts independently of other content within a particular HTML document,"[12] the

Court adopts the Special Master's construction of "window object," as a "module or a layer."

(R&R at 139.)

## III.    "[A] layer acts independently of other content within a particular HTML document"

The phrase "a layer acts independently of other content within a particular HTML

document" is not found in any claim but remains critical to defining the scope of the patents in

suit because it defines an embodiment of a "Window Object."  The term "Window Object"

("window object") appears in every independent claim of the '493, '563, and '882 Patents.  "A

window object is a Module or a Layer."  *E.g.* '493 Patent col. 5, l. 64.  A "Layer" ("layer") is

defined in identical glossaries found in the '493, '563, and '882 Patents as follows:

> A Layer is a WWW browser content display section produced
> within a content manifestation environment (CME) including, but
> not limited to, any object within an HTML document that may be
> scaled, dragged, or otherwise operated upon such as an IMG
> object, a SPAN object, a DIV object, a form element, etc. and
> which may be associated with program logic such as within a
> script, etc. A layer has its own properties including, but not limited
> to, a name, etc. within an HTML rendition model such as those

---

[12]*See infra* § C.3.

defined by DHTML standards. Additionally, *a layer acts
independently of other content within a particular HTML
document*.

*E.g.*, '493 Patent col. 5, l. 65 - col.6, l. 8 (emphasis added).  Accordingly, construing the phrase

"a layer acts independently of other content within a particular HTML document," directly

impacts every claim in the '493, '563, and '882 Patents.  Having placed the disputed phrase in

the context of the patents in suit, the Court will review its proposed constructions.

## A.      The Special Master's Recommended Construction

According to the Special Master, "'a layer acts independently of other content within a

particular HTML document' means that the activity associated with a layer, such as moving or

resizing, does not depend on other content within a particular HTML document." (R&R at 139-

40.)  The Special Master's recommended construction was built upon an extensive analysis

which included the following steps: (1) construing the term "window object" according to the

claim language and specifications of the '493, '563, and '882 Patents; (2) describing the relevant

technical background of a "layer" in the context of HTML and DHTML standards; (3) defining

the attributes of a layer within the context of the specifications of the patents in suit; and (4)

analyzing the source code disclosed in the '493 Patent in order to determine how certain

embodiments of the claimed invention would operate in light of the requirement that a layer act

independently of other content in the same HTML document. (*Id.* at 90-137.)

After framing the term "window object" in the context of the of the claim language of the

patents in suit, the Special Master turned to their specifications.  (*See id.* at 90-97 (construing the

term "window object" according to claim 1 of the '493, '563, and '882 Patents).)  Based on the

identical glossaries found in the specifications of the '493, '563, and '882 Patents, the Special

Master defined a "window object" as a "Module or Layer." (*Id.* at 98 (citing '493 Patent col. 5, l. 64; *CSS Fitness*, 228 F.3d at 1366).) Combining the teachings of the specifications with the requirements of the claim language of the patents in suit, the Special Master determined that, at the least, DMODs and TMODs were layers which had to "act independently of other content." Next, the Special Master, construed the term "layer."

As an initial matter, the Special Master established that the patentees' glossary definition of the term "layer" would control. (R&R at 99.) What remained was to resolve the parties' dispute over exactly how the glossary definition was to be interpreted. In analyzing the definition of the term "layer," the Special Master noted that a "layer" can be placed in the context of "HTML" and have properties as defined by "'DHTML standards.'" (*Id.* at 99-100.)[13] According to the Special Master, associating the properties of a "layer" with DHTML allows a window object to: (1) execute scripts that allow for their "dynamic" modification and (2) be acted upon without necessarily impacting other portions of a content manifestation environment.[14] (*Id.* at 111; *see also id.* at 106-11 (citations omitted).) Having provided a technical overview of HTML and DHTML, as they relate to the patents in suit, the Special Master turned to the specifications of the '493, '563, and '882 Patents to analyze the

_____

[13]HTML and DHTML are programming languages used to develop web pages. In combination with other programs including JavaScript, HTML and DHTML can be used to create the windowed content manifestation environment claimed by the patents in suit.

[14]"Dynamic" modification includes but is not limited to user actions such as moving, resizing, closing and minimizing window objects within their content manifestation environments. In the context of the patents in suit, the patentees claim that dynamic modification can be done without triggering a "refresh." In essence, DHTML contributes to the ability of a user to manipulate a window object without causing the content manifestation to be reloaded or redrawn.

characteristics of a "layer." (*See id.* at 100-11 (discussing the HTML and DHTML standards which informed his recommended construction).)

In order to construe the disputed phrase, "a layer acts independently of other content within a particular HTML document," the Special Master first determined the acts a layer was capable of performing and then determined the scope of the term "independently" as intended by the patents in suit. According to the Special Master, the claim language and specifications of the patents in suit clearly indicate that the acts of a "layer" include: (1) scaling; (2) dragging; (3) resizing; (4) minimizing; (5) maximizing; (6) being made to pop up; (7) being closed; and (8) manifesting and refreshing content such as text, video or sound. (*Id.* at114-15.) However, the Special Master indicated that it was unclear as to whether or not the acts of a layer included "refreshing or reloading content." (*Id.* at 115-17.) Next, upon consideration of the relevant intrinsic evidence and the acts a "layer" is capable of performing, the Special Master noted that "the word 'independent' in the context in which it is used appears to mean just that – 'not dependent.'" (*Id.* at 117.) Accordingly, the Special Master determined that "the phrase 'a layer acts independently of other content' merely connotes that the acts of a layer are not subject to control by other content, or do not require or rely on other content." (*Id.*) Next, the Special Master determined whether DMODs and TMODs "acted independently" as contemplated by the patents in suit.

The Special Master pointed out that there was little dispute over the behavior of DMODs which could be "moved independently ('freely') within the browser CME, *i.e.*, without

constraint by other content." (*Id.* at 118.)[15]  However, the truly debatable issue was whether

TMODs "acted independently." (*Id.*)  As the Special Master pointed out, the parties agreed that

"tiled" means "arranged to be adjacent and non-overlapping" (*Id.* at 119.)  In light of the patents

in suit, the Special Master proceeded to find that, as a verb, "tile" would be understood as

follows by one skilled in the art: "'[i]n an environment with multiple windows, to rearrange and

resize all open windows so that they appear fully on the screen without any overlap.'" (*Id.*

(citation omitted).)  In laymen's terms, window objects that remain tiled could be adjacent to

each other but could not be placed or positioned so that they overlap each other.  The next step

was to determine the behavior of TMODs when they were moved.

The Special Master concluded that, according to the specifications of the patents in suit,

TMODs can be defined "'much like a tiled type window provided within an operating system

environment,'" such as "'Microsoft Windows.'" (*Id.* at 119-20 (citing '493 Patent col. 6, ll. 25-

26, col. 9, ll. 1-6, col. 11, ll. 26-35).)  This is significant because of the way in which windows

could be "tiled" in Microsoft Windows. (*Id.* at 120.)  Specifically, "in the Microsoft Windows

environment, tiled windows may be tiled or untiled by the user, and also dragged about the

screen."[16] (*Id.* (citation omitted).)  This led the Special Master to find that the specifications of

---

[15] Once again, in this context, "independently" means "not subject to control by other content, or . . . not requir[ing] or rely[ing] on other content." (R&R at 118.)

[16] The Special Master detailed how windows were tiled in the Microsoft Windows Operating System as follows:

> There seems to be no dispute over how Microsoft Windows
> worked at the time of invention. Mr. Goodman, for example, has
> explained that "[i]n Microsoft Windows you can place your cursor
> on a blank portion of the task bar (the bar with the 'Start' button),
> right click, and select 'Tile Windows Vertically.' If you run Excel,

the patents in suit did not "require or even suggest" that TMODs snap into predetermined rows

and columns.[17] (*Id.*)  In essence TMODs could only behave as tiled windows in the Microsoft

Windows operating system, if they were to "act independently of other content," since snapping

---

> Word, and Adobe Acrobat applications, and select 'Tile Windows
> Vertically,' you will end up with a screen * * * showing Excel,
> Word, and Adobe Acrobat windows tiled across the screen. You
> can drag and resize any window independently of anything else on
> the screen." Goodman CC Decl. at ¶ 26. That is, in the Microsoft
> Windows environment, tiled windows may be tiled or untiled by
> the user, and also dragged about the screen.

(R&R at 120.)

[17]The Special Master defined the term "snapping" as follows:

> Although the parties do not explicitly say what "snapping" is, they
> appear to have a common understanding of that term, namely, that
> automatic alignment into rows and columns, or at least with
> respect to other tiled elements, when moved or resized so that all
> of the elements remain tiled. None of the references at hand define
> "snapping" *per se*; nevertheless, it seems clear that "snapping"
> perhaps implies the existence of an invisible "table" or grid
> arrangement into which window objects are forced to avoid
> overlap with other windows when dragged about and imprecisely
> dropped by user. The MICROSOFT COMPUTER DICTIONARY
> (4th ed. 1999) defines "drag-and-drop" as a verb:
>> 2. [T]o perform operations in a graphical user
>> interface by dragging objects on the screen with the
>> mouse. For example, to delete a document, a user
>> can drag the document icon across the screen and
>> drop it on the trashcan icon (Macintosh OS) or in
>> the Recycle Bin (Windows).

(R&R at 118 n. 55.)  Indeed, this comports with Simple's understanding of the term as applied to
TMODs.  "According to Simple, '[b]y definition, tiled window objects cannot be 'freely moved'
independently of other window objects,' but rather ''snap' into a column and row of a table of
window objects,' which sometimes ''causes other window objects in a 'column' to be moved.'"
(*Id.* at 86-87 (quoting Defs.' Mem. of Law in Supp. of Summ. J. on Claim Construction (Dkt.
No. 365), at 23).)

41

would require that the movement of a window object be constrained by other content such as position information or other window objects in the same content manifestation environment. The Special Master then reinforced his conclusion by analyzing the specifications fo the patents in suit.

The Special Master found that according to the specifications of the '493, '563, and '882 Patents, one need only conclude that TMODs are "'arranged in <u>table fashion</u>,' [but] not that [they] . . . are <u>actually</u> arranged in a table or grid." (*Id.* at 122.) The Special Master reviewed the relevant portions of the specification, the relevant figures, such as Figure 2A of the '493 and '882 Patents, *supra* at 22, the relevant source code, such as the "module_draw.js" and "positioning_function.js" files, and questioned Simple's expert witness as to how the patents in suit ***specifically*** showed how TMODs could be made to snap into a grid formation. (*Id.* at 120-30.) Taking the foregoing evidence into account, the Special Master found that, at best, the ability of TMODs to snap was only implied. However, there was no direct indication or proof of this on the record. (*Id.* at 120-30.) Accordingly, the Special Master found that:

> Overall, . . . the specification does not *per se* disclose or require "snapping" by TMODs, whether in the glossary, description, figures or code. The specification only provides inferences, at best. Nor has Simple pointed to anything in the prosecution histories of the patents-in-suit that requires TMODs to "snap." In short, the glossary's requirement that a "layer" "act independently * * *" is not inconsistent with the specification's disclosure of TMODs.

(*Id.* at 130.) Since the Court has already discussed the Special Master's proposed construction of the term "content," it will not do so again. Building upon his analysis of the term content, the Special Master concluded that "[t]he phrase 'a layer acts independently of other content within a particular HTML document' means that the activity associated with a layer, such as moving or

resizing, does not depend on other content within a particular HTML document." (*Id.* at 139-40.)  The parties however, disagree, and propose their own constructions.

**B.**       **The Parties' Objections**

CA's "proposed construction would require the acts of the window object neither be affected by nor affect other content."  (CA's Claim Construction Objections at 1.)  Simple, for its part, attacks the Special Master's definition on various fronts.  First, Simple asserts that the Special Master improperly imported a limitation from the specification into a claim term by incorporating the glossary definition of a "layer" into his construction of the term "window object."  (Simple's Claim Construction Objections at 2.)  Simple further contends that the Special Master improperly excluded a preferred embodiment of the claimed subject matter, TMODS, by (1) incorrectly broadening the definition of the term "content" and then (2) requiring that "the activity associated with a layer, such as moving or resizing, . . . not depend on other ***content*** within a particular HTML document."  (*Id.* at 6 (emphasis added).)  In addition, Simple asserts that the Special Master failed to consider the acts of refreshing or reloading in reaching his determination.  (*Id.* at 13.)

**C.**       **Analysis**

Since the parties have not objected to the Special Master's interpretation of "a particular HTML document" the Court need only interpret the phrase "a layer acts independently of other content."  Defining exactly what a "layer" is and how it may "act" form the crux of the matter.  The Court's analysis of the phrase "a layer acts independently of other content within a particular HTML document" will entail the following steps: (1) defining the terms "window object" and "layer"; (2) identifying the "acts" which can be performed by or upon a "layer"; (3)

defining the term "independently" in the context of the patents in suit; (4) defining the phrase "a layer acts independently of other content"; and (5) addressing the parties' objections and arguments.

### 1. The Patentees' Glossary Definitions of "window object" and "layer" Control

Federal Circuit precedent and the intrinsic evidence before the Court require that: (1) a "window object" be defined as a "Module or a Layer," and similarly (2) a "layer" be defined according to the glossaries in the '493, '563, and '882 Patents. *Phillips*, 415 F.3d at 1316; *CCS Fitness, Inc.*, 288 F.3d at 1366; *Durel Corp.*, 256 F.3d at 1303-04; *Sinorgchem*, 511 F.3d at 1136-39; *Abraxis Bioscience, Inc.*, 467 F.3d at 1376; *PC Connector Solutions LLC*, 406 F.3d at 1363; '493 Patent col. 5, l. 64 (stating that "A window object is a Module or a Layer."), col. 5, l. 65 - col. 6, l. 8 (defining a layer); '563 Patent col. 5, l. 50, col. 6, ll. 1-13; '882 Patent col. 5, l. 67, col. 5, ll. 51-61.  Indeed, it is well established that a patentee's own lexicography will govern claim construction, when she has clearly set out to define a term.  *E.g.*, *Phillips*, 415 F.3d at 1316.  With identical glossaries in the '493, '563, and '882 Patents, it is abundantly clear that the patentees sought to provide their own specialized definitions for the terms "window object" and "layer."

The glossaries of the patents in suit fit well within the boundaries of instances where the Federal Circuit has found that a patentee's own lexicography will determine the meaning of a disputed term.  For example, in *Sinorgchem*, the patent specification in question stated that  a "'controlled amount' of protic material *is* an amount up to that which inhibits the reaction of aniline with nitrobenzene, e.g., up to about 4% $H_2O$ based on the volume of the reaction mixture when aniline is utilized as the solvent."  511 F.3d at 1136 (emphasis added).  According to the

Federal Circuit, setting the term apart in quotation marks and following it with the word "*is*" was enough to "clearly, deliberately, and precisely . . . [define] the term 'controlled amount' of protic material as 'an amount up to that which inhibits . . . , e.g., up to about 4% . . . '" and require that the patentee be bound to this definition. *Id.* (emphasis and bracketed text added). Similarly, in *Abraxis Bioscience, Inc.*, the Federal Circuit found that the patentee's lexicography trumped ordinary usage because a patent specification clearly defined the term "edetate" in the following passage: "'By the term 'edetate' we mean ethylenediaminetetraacetic acid (EDTA) and derivatives thereof . . . .'" 467 F.3d at 1376 (citation omitted).

In the case at bar, the answer is obvious. The patentees have gone so far as to use a glossary to clearly define a window object as a "Module or a Layer" and then provide a separate definition for the term "layer." *E.g.*, '493 Patent col. 5, l. 64 - col. 6, l. 8. This level of clarity goes well beyond the quotation marks and the term "is" used in *Sinorgchem*. Accordingly, a window object must act as either a layer or module would. Having established that a window object is a "module or a layer," and that a "layer" will be understood as defined by the patentees' glossary, the Court will further inform its interpretation of the term "layer."

## 2.    Identifying the "acts" of a "layer"

In order to construe the disputed phrase "a layer acts independently," the Court must first identify the qualities and "acts" of a "layer." In order to define the acts of a "layer," the Court will first identify exactly which "window objects" and embodiments fall under the scope of the term "layer." According to the specifications of the patents in suit, a layer can refer to a DMOD, TMOD, " Fixed Layer," or "Content Manifestation Layer" used to display information within a content manifestation environment in accordance with the patents in suit. *See*, *e.g.*, '493 Patent

col. 5, l. 65 - col. 6, l. 8, col. 6, ll. 22-36.  "Layers," as understood by the patents in suit,  include DMODs and TMODs because a "Module" is simply a "layer" with a control section and content display section.  *E.g.*, '493 Patent col. 6, ll. 13-21.  Accordingly, the acts and properties of a "module" fall under the ambit of the term "layer."  (*See generally* Markman Tr. at 74:3-15.)  Consequently, a "layer" can, among other things, be: (1) scaled; (2) dragged; (3) minimized; (4) maximized; (5) restored; (6) made to-pop up; (7) display content; or (8) made to display content or host a module based on user or module operations.  *E.g.*, '493 Patent col. 5, l. 65 - col. 6, l. 8, col. 6, ll. 27-30,  col. 10, ll. 33-51, col. 26, ll. 41-47.   Having listed the acts of a layer, the Court will construe the term "independently" in the context of those actions.

3.     **"[I]ndependently" Cannot Be Interpreted in an Absolute Sense Because Actions in One Window Object Can Impact Other Window Objects in a Content Manifestation Environment**

The intrinsic evidence before the Court makes it clear that a layer can be impacted by or affect other window objects, but need not have a "global" impact on every other element in a content manifestation environment provided in accordance with the '493, '563, and '882 Patents. Any definition of "acts independently" can not require absolute autonomy on the part of all layers at all times since: (1) actions in one window object can cause a new layer to "pop-up"; (2) actions in one window object can lead directly to the display of information in another layer; and (3) certain layers are used to display information not destined for other window objects in a content manifestation environment.  *E.g.*, '493 Patent col. 6, ll. 27-30, col. 10, ll. 33-52.  For example, one embodiment of a "layer" is a "Content Manifestation Layer or CML."  *E.g.*, '493 Patent col. 6, ll. 32-36.  CMLs can be made to "pop-up" "based on operations occurring within a[nother] Module" in the same content manifestation environment, such as when a user clicks on

a link or scrolls her mouse over a certain portion of an active module. *See id.* Another embodiment of a layer is a "Fixed layer or FL," which is a "static, always visible" layer used to display information not destined for other window objects within the same content manifestation environment. '493 Patent col.6, ll. 27-32, col. 10, ll. 33-52. For example, a FL, as described by the patents in suit, could possibly be made to display flight schedules, weather reports or other travel related information if a user were to scroll over the "BOOK A FLIGHT" link in item 203, the "TRAVEL" module, in Figure 2B, *supra* at 17. Accordingly, it is clear that one layer can be impacted by acts performed in another window object.

The specifications of the patents in suit also point out that when a module control is acted upon, it "need not have a global effect on the entirety of the CME in which [a] module . . . is displayed." *E.g.*, '493 Patent col. 8, ll. 46-48. Accordingly, the Court recognizes that a user can minimize, maximize, close, restore, scroll through, or request a help screen from one window object without affecting every other window object in a CME. The Court also recognizes that a user can move, minimize, maximize, resize, or otherwise perform the acts of a layer, without being constricted by or depending on other "content" in the same HTML document. Having identified the functions and properties of a layer according to the specifications of the '493, '563, and '882 Patents, the Court will define the phrase "a layer acts independently of other content within a particular HTML document."

     **4.**     **"[A] layer acts independently of other content within a particular HTML document" Defined**

The Court adopts the Special Master's recommendation and finds that the phrase "'a layer acts independently of other content within a particular HTML document' means that the activity associated with a layer, such as moving or resizing, does not depend on other content

within a particular HTML document." (R&R at 139-40.) This definition is consistent with the Court's finding that the acts of a layer can be performed regardless of the other content within a particular HTML document but may have an impact upon other content or window objects within a particular HTML document. (*See also id.* at 117 (stating "the phrase 'a layer acts independently of other content' merely connotes that the acts of a layer are not subject to control by other content, or do not require or rely on other content.").)[18] In short, the Special Master's recommended construction is fully supported by the evidence before the Court. Having defined the relevant phrase, the Court will address the parties' objections and arguments below.

### 5. CA's Argument Is Inconsistent with the Specifications of Patents in Suit

CA's assertion that the "acts of . . . [a] window object neither be affected by nor affect other content" is inconsistent with the specifications of the patents in suit. In light of the fact that the specifications of the '493, '563, and '882 Patents establish that a layer can be made to display content, host another window object or even pop-up based on user actions or merely because other window objects are active within a content manifestation environment, it is clear that a window object is affected by other content. *E.g.*, '493 Patent col. 5, l. 65 - col. 6, l. 8., col. 6, ll. 27-36, col. 9, ll. 39-43, col. 10, ll. 33-51, col. 26, ll. 41-47. However, it is critical to note that one can move, resize, scroll through, close, or otherwise act upon a layer regardless of the other content within a particular HTML document. In short, though a layer can be impacted by

---

[18]The Court also agrees with the Special Master's interpretation of the claim language and specifications of the '493, '563, and '882 Patents as to the acts which a layer can perform. These acts, as previously mentioned, include: (1) scaling; (2) dragging; (3) resizing; (4) minimizing; (5) maximizing; (6) being made to pop up; (7) being closed; (8) manifesting content such as text; and (9) playing sound. (R&R at 114-15.)

user actions upon other window objects in the same content manifestation environment, the acts of a layer cannot be constricted by other content in an HTML document. Having addressed CA's objection, the Court turns to the various issues raised by Simple.

### 6. The Special Master Correctly Applied the Glossary Definition of the Term Window Object as Required By the Specifications of Each Patent in Suit

Simple's argument that the Special Master improperly imported a limitation from the specification into a claim term by incorporating the glossary definition of a "layer" into his construction of the term "window object" is without merit. (*See* Simple's Claim Construction Objections at 2.) The '493, '563, and '882 Patents contain identical glossaries. Each glossary states that "[a] window object is a Module or a Layer." *E.g.*, '493 Patent col.5 l. 64. Additionally, a "module" is merely a "layer" with a control section and an associated content display section that can host other window objects. *E.g.*, '493 Patent col. 6, ll. 13-21. As such, any embodiment of a window object, as claimed by the patents in suit, must have the properties of a layer. Indeed, the Special Master would be wrong in not requiring that a window object act as a layer. *See, e.g., Phillips*, 415 F.3d at 1316; *CCS Fitness, Inc.*, 288 F.3d at 1366; *Durel Corp.*, 256 F.3d at 1303-04; *Sinorgchem*, 511 F.3d at 1136-39; *Abraxis Bioscience, Inc.*, 467 F.3d at 1376; *PC Connector Solutions LLC*, 406 F.3d at 1363. In yet another attempt to circumvent the cannons of claim construction and the plain language of the '493, '563, and '882 Patents, Simple argues that the term "layer" should not be interpreted consistently throughout any of the patents in suit.

### 7. The Term "Layer" Should Be Given the Same Meaning Regardless of Whether or Not it Is Capitalized

Simple's argument that the Court should ascribe a different definition to "Layer" when it

is not capitalized finds no support in the intrinsic evidence before the Court.  (*See* Simple's

Claim Construction Objections at 2.)  In fact, the patentees' glossary informs its definition of the

term "Layer" by referring to it in an un-capitalized format.  Specifically, the glossary provides

that:

> A ***Layer*** is a WWW browser content display section produced
> within a content manifestation environment (CME) including, but
> not limited to, any object within an HTML document that may be
> scaled, dragged, or otherwise operated upon such as an IMG
> object, a SPAN object, a DIV object, a form element, etc. and
> which may be associated with program logic such as within a
> script, etc. A ***layer*** has its own properties including, but not limited
> to, a name, etc. within an HTML rendition model such as those
> defined by DHTML standards. Additionally, a ***layer*** acts
> independently of other content within a particular HTML
> document.

*E.g.*, '493 Patent col. 5, l. 65 - col. 6, l. 8 (emphasis added to identify each time the term "layer"

is used).  The Court finds it implausible that the patentees would choose to refer to a different

meaning of the term "layer" in the very paragraph they were using to define the term.  Indeed,

the intrinsic evidence before the Court critically undermines Simple's argument.  In short, the

patentees have defined the term "layer" in a glossary within the patents in suit and this

lexicography will govern.

If the Court were to apply Simple's rationale, one of ordinary skill in the art would be

forced to guess whether the patentees meant for the term "layer" to have its specially defined

meaning or its ordinary meaning in the art.  For example, the capitalized term "Layer" is used

four times in the specification of the '493 Patent.  '493 Patent col. 5, ll. 64-66 ("A window object

is a Module or a ***Layer***. . . . A ***Layer*** is a WWW browser content display section"), col. 6, ll. 30-

31 ("A Fixed ***Layer*** or FL is a ***layer*** having the same behavior as a FSR."); col. 6, l. 32 ("A

Content Manifestation *Layer* or CML is a pop-up type **layer** much like a pop-up dialog box that can manifest . . . .").  The un-capitalized term "layer" is used 19 times, five of which correlate to instances where the term "layer" is used to help define other terms within the glossary of the '493 Patent.  *See*, *e.g.*, '493 Patent col. 5, l. 65 - col. 6, l. 8 (quoted *supra*, at 50).  As shown below, the glossary entry for the term "module" also contains a reference to the un-capitalized term "layer."

> A Module (also referred to herein as a Window Module) is a **layer** having (1) a control section, and (2) a related content display section which may be manifested within a CME. A module may be recursively referenced in that a particular module provided in accordance with the present invention may include other modules. In other words, the present invention makes it possible to have window objects within window objects.

*E.g.*, '493 Patent col. 6, ll. 13 - 21 (emphasis added).  This pattern of usage is consistent with the '563 and '882 Patents as well.  Needless to say, the Court will once again decline Simple's request to add uncertainty to the art of claim construction.

### 8. Since TMODs Are Not Explicitly Disclosed and Contradict the Unambiguous Language of the Patents in Suit, Certain Unproven Aspects of Their Behavior May Be Excluded when Determining the Scope of Patent Claim Language

Simple asserts that the Special Master's interpretation of "acts independently" excludes the embodiment shown above in Figure 2A, *supra* at 22, featuring TMODs.  According to Simple, TMODs must "snap into a column and row of a table of window objects."  (Highly Confidential Expert Report of Richard A. Belgard (Dkt. No. 366) ("**HC** Belgard Expert Report"), at ex. 36 ¶ 101.)  Simple's expert witness also asserted that this snapping action may cause "other window objects in a 'column' to be moved" so as to keep a tiled appearance.  (*Id.*)  However, in light of this expert report and the specifications of the patents in suit, the Court sees

no way in which a window object can remain tiled **and** act independently of other content in the same HTML document. Moreover, even if it were necessary for a TMOD to remain "tiled," the Court, like the Special Master, finds no express proof of this behavior in the record. The Court provides its rationale below.

When patent specifications disclose multiple embodiments, claims may be interpreted to exclude embodiments which are "inconsistent with unambiguous language in the patent's specification or prosecution history." *Sinorgchem*, 511 F.3d at 1138 (citing *Telemac Cellular Corp. v. Topp Telecom, lnc.*, 247 F.3d 1316, 1326 (Fed. Cir. 2001); *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1347 (Fed. Cir. 2005)); *see also Wang Lab., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir.1999) (the designation of a particular embodiment as "preferred" does not of itself broaden the claims beyond their support in the specification). Though the Court acknowledges that "'[a] patent claim **should** be construed to encompass at least one disclosed embodiment in the written description portion of the patent specification,'" it is undeniable that the patents in suit fail to disclose TMODs that **remain** tiled. *See Sinorgchem*, 511 F.3d at 1138 (citing *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1355 (Fed. Cir. 1998)) (emphasis added). Moreover, the Court has already construed the disputed claim terms to encompass a content manifestation environment featuring DMODs, one of the preferred embodiments described in the '493, '563, and '882 Patents.

The Federal Circuit's recent decision in *Sinorgchem* is highly analogous to the case at bar. At issue in *Sinorgchem*, was the definition of the term "controlled amount" as it pertained to the quantity of "protic material" necessary to inhibit a reaction of aniline with nitrobenzene. *Id.* at 1136. According to the patent at issue in *Sinorgchem*, a "'controlled amount' of protic

material is an amount up to that which inhibits the reaction of aniline with nitrobenzene, e.g., up to about 4% $H_2O$ based on the volume of the reaction mixture when aniline is utilized as the solvent." *Id.* (quotations omitted). In a ruling that was vacated and remanded by the Federal Circuit, the United States International Trade Commission held this definition was not controlling for two reasons, the most relevant being that it was countered by an example of a "preferred" embodiment. However, the preferred embodiment was actually one of many disclosed "preferred" examples in two related patent specifications. The example in question related to a reaction of "aniline, nitrobenzene" and another compound under specified conditions, but failed to ***explicitly*** disclose the amount of water necessary to facilitate said reaction. *Id.* at 1139. Due to this omission, one of ordinary skill in the art would have to perform a calculation to determine the proper amount of water used in the reaction. *Id.* The Federal Circuit reasoned that this inadequately described embodiment was inconsistent with the unambiguously defined term "controlled amount" and could thus be excluded from the scope of the claimed invention.

Simple's interpretation of how TMODs act is not directly shown or taught by the '493, '563, or '882 Patents and would run counter to the consistently stated definition of the terms "content" and "layer." Accordingly, the embodiment of a content manifestation environment featuring TMODs that remain "tiled" is inconsistent with the unambiguous language of the patents in suit and may be excluded when determining the claim scope of the patents in suit. Indeed, an analysis of the relevant intrinsic evidence and Simple's expert testimony only reinforces this finding.

The term "layer" can refer to both TMODs and DMODs.

> SPECIAL MASTER PETERSON:  Now, let's look at this
> definition of layer: '... a layer acts independently of other content
> ....'  A layer may be either a DMOD or a TMOD, right, or include
> a TMOD or a DMOD?
> THE WITNESS [Mr. Richard A. Belgard, Simple's expert
> witness]:  Well, actually a layer is the primitive of DHTML that a
> TMOD or a DMOD can be constructed of.
> SPECIAL MASTER PETERSON:  All right. Point being that a
> layer can refer to both?
> THE WITNESS:  Correct.

Markman Tr. at 74:3-15; *see also*, *e.g.*, '493 Patent col. 6 ll 13-26.  Moreover, the specifications

of the patents in suit distinguish DMODs from TMODs by stating that, a TMOD must be "tiled"

while a DMOD must be draggable and freely movable.  *See*, *e.g.*, '493 Patent, col. 6, ll. 21-26,

col. 10, ll. 17-32.  Yet, there is no mention that TMODs must remain tiled after they are moved.

In fact, the specifications of the patents in suit make no reference to modules that "snap" into a

pre-aligned grid to remain tiled at all times.  Moreover, as Mr. Belgard admits, the patents in suit

fail to disclose the programming source code necessary to create an executable embodiment of

the claimed subject matter featuring TMODs that remain "tiled."  (Markman Tr. at 71:14 - 73:25,

83:24 - 84:11.)  Indeed, for TMODs such as those described by Simple to exist, they would

potentially have to be repositioned every time they were moved so as to remain adjacent while

not overlapping other window objects.  Yet, there is no express showing that the source code

disclosed in the '493 Patent will even perform this repositioning, as evinced by the following

excerpt from the *Markman* hearing.

> Q.   [Questions posed by Mr Fram, CA's attorney, on cross
> examination] Before, you said there were missing parts of the
> code?
> A.  [Answers provided by Mr. Belgard] Yes.
> Q.   And some of that missing parts of the code affects, as you
> understood it, the parts of the code concerning the TMODs that we
> were looking at; isn't that right?

A.   Well, it concerns both.  It concerns positioning of the window objects on the screen.
Q.   So when something is moving one way or the other positioning, that's what -- that's part of the code that's missing?
A.   Yes, some of that code is missing.

(*Id*. at 83:24 -84:11.)  In fact, a detailed analysis of the source code referred to by Mr. Belgard, Simple's expert witness, merely ***hints*** that repositioning ***may*** occur.  *E.g.*, '493 Patent cols. 41-48, 53-58;  *see also* Markman Tr. at 71:10-14 ("[T]his is the outer JavaScript that draws the modules on the screen or helps to draw the modules on the screen, and it calls ancillary routines throughout.  It's not --  It would be nice if it was fully contained here, but it's not."[19])  As Mr. Belgard, Simple's expert, admits, there are certain JavaScript functions and "routines" which are not disclosed by the '493 Patent but are necessary to position TMODs in a tiled format. (Markman Tr. at 71:10-14.)  In short, there is nothing on the record which expressly shows that TMODs must remain tiled or snap into a grid of rows and columns when moved, as suggested by Simple.

The assumption that TMODs snap into place would directly contradict the definition of a layer which must act independently of other "content" in a particular HTML document.  The '493, '563, and '882 Patents all state that "content" includes the positioning information of a window object.  Ensuring that a TMOD did not overlap but remained adjacent to another window object would require that the act of moving one layer be constrained by the position information of another window object.  In the case at bar, just as in *Sinorgchem*, an inadequately

---

[19]In the testimony excerpt above, Mr. Belgard is referring to the JavaScript source code that is used to "draw modules" as they appear in the claimed content manifestation environment. (*See* Markman Tr. at 71:10-14.)  However, as Belgard points out, the JavaScript included in the specification of the '493 Patent is incomplete because it does not disclose the source code necessary to implement TMODs that remain tiled.

disclosed "preferred" embodiment must be excluded from the scope of a claimed invention. In sum, TMODs which remain tiled are not fully disclosed and run counter to repeated and clearly stated language found throughout the patents in suit.

Even assuming that the TMODs disclosed in the '493, '563, and '882 Patents could "snap" into position after being moved, this would contradict the definition of a layer which must act "independently of other content within a particular HTML document." Indeed, other window objects would potentially have to be repositioned and the layer being moved would be constrained to snap into a specific location since something that is always "tiled" can be adjacent to but may not overlap other window objects. If TMODs were to snap, the independent acts of a layer would be limited to refreshing since resizing, minimizing, moving and maximizing functions would all be constrained by an invisible grid or the placement of other window objects. (**HC** Belgard Expert Report ¶ 104.) However, the intrinsic evidence makes it clear that a layer can do more than be refreshed. In fact, the Special Master correctly points out that "the patentees consistently described refreshing content as something unnecessary and something that the layers did not cause." (R&R at 115.) In sum, Simple's argument that the Special Master's construction of the phrase "a layer acts independently of other content" is incorrect because it excludes a preferred embodiment of the patents in suit and is inconsistent with the evidence before the Court.

**D.      The Court's Ruling on the Phrase "a layer acts independently of other content"**

Having considered the intrinsic evidence, *Markman* hearing transcripts, expert witness reports and technical dictionaries associated with the '493, '563, and '882 Patents, in addition to the parties' objections and counter arguments, the Court concludes that the phrase "a layer acts

independently of other content within a particular HTML document" means that the acts of a layer can be performed regardless of the other content within a particular HTML document but may have an impact upon other content or window objects within a particular HTML document. Accordingly, the Court adopts the Special Master's recommended construction of "a layer acts independently of other content within a particular HTML document" and interprets the phrase, as he does, to mean "that the activity associated with a layer, such as moving or resizing, does not depend on other content within a particular HTML document." (R&R at 139-40.) In sum, for a layer to act independently, its acts cannot be constricted by other content in an HTML document.

## IV.     "[C]ontinuously manifested"

The next contested term is "continuously manifested." At issue are the phrases: "said information to be dynamically and continuously manifested within said at least one window object," which appear in the '493 and '882 Patents, and  "said information to be dynamically and continuously manifested within said at least one corresponding window object," which appears in the '563 Patent.  *See* '493 Patent Cl. 5; '882 Patent Cl. 10; '563 Patent Cl. 10.  The relevant claim language is provided below:

> 5. The system according to claim 1, wherein said associated content includes at least one address of a network content source that is configured to download information to said data processing system via said electronic data network, ***said information to be dynamically and continuously manifested within said at least one window object*** within said content manifestation environment.

'493 Patent Cl. 5.

> 10. The network client according to claim 6, wherein said content includes at least one address of a network content source that is configured to download information to said data processing system via said electronic data network, ***said information to be dynamically and continuously manifested within said at least one***

57

> *corresponding window object* within said content manifestation
> environment.

'563 Patent Cl. 10.  In short, the Special Master's recommended construction of the phrase

"continuously manifested" is at issue.

### A.   The Special Master's Recommended Construction

The Special Master recommended that "'said information to be dynamically and

***continuously manifested*** within said * * * window object'" be interpreted to mean "that the

display of information or content changes over time and . . . [that] information is ***displayed***

***without interruption*** within 'said * * * window object' ***while the 'content display section'*** of the

'window object' ***is visible***."  (R&R at 143 (emphasis added).)  The Special Master interpreted the

relevant intrinsic evidence to mean that information is to be "manifested" within the content

display sections found in window objects.  (*Id.* at 142.)  The Special Master then used a common

dictionary definition of "manifest" as being "'readily perceived by the senses and especially by

the sight.'"  (*Id.* at 143 n.58. (using an Internet based dictionary to define the term "manifest").)

Although the dictionary used by the Special Master did not explicitly limit manifestation to

visual perception, the Special Master chose to do so.  (*Id.* at 143.)

> 'Manifest,' of course, simply means 'readily perceived by the
> senses and especially by the sight,' and in the context of the claim,
> the information is to be displayed, *i.e.*, visually manifested to the
> user. For the information to be displayed, the 'content display
> section' must be visible to the user. To meet that particular
> limitation of the claim, therefore, (1) the 'content display section'
> of the 'window object' must be visible, and (2) the information
> must be displayed therein. Put another way, the information is to
> be manifested within the window object while the content display
> section is visible.

(*Id.* (footnotes omitted).)  Based on this analysis, the Special Master required that information in

58

a content display section be "visible to the user" in order for it to be manifested. (*Id.* at 142-43.) Having summarized the Special Master's recommended construction of "continuously manifested," the Court will summarize the parties' corresponding objections and counter arguments.

**B.     Simple's Objection and CA's Counter Argument**

Simple asserts that the Special Master "improperly limits the 'continuously manifested' requirement on a durational basis to the period while the content display section is visible without any explicit support in the intrinsic record." (Simple's Claim Construction Objections at 15.)  Simple goes on to argue that the proper definition of "continuously manifested" should be "displayed without interruption." (*Id.* at 16.)  Conversely, CA argues that the Special Master's recommended construction is supported by (1) the plain meaning of the terms at issue and (2) the specifications of the patents in suit. (CA's Resp. to Simple's Objections to Claim Construction R&R (Dkt. No. 583) ("CA's Claim Construction Response"), at 16-17.)  Having summarized the parties arguments, the Court will put forth its own analysis.

**C.     Analysis**

The Court's analysis of the phrase "continuously manifested" will entail the following steps: (1) constructing the term based upon a review of the claim language and the specifications of the patents in suit; (2) addressing the deficiencies in the Special Master's interpretation of the phrase; and (3) addressing the arguments raised by the parties.  The Court will focus its analysis on whether the Special Master correctly emphasized the visual aspect of content manifestation. Indeed, this issue lies at the heart of resolving Simple's objection.

### 1. The Intrinsic Evidence Before the Court Indicates That Manifestation Should Not Be Limited to a User's Visual Perception

A step-by-step analysis of claim 5 of the '493 Patent indicates the following process: (1) a user on a client side network client receives content from a remote server system over the Internet; (2) this content includes the address of a network content source; (3) the network client accesses said address and downloads information; and finally (4) said information or a portion thereof is continuously manifested within a window object. None of the relevant claim language makes any mention of whether or not information must be seen to be manifested. Accordingly, the Court must turn to the specifications of the patents in suit to determine whether or not information or content must be seen to be manifested.

The manifestation of information should not be confined to visual perception since: (1) user actions may lead to the manifestation of sound; (2) the parties do not dispute that window objects can manifest sound (*see* R&R at 115 (citation omitted)); and (3) window objects are equipped to manifest content which may extend beyond what can be shown at one specific moment. The specifications of the '493, '563, and '882 Patents state that the "manifestation of content is a broader concept than simple screen display." *E.g.*, '493 Patent col. 9, ll. 22-30. For example, a window object may display a hyper-link within its content display section, "to invite a user click to cause sound to be manifested." *Id.* Since neither party disputes this finding, it also follows that a window object can deliver sound as content. *See id.* Additionally, the specifications of the '493, '563, and '882 Patents all describe window objects equipped with a scrolling functionality that allows for the manifestation of content which may extend beyond the visible portion of a content display area. *E.g.*, '563 Patent col. 8, ll. 55 - 61 (specifically mentioning the use of "OCX files and systems to derive a customized WWW browser. . .

[capable of supporting] an 'overflow:auto' CSS (cascading style sheet) property which applies to facilitate scroll bars, . . . to allow management of content that extends beyond a bottom edge of a visible area of a selected module").  In short, the specifications of the '493, '563, and '882 Patents clearly indicate that manifestation is more than what is seen.

### 2.      "[C]ontinuously manifested" Defined

The Court interprets the phrase "continuously manifested" to mean: delivered without interruption.   Accordingly, the phrase "said information to be dynamically and ***continuously manifested*** within said * * * window object" will be interpreted to mean that the display of information or content changes over time and that information is ***delivered without interruption*** within "said * * * window object."  This construction is based on the fact that content need not be seen to be manifested.  The patents in suit indicate that content is "any form of digital data." *See* '493 Patent col. 5, ll. 46-48; '563 Patent col. 5, ll. 32-34; '882 Patent col. 5, ll. 49-51.  To assume that: (1) content cannot include audio as well as visual media and (2) that content must be seen to be delivered, would contradict the term's clearly established glossary definition as well as the scrolling functionality taught by the patents in suit.  Accordingly, the concept of content delivery as opposed to a mere visual representation is more appropriate in the context of the '493, '563, and '882 Patents.

### D.      The Court's Ruling on the Term "continuously manifested"

Simple's objection is granted in part because the Special Master's construction seems to limit content manifestation to visual perception.  The Special Master's application of the dictionary definition of "manifest" is countered by the patent specifications, which should be given greater weight in claim construction. *Phillips*, 415 F.3d at 1316, 1318.  Nonetheless,

instead of adopting Simple's proposed construction, the Court will use the term "delivered" because the specifications of the '493, '563, and '882 Patents indicate that the manifestation of content is more than what appears on screen. Indeed, content **_delivery_** better comports with this conception of manifestation than the visual emphasis placed on the term by the Special Master or the term "display," as suggested by Simple.

**V.        "[C]ontrol section"**

Claim 2 of the '563 and '882 Patents utilizes the term "control section." The term is also described in the specification of each patent in suit. _E.g._, '493 Patent col. 8, ll. 25-47. Having placed the disputed term in context, the Court will summarize the Special Master's proposed construction as well as his rationale.

**A.        The Special Master's Recommendation**

Based on his analysis of the relevant claim language and portions of the specifications of the patents in suit, the Special Master recommended that a "control section" be defined as "a portion of a window module that includes at least one module control." (R&R at 152.) In essence, the Special Master found that the relevant claim language required that a "control section" have at least one module control, and that this interpretation was consistent with the specifications of the patents in suit, which mentioned or described "control sections." Although the Special Master found that: (1) DMODs "act like any other window such as those within a windows based operating system desktop environment"; (2) the patents in suit identify Windows 98 as an example of such a "windows based operating system desktop environment"; and (3) "the windows in Windows 98 could be dragged . . . by placing the cursor of a mouse on the control section of the window, depressing the mouse button, moving the mouse to drag the

window to a different location on the screen, and releasing the mouse button," he determined that it would be inappropriate to ascribe this functionality to control sections in the context of the patents in suit because the relevant claim language was silent regarding the matter. (*Id.* at 151-52.) Having summarized the Special Master's reasoning and recommended construction of the term "control section," the Court turns to CA's corresponding objection and Simple's counter arguments.

## B. CA's Objection and Simple's Counter Arguments

CA objects to the Special Master's recommended construction of "control section" because it obscures the fact that a user may place a cursor, controlled by a mouse, over the "control section" of a window object and then move said window object to a different location on screen by depressing the mouse button and moving said mouse. (*See* CA's Claim Construction Objections at 20.) For its part, Simple agrees with the Special Master's analysis and recommended construction and argues that it is consistent with the claim language and specifications of the '563 and '882 Patents. (Simple's Resp. to CA's Objections to the Claim Construction R&R (Dkt. No. 586) ("Simple's Reply to CA Objection"), at 16-17.) Simple further argues that CA's proposed construction ignores the relevant claim language of the '563 and '882 Patents which requires that a control section include at least one module control. (*Id.* at 17.) Having summarized the parties' objections and counter arguments, the Court will conduct its own analysis of the term "control section."

## C. Analysis

As the Special Master points out, a "control section" is not expressly defined by the intrinsic evidence found in the '493, '563, and '882 Patents, but claim 2 of the '563 and '882

Patents clearly states that a "'control section' is . . . a portion of a window object . . . associated with control of the window object." (R&R at 146.) Specifically, claim 2 of the '563 Patent states that a control section includes "a set of at least one *control* corresponding to a set of attributes which operate *to affect manifestation* of said at least one window object and at least a portion of said content within said content display section." *Id.*; *see also* '882 Patent Cl. 2. Indeed the real dispute between the parties is over "whether the 'control section' itself – apart from the 'control' and 'attributes' – may be used to control the 'window object.'" (R&R at 146.)

The Court's analysis of term "control section," will entail the following steps: (1) construing the relevant claim language; (2) analyzing the relevant portions of the specifications of the '563 and '882 Patents; (3) accounting for the knowledge of one skilled in the art; and (4) addressing the deficiencies in the Special Master's proposed construction and the parties arguments.

### 1. The Patents in Suit Indicate That "control sections" Can Be Used to Move Window Objects

Claims 1 and 2 of the '563 and '882 Patents indicate that window objects can be moved and contain a control section. As shown by the excerpted claim language below, claim 1 of the '563 and '882 Patents indicates that a window object can be moved as a result of a "moving operation" performed on a controllable attribute. Specifically, claim 1 of the '563 Patent claims:

> 1. A network client . . . comprising:
>
> a content retrieval module . . . ; and
>
> a processing engine coupled to said content retrieval module configured to provide a content manifestation environment within the data processing system, to process said content to produce at least one corresponding window object . . . ,
>
> said at least one corresponding *window object* is *associated with a*

64

> **controllable attribute,** said controllable attribute **configured to permit said** at least one corresponding **window object to be controlled as a result of performing at least one of a moving operation,** a resizing operation, a minimizing operation, or a maximizing operation within said content manifestation environment.

'563 Patent Cl. 1 (emphasis added).  Claim 1 of the '882 Patent claims:

> 1. A network client . . . comprising:
>
> a content retrieval module . . . ; and
>
> a processing engine . . . , to process said content to produce at least one window object within said content manifestation environment, said at least one **window object** is **associated with a controllable attribute,** said controllable attribute **configured to permit** at least one **window object to be controlled as a result of performing at least one of a moving operation**, a resizing operation, a minimizing operation, or a maximizing operation within said content manifestation environment.

'882 Patent Cl. 1 (emphasis added).  Claim 2 of the '563 and '882 Patents "depends" from claim

1 of said patents.[20]  Accordingly, the window object referenced in claim 2 of the '563 and '882

---

[20]The following may be of assistance in deciphering the meaning of the term "depends": 35 U.S.C. § 112 ¶ 2 and 37 C.F.R. § 75(a) require that a patent's specification conclude with one or more claims.  *See* Landis on the Mechanics of Patent Claim Drafting § 2:1.  There are three types of claims: (1) independent; (2) dependent; and (3) multiple dependent.  *Id.* § 2:10.  Since the '493, '563, and '882 Patents only have independent and dependent claims, the Court need not discuss multiple dependent claims.

An independent claim, is one that "stands alone, includes all its necessary limitations, and is not dependent upon and does not include limitations from any other claim to make it complete."  *Id.*  Independent claims are usually the broadest claims in a patent.  *See generally id.*  In essence, they contain the fewest limitations and claim the most subject matter.  *See generally id.*

Dependent claims depend from a single independent claim and incorporate an additional limitation.  *See* 35 U.S.C. § 112 ¶ 4.  For example **independent claim** 1 Could read as follows:
> We Claim:
> 1. A car with four wheels, four doors, and an engine that runs on gasoline.

**Dependent claim** 2 would read:
> 2. The car **according to claim 1** wherein said engine also runs on

65

Patents can be movable.  Claim 2 of the '563 and '882 Patents further refines window objects to include a content display section and a control section.  As provided below, Claim 2 of the '563 Patent claims:

> 2. The network client according to claim 1, wherein said processing engine is ***further configured to process said content to produce a control section and a content display section within said at least one corresponding window object***, said content display section configured to manifest at least a portion of said content therein, ***said control section including*** a set of ***at least one control*** corresponding to a set of attributes which operate to affect manifestation of said at least one window object and at least a portion of said content within said content display section.

'563 Patent Cl. 2 (emphasis added).  For its part, claim 2 of the '882 Patent claims:

> 2. The network client according to claim 1, wherein said processing engine being ***further configured to process said content to produce a control section and a content display section within said at least one window object***, said content display section configured to at least a portion of said content therein, ***said control section including a set of controls*** corresponding to a set of attributes which operate to affect manifestation of said at least one window object and at least a portion of said content within said content display section.

'882 Patent Cl. 2 (emphasis added).  As shown above, claim 2 of the '563 and '882 Patents refers to a window object, which may be movable and contains a control section, which is distinct from its content display section.  Having analyzed the claim language of the '563 and '882 Patents, the Court will turn to their specifications to further inform its construction of the term "control

---

electricity.

In actuality, claim 2 covers: A car with four wheels, four doors, and an engine that runs on gasoline ***and electricity***.  As one may already have deduced, a dependent claim includes ***every limitation*** found in the independent claim, from which it depends, and another limitation or limitations.

section."

According to the specifications of the '493, '563, and '882 Patents, "control sections" allow for the manipulation of modules through the use of "Module Controls."[21] The identical glossaries found in each of the patents in suit state that a module is a layer "having (1) a control section, and (2) a related content display section." *E.g.*, '563 Patent col. 6, ll. 1-4. The "control section" hosts "Module Controls," which "control objects . . . associated with screen icons." *E.g.*, '563 Patent col. 6, ll. 25-30. By reacting "to events, . . . [such as] mouse clicks, mouse-overs, double-clicks, etc," said objects allow a user to control certain attributes of a module, such as "minimization, maximization, closure, resizing, etc." *Id.* This description correlates with the ability of a "control" to affect the manifestation of a window object as specified in claim 2 of the '563 and '882 Patents. However, if the role of "control sections" were to end there, there would be no way in which a user would be able to move a module type window object such as a DMOD. This deficiency is critical since it is undisputed that certain embodiments of window objects, such as DMODs, are movable. As the following analysis of the relevant extrinsic evidence shows, control sections also allow users to move windows in windows based content manifestation environments.

        **2.**        **A User Cannot Move a Module Without Utilizing its "control section"**

When evaluating disputed claim terms, it is critical to note that: (1) claim interpretation is performed "from the perspective of one of ordinary skill in the pertinent art at the time of filing"; (2) claims do not stand alone and must be read in light of their accompanying specifications; and

---

[21]The operation of module controls in TMODS and DMODS is described above in § V.D, *supra*, entitled "DMOD's and TMOD's Are Used to Embody the Window Objects Critical to Facilitating a CME."

(3) it is not improper to refine a claim term in light of consistent definitive remarks within a patent specification. *See Chamberlain Group, Inc.*, 516 F.3d at 1335; *Computer Docking Station Corp.*, 519 F.3d at 1374; *Markman*, 52 F.3d at 979; *Phillips*, 415 F.3d at 1314. In light of the specifications of the '563 and 882 Patents, one of ordinary skill in the art at the relevant time period would understand that control sections also allow users to move window objects. The patentees and CA agree, in accordance with the relevant intrinsic evidence, that window objects such as DMODs can be dragged and acted upon "like any other window such as those within a windows based operating system desktop environment." *See, e.g.*, '563 Patent col. 7, l. 65 - col. 8, l. 18, col. 8, ll. 4-6; '882 Patent col. 8, ll. 25 - 46, col. 9, ll. 1-6; Decl. of Danny Goodman in Supp. of the Claim Construction Brief of CA (Dkt. No. 326) ("Goodman Claim Construction Declaration"), at Attach. 22 ¶ 28. CA's expert, Mr. Goodman, stated that Microsoft Windows, Apple Macintosh and "almost every windowed operating system environment" allow users to drag a window by placing a cursor over the title bar region, clicking and dragging. (Goodman Claim Construction Declaration ¶ 28.) One of ordinary skill in the art would know this while interpreting the function of a control section within a window object.

Indeed, Figure 2B, *supra* at 17, in the '493 and '882 Patents as well as Figure 2, *supra* at 20, in the '563 Patent all display DMODs with titles imbedded into their control sections. '882 Patent fig. 2B, items 203 and 204, col. 8, ll. 25 - 56, col. 10, ll. 13-28; '563 Patent fig. 2, items 204, 206, 208 and 210 col. 9, l. 54 - col. 10, l2. In this context, one of ordinary skill in the art would understand that control sections are analogous to the title bar sections referred to by Mr. Goodman. In light of the undisputed facts that DMODs are movable and intended to act like windows in a "windows based operating system," the intrinsic evidence before the Court leads to

the conclusion that control sections can be clicked on and dragged in order to move a window object. Having analyzed the term control section in light of the intrinsic evidence before the Court as well as the knowledge of one skilled in the art, it is clear that a control section not only contains a module control, but must also enables a user to move a movable window object.

### 3. "[C]ontrol section" Defined

The Court defines a "control section" as a portion of a window object that contains a module control and enables user control. The Court finds that one of ordinary skill would interpret the intrinsic evidence found in the '493, '563, and '882 Patents to mean that control sections allow users to manipulate and control window objects. Necessarily included in this functionality is the ability to move a window object, which acts like a window in a standard operating system, such as Windows 98. The ability to move a module window object cannot be separated from the definition of a control section. Having defined the term "control section," the Court will discuss the deficiencies in the definitions proposed by the Special Master and CA.

### 4. The Special Master Incorrectly Narrowed the Meaning of the term "control section"

In the context of defining a "control section," the Court disagrees with the Special Master's overly narrow interpretation of claims 1 and 2 of the '563 and '882 Patents. Although it is irrefutable that the patentees intended for certain embodiments of modules to be movable, the Special Master stated that such a "method of control[, via the control section,] is simply not addressed in the claims or specification." (R&R at 152.) The Special Master rested his finding on the language of claims 1 and 2 of the '563 and '882 Patents. (*Id.* at 145-46, 151-52.) However, in doing so, the Special Master gave insufficient consideration to statements made consistently throughout the specifications of the patents in suit and ignored the knowledge of one

69

skilled in the art. To that point, the Special Master does not seem to dispute that: (1) window objects are movable; (2) window objects can be and are meant to be moved like windows in the Windows 98 operating system; *e.g.*, '882 Patent col. 9, ll. 1-6, (3) windows in Windows 98 operating system are moved by clicking on their "title bar regions" and dragging; (4) the control sections in the DMODs disclosed in the patents in suit are functionally similar to these title bar regions; (5) one skilled in the art would know of the Windows 98 operating system; and (6) the patents in suit disclose no other way of moving DMODs, apart from the inherently known method of clicking on the control section and dragging. (*See generally* R&R at 151-52.) Accordingly, any construction of the term "control section" must also account for the user's ability to drag a DMOD type window object and the only way to move a DMOD would be by clicking on its "control section" and dragging.

### 5. The Court Agrees, in Part, with CA but Declines to Adopt Its Proposed Construction

Although the Court agrees with some of CA's arguments, it declines to adopt their recommended construction in its entirety. CA correctly points out that the Special Master's recommended construction of "control section" obscures the fact that a user may move a window object by placing a mouse over its "control section" and dragging. Indeed there is ample support for this view in the specifications of the patents in suit although it may not be explicitly stated in the language of claim 2 of the '563 and '882 Patents. However, since CA's proposed construction does not explicitly state that a control section contains a module control, the Court will decline to adopt it.

### 6. Simple's Argument's Parallel the Special Master's Analysis and are Rejected for the Same Reasons

The thrust of Simple's response to CA's objection aligns with the Special Master's recommended construction of the term "control section." Accordingly, the Court rejects Simple's arguments for the same reasons it declines to adopt the Special Master's recommended construction of the term "control section." Having conducted its analysis, the Court will rule on the term "control section."

### D. The Court's Ruling on the Term "control section"

CA's objection is granted in part and the Court defines a "control section" as a portion of a window object that contains a module control and enables user control.

## VI. "[N]etwork client"

The term "network client . . . appears in all of the claims of the '563 [P]atent and in claims 1-15 of the '882 [P]atent." (R&R at 152.) The term also appears in the specifications of the patents in suit. *See*, *e.g.*, '493 Patent col. 8, ll. 7-13 (stating that the term "network client" includes web browsers); '563 Patent col. 4, ll. 26 - 27 (stating that the term "network client" includes customized web browsers). As further discussed below, the issue in construing the term"network client" turns on whether it can be defined as a web browser or a customized web browser.

### A. The Special Master's Recommendation

The Special Master laid the foundation for his analysis of the term "network client" with a thorough dissection of claim 6 of the '563 Patent. (R&R at 154-56.) He then determined that a "network client" in accordance with the '493, '563, and '882 Patents resides within a personal computer, receives content from the Internet and processes it to produce a content manifestation environment which contains a window object. (*Id.*) According to the Special Master, these

71

functions are akin to those performed by a web browser that has been customized by the subject matter claimed in the '493, '563, and '882 Patents. Having summarized the Special Master's reasoning, the Court will explain his analysis of the relevant claim language in greater detail.

According to the Special Master, a "network client" is a web browser. Specifically, the relevant claim language starts out with a web browser and then customizes it to create a "customized web browser." (*Id.* at 158; *see also* '563 Patent Cl. 6.) In order to facilitate his analysis, the Special Master formatted claim 6 of the '563 Patent as shown below.

> 6. A network client configured [1] to operate within a data processing system and [2] to receive content from a remote server system [3] to facilitate a windowed content manifestation environment therein, comprising:
>
> [A] a content retrieval module configured to receive content from a network server system via an electronic data network; and
>
> [B] a processing engine [i] coupled to said content retrieval module [ii] configured [(a)] to instantiate a content manifestation environment within the data processing system, [(b)] to process said content to produce at least corresponding window object within said content manifestation environment,
>
> [C] said at least one corresponding window object [i] associated with a set of at least one controllable attribute and [ii] configured to manifest at least a portion of said content therein,
>
> [D] said set of at least one controllable attribute [i] configured to affect manifestation of said at least one corresponding window object by the network client within said content manifestation environment [ii] by permitting said at least one corresponding window object to be controlled as a result of performing at least one of [1] a moving operation, [2] a resizing operation, [3] a minimizing operation, or [4] a maximizing operation within said content manifestation environment without requiring said content manifestation environment to be refreshed.

(R&R at 154-55 (quoting '563 Patent Cl. 6 with the addition of clarifying text within

brackets).)[22]  According to the Special Master, claim 6 covers and starts out with a "network

client," comprised of a "content retrieval module" coupled to a "processing engine," that is then

configured to "perform three functions, namely, '[1] to operate within a data processing system

and [2] to receive content from a remote server system [3] to facilitate a windowed content

manifestation environment therein.'"  (*Id.* at 155 (brackets in original).)  The Special Master then

pointed out that the "content retrieval module" is simply defined as being configured to receive

content from a network system over an electronic data network.  (*Id.*)  Next, the Special Master

described the "processing engine," as configured "'[(a)] to instantiate a content manifestation

environment within the data processing system, [and (b)] to process said content to produce at

least [***one***] corresponding window object within said content manifestation environment.'"  (*Id.*

(brackets in original) (emphasized text added).)  According to the Special Master, claim 6 further

provides that the window object must have at least one "control attribute" capable of affecting its

manifestation ". . . within said content manifestation environment" via "the <u>network client</u> . . . ."

(*Id.*  at 156 (discussing '563 Patent Cl. 6).)  In essence, the Special Master explained and

examined each element of claim 6 of the '563 Patent to show that a network client is a web

browser that is customized, as described by the claim language, to provide a windows based

content manifestation environment according to the patents in suit.  Having discussed the Special

Master's analysis of the relevant claim language, the Court now turns to his analysis of the

specifications of the patents in suit as well as the relevant objective extrinsic evidence.  (*See id.*

---

[22]The bracketed text was added by the Special Master to: (1) help organize claim 6 into
its base elements and (2) make an analysis of the relevant claim language easier to follow.  As
can be seen, the Special Master's reasoning directly parallels the relevant claim language
because the focus of claim construction, as always, starts with the plain language of the claim.
*Innova/Pure Water, Inc.*, 381 F.3d at 1115.

at 156-57.)

According to the Special Master, the specifications of the patents in suit and relevant objective extrinsic evidence indicate that the term "network client" be defined as a web browser. The Special Master found that "network client" is an open ended term, which according to the specifications of the patents in suit can include a web browser or a customized web browser. (*Id.* (citing '493 Patent col. 6, l. 53 - col. 7, l. 9).) According to the Special Master, the specifications of the '493, '563, and '882 Patents indicate that a web browser is just one example of a "network client." (*Id.*) The Special Master then concluded that the "patentees appear to have used the term 'network client' in the subject claims according to its ordinary and customary meaning in the context of client-server network architecture." (*Id.* at 157.)

As further support for his recommended construction, the Special Master used technical dictionaries to construe the term "network client." (*See id.* at 157-58 (citing Computer & Internet Dictionary (3d ed. 1999); Microsoft Computer Dictionary (4th ed. 1999))). Finding that the term "network client" was not "per se" defined, the Special Master construed the term by defining the words "network" and "client" separately, as shown below. (*Id.* at 157-58.)

> A "network" is, for example, "a group of two or more computer systems linked together." *See* COMPUTER & INTERNET DICTIONARY at 374. *See also* MICROSOFT COMPUTER DICTIONARY at 308 ("A group of computers and associated devices that are connected by communications facilities."). A "client" is "[t]he client part of a client-server [network] architecture," *e.g.*, "an application that runs on a personal computer or workstation and relies on a server to perform some operations." *See* COMPUTER & INTERNET DICTIONARY at 94. *See also* MICROSOFT COMPUTER DICTIONARY at 88 ("3. On a local area network or the Internet, a computer that accesses shared network resources provided by another computer (called a *server*).").
> The term "network client" *per se* thus appears to have a

readily-discerned ordinary and customary meaning, and connotes a range of applications possible within the client-server network architecture. The term "network client" *per se* does not connote a "customized WWW browser." Additional attributes and requirements of the "network client," though, are expressly set out in the claims. Those additional requirements may make the "network client" as defined by the claim language as a whole a "customized web browser."

(*Id.*)  Consistent with his interpretation of the claim language and the specifications of the patents in suit, the Special Master found that a "network client" is best construed as a web browser that can be customized.  Having detailed the Special Master's reasoning and recommended construction, the Court will summarize CA's objections and Simple's corresponding counter arguments.

### B.    CA's Objections and Simple's Counter Arguments

According to CA, the relevant claim language and portions of the specifications indicate that a "network client" can only be a customized web browser.  CA argues that: (1) the use of the term "network client" in the claim language of the '563 and '882 Patents indicate that it should be defined only as a "web browser designed to provide window objects without requiring the download of a software system for that purpose"; and  (2) a "network client" is not a web browser because claims 1 and 6 of the '563 Patent merely require that "content" be downloaded to enable a content manifestation environment featuring window objects, as opposed to the "software system" referred to in claim 1 of the '493 Patent.  (*See* CA's Claim Construction Objections at 11-13.)  According to CA, since the specifications of the '563 Patent consistently use the term "network client" to refer to a customized web browser, the Special Master's recommended construction has no basis in the '563 Patent.  (*Id.* at 13-16.)  CA also objects to what it calls the Special Master's inappropriate use of extrinsic evidence when constructing the

term "network client."  (*Id.* at 16-17 ("Stringing Together Dictionary Definitions Cannot Trump The Consistent Teaching Of The Specification").)

CA also argues that "'network client' has a different meaning in the '882 patent than it does in the '563 [P]atent" because of "sloppy patent prosecution."  (*Id.* at 17-19.)  In "the first application that was filed in the prosecution of the '882 [P]atent, claims 1-13 were identical to claims 1-13 of the '493 [P]atent."  (*Id.* at 18 (*comparing* '882 Prosecution History (Dkt. No. 366), Ex. 3 at SIM-007016-18 *with* '493 Patent, Cls. 1-13).)  The first 13 claims of application number 09/843,130, which matured into the '882 Patent, were then canceled since they had already issued in the '493 Patent.  (*Id.* (citing '882 Prosecution History at SIM-007244).)  In their place, the patentees inserted claims that were "substantially identical to" those found in the '563 Patent, "as claims 1 through 15 of the '882 patent."  (*Id.*)  In light of this prosecution history, CA concluded that the Special Master incorrectly interpreted the term "network client" so as to preserve the validity of the '882 Patent, which failed to meet the written description requirement of 35 U.S.C. § 112 ¶ 1.  (*Id.* at 18.)

In response, Simple argues that the Special Master correctly construed a "network client" as a web browser.  (Simple's Reply to CA's Objections at 12.)  According to Simple, the Special Master's recommended construction was properly based on the claims of the '563 and '882 Patents, which "strongly imply that the customization of the 'network client' . . . [was] not an inherent feature."  (*Id.* at 13 (citing *Phillips*, 415 F.3d at 1309-10 (for the proposition that the "claim language 'steel baffles' strongly implies baffles are not inherently made of steel")).)  Simple further argues that the Special Master's proposed construction is supported by the specifications of the '563 and '882 Patents as well as relevant extrinsic evidence.  (*Id.*)  Finally,

Simple argues that CA "did in fact agree that the 'network client' could be construed as a web browser." (*Id.* at 14 (quoting Markman Tr. at 230:8-19).) Having summarized the parties' objections and counter arguments, the Court will conduct its analysis of the disputed term.

## C. Analysis

The Court's analysis of the term "network client" will entail: (1) constructing the term based upon a review of the claim language and the specifications of the patents in suit and (2) addressing the arguments raised by the parties.

### 1. The Claim Language of the Patents in Suit Indicates That a "network client" is a Web Browser, Capable of Being Customized

Quite simply, the relevant claim language of the '563 and '882 Patents, starts out with a "network client" or web browser and then custom configures it to facilitate a windows based content manifestation environment. As such, concluding that a "network client" is already customized would make the associated claim language redundant. The Court's analysis of the relevant claim language leads to the same conclusion reached by the Special Master, namely that a "network client" is a web browser that can be customized according to the relevant claim language of the patents in suit. Accordingly, the Court adopts the Special Master's proposed construction of the term "network client" and directly incorporates his reasoning as it pertains to the intrinsic evidence before the Court. (*See generally* R&R at 156 ("With the foregoing in mind, it is difficult to see what further 'construction' of 'network client' is necessary.").) The Special Master correctly concluded that, though a "network client" should be construed as a web browser, a "network client" *as refined by the relevant claim language* becomes a customized web browser. (*Id.* at 158; *see also*, *e.g.*, '563 Patent Cl. 6.) In other words, a customized web browser is still a web browser. Having discussed the relevant claim language, the Court's

analysis turns to the specifications of the patents in suit.

  **2.**   **The Specifications of the Patents in Suit Indicate That the Term "network client" Should Be Broadly Construed as a Web Browser**

  According to the specifications of the patents in suit, a "network client" is broadly defined as a web browser. The specifications of the '493, '563, and '882 Patents use the open ended phrase "such as" when stating that a "network client" can be a web browser or a customized web browser. *Innova/Pure Water, Inc.*, 381 F.3d at 1117 ("claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction.") (internal quotations omitted). For example: (1) the '493 and '882 Patents provide: "Client system 108 is configured to operate in accordance with an operating system such as MICROSOFT WINDOWS 98 . . . which may be operated in accordance with a ***network client application such as Internet Explorer*** version 4.x, ***Netscape*** Communicator 4.x, etc." and (2) the '563 Patent describes "a ***network client***, ***such as a customized WWW browser client*** or application, which is configured to operate within a data processing system and to receive content from a remote server system to facilitate a windowed content manifestation environment." '493 Patent col. 8, ll. 7-13; '882 Patent col. 8, ll. 7-13; '563 Patent col. 4, ll., 24-30 (emphasis added). Accordingly, the specifications of the '493, '563, and '882 Patents indicate that the term "network client" should be defined as a web browser, which, as the patents in suit clearly indicate, can be customized.

  The '493 and '882 Patents teach that a network client such as a web browser can be customized to provide the claimed invention. In the following excerpt, the '493 and '882 Patents list a WWW/web browser as an example of a network client that can use files downloaded over an electronic data network to facilitate a windows based content manifestation environment.

> Such files are generated in accordance with the present invention to facilitate a windows based content manifestation environment ***on or within network clients such as WWW browsers*** that may be used to download the same and to display content therein.
> . . .
> At a client side . . . a client system 108 is outfitted with appropriate ***network client software to access an electronic data network*** . . . . Accordingly, client system 108 is configured to access and download HTML documents such as HTML documents and other related files 106 which may be generated and stored in data store 104.

'493 Patent col. 6, l. 60 - col. 7, l. 9 (emphasis added.); *see also* '563 Patent col. 4, ll. 24-30; '882 Patent col. 8, ll. 7 - 16.  Indeed, as the '493 and '882 Patents go on to point out, the aforementioned HTML files are subsequently loaded onto the network client/web browser to "facilitate a windows based content manifestation environment."  *E.g.*, '882 Patent col. 7, ll. 9-12 (stating "It is the HTML documents and the related files as discussed herein which facilitate a windows based content manifestation environment within a client system such as within client system 108.").  Since the intrinsic evidence at hand is sufficient to define a "network client," the Court finds it unnecessary to refer to technical dictionaries in defining the term.

### 3. "[N]etwork client" Defined

The intrinsic evidence before the Court indicates that a "network client" is a web browser.  This construction comports with: (1) the claim language of the patents in suit, which starts out with a web browser and then customizes it; (2) the portions of the specifications of the patents in suit which state that a network client can be a web browser or a customized web browser; and (3) the fact that a web browser, whether customized, enhanced or reconfigured, is still a web browser.  Having construed the term "network client," the Court turns to CA's objections.

### 4.   CA's Proposed Construction of "network client" Ignores the Relevant Intrinsic Evidence

CA's objections to the Special Master's recommended construction of the term "network client" inappropriately focus on narrowly limiting a "network client" to the end product of the relevant claim language found in the '563 and '882 Patents and ignoring the specifications of the '882 Patent.  The Court has already stated that the relevant claim language of the '563 and '882 Patents starts out with a "network client" that is merely a conventional web browser and then proceeds to customize it according to claim elements therein.  This point has been well discussed by the Special Master and need not be analyzed again.

CA seeks to improperly limit the construction of the term "network client" by selectively using language found in the specifications of the '563 Patent and ignoring the '493 and '882 Patents.  (*See* CA's Claim Construction Objections at 13-16.)  CA cites the following portion of the '563 Patent specification as proof that a network client must be a "customized WWW browser client."  (*Id.* at 14.)

> Accordingly, the present invention solves the aforementioned problems to deliver the above-described benefits by providing a network client, *such as a customized WWW browser client*, which is configured to operate within a data processing system and to receive content from a remote server system to facilitate a windowed content manifestation environment (CME).

(*Id.* (citing '563 Patent col 4, ll. 24-30).)  CA then argues that the specification of the '882 Patent, which directly contradicts its own proposed construction, should be ignored since it is merely the product of "sloppy" prosecution.  (*Id.* at 17-18.)  Both arguments fail to account for the fact that the phrase "such as" does not connote an exclusive relationship.  Rather, the foregoing passage merely conveys that a customized WWW browser is one example of a

network client.  This is consistent with the finding that, a network client can be both a web browser and a customized web browser since a web browser remains a web browser even after it is customized.  *See*, *e.g.*, '882 Patent col. 8, ll. 7-13.  CA's argument, that the specifications of the '882 Patent should be ignored, fails if one were to construe a "network client" to be a web browser.  This is because CA's argument that the '882 Patent is invalid and its specifications should be ignored hinges on construing a network client as a customized web browser.  Accordingly, the Court is unpersuaded by CA's arguments.  The Court now turns to CA's objection to the Special Master's use of extrinsic evidence.

CA's assertion that the Special Master inappropriately applied extrinsic evidence when constructing the term "network client" is incorrect.  (CA's Claim Construction Objections at 16-17.)  Although the Special Master augmented his analysis with extrinsic evidence, he defined "network client" according to intrinsic evidence found in the '493, '563, and '882 Patents.  Indeed, the Special Master indicated that, after his analysis of claim 6 of the '563 Patent, it was "difficult to see what further 'construction' of 'network client'" was necessary.  (R&R at 156.)  Having addressed the deficiencies in CA's objections, the Court will address Simple's counter arguments.

### 5.     Simple's Counter Arguments

Simple correctly agrees with the Special Master's recommended construction of a "network client" as a web browser and seems to endorse much of his logic.  However, Simple also argued that CA agreed with the Special Master "that the 'network client' could be construed as a web browser."  (Simple's Reply to CA's Objections at 14 (quoting Markman Tr. at 230:8-19).)  The Court is underwhelmed by this argument since reference to the Markman Transcript

81

clearly shows that this was not the case. (Markman Tr. at 231-37.) Having addressed the

parties' arguments, the Court will issue its ruling on the term "network client."

### D.     The Court's Ruling on the Term "network client"

CA's objection to the Special Master's recommended construction of the term "network

client" is denied. Rather, the Court adopts the Special Master's recommended construction and

rules that a "network client" is a web browser. The intrinsic evidence before the Court shows

that the term "network client" includes a web browser as well as a customized web browser.

*See*, *e.g.*, '493 Patent col. 8, ll. 7-13 (stating that the term "network client" includes web

browsers); '563 Patent col. 4, ll. 26-27 (stating that the term "network client" includes

customized web browsers). Specifically, the relevant claim language of the '563 and '882

Patents shows that a "network client" is a web browser capable of being customized to produce a

content manifestation environment featuring window objects. *E.g.*, '882 Patent Cl. 1; '563

Patent Cls. 1, 6. Indeed, the entire purpose of claim 6 of the '563 Patent is to start out with a

web browser, and then customize it.

## VII.   "[S]olely contained within"

"Solely contained within" is found in claim 1 of the '493 Patent and claim 16 of the '882

Patent. Claim 1 of the '493 Patent is representative and covers:

> 1. A system for facilitating a windowed content manifestation
> environment within a web browser, comprising:
> a server system . . . ; and
> a web browser client . . . coupled to said server system . . . having
> a content manifestation environment, said web browser client . . .
> to process said software system and said associated content to
> produce **window objects solely contained within said content
> manifestation environment**, each window object of said window
> objects is associated with a set of controllable attributes and is . . .
> [configured] to . . . manifest at least a portion of said associated

content therein, said controllable attributes configured to affect manifestation of said each window object by said web browser client within said content manifestation environment, wherein said each window object executes within and is directly controlled by said web browser client which operates within said data processing system, . . . .

'493 Patent Cl. 1 (emphasis added).  Having placed the disputed term within the context of the patents in suit, the Court will discuss the Special Master's recommended construction, Simple's objection and CA's corresponding counter-arguments.

### A.    The Special Master's Recommended Construction

The Special Master recommended that "'window objects solely contained within said content manifestation environment' means that the window objects only appear inside the boundaries of the content manifestation environment.**"** (R&R at 162.)  The Special Master arrived at his conclusion in a three step process.  First, he used a dictionary to define "within" as "inside." (*Id.* at 161.)  Second, the Special Master used a dictionary to define "contain" as "'to keep within limits.'" (*Id.*)  Finally, the Special Master interpreted the glossary definition of a content manifestation environment which stated that "a CME is a 'controllable WWW browser content display window,'" to conclude that "solely contained within" dealt with the visual appearance of a window object within the boundaries of a content manifestation environment. (*Id.*)

### B.    Simple's Objection and CA's Counter Argument

Simple argues that the "proper construction [of solely contained within] is [that] '. . . window objects are only kept inside the boundaries of the content manifestation environment.'" (Simple's Claim Construction Objections at 17.)  According to Simple's statements during the Markman hearings as well as its expert testimony, for a window object to be solely contained

83

within a content manifestation environment: (1) a user must not be able to drag the entire window object out of the content manifestation environment and (2) no portion of the window object can be displayed outside the content manifestation environment.  (Markman Tr. 23:2-23; **HC** Belgard Expert Report ¶ 167 (referring to a representation of CA "Portal Components," p. 44 fig. 1).)

> SPECIAL MASTER PETERSON: . . .And the full phrase is . . . -- quote, "... to process said software system and said associated content to produce window objects solely contained within said content manifestation environment,...."
> MR. UNGERMAN: [on behalf of Simple]  And that's as opposed to window objects which might move outside the content manifestation environment.  That's the limitation that it's getting at.
> SPECIAL MASTER PETERSON:  All right. Jumping to the bottom line, what you're saying is that that means you could not drag one of those windows outside the CME?
> MR. UNGERMAN:  Correct, and still be within the limitations of the claim.
> SPECIAL MASTER PETERSON:  So if a software system allowed you to drag a window outside the CME, that would take it outside the scope of the claim as you interpret it?
> MR. UNGERMAN:  Right, Your Honor.
> SPECIAL MASTER PETERSON:  Okay.

(Markman Tr. at 23:3-23.)  For its part, CA argues that the Special Master correctly placed a visual emphasis on content manifestation.  (CA's Claim Construction Response at 17-18 ("As the Special Master correctly concludes, so long as the window object does not appear outside the CME it does not violate the requirement of being 'solely contained within' it.").)  Having summarized the Special Master's proposed construction of the term as well as the parties' corresponding objections and counter arguments, the Court will put forth its own analysis.

## C.    Analysis

The Court's analysis of the disputed phrase "solely contained within" will focus on the

functional aspects of window objects within the context of the patents in suit and then address the deficiencies in the Special Master's proposed construction.

> **1.    The Phrase "solely contained within" Should Be Construed so as to Comport with the Functional Aspects of Window Objects and the Claimed Content Manifestation Environment**

The Court does not base its interpretation of "solely contained within" solely on visual parameters because window objects can deliver content without it being seen by a user.  The Court takes care to note that  a window object can be "solely contained within" a content manifestation environment even when part of it cannot be seen because: (1) window objects, particularly DMODs, "act like any other window such as those within a windows based operating system desktop environment" and (2) the specifications of the '493, '563, and '882 Patents clearly establish that content manifestation is more than what appears on screen.  *See*, *e.g.*, '493 Patent col. 8, ll. 29-34, col. 9, ll. 7-20.  Indeed, windows within a windows based operating system desktop environment can be moved partially out of the viewable display area but still be solely contained within a windows desktop operating environment.  For example, even if one were to move a window object such that only its control section could be seen, the window object would still be contained solely within a content manifestation environment despite the fact that part of it was hidden.  This is analogous to window objects equipped with scroll bars to "allow [for the] management of content that extends beyond a bottom edge of a visible area."  *E.g.*, '493 Patent col. 9, ll. 7-20 (describing the scroll function in modules); *see also*, *e.g.*, '493 Patent fig. 1D.  At this point, a working example may be in order.

Indeed, CA's own implementation of the source code disclosed in the '493 Patent shows that a window object can be solely contained within a content manifestation environment

without being seen.  (Supplemental Decl. of Danny Goodman in Supp. of CA's Objections to the Special Master's R&R as to Anticipation & Obviousness (Dkt. No. 620) ("Second Goodman Supplemental Anticipation and Obviousness Decl."), at 2-3.)  CA's expert, Mr. Goodman, "was asked. . . to reconstruct the browser page of . . . the '493 Patent . . . from the source code . . . displayed within the patent's text."  (*Id.* ¶ 2.)  Although certain typographical errors needed to be corrected and some source code was missing, such as the "d&d.js [file necessary] for dragging and dropping operations," Goodman was able to "reconstruct the rest of the HTML and JavaScript files to . . . load the page into Microsoft Internet Explorer 4."  (*Id.*)

In addition to completing his reproduction, Goodman provided the Court with two screen illustrations.  (*Id.* at 2-3.)  The first screen illustration shows a content manifestation environment displaying "three window objects" corresponding to the "News, Homepage, and Chat" functions.  (*Id.* ¶ 3.)  Goodman's description of the first screen shot provides:

> 3. The following screen illustration shows the results of loading the reconstructed code into an Internet Explorer 4 browser window maximized to fill an 800x600 pixel screen, a very common screen resolution at the time of the patent filing. Because I did not have access to the image files referenced in the code, the browser
>
> displays a placeholder (white box with a red "x" and alternative text) where an image would have appeared. The titlebars of three window objects (News, Homepage, and Chat) can be seen in the initial view.
>
> 4. In this example, the browser window is maximized to fill the display screen. Even in this configuration, one of the window objects (the "Chat" window) is only partially visible.
>
> 5. When I clicked the unmaximize button of the browser window, the browser window reduced in size, as shown in the following screen illustration. This reduces the size of the browser display area.

(*Id.* ¶¶ 3-5.)  A copy of the Screen illustration is shown below:



(*Id.* at 2.)  As one can observe, certain window objects can only be partially seen.  Even so, they are still solely contained within their content manifestation environment.  Though Goodman's initial screen illustration was "maximized to fill an 800x600 pixel screen," his subsequent illustration showed the same web page, but in a web browser window that did not take up the entire screen.  (*Id.* at 3.)  Goodman observed that by reducing the size of the web browser window, the "News window" became only partially visible and the "Chat window" could not be seen at all.  (*Id.* ¶ 6 ("Upon reducing the browser window size, the News window is partially not visible. Additionally, the Chat window is now not visible at all.").)  Goodman's second screen illustration is produced below.



Notably, Goodman does not claim that the "Chat window," which cannot be seen, is not "solely contained within" its content manifestation environment. This is because it is possible for one to scroll further down the web browser in an Internet Explorer 4 web browser. Indeed, just as window objects can be equipped to manage "content that extends beyond a bottom edge of a visible area," the Internet Explorer 4 web browser can deliver content that extends beyond the bottom edge of its visible area. *See generally* '493 Patent col. 9, ll. 7-20 (describing the scroll function in module window objects); col. 2, ll. 18-23 (stating that prior art browsers had "scroll bars" which could be used to "scroll through a relatively large amount of text"). In short, merely because a window object is: (1) partially obscured by another window object; (2) in a portion of the web browser that the user must scroll to, to see; or (3) minimized so that only its control

section can be seen, does not mean that it is not solely contained within its content manifestation environment. Goodman's screen illustrations serve as an excellent visualization of the Court's finding, that the term "solely contained within" should not be based solely on visual perception. Having analyzed the relevant intrinsic evidence and filings on record, the Court will define the term "solely contained within."

### 2. "[S]olely contained within" Defined

The Court interprets "solely contained within" to mean that a window object cannot be moved from or displayed, in whole or in part, outside a content manifestation environment. "Solely contained within" a content manifestation environment includes the following requirements: (1) the user cannot move a window object out of the content manifestation environment; (2) no portion of the window object can be displayed outside the content manifestation environment; and (3) though a portion of a window object may not be displayed or may be obscured or hidden, said window object is still solely contained within a content manifestation environment.

### 3. The Special Master's Recommended Construction Overemphasizes Visual Perception

In view of the foregoing analysis, the Court declines to adopt the Special Master's proposed construction of the term "solely contained within" because it focuses too much on a user's visual perception of a window object. As discussed above, a window object need not be seen to be within a content manifestation environment.

### D. The Court's Ruling on the Phrase "solely contained within"

The Court sustains, in part, Simple's objection to the Special Master's recommended construction of "solely contained within." The Court agrees with Simple, and finds that the

phrase "solely contained within" should not be linked exclusively to the visual representation of a window object but adopts a more detailed construction of the term, which better comports with the behavior of window objects rather than adopting Simple's proposed construction. (*See* Simple's Claim Construction Objections at 16-17.)

## VIII. "[E]xecutes within"

The phrase "executes within" expressly appears in claims 1 and 2 of the '493 Patent, claim 7 of the '563 Patent, and claims 7 and 16 of the '882 Patent.

### A. The Special Master's Proposed Construction

The Special Master interpreted the phrase "[a] window object ***executes within*** . . . said web browser client" to mean "that the window object ***runs inside*** the [web browser] client." (R&R at 161-62 (emphasis added).) According to the Special Master, there was no issue over whether "within" meant "inside." (*Id.* at 161.) The Special Master then noted that the "phrase 'executes within,' . . . does not refer to where a window object appears on the web browser screen." (*Id.*) Rather, as the Special Master pointed out, the "phrase is recited in the context of a 'web browser client,' *e.g.*, 'wherein said each window object executes within and is directly controlled by said web browser client which operates within said data processing system' called for in claim 1 of the '493 [P]atent." (*Id.* at 161-62 (also citing '563 Patent Cl. 7 for the proposition that "'The network client according to claim 6, wherein said at least one corresponding window object executes within the network client.'").) This led the Special Master to construe the phrase "in the context of computers"; in other words, as it was commonly understood by one skilled in the art. (*Id.* at 162.) Citing from various technical dictionaries, the Special Master then concluded that "'[e]xecute,' in the context of computers, simply means

90

'run,' 'perform' or 'operate.'" (*Id.* (citing Computer & Internet Dictionary 200, 488 (3d ed. 1999); Microsoft Computer Dictionary 173 (4th ed. 1999))).  In further clarifying his interpretation, the Special Master stated that "[e]ssentially, the web browser client causes, *i.e.*, processes some set of instructions or performs some action, the window object to be manifested within the CME." (*Id.* at 162.)  This clarifying language was not however part of the Special Master's final construction of the phrase "executes within," rather it was included to add context. Having summarized the Special Master's proposed construction, the Court will discuss CA's objection and Simple's corresponding counter arguments.

### B.  CA's Objection and Simple's Counter Argument

CA objects to the Special Master's definition because it may confuse a jury and instead recommends that his clarifying language also be adopted, "*verbatim*." (CA's Claim Construction Objections at 19 (stating that the Special Mater's "recommended construction – 'the window object runs inside the client' – may inadvertently obscure its meaning because a jury may be confused by how a 'window object' can be said to 'run inside the client.'"); CA International, Inc.'s Reply In Support of Objections To Special Master's Report and Recommendation Regarding Claim Construction (Dkt. No. 599) ("CA's Claim Construction Objections Reply"), at 9-10.)  In affect, CA argues that rather than merely construing "executes within" as "runs inside the [web browser] client," the Special Master should have defined the phrase in greater detail and incorporated his clarifying language as follows: "'the web browser client causes, *i.e.*, processes some set of instructions or performs some action, the window object to be manifested within the CME.'" (CA's Claim Construction Objections Reply at 10 (citing R&R at 162).)  For its part, Simple argues that the Special Master's proposed construction is

clear and need not be altered as suggested by CA. (Simple's Reply to CA's Objection at 14-16.)

**C.     Analysis**

The Court's analysis of "executes within" will focus on the plain meaning of the term at the date of invention.

**1.      One Skilled in the Art at the Time the '493 Patent Was Filed Would Interpret "executes within" to Mean "Runs Inside"**

Since the relevant claim language does not indicate that the phrase "executes within" should be given a special meaning, the Court  will define the phrase as it would be understood by one of ordinary skill in the art.  In fact, the record lacks any evidence that the term "executes within" should be construed other than as it was by one skilled in the art, when the patents in suit were filed.  *Symantec*, 522 F.3d at 1291 (stating that if a patent "specification does not reveal any special definition for . . . [a term, it must be construed] according to [its] . . . ordinary meaning").

As implied by the term "executes," the phrase "executes within" does not refer to where a window object appears on a web browser screen.  Rather, the Court will turn to technical dictionaries to understand the plain meaning of the term since no special meaning has been indicated by the intrinsic evidence on record.  As the Special Master observed, "'[e]xecute,' in the context of computers, simply means 'run,' 'perform' or 'operate.'" (R&R at 162, citing Computer & Internet Dictionary at 200 and 488 (defining 'execute' as '. . . RUN. *Execute* means to perform an action, as in executing a program or a command;' defining 'run as '1. To execute a program. 2. To operate.'); Microsoft Computer Dictionary at 173 (defining 'execute' as 'to perform an instruction).)  Neither the parties nor the Special Master had any issue with construing the term "within" as inside.  (*Id.* at 161.)  Accordingly, a window object will not act as a separate application on the operating system, rather it will run inside a web browser.  For

example, a web browser hosting a single content manifestation environment with three window objects will count as one application level program if each window object executes within the web browser.  However, if the window objects did not execute within the web browser, there would be at least four application level programs running, one of which would be the web browser while the other three would be the window objects running separately on the operating system, as opposed to executing within the web browser client.

### 2. "[E]xecutes within" Defined

In light of the foregoing analysis, the Court adopts the Special Master's interpretation of "executes within."  Accordingly, the phrase "[a] window object ***executes within*** . . . said web browser client" means "that the window object ***runs inside*** the client."  (R&R at 161-62 (emphasis added).)

### 3. Since the Special Master Correctly Focused on the Functional Properties of Window Objects as They Would Be Understood by One Skilled in the Art, There is No Need to Incorporate His "Clarifying" Language

Since the relevant claim language does not indicate that the term "executes within" should be given a special meaning, the Special Master was correct in defining the term as it would be understood by one of ordinary skill in the art.  In addition, the Special Master correctly pointed out that the term "'executes within' does not refer to where a window object appears on the web browser screen."  (*Id.* at 161.)  Accordingly, the Court will adopt the Special Master's recommended construction of the phrase "executes within," without needlessly incorporating his "clarifying" language.

**D.      The Court's Ruling on the Phrase "executes within"**

CA's objection is denied since the Special Master's proposed construction of "executes within" as "runs inside" is sufficiently clear when viewed in context of the relevant claim language.

**CONCLUSION**

In addition to the portions of the R&R which have not been objected to, the Court adopts the Special Master's construction of the following terms: (1) "window object"; (2) "a layer acts independently of other content within a particular HTML document"; (3) "network client"; and (4) "executes within."  The Court declined to adopt the Special Master's proposed construction of the following terms: (1) "content"; (2) "continuously manifested"; (3) "control section"; and (4) "solely contained within."  In sum, the disputed claim terms are defined as follows:

| Term | Definition |
|---|---|
| window object | a module or a layer |
| a layer acts independently of other content within a particular HTML document | the activity associated with a layer, such as moving or resizing, does not depend on other content within a particular HTML document |
| content | any form of digital data stream that may be supplied or sent to a computing system such as a personal computer |
| continuously manifested | delivered without interruption |
| control section | a portion of a window object that contains a module control and enables user control |
| network client | web browser |
| solely contained within | a window object can not be moved from or displayed, in part or in whole, outside a content manifestation environment |

| executes within | the window object runs inside the client |

**SO ORDERED.**

Dated: Central Islip, New York
       March 5, 2009

/s/_____
Denis R. Hurley
Senior District Judge