UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
CA, INC.,

                      Plaintiff,

          - against -

SIMPLE.COM, INC., WIRED
SOLUTIONS, LLC., a revoked Nevada LLC,

                      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM & ORDER**
02 Civ. 2748 (DRH) (MLO)
<u>UNDER SEAL</u>

**APPEARANCES:**

**COVINGTON & BURLING**
Attorneys for Plaintiff
One Front Street
San Francisco, California 94111
By: Samuel F. Ernst, Esq., Robert D. Fram, Esq., Michael M. Markman, Esq., & Leonard Joseph
Martiniak, Esq.

**FARRELL FRITZ, P.C.**
Attorneys for Defendants
EAB Plaza
West Tower-14th Floor
Uniondale, New York 11556
By: John P. McEntee, Esq. & David A. Scheffel, Esq.

**FULBRIGHT & JAWORSKI LLP**
Attorneys for Defendants
225 South Sixth Street, Suite 4850
Minneapolis, Minnesota 55402
By: John E. Lynch, Esq. & Joseph P. Zammit, Esq.

**RIVKIN RADLER LLP**
Attorneys for Defendants
EAB Plaza
Uniondale, New York 11556
By: Celeste M. Butera, Esq. & Stephen J. Smirti, Jr., Esq.

**GALE R. PETERSON, ESQ.**
Special Master
112 E. Pecan Street
Suite 1800
San Antonio, Texas 78205

**HURLEY, Senior District Judge:**

## INTRODUCTION

Plaintiff CA Inc. ("CA"), formerly known as Computer Associates International, Inc., commenced this action seeking a declaratory judgment that three patents owned by Defendants Simple.com, Inc. and Wired Solutions, LLC (collectively "Simple") are invalid, unenforceable, and not infringed by CA. Simple has counterclaimed for infringement. Presently before the Court are the parties' objections to the Report and Recommendation Regarding Infringement ("R&R") (Dkt. No. 561) of Special Master Gale Peterson. For the reasons set forth herein, the objections are denied in part and granted in part.

## I.   Background

A complete factual recitation regarding this matter is contained in this Court's Claim Construction Memorandum & Order, dated March 5, 2009 ("Claim Constr. Mem."), familiarity with which is presumed. For present purposes it suffices to state that the three patents at issue relate to computer technology and are U.S. Patent Nos. 6,272,493, 6,434,563, and 6,535,882 (the '493, '563, and '882 Patents respectively). In general, the subject matter claimed in the '493, '563, and '882 Patents is meant to provide, what the patentee terms, a windowed content manifestation environment ("CME"). An exemplary CME is displayed below in **Figure 1,**[1] a

---

[1]The Court attempted to ensure that the figures reproduced herein are clear images. Nonetheless, many of the figures contained in this Memorandum are best viewed electronically, *i.e.* on a computer screen, as certain features and colors may not be easily perceptible when

copy of Figure 2B from the '493 Patent.

**Figure 1:**



According to the patentee, this was an improvement over preexisting technology because the claimed invention lets one open, view, resize, minimize, move and otherwise use multiple window objects on the same web browser screen, without: (1) triggering a refresh;[2] (2) having to go back and forth from one web page to another; or (3) requiring the use of another web browser. For example, a user could open, resize, move, close or otherwise manipulate the "NEWS" and

_____

reproduced in black and white.

[2] "Refresh" means updating "the displayed web page with the newest content." (Report and Recommendation Regarding Claim Construction (Dkt. No. 559) ("Claim Construction R&R"), at 173.)

3

"TRAVEL" windows, shown above, without forcing the entire CME to be refreshed.  Having

briefly described the technology at issue, the Court will summarize the Special Master's

recommended disposition.

## II.      The Special Master's Recommendation

In his R&R, the Special Master recommended that the Court grant CA's motion for

summary judgment of non-infringement and deny Simple's motion for summary judgment of

infringement.  (R&R at 65, 138-40.)  He based this recommendation on the observation that

there was no genuine issue of material fact that: (1) "the accused products do not contain

'window objects,' do not meet the 'continuously manifested' limitation and do not meet the

limitations of the asserted claims when used with Netscape Navigator"; (2) CA "does not make,

sell or offer  to sell the claimed inventions"; and (3) CA's "UniCenter TNG; CleverPath Portal

SDK v. 4.0, 4.01, 4.5 & 4.51; CleverPath Portal Visualization Preview v. 3.51; UniCenter CA7

Job Mangement Work Station; UniCenter Enterprise Job Manager v. 1.0; [and] BrightStor Test

Drive do not meet the limitations of the asserted claims."  (*Id.* at 138-39.)  The Court will now

summarize the parties' objections.

## III.     Objections

Simple objects to the R&R, maintaining that the Special Master failed to recognize that

CA's CleverPath Portal and related products infringe the '493, '563, and '882 Patents.  (Defs.'

Mem. In Supp. of Their Objections to the R&R (Dkt. No. 567), at 1 ("Simple's Objections").)

According to Simple, the Special Master's recommendation of non-infringement is incorrect

because it is based on an inaccurately construed set of claim terms and, even if the Special

Master's claim construction were correct, he misapplied his own definitions in comparing CA's

infringing software with the claim language at issue.  (*Id.* at 1; Defs.' Reply Mem. In Supp. of Their Objections to the R&R (Dkt. No. 594) ("Simple's Reply Objections"), at 1.)

For its part, CA argues that the Special Master: (1) incorrectly determined that certain claims in the '493, '563, and '882 Patents, which were initially put at issue by Simple, were "*implicitly* withdrawn merely because [(a)] Simple failed to provide any evidence to support" claims that they were infringed "in response to CA's motion for summary adjudication and . . . [(b)] Simple's expert either failed [to] include infringement contentions in his expert report or, in the case of certain claims, affirmatively found that the claims were not infringed"; (2) failed to include additional proof that the CleverPath portlets are not window objects in the R&R; (3) wrongly focused "solely on whether a portlet's act is *affected by other content*"; (4) improperly construed the term "content" and thus wrongly concluded that "changes in a portlet's size, position or display in response to user operations are not instances in which a portlet is affected by 'other content'"; (5) failed to recognize that it is entitled to summary judgment with respect to all the claims of the '563 Patent and claims 1 through 15 of the '882 Patent because "[t]here is no proof that anyone uses a 'customized browser' with CA's accused products"; and (6) incorrectly found that CA's products are used within a customized web browser.  (CA's Objections to the R&R (Dkt. No. 574) ("CA's Objections"), at 1-3 (emphasis in original).)

The parties' objections will be addressed as necessary in the Court's Discussion.  First, the Court shall summarize the legal standards applicable to the case at bar.

## APPLICABLE LAW

**I.      Standard of Review**

**A.      The R&R**

If objected to, findings of fact or legal conclusions recommended by the Special Master

will be reviewed *de novo*.  *See* Fed. R. Civ. P. 72(b); *Thomas E. Hoar v. Sara Lee Corp.,* 900

F.2d 522, 525 (2d Cir. 1990); *see also* Order Formally Appointing the Special Master, Docket

No. 152, at 4 (stating "[r]eview of and appeal from all orders and recommendations, as well as

the

appropriate standard of review shall be governed by Federal Rule of Civil Procedure 72 and

associated case law"); Fed. R. Civ. P. 53(f)(3), (4).  Otherwise, the Special Master's findings of

fact or legal conclusions must be clearly erroneous to be overturned.  *See Benicorp Ins. Co. v.*

*Nat'l Med. Health Card Sys.*, 447 F. Supp. 2d 329, 331 (S.D.N.Y. 2006) (citing Fed. R. Civ. P.

72(b); *Thomas v. Arn*, 474 U.S. 140, 149 (1985)).

**B.      Summary Judgment**

The standard for summary judgment in a patent case is the same as in any other case.  *See*

*Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998); *Union*

*Carbide Corp. v. American Can Co.*, 724 F. 2d 1567, 1571 (Fed. Cir. 1984).  Summary judgment

pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in

the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of

a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  *See*

*Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984).  "In ruling on a motion for

summary judgment, . . . [a court must] view the evidence presented in a light most favorable to

the nonmoving party and . . . draw all reasonable inferences in favor of the nonmoving party." *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 672 (Fed. Cir. 1990). Once a movant has shown the absence of a material issue of fact, the nonmovant must put forth sufficient evidence to show that a reasonable jury could rule in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II. Standard of Law: Infringement

Section 271 of the Patent Act governs infringement and provides that:

> (a) Except as otherwise provided in this title [35 U.S.C. §§ 1 et seq.], whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271(a). An infringement determination is a two step process in which a court must first "determine the scope and meaning" of the asserted patent claims and then compare the "properly construed claims . . . to the allegedly infringing device." *Cybor Corp. v. Fas Techs.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998); *see also Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir.) (en banc), *aff'd*, 517 U.S. 370 (1996). An accused product may infringe literally or under the doctrine of equivalents. "Literal infringement requires that each and every limitation set forth in a claim appear in an accused product." *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.,* 389 F.3d 1370, 1378 (Fed. Cir. 2004) (internal citation omitted). "An accused device that does not literally infringe a claim may still infringe under the doctrine of equivalents if each limitation of the claim is met in the accused device either literally or equivalently." *Telemac*, 247 F.3d at 1330 (citations omitted).

> An element in the accused product is equivalent to a claim
> limitation if the differences between the two are insubstantial. The
> analysis focuses on whether the element in the accused device
> performs substantially the same function in substantially the same
> way to obtain the same result as the claim limitation.

*Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005). An

infringement determination, "whether literal or under the doctrine of equivalents, is a question of

fact." *Fantasy Sports Props. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1113 (Fed. Cir. 2002). A

finding of infringement cannot be avoided with the addition of features or functions to an

embodiment of every element of a claimed invention. *Vulcan Eng. Co. v. Fata Aluminum Inc.*,

278 F.3d 1366, 1374 (Fed. Cir. 2002); *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931,

945 (Fed. Cir. 1990).

Generally the burden of proving infringement is "always" on the patentee and must meet

the preponderance of evidence standard. *Under Sea Indus., Inc. v. Dacor Corp.*, 833 F.2d 1551,

1557 (Fed. Cir. 1987). Even when an alleged infringer has moved for declaratory judgment of

non-infringement, the patent holder still retains the burden of proof. *See, e.g.*, *Glenayre Elecs.,

Inc. v. Jackson*, 2003 U.S. Dist. LEXIS 2332, at *47 (N.D. Ill. Feb. 18, 2003). As such, "an

accused infringer seeking summary judgment of non[-]infringement may meet its initial

responsibility either by providing evidence that would preclude a finding of infringement, or by

showing that the evidence on file fails to establish a material issue of fact essential to the

patentee's case." *Novartis Corp. v. Ben Venue*, 271 F.3d 1043, 1046 (Fed. Cir. 2001). Having

set forth, in general, the legal standard for infringement, the Court will apply specific case law as

needed in its discussion.

**DISCUSSION**

Generally speaking, the Court must answer the following questions: (1) Do CA's accused products contain window objects whose acts are not constricted by other content in the same HTML document?; (2) Does Simple's claim for infringement under the doctrine of equivalents survive?; and (3) Does the Court retain jurisdiction to determine whether all of the claims in the '493, '563, and '882 Patents are not infringed by CA. The foregoing questions will be addressed below *seriatim*.

**I.      CA's Accused Products Do Not Infringe the Patents In Suit Because They Do Not Contain Window Objects**

Rather than addressing each objection raised by the parties, the Court will focus on determining whether CA's accused products feature window objects that act independently of other content. Indeed, this issue is dispositive and lies at the heart of the parties' dispute. What follows is a summary of the Special Master's pertinent recommendations, the parties corresponding objections and counter arguments, and the Court's analysis and ruling.

**A.      The Special Master's Recommendation**

The Special Master began his infringement determination by selecting a representative accused product and then discussing whether it contained window objects that acted independently of other content.[3]  After issuing his substantive recommendations, the Special Master addressed specific arguments raised in the parties' motions for summary judgment of infringement/non-infringement.

_____

[3]The parties' objections and the Court's analysis also focus on this central element of the patents in suit.

9

### 1.    Selecting a Representative Product

Simple accused the following products of infringing the patents in suit:

> (1) CleverPath Portal, versions 3.5, 3.51, 4.0, 4.01, 4.5, 4.51, 4.7
> beta;
> (2) Cleverpath Portal Test Drive;
> (3) UniCenter Management Portal versions 2.0, 3.1;
> (4) Brightstor Portal version 1.0;
> (5) Bizworks Portal, version 1.5; and
> (6) eTrust Security Command Center version 1.0.[4]

(R&R at 13.)  The parties however, agreed "that the appearance and function of the CleverPath Portal is representative of the appearance and function of all the accused portal products."  (*Id.*)  Accordingly, the Special Master focused his analysis on the behavior of "portlets" found in the CleverPath Portal version 3.51 and then applied his recommendations to the remainder of CA's allegedly infringing products.

A screenshot containing an embodiment of the CleverPath Portal is shown below in **Figure 2**.

---

[4]The foregoing will be referred to as CA's "accused products."

**Figure 2:**



The Special Master recognized that it would be necessary to place his interpretation of how a window object, as defined by the patents in suit, would behave independently of "other content" in a "particular HTML document" within the context of CA's CleverPath Portal.   In order to do this, he began by explaining that a "'particular HTML document' appears to be [a] browser's rendition of the HTML document from [a host web page such as] www.windows-website.com,[5] and [that] 'other content' appears to be the items displayed within the browser's" content manifestation environment.  (*Id.* at 25.)  The Special Master then applied these terms to the CleverPath Portal shown above in **Figure 2**.

To begin with, the Special Master observed that the content manifestation environment of the CleverPath Portal contains portlets such as the "'Accounting.html' (the 'Accounting portlet'), 'Advertising and Marketing.html' (the 'A&M portlet'), 'Computers and Software.html' (the 'C&S portlet'), and 'Electronics and Semiconductors.html' (the 'E&S portlet')."  (*Id.* at 30.) The Special Master went on to note that "other content" in the CleverPath Portal's content manifestation environment also specifically includes: "(1) a logo header having the words 'Workplaces,' 'Knowledge,' 'My Profile,' 'Logoff,' 'Help' and 'Search,' (2) a workplace subheader, and (3) a banner indicating unlicensed use."  (*Id.*)  The Special Master then reasoned that while "size and position information from a user, such as dragging and resizing based on the portlet controls, is not 'content[,]' . . . portlet size and position information, not input by a user,

---

[5]In the context of the patents in suit, the relevant source of the HTML document is "www.windows-website.com." *See* **Figure 1** *supra* at 3.  However, put in context of the allegedly infringing products, the relevant source of the HTML document would be a server of web page that provided a user with access to CA's accused products, namely http://192.168.1.106:8080/servlet/portal/?escmd=startup.  *See* **Figure 2** *supra* at 11.

should be considered 'content'" because it is supplied by a server.[6]  (*Id.* at 32.)  In laymen's terms, the Special Master found that other content includes other portlets as well as the header, subheader, banner and anything else displayed in the content manifestation environment of the CleverPath Portal.  Having placed its components and features within the context of the patents in suit, the Special Master went on to determine whether the CleverPath Portal actually infringed any of the claims in the '493, '563, and '882 Patents.

### 2.    Determining Whether Portlets Are Window Objects

The Special Master's infringement recommendation began with determining whether the CleverPath Portal contained window objects as defined by the '493, '563, and '882 Patents. According to the Special Master, "[t]he parties' dispute regarding the existence of 'window objects' in the accused portal products center[ed] about whether so-called 'portlets' created in those products meet the requirement that 'a layer acts independently of other content within a particular HTML document.'"  (*Id.* at 14.)  Prior to issuing his recommendations, the Special Master conducted a detailed analysis in which he identified the acts of a CleverPath portlet as including: "(1) dragging or moving, (2) resizing[,] . . . [(3)] minimizing[,] . . . [(4)] restoring to pre-minimized size . . . ," as well as (5) displaying content, and then determined whether they could be conducted independently of other content.  (R&R at 14-65.)  What follows is a summary of that analysis.

---

[6]The Court will not adopt this portion of the R&R because it runs contrary to the Court's construction of the term "content."  Even so, the Special Master correctly recommended that CA's products do not infringe the Patents in suit.  As a result, the Court adopts the Special Master's finding of non-infringement, but not his reasoning.

### a. The Special Master Recommended That Portlets Cannot Be Moved Independently of Other Content

The Special Master recommended that portlets are not window objects because they cannot be moved independently of other content.  In particular, the Special Master focused on what happened when a user tried to: (1) move a portlet over the logo header of the CleverPath Portal; (2) horizontally move a portlet; and (3) vertically move a portlet.

### (1) Portlets Cannot Be Dragged Over the Logo Header

First, the Special Master observed that portlets cannot be moved over the logo header found in the content manifestation environment of the CleverPath Portal.  (*Id.* at 31.)

> In his demonstration, Mr. Belgard was unable to move the C&S portlet over the logo header.  When Mr. Belgard tried to do so, the C&S portlet stopped moving upward.  However, the mouse cursor continued to move upward to rest briefly on the word [i.e. link] 'Logoff.'  That word changed color, suggesting that the words across the header function in some way when clicked on[.]

(*Id.*)  According to the Special Master, the "inability of Mr. Belgard to move the C&S portlet to overlap the header indicates that the act of moving, at least, is constrained by that header."  (*Id.* at 47.)  **Figure 3** below provides a visual depiction of Belgard's inability to move the C&S portlet over the logo header.

**Figure 3:**



(2)     **The Horizontal Movement of Portlets Triggers Various Changes in the Content Manifestation Environment and Is Constrained By an Invisible Grid**

The Special Master found that, when portlets are moved horizontally, they trigger various changes in their content manifestation environment but cannot be moved freely.  To begin with, the Special Master noted that a portlet can cause other portlets in its content manifestation environment to move as a result of being dragged, horizontally, to another location.  For example, the Special Master observed that when the "Accounting portlet moves, primarily three

15

things happen: (1) it 'snaps' to a position relative to the other portlets, (2) it takes the width of the column to which it jumps, and (3) it changes to blue for the duration of the move." (*Id.* at 42.)  The Special Master then noted that when the "C&S portlet [was] moved to an empty space to the right of the columns," and dropped, it "remained at the top of a third column (from the left)" and caused the "E&S portlet [which was] below it" to move up and take its place, as shown below in **Figures 4 and 5**. (*Id.* at 42-43.)

**Figure 4:**



**Figure 5:**



The Special Master further observed that the "C&S portlet 'snapped' to a position near the second column, *i.e.*, the gap between the columns remained constant despite dropping the C&S portlet some distance away from the second column from the left." (*Id.* at 43.) Based upon these observations, the Special Master concluded that when portlets are moved horizontally their position is "constrained by, and depends on, 'other content,' and appears not to meet the definition of 'window object.'" (*Id.*) The Special Master then detailed the behavior of portlets when they are moved vertically, both up and down a column.

**(3)      The Vertical Movement of Portlets Triggers Various
Changes in the Content Manifestation Environment
and Is Constrained By an Invisible Grid**

The Special Master found that portlets fail to move independently of other content when

they are moved down a column in their content manifestation environment because they cause

other portlets in the same column to change their location.  (*Id.* at 44-46.)  The Special Master

also noted that the repositioned portlet "automatically resizes to adopt the width of the column

into which it is moved, as well as . . . the height of the adjacent portlet."  (*Id.* at 46.)  The Special

Master further observed that a "snapping" feature prevents portlets from either partially or

wholly covering any other portlets when they are moved.  According to the Special Master, this

was further proof of a portlet's dependence on other content.  (*Id.*)

The Special Master then addressed the significance of the fact the portlets turn blue when

they are moved.

> Also . . . , when moved, the C&S portlet, along with all of the other
> portlets, turn blue for the duration of the move.  That is, the act of
> displaying information in the C&S portlet is interrupted.
> However, it is not clear why that takes place, or that it occurs as a
> result of "other content within [the] HTML document."  It is
> impossible, therefore, to determine on the present record if turning
> blue is an instance in which the Accounting portlet does not meet
> the definition of "window object."

(*Id.* at 50.)  In other words, the Special Master found that because CA failed to explain the

source code which caused portlets to turn blue when they are moved, it was unclear whether this

change in appearance qualified as further proof that they were not window objects that acted

independently of other content.[7]  (*Id.*)  The Special Master then turned his focus to determining

---

[7]The Special Master does not, however, recommend that there is a genuine issue of
material fact over whether portlets do not continuously manifest content when they turn blue.

whether portlets could be resized independently of other content.

> **b.**  **Resizing**

The Special Master observed the behavior of portlets when they are both horizontally and vertically resized.  Each action is summarized below.

> **(1)**  **The Special Master Found That Portlets Can Be Horizontally Resized Independently of Other Content**

According to the Special Master, a portlet may be "resized in four ways: (1) changing width, (2) changing height, [(3)] minimizing[,] and (4) restoring to its pre-minimized size."  (*Id.*) The Special Master observed that changing the width of a portlet resulted "in resizing the width of all of the portlets in that row."  (*Id.* at 51-52.)  This behavior is illustrated below in **Figures 6** and **7**.  **Figure 6** depicts the content manifestation environment of the CleverPath Portal while a user is changing the width of the C&S portlet.  **Figure 7** depicts the content manifestation environment of the CleverPath Portal after a user has finished changing the width of the C&S portlet.

19

**Figure 6:**



**Figure 7:**



The Special Master further observed that a user "may not widen a portlet such that it overlaps another portlet." (*Id.* at 53.) Based on these observations, the Special Master concluded that horizontal resizing was not constricted by other content because it does not: (1)"appear to involve 'snapping;'" (2) depend "on the size and position information of the other portlets"; or (3) seem to be restricted by the header. (*Id.*) Thus, according to the Special Master, portlets act independently when they are horizontally resized. (*Id.*) The Special Master then discussed whether portlets could be resized vertically without being constricted by other content.

**(2)    The Special Master Found That Portlets Cannot Be
Vertically Resized Independently of Other Content**

According to the Special Master, the ability to vertically resize a portlet is constricted by the header.  (*Id.* at 54, 55.)  In particular, the Special Master observed that a window object cannot be vertically enlarged so that it overlaps the header in the CleverPath Portal's content manifestation environment.  (*See id.*)  The Special Master also observed that a portlet can be resized vertically by dragging its bottom edge up or down.  (*Id.* at 54.)  As noted by the Special Master, "moving the bottom edge of . . . [a] portlet upward, [causes] the portlets below it [to] move upward."  (*Id.* at 55.)  **Figures 8** and **9**, shown below provide a visual depiction of the content manifestation environment of the CleverPath Portal while its portlets are being vertically resized.

**Figure 8** below depicts the CleverPath Portal while the C&S portlet is being vertically resized.

**Figure 8**:



Figure 9 below depicts the CleverPath Portal after the C&S portlet has been resized.

**Figure 9:**



Having addressed vertical resizing, the Special Master turned to whether portlets could be minimized independently of other content.

> c.   **The Special Master Found That Portlets Can Be Minimized and Restored Independently of Other Content**

According to the Special Master, portlets can be minimized and restored independently of other content.  (*Id.* at 56-57.)  The Special Master based his recommendation on three observations: (1) "[t]here appears to be no 'snapping' or other constraint involved when minimizing a portlet"; (2) rather, when a portlet is minimized, it merely causes the portlet below it to "move up" and take its position in a column; and (3) restoration of a portlet "simply results in restoration to preminimized size."  (*Id.*)  The Special Master then discussed whether portlets

were able to remain independent of other content when other portlets in the same content

manifestation environment were acted upon.

> **d.**   **The Special Master Found That Portlets Reacting to User Manipulation of Other Portlets Act Independently of Other Content**

According to the Special Master, portlets which are repositioned or resized when a user

moves, resizes, minimizes or restores another portlet, act independently of other content because

information provided by the user, such as new size and position information is not content.  (*Id.*

at 57-59.)[8]  The following excerpt conveys the Special Master's reasoning as to why portlets

which change in size or location as a result of user interactions with other portlets still act

independently of other content.

> [W]hen the Accounting portlet "snaps" into the left column below the A&M portlet, the C&S portlet must move further down the column.  In other words, the C&S portlet is constrained by, and thus depends on, at least the size and position information of the Accounting portlet.  However, ***because it is the user that provides the size and position information for the Accounting portlet by dragging it, that size and position information is not a "digital data stream that may be supplied or sent" to the web browser. Thus, once again, that information should not be considered "content"*** within the meaning of the patents-in-suit.  ***Thus, the C&S portlet, although dependent on the size and position information of the Accounting portlet, acts independently of other content in the HTML document*** . . . at least in this instance.

(*Id.* at 58-59 (emphasis added).)  The Special Master applied this same reasoning to his

recommendation that portlets which are: (1) narrowed when other portlets in the same column

are narrowed; or (2) elongated when other portlets in the same column are shortened, act

---

[8]The Court does not adopt the Special Master's recommendation with regard to this issue. Unlike the Special Master, the Court finds that content can be supplied by any source, even a user.  Nonetheless, the Court agrees with the Special Master's finding of non-infringement.

independently of other content.

> Similarly, **when the Accounting portlet is narrowed** in width by
> dragging its side, **the A&M and C&S portlets are also narrowed**.
> That is, from the A&M and C&S portlets' point of view, the act (or
> reaction) of resizing depends on the size information of the
> Accounting portlet. **That size information, however, is not
> "content"** *per se* for the foregoing reason – **it was provided by the
> user.** The **same may be said** for what happens **when the A&M
> portlet is resized by dragging its bottom edge upward – the
> portlets below that portlet move upward to follow the bottom
> edge, but that is not dependence on "other content." Likewise,
> when the A&M portlet is minimized, the portlets below it move up
> to stay adjacent that portlet.** Of course, as Simple points out, the
> bottom portlet in a row may be minimized without affecting the
> size or position of the other portlets in the column or any other
> column. Nevertheless, **the reaction of the other portlets to the
> acting portlet in the foregoing situations is independent of "other
> content" because the size and position information of the acting
> portlet is not "content."** From the "reacting" portlets' point of
> view, then, such actions are generally independent of "other
> content" within the HTML document.

(*Id.* at 59 (emphasis added).) Overall, the Special Master concluded that portlets do not perform

all of their acts independently of other content. (*Id.*) After detailing the acts of portlets featured

in CA's Cleverpath Portal, the Special Master addressed Simple's arguments that: (1) the "acts

independently" limitation need not apply to every act of a window object; and (2) "[a]n accused

device infringes a patent if it is capable of satisfying the claim limitations, even if it is also

capable of non-infringing modes of operation." (*Id.* (citations omitted).)

### 3.   The Special Master Was Not Persuaded By Simple's Arguments that Portlets Were Window Objects Even Though They Did Not Perform All of Their Acts Independently of Other Content

The Special Master thoroughly addressed Simple's arguments in favor of infringement

and, as discussed below, found them to unpersuasive.

a.      **The Special Master Recommended That the Acts Independently Requirement Apply to All the Acts of a Window Object**

Based on his interpretation of the specifications of the patents in suit, the Special Master recommended that the acts independently requirement apply to all the acts of a window object. The following excerpt from the R&R conveys the Special Master's reasoning:

> While it is helpful to view each "act" individually in light of the "acts independently" requirement, ***the ultimate determination of infringement or non-infringement does not rest on one, or two or more "acts" taken in isolation***. The patents plainly require that all "acts" be accomplished "independently of other content * * *."
> . . . .
> Accordingly, the "acts independently" characteristic must be read as applying to all "acts" of a layer. At the very least, that requires that moving and resizing be independent of "other content."

(*Id.* at 64-65.) The Special Master then distinguished the case at bar from instances where the Federal Circuit held that "[a]n accused device infringes a patent if it is capable of satisfying the claim limitations, even if it is also capable of non-infringing ***modes*** of operation." (*Id.* at 59-65 (discussing *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336 (Fed. Cir. 2001)) (emphasis added).)

According to the Special Master, Simple inappropriately relied on *Hilgraeve.* (*Id.*) In particular, the Special Master reasoned that the "non-infringing" ***modes*** of operation in *Hilgraeve*, were distinguishable from the individual ***acts*** window objects can perform without being constricted by other content. (*See id.* at 63-64.) In laymen's terms, since a mode of operation consists of multiple acts in a predefined grouping, it is logically inconsistent to say that one act or an arbitrarily defined subset of acts is equivalent to one mode of operation. Consequently, the Special Master recommended that portlets were not window objects because

27

they could perform only some of their acts independently of other content.  Having summarized

his general premise, the Court provides a more detailed summary of the Special Master's

analysis of *Hilgraeve.*

According to the Special Master, the issue in *Hilgaeve* was whether the accused virus

detection software "screened incoming digital data for viruses during transfer and before

'storage' on the destination storage medium."  (*Id.* at 61.)  The Special Master noted that the

Federal Circuit adopted the district court's interpretation of the term "storage" as "occurring

'when the incoming digital data is sufficiently present on the destination storage medium so that

any viruses contained in the data can spread and infect the computer system.'"  (*Id.* (quoting

*Hilgraeve*, 265 F.3d at 1339).)[9]  The Special Master then reasoned that for Symantec's products

to infringe, they would have to scan data files for viruses ***before*** they were "stored."  (*Id.*)  In

other words, before they were "sufficiently present on the destination storage medium so that

any viruses contained in the data . . . [could] spread and infect the computer system."  (*Id.* (citing

*Hilgraeve Corp.*, 265 F.3d at 1349).)  "Hilgraeve contended that several Symantec products,

including . . . Norton Antivirus ('NAV') . . . , infringed . . . [the patent at issue because they]

screened incoming digital data for viruses during transfer and ***before*** 'storage' on the destination

---

[9]In laymen's terms, a data file is not "stored" onto a computer the instant it is received by the computer, rather it may have to be processed and/or moved to a destination before it is considered "stored."  A step by step example may clarify the situation.  First, a computer is connected to the Internet.  Next, a file is transferred over the Internet to the computer.  Notably though, the file is not, technically speaking, stored on the computer the moment it is received.  Rather, in the context of *Hilgraeve*, a file is only stored on a computer when it is transferred to a place within the computer where, if infected with a virus, it can spread and infect the entire computer system.  Presumably, this is the subsequent step which renders a file in "storage."

To place this digital example in analog terms: groceries left on the front doorstep of a house are not stored in the house.  Rather the "storage" of groceries only happens once they have been placed in the house and put away in a cupboard or refrigerator.

storage medium." (*Id.* at 60-61 (emphasis added).)  The Special Master observed that in *Hilgraeve,* Symantec's expert argued that their products, including the NAV program, did not infringe Hilgraeve's patent because they placed data files into a "storage medium . . . [which made them] accessible to the operating system and other programs" ***and then*** scanned them for viruses.  (*Id.* (citing *Hilgraeve Corp.*, 265 F.3d at 1342).)

The Special Master noted that as proof of non-infringement, Symantec submitted various tests conducted by its expert to show that their products "stored" data files before scanning them for viruses.  (*Id.* at 61-63 (citing *Hilgraeve Corp.*, 265 F.3d at 1343-44).)  However, the Federal Circuit took issue with these tests and "concluded that they did not represent 'normal operating conditions.'"  (*Id.* (citing *Hilgraeve*, 265 F.3d at 1343-44).)  For example, in the first disputed test, Symantec's expert "shut off power to the computer" while a data file was being transferred to the computer.  (*Id.* at 62 (citing *Hilgraeve*, 265 F.3d at 1343-44).)  During the second disputed test, "he restarted the computer instead of shutting off its power, prior to scanning by NAV."[10] (*Id.* at 62 (quoting *Hilgraeve*, 265 F.3d at 1343-44).)  In the third disputed test, he "downloaded an infected file to a computer running both NAV and McAfee's anti-virus screening program, VirusScan" and argued that because "VirusScan[, another program,] intercepted and examined the file before NAV screened it for viruses," NAV did not infringe Hilgraeve's patent.  (*Id.* at 62-63 (quoting *Hilgraeve*, 265 F.3d at 1343-44).)  Finally, in the fourth disputed test, Symantec's expert "loaded into memory NAV and a special program" capable of "intercepting a

---

[10]In computers running the Microsoft Windows operation system, the user can, among other options, "Shut Down" her computer or "Restart" it.  The Shut Down option powers the computer down (turns it off) while the Restart option powers the computer down and then automatically turns it back on again.

particular file while the file is being downloaded and redirecting the file to the computer's

storage medium." (*Id.* at 63 (quoting *Hilgraeve*, 265 F.3d at 1343-44).)  Consequently, as the

Special Master noted, when Symantec's expert "downloaded the particular file, which contained

a virus, it was intercepted and redirected to the storage medium by the special program before it

could be screened by NAV for viruses." (*Id.* (quoting *Hilgraeve*, 265 F.3d at 1343-44).)

As shown in the following excerpt, the Special Master concluded that Simple was

inappropriately trying to isolate each individual act of a window object as a mode of operation,

when instead, a normal mode of operation encompassed ***every*** act of a window object.

> In the present case, Simple appears to view each portlet
> "act" as a "mode of operation."  But that is not analogous to the
> sort of "mode" discussed in *Hilgraeve*.  In *Hilgraeve*, the "modes
> of operation" were a normal mode and several "unusual" modes of
> operation contrived by Symantec's expert. . . . Here, though,
> Simple has not pointed to any unusual modes of operating the
> CleverPath Portal.  The parties agree on how the CleverPath Portal
> operates, and experts for the parties appear to have analyzed that
> product in its normal mode of operation.  ***Thus, only the "normal"***
> ***mode of operation for the CleverPath Portal is at issue, and that***
> ***is the focus of the infringement analysis.***
> Again, ***it is clear that the portlets do not wholly "act[ ]***
> ***independently" of other content in the HTML document.  As***
> ***discussed above, some portlet "acts" appear not to be***
> ***independent of "other content," such as moving and resizing***
> ***vertically.***  Other "acts," such as resizing horizontally, appear to be
> independent of "other content."  The question thus arises: Do the
> claims require that *all* acts of a "window object" be independent?
> ***The Markman RR noted that the parties did not appear to dispute***
> ***that was the case, i.e., the limitation "acts independently" applies***
> ***to all acts.***

(*Id.* at 63-64 (emphasis added).)  As shown in the foregoing excerpt, the Special Master

concluded that *Hilgraeve* fails to advance Simple's argument because the non-infringing uses in

that case were unusual modes of operation and specially contrived by the alleged infringer's

expert witness, whereas, in the case at bar, moving and resizing a window object can hardly be termed as contrived or unusual.  (*Id.*)  Having addressed what he found to be Simple's misunderstanding of *Hilgraeve*, the Special Master issued his recommendation on whether portlets could be considered window objects.

> **b.    The Special Master Recommended That Portlets Could Not be Considered Window Objects Because They Did Not Act Independently of Other Content**

According to the Special Master, CA's motion for summary judgment of non-infringement should be granted based on the undisputed facts on record.  (*Id.* at 65.)  The Special Master based this recommendation on his observation that there "is no dispute" that "a portlet at least cannot [: (1)  move without 'snapping' into a position *vis-à-vis* other portlets, along with resizing" or (2) "overlap the logo header or subheader."  (*Id.*)  What follows is a summary of the parties' relevant objections.

### B.    The Parties' Arguments

The Court will summarize the parties' objections and counter arguments as they relate to the Special Master's recommendation that CA's accused products do not infringe the patents in suit because they do not have window objects that act independently of other content.  Although the parties raise various objections, the Court need only address certain issues.  The Court begins with a recitation of Simple's objections and then proceeds to CA's arguments.

### 1.    Simple's Objections

Simple argues that: (1) the Special Master incorrectly applied his own claim construction to find that CA's products did not infringe the patents in suit; (2) CA's accused products infringe the patents in suit because the Federal Circuit does not require that an accused product infringe

at "all times" to be in violation of the Patent Act; (3) the accused products infringe because they contain DIV objects which must be window objects; and (4) portlets in CA's accused products infringe the patents in suit because they are window objects in the specific instances when they act independently of other content.  CA counters by arguing that its accused products do not contain window objects, Simple misconstrues the relevant case law, and that a DIV object is not necessarily a window object.  These arguments will be discussed in further detail below.

### a.    Simple Argues That the Special Master Incorrectly Applied His Own Claim Construction

Simple maintains that the CleverPath Portal infringes, even if it does not infringe at all times.  (Simple's Objections at 2.)  According to Simple, the only basis for the Special Master's "conclusion that the CleverPath Portal does not infringe at least claim 1 of the '493 Patent was the purported absence of at least one 'window object.'"  (*Id.* at 3.)  Simple contends that the Special Master reached this conclusion by ignoring his own construction of "acts independently" and inappropriately adding the limitation that the "'acts independently' characteristic must be read as applying to 'all' acts of a layer."  (*Id.* at 4; Simple's Reply Objections at 4.)  According to Simple, "anytime a portlet is used in normal operation to resize width, minimize, or display content . . . , and is not also used to move or vertically resize, then all of the acts actually carried out are independent of other content."  (Simple's Reply Objections at 5.)  According to Simple, the Special Master's errors were further compounded by his misconstrual of other relevant claim terms.

Simple maintains that the Special Master failed to recognize that the CleverPath Portal infringes at least claim 1 of the '493 Patent, because he misconstrued the terms "content" and "acts independently."  (*Id.* at 2-3.)  Simple argues that the Special Master's interpretation of

these terms led to the inappropriate exclusion of TMODS, a preferred embodiment of the patents in suit.[11]  (*Id.* at 2-3.)  Simple also contends that the "Special Master's expansion of the term 'content' to include 'window object size and position information' improperly limit[ed] the scope of the claims of the" patents in suit and led to the inaccurate finding that the CleverPath Portal does not infringe.  (*Id.* at 3.)  Simple further asserts that if the Court were to limit "content" to "refer exclusively to things that are displayed on the computer screen within a window object," it would find that the CleverPath Portal infringes the '493, '563, and '882 Patents.  (*Id.* at 4.)  Simple then argues that their objections are supported by relevant precedent.

### b.     Simple Argues That CA's Accused Products Infringe Under Applicable Federal Circuit Precedent

According to Simple, CA's CleverPath Portal infringes the patents in suit because the "Federal Circuit has never held that an apparatus cannot infringe unless it infringes at *all* times." (Simple's Objections at 4.)  Rather, Simple points out that "'an accused product that sometimes, *but not always*, embodies a claimed method nonetheless infringes.'"  (*Id.* at 4-5 (quoting and adding emphasis to *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995); citing *Hilgraeve*, 265 F.3d at 1343; *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991); and *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 20 (Fed. Cir. 1984)).)  According to Simple, the foregoing case law compels a finding that the CleverPath Portal infringes "at least claim 1 of the '493 Patent"

---

[11] A TMOD is a module type window object, with a control section and content display section that the patentee claims must remain in a tiled arrangement (adjacent to but not overlapping other window objects).  (*See* Claim Constr. Mem. at 21-24.)  The Court and Special Master have found that TMODS which remain tiled are not disclosed by the patents in suit. (*Id.* Discussion § III.C.8 at 51-56.)

because portlets in its content manifestation environment can perform certain tasks, "such as resizing horizontally," independently of other content.  (*Id.* at 5-7, 9-16.)  Simple then goes on to mount an argument based on the glossary definition of the term window object as found in the '493, '563, and '882 Patents.

### c.    Simple Argues the Portlets in the CleverPath Portal Are Infringing Window Objects

According to Simple, even if the Court were to apply the Special Master's improper construction of the term "window object," the CleverPath portlets would still infringe the patents in suit because they "are nested DIV objects."[12]  (*Id.* at 16-18.)  Simple's argument can be syllogized as follows: (1) the Special Master defined a window object as a layer or module; (2) modules, as window objects, "may be recursively referenced, i.e., nested"; (3) CleverPath portlets are nested DIV objects; and therefore (4) Cleverpath portlets are "by definition 'window objects.'"  (*Id.* at 16-17 (citations omitted); Simple's Reply Objections at 6 ("[A] recursively referenced DIV object *must* be a module").)

### d.    Simple Argues That the Portlets in CA's Accused Products Are Window Objects When They Act Independently of Other Content

Simple also argues that since portlets can be resized horizontally, minimized, and display content independently of other content, the record evidence establishes that CA's CleverPath portal contain window objects and infringe the patents in suit.  (*Id.* at 17-18 (emphasis in original, bracketed text added).)  The excerpt below conveys Simple's argument in support of

---

[12]A "DIV" object/element "[s]pecifies a container [within a content manifestation environment] that renders HTML[/content]."  *See* Microsoft Developer Network web page, at http://msdn.microsoft.com/en-us/library/ms535240(VS.85).aspx (last visited Feb. 24, 2009).

their position:

> In addition, according to the Special Master, a "window object" is "a module or layer."  . . .  A "module" according to the Special Master, must be a "layer."  . . . A "layer" must "act[] independently of other content within a particular HTML document."  . . .  Logic dictates that a portlet that does *not* "act[] independently of other content within a particular HTML document" *cannot* be a "layer" under the Special Master's claim construction.  . . .  Thus, portlets that are moved or vertically resized, both of which the Special Master found *not* to be "independent[] of other content" . . . *cannot* be "layer[s]" under the Special Master's construction.  . . .  Conversely, *only* portlets that conduct the activities of resizing width, minimizing, and displaying content, all of which the Special master found to be "acts indendent[] of other content" . . . *can* be "layer[s]." . . . Thus if a portlet is a "layer," then it is also, by definition, a "window object," and the "acts independently" characteristic necessarily applies to *all* acts it undertakes. . . .

(*Id.* at 17.)  In other words, Simple urges that CleverPath portlets infringe and are layers when they are resized horizontally, minimized and display content but are not layers and do not infringe when they are "moved or vertically resized" because those actions are not conducted independently of other content.  (*Id.*)  Having summarized Simple's relevant objections, the Court turns to CA's counter arguments.

## 2.    CA's Arguments

According to CA, "[t]he error in Simple's logic is in its statement that if the portlet can do some acts independently – *e.g.,* horizontal resizing – it must be a layer as defined in the patent."  (CA's Resp. To Simple's Objections To the R&R (Dkt. No. 584) ("CA's Resp. To Simple's Objections"), at 8, 4.)  CA also contends that Simple misapplies precedent because: (1) in *TM Patents*, *L.P. v. Int'l Business Machines Corp.*, 121 F. Supp. 2d 349 (S.D. N.Y. 2000), the alleged infringer successfully argued that the relevant claim language, "each message" precluded the finding of part time infringement, which Simple argues for; (2) Simple's reliance on *Intel* is unavailing because the claim language in that case could be infringed by a device that was

merely capable of performing a certain task while the language of the patents in suit actually require that all the acts of a window object be independent of other content; and (3) *Hilgraeve*, *Bell Commc'ns*, and *TM Patents*, relied upon by Simple, are distinguishable from the case at bar because they involve "method claims as opposed to system claims." (*Id.* at 4-5.) CA also argues that "[w]hile it is true that some window objects may be DIV objects, it is not true that all DIV objects are window objects" because, "[i]n order to be a 'layer,' a nested DIV object must still meet other requirements, namely, that it 'acts independently of other content.'" (*Id.* at 7.) In its objections, CA argues that if the Special Master had correctly interpreted the terms "acts independently" and "content" he would have found further proof that the patents in suit were not infringed. (CA's Objections at 10-11; CA's Reply in Supp. of Their Objections to the R&R (Dkt. No. 598) ("CA's Reply In Supp."), at 4.)

### C.   Analysis

The following issues form the crux of the parties' objections: (1) whether portlets, which perform some of their acts independently of other content, qualify as window objects and infringe the patents in suit; and (2) whether the Special Master used properly construed claim terms while conducting his infringement analysis. The Court will first determine whether the record evidence indicates that portlets are window objects,[13] and then reinforce its conclusion with an analysis of relevant case law.[14] What immediately follows is the Court's determination of whether portlets are window objects.

---

[13]Section I.C.1 *infra*.

[14]Section I.C.2 *infra*.

1.    **CA's Portlets Are Not Window Objects Because They Do Not Perform All of Their Acts Independently of Other Content**

The Court begins by determining whether CA's portlets are window objects that act independently of other content.  In order to perform this analysis, the Court will first provide its construction of the term "content," as well as the phrase "independently of other content" and then place them in the context of the Cleverpath Portal, as these terms go to the heart of the matter.[15]

a.    **Content**

In the context of the patents in suit, the Court construes the term "content" to mean "'any form of digital data stream that may be supplied or sent to a computing system such as a personal computer.'"  (Claim Constr. Mem. at 30 (citing '493 Patent col. 5 ll 46-48).)  This "includes but is not limited to: (1) information delivered to a user; (2) window object attributes such as size and location; (3) the address of a network client source; and (4) window object instructions." (*Id.* at 30.)  Moreover, unlike the Special Master, the Court finds that content can be supplied from any source, including user interaction with the content manifestation environment.  (*Id.* at 30-34.)  Accordingly, position and size information generated when a user moves, resizes, minimizes, restores, or otherwise acts upon a window object within its content manifestation environment is considered other content under the Court's broader construction of the term.  (*Id.*) The Court will now provide its definition of the phrase "independently of other content."

---

[15]Like the Special Master, the Court will apply its infringement analysis of the CleverPath Portal portlets to all of CA's accused products.  Consequently, if portlets are not found to be window objects that act independently of other content, CA's motion for summary judgment of non-infringement will be granted.

### b.      Acts Independently of Other Content

Like the Special Master, the Court construed the phrase "a layer acts independently of

other content" to mean that "'the activity associated with a layer, such as moving or resizing,

does not depend on [and cannot be constricted by] other content within a particular HTML

document.'"  (*Id.* at 48 (citing Claim Construction R&R at 139).)  In other words, "the acts of a

layer are not subject to control by other content," and they "do not require or rely on other

content."  (Claim Construction R&R at 117.)  The acts of a window object include: "(1) scaling;

(2) dragging; (3) resizing; (4) minimizing; (5) maximizing; (6) being made to pop up; (7) being

closed; (8) manifesting content such as text; and (9) playing sound."  (*Id.* at 48, n.18.)  Aside

from popping up, to the extent that these acts are performed by a layer, they cannot be

constricted by or dependent on other content "in the same HTML document."  (*Id.* at 48.)

Nevertheless, when construing the term "acts independently of other content" one must account

for the fact that layers can be impacted by other content in the same content manifestation

environment.

As explained in the excerpt below, the phrase "acts independently of other content"

cannot be interpreted in an absolute manner.

> Any definition of "acts independently" cannot require absolute
> autonomy on the part of all layers at all times since: (1) actions in
> one window object can cause a new layer to "pop-up"; (2) actions
> in one window object can lead directly to the display of
> information in another layer; and (3) certain layers are used to
> display information not destined for other window objects in a
> content manifestation environment.  *E.g.*, '493 Patent col. 6, ll. 27-
> 30, col. 10, ll. 33-52.  For example, one embodiment of a "layer" is
> a "Content Manifestation Layer or CML."  *E.g.*, '493 Patent col. 6,
> ll. 32-36.  CMLs can be made to "pop-up "based on operations
> occurring within a[nother] Module" in the same content
> manifestation environment, such as when a user clicks on a link or

38

scrolls her mouse over a certain portion of an active module.  *See id.*  Another embodiment of a layer is a "Fixed layer or FL," which is a "static, always visible" layer used to display information not destined for other window objects within the same content manifestation environment.  '493 Patent col.6, ll. 27-32, col. 10, ll. 33-52.

(*Id.* at 47.)  Accordingly, window objects can "act independently" of other content while reacting to certain user interactions with other window objects or portions of the content manifestation environment, as described above.  The focus now shifts to applying the Court's claim construction to the CleverPath Portal and the portlets utilized therein.

> ### c.     Independently of Other Content in the Context of the CleverPath Portal

Like the Special Master, the Court finds that "other content" in the CleverPath Portal includes everything displayed in its content manifestation environment including portlets, the logo header, the workplace subheader and a banner indicating unlicensed use.  (R&R at 25, 30.) However, unlike the Special Master, the Court finds that "other content" can also include size and position information caused by user manipulation of portlets in the content manifestation environment of the CleverPath Portal.  This is because the Court recognizes that content can come from *any* source and is not limited to data sent from a server over an electronic data network.  Accordingly, for a portlet to be considered a window object, a user must be able to act upon it without being constricted by other portlets, the logo header, workplace subheader, banner indicating unlicensed use, and size and position data, including such data created as a result of user interaction with the CleverPath Portal's content manifestation environment.  For example, a portlet does not act independently of other content if its movement is constricted by another portlet, whether or not a user has dragged that portlet from its original location.  Having placed

the phrase "acts independently of other content" in the context of the CleverPath Portal, the Court will determine whether portlets are window objects.

### d.      Portlets Do Not Act Independently of Other Content

Based on the undisputed facts on record, portlets cannot be window objects because they do not perform all of their acts independently of other content.  As the Special Master observed, portlets cannot be moved or vertically resized without being constricted by the logo header in the CleverPath Portal.  In addition, when a portlet is moved to another location, it: (1) snaps to a position relative to other portlets; (2) takes the width of the column it snaps into; and (3) cannot be placed on top of other portlets.  In short, the ability to move a portlet is constricted by other content.  As such, the record contains no evidence that portlets are window objects, under either the Special Master's construction of the term "content" or the Court's.[16]  Since every claim of the '493, '563, and '882 Patents require at least one window object, none of them are infringed by CA's accused products.  The focus now turns to addressing why Simple's arguments that portlets are window objects are without merit.

### e.      All Acts of a Window Object Must Not Be Constrained by Other Content

Simple argues that window objects need not always act independently to meet the "acts independently" limitation found in the glossaries of the patents in suit.  (Simple's Objections at 4.)  However, as the Special Master correctly pointed out, the '493, '563, and '882 Patents

---

[16]Since the Court applies a broader definition of "content," which includes size and position information that is altered and/or generated as a result of user interaction, it will not adopt the Special Master's reasoning but agrees with his recommendation that portlets do not act independently of other content.

require that all the acts of a layer remain independent of other content.[17]  (R&R at 64-65 (citing '493 Patent col. 5, l. 65 - col. 6, l. 8).)  An analysis of the patents in suit clearly supports the Special Master's recommendation.  To that point, a layer type window object is defined as follows:

> A layer is a WWW browser content display section produced within a content manifestation environment (CME) including, but not limited to, any object within an HTML document that may be scaled, dragged, or otherwise operated upon such as an IMG object, a SPAN object, a DIV object, a form element, etc. and which may be associated with program logic such as within a script, etc.
>
> A layer has its own properties including, but not limited to, a name, etc. within an HTML rendition model such as those defined by DHTML standards.
>
> Additionally, a layer acts independently of other content within a particular HTML document.

*E.g.*, '493 Patent col. 5, l. 65 - col. 6, l. 8 (formatting added).  Based on this language, the Special Master correctly reasoned as follows:

> [T]he first sentence [defining a layer type window object] plainly describes two "acts" of a layer, namely, "scaled" and "dragged" – or, put differently, moving and resizing. . . .  The last sentence simply requires that "a layer acts independently * * *" – and that includes the two "acts" of moving and resizing.  The last sentence does not say that a layer sometimes acts independently.  Rather, the last sentence clearly refers to all of the acts earlier mentioned in the definition.  Accordingly, the "acts independently" characteristic must be read as applying to all "acts" of a layer. . . .

(R&R at 64-65.)  The Court agrees and finds no indication whatsoever that the patentee intended

---

[17]It is already established that window objects must have at least the qualities of a layer since a window object is defined as a layer or module and a module is simply a layer with a separate content display and control section.  (*See* Claim Constr. Mem. at 44-46 (citing *e.g.*, '493 Patent col. 5, l. 64 - col. 6, l. 8).)

for some of the acts of a layer to be independent while others could be constricted by other content.  In addition, as the Court has already established that the Special Master's construction of the phrase "independently of other content" does not ***inappropriately*** exclude TMODs, it need not readdress Simple's objections to the contrary.  (*See* Claim Constr. Mem. at 51-56.)  The focus now turns to addressing why: (1) the case law cited by Simple in furtherance of their objections is inapposite and (2) relevant case law compels a finding of non-infringement.

### 2.   A Proper Interpretation of the Case Law Cited By Simple Does Not Lead To the Conclusion that Portlets are Window Objects

Although it is correct that "'an accused product that sometimes, *but not always*, embodies a claimed method nonetheless infringes,'" Simple fails to recognize that portlets never infringe the patents in suit because they are never window objects.  (Simple's Objections at 4-5 (quoting and adding emphasis to *Bell Commc'ns*, 55 F.3d at 622-23; citing *Hilgraeve*, 265 F.3d at 1343; *Intel*, 946 F.2d at 832; *Paper Converting Mach.*, 745 F.2d at 20).)  Quite simply, since a portlet never completes ***all of its acts*** independently of other content, it is never a window object and thus, never infringes.  Accordingly, as explained below, none of the case law cited by Simple supports the conclusion that CA infringes the patents in suit.

### a.   *Bell Commc'ns* Is Inapposite

*Bell Commc'ns* is distinguishable from the case at bar and does not suggest that the Court find infringement.  As the Federal Circuit pointed out, the district court in *Bell Commc'ns* wrongly granted summary judgment of non-infringement by adding a claim limitation that was not supported by the specifications of the patent at issue.  55 F.3d at 621-23.  Conversely, in the case at bar, the Special Master's recommendation that all of the acts of a window object not be constricted by other content is squarely supported by the specifications of the patents in suit.

*Compare* '493 Patent col. 5, l. 65 - col. 6, l. 8 *with* R&R at 64-65.  As such, *Bell Commc'ns* does not compel a finding of infringement.

> **b.** *Hilgraeve* **Is Inapposite**

Simple's citation of *Hilgraeve* is also inapposite.  Rather, the Court agrees with and adopts the Special Master's interpretation and analysis of that case.  (R&R at 59-63.)  *Hilgraeve* is distinguishable from the case at bar because the ***modes*** of operation at issue in that case are not analogous to the ***acts*** of a window objects.  (*See id.*)  Rather, every act of a window object falls under a single mode of normal operation.  Accordingly, under a normal ***mode*** of operation, portlets must perform all of their ***acts*** without being constrained by other content.  Moreover, Simple, like the alleged infringers in *Hilgraeve*, proffers unusual scenarios in support of their position, by arguing that portlets are window objects while they are being resized horizontally but not window objects when they are resized vertically.  In short, even if it were applicable to the case at bar, *Hilgraeve* would counsel ***against*** finding infringement because Simple's arguments mirror the unusual scenarios concocted by the alleged infringer's expert witness in that case.

> **c.** *Intel* **Is Distinguishable From the Case at Bar**

*Intel* is also inapplicable to the case at bar.  In *Intel*, the Federal Circuit found infringement because, although the infringing device was "never sold to operate in" the patented mode, it was still "*capable* of performing in . . . [the patented] mode" of operation.  946 F.2d at 824, 830-32; *see also Fantasy Sports*, 287 F.3d at 1117 (discussing *Intel*) ("Although we concluded that the defendant's products did infringe, we explained our basis for doing so as follows: 'Because *the language  of claim 1* refers to 'program*able* selection means' . . . the

accused device, to be infringing, need only be capable of operating in the page mode.'"). Notably, *Intel* "does not stand for the proposition . . . that infringement may be based upon a finding that an accused product is merely capable of being modified in a manner that infringes the claims of a patent." *Fantasy Sports*, 287 F.3d at 1117-18 (discussing *Intel*).  Instead "the language of the claims, as well as the nature of the accused product, dictates whether an infringement has occurred." *Id.* at 1118 (discussing *Intel*; citing *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1555-56 (Fed. Cir. 1995); *Telemac*, 247 F.3d at 1330).

In the case at bar, portlets are never capable of performing in an infringing mode because all of their acts cannot be conducted independently of other content.  Accordingly, the nature of the allegedly infringing product, portlets in the CleverPath Portal, and the language of the patent specifications, which mandates that all the acts of a window object be independent of other content, dictate that the Court grant CA's motion for summary judgment of non-infringement. Having distinguished *Intel* from the case at bar, the Court turns to *Paper Converting Machine.*

### d.    *Paper Converting Mach.* **Is Distinguishable From the Case at Bar**

In *Paper Converting Mach.*, the Federal Circuit found infringement where the defendant tested and assembled the patented device, an "automatic rewinder" used to manufacture products like toilet tissue and paper towels, in a series of stages.  745 F.2d at 13, 15-16, 19-20.  For example, in one iteration, the "pin" component of the claimed invention would be tested and assembled while in another iteration, the "pusher" or "blade" components would be tested.  *Id.* at 15.  "At no time during the tests were the pins, pushers, and blade installed and operated together." *Id.*  Nevertheless, the *Paper Converting Mach.* panel reasoned that when "significant,

44

unpatented assemblies of elements are tested during the patent term" and they enable "the infringer to deliver the patented combination in parts to the buyer, without testing the entire combination together, . . . testing the assemblies can be held to be in essence testing the patented combination and, hence, infringement." *Id.* at 19-20.

The case at bar is distinguishable from *Paper Converting Mach.* because it is not possible to look at each individual act of a window object in isolation when considering the "acts independently" requirement. Rather, the specifications of the patents in suit make it clear that unless the "independently" limitation is attached to all the acts of a window object, it would be rendered meaningless. For *Paper Converting Mach.* to be applicable, the Court would have to find that because a user can perform some acts on a portlet without being constricted by other content, that person has used CA's accused products in an infringing manner. This would in effect, rewrite the patents in suit to require that a "layer [*sometimes*] acts independently of other content." There is no record evidence to support this course of action. Moreover, there is no evidence that CA, at any point in time, provided any combination of services that can be viewed as infringing the patents in suit. CA's accused products do not infringe the patents in suit because they do not contain window objects.

### 3.       Analogous Precedent Supports a Finding of Non-infringement

Both *Telemac* and *Fantasy Sports* support a finding of non-infringement. In *Telemac*, the patented "complex billing algorithm" required a "calculation of charges using call rates based on classification of calls into local, long distance, international and roaming call categories." 247 F.3d at 1330 (quotation omitted). In that case, the Federal Circuit affirmed a finding of non-infringement, literal and equivalent, because the accused infringer built a restriction into the

source code stored in its cellular phones that prevented users from "directly placing international calls," effectively disabling the ability to calculate charges for international calls from its billing algorithm. *Id.* In other words, software in the allegedly infringing phones prevented the execution of a patented functionality.

In *Fantasy Sports*, the claimed invention was a "Computer for playing football based upon actual football games" that included a "bonus points" limitation. 287 F.3d at 1112. Bonus points were points, in addition to those normally allotted for a scoring play, which could be awarded for "unusual plays such as out-of-position scoring." *Id.* at 1117. In vacating the district court's grant of summary judgment of non-infringement, the Federal Circuit relied heavily on the nature of software and reasoned that "infringing software must include the 'means for scoring . . . bonus points' regardless [of] whether that means is activated or utilized in any way." *Id.* at 1118. The following excerpt is highly relevant:

> Software is a set of instructions, known as code, that directs a computer to perform specified functions or operations. Thus, the software underlying a computer program that presents a user with the ability to select among a number of different options must be written in such a way as to enable the computer to carry out the functions defined by those options when they are selected by the user. Therefore, although a user must activate the functions programmed into a piece of software by selecting those options, the user is only activating means that are *already present in the underlying software*. Otherwise, the user would be required to alter the code to enable the computer to carry out those functions. Accordingly, in order to infringe the *'603 patent*, the code underlying an accused fantasy football game must be written in such a way as to enable a user of that software to utilize the function of awarding bonus points for unusual plays such as out-of-position scoring, without having to modify that code. In other words, an infringing software must include the "means for scoring . . . bonus points" regardless whether that means is activated or utilized in any way.

46

287 F.3d at 118.  In essence, since the user did not have to alter the software underlying the allegedly infringing computerized fantasy football game, infringement could not be foreclosed.

*Telemac* and *Fantasy Sports*, when applied to the present record, support a finding of non-infringement.

Under *Telemac*, it is appropriate to grant CA's motion for summary judgment of non-infringement because the source code behind CA's allegedly infringing products directly prevents portlets from acting independently of other content.  For instance, portlets cannot be placed over the logo-header or other portlets in their content manifestation environment, specifically because they have been programmed to preclude that action.  Accordingly, just like the source code in *Telemac*, which prohibited users from directly placing international calls and calculating the charges associated therewith, the source code in CA's accused products prevents portlets from being window objects that act independently of other content and infringing the patents in suit.

*Fantasy Sports* also supports a finding of non-infringement.  In that case, the Federal Circuit vacated a summary judgment of non-infringement because the underlying software of the allegedly infringing fantasy football game would not have to be altered in any way to allow for the utilization of bonus points, which were claimed by the patent at issue.  Conversely, the source code of CA's accused products ***would*** have to be altered in order to allow portlets to act independently of other contents.  For example, a user would have to disable the source code which made portlets snap into a grid alignment or prevented them from being placed over the logo header and other portlets to allow them to be moved independently of other content. Having established that applicable case law fully supports CA's motion for summary judgment,

the focus turns to Simple's argument that portlets are layers when they perform certain acts and are not layers when they perform other acts.

### 4. A Portlet Is Never a Window Object Since It Cannot Perform All of its Acts Independently of Other Content

In what can charitably be described as an interesting set of arguments, Simple maintains that portlets are window objects because: (1) they are nested DIV objects and (2) they can be layers in one instance but not in other instances, depending on how they are interacted with. Neither argument is persuasive.

Although Simple is correct in pointing out that a layer type window object can be a DIV object, it does not necessarily follow that all DIV objects are window objects. Once again, the Court turns to the specifications of the patents in suit, which define a layer as follows:

> *A Layer is a WWW browser content display section* produced within a content manifestation environment (CME) including, but not limited to, any object within an HTML document that may be scaled, dragged, or otherwise operated upon *such as* an IMG object, a SPAN object, *a DIV object*, a form element, etc. and which may be associated with program logic such as within a script, etc.

> A layer has its own properties including, but not limited to, a name, etc. within an HTML rendition model such as those defined by DHTML standards.

> *Additionally*, a layer acts independently of other content within a particular HTML document.

'493 Patent col. 5, l. 65- col. 6, l. 8 (emphasis and formatting added).  As shown above, while a layer type window object can be a DIV object, it must *also* act independently of other content. Consequently, a portlet is not a window object just because it is a DIV object.  Rather it would have to be a DIV object that *also* acts independently of other content.

48

If as Simple asserts, a CleverPath Portal were a window object when it acted

independently of other content and not a window object when it did not act independently of

other content, the window elements in the Meininger and Visual DHTML references would also

be layers and the patents in suit would be invalid as anticipated by prior art.  (*See* Simple's

Objections at 17.)  As the Court noted in its memorandum on Anticipation & Obviousness, the

window elements in the Meininger and Visual DHTML references were not window objects

because, although they could be moved and minimized independently, they could not be restored

independently of other content.  (*See* Anticipation & Obviousness Mem. at 33-39, 68-70.)  In

other words, these references did not anticipate any of the patents in suit because *inter alia* they

could not perform ***all*** of their acts independently (without being constrained by other content).

Under Simple's logic, window elements in the Meininger and Visual DHTML references would

be window objects when they are moved around their content manifestation environment or

minimized, since those acts are performed independently of other content, but would not be

window objects when they are restored, since that act is dependent upon other content.  Thus,

acceptance of Simple's logic would compel the Court to invalidate the patents in suit as

anticipated by the Visual DHTML reference.[18]

### D.    The Court's Ruling on Infringement

In sum, the record contains no evidence that CA's allegedly infringing software products

contain window objects.  Consequently, Simple's objections to the contrary are denied.  The

Court adopts the Special Master's factual recitations as well as his finding of non-infringement,

---

[18] The Meininger reference does not disclose the solely contained within requirement, but under Simple's unique interpretation of the term would have disclosed a window object.

although its reasoning differs in some respects.[19]   The Court will now address whether Simple's

claim of infringement under the doctrine of equivalents survives.

## II.    Simple Waived Any Claim for Infringement Under the Doctrine of Equivalents

Below is a summary of the parties' objections and counter arguments followed by the

Court's analysis and ruling.

### A.    The Parties' Arguments

Simple contends that since the R&R did not address whether the CleverPath Portal

infringes the patents in suit under the doctrine of equivalents, that claim "remains actively

asserted."  (Simple's Objections at 19; *see also* Simple's Reply Objections at 9-13.)  According

to Simple, they asserted that the CleverPath Portal "infringes, either literally or under the

doctrine of equivalents . . . in several pleadings including" their Fourth and Fifth Supplemental

Answers to CA's First Set of Interrogatories, as well as the Expert Report of James Maune, Esq.

(Simple's Objections at 19.)  Simple also argues that, since: (1) CA did not seek summary

judgment on infringement under the doctrine of equivalents "[d]espite these allegations" and (2)

"the Special Master did not address this allegation nor recommend granting summary judgment

on this" issue, their claim of infringement under the doctrine of equivalents has not been

addressed.  (*Id.*)  Simple further argues that they could not have moved for summary judgment

under the doctrine of equivalents because the Special Master had not yet issued the Claim

Construction R&R.

According to Simple, their "claim of infringement under the doctrine of equivalents was

---

[19]*See* notes 5,7 and accompanying text *supra* (declining to adopt certain portions of the
Special Master's reasoning).

not amenable to even being articulated without the [C]ourt having previously adopted a claim construction."  (Simple's Reply Objections at 10 (citing *Sri Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985)).)  Simple argues that since the parties were required to file their motions for summary judgment "nearly sixteen months" before the Claim Construction R&R was issued, they "would have had to anticipate every possible claim construction" in order to have "moved for summary judgment of infringement under the doctrine of equivalents."  (*Id.*) Simple also urges that the case at bar is distinguishable from case law cited by CA.  (*Id.*)

For its part, CA argues that: (1) it is "is established that a party waives any argument of infringement under the doctrine of equivalents by failing to raise it in opposition to summary judgment."  (CA's Resp. To Simple's Objections at 12-13 (citing *Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1380 (Fed. Cir. 2005); *Kim v. Dawn Food Prods., Inc.*, 2004 WL 2658068 (N.D. Ill. Oct. 13, 2004); *Blistix Inc. v. Circle Labs, Inc.*, 2001 WL 388884 (N.D. Ill. Apr. 12, 2001))) and (2) the Special Master's "ruling of non-infringement disposes of all theories of infringement" because "the Federal Circuit consistently states that equivalent infringement is merely a *theory* of infringement – not a separate claim."  (*Id.* at 14-15 (citing *Genentech, Inc. v. Amgen, Inc.*, 289 F.3d 761, 774 (Fed. Cir. 2002); *Jeneric/Pentron, Inc. v. Dillon Company, Inc.*, 205 F.3d 1377, 1382 (Fed. Cir. 2000)).

**B.    Analysis**

An analysis of the relevant case law shows that Simple waived any argument for infringement under the doctrine of equivalents.  In *Boss Control*, the Federal Circuit held that Boss, the patentee, waived its doctrine of equivalents argument because it failed to present any "substantive arguments" on the issue "to the district court."  410 F.3d at 1380.  In reaching that

conclusion, the Federal Circuit noted that Boss "failed to address infringement under the doctrine

of equivalents in its complaint or in its two briefs to the district court on the issue of summary

judgment of non-infringement." *Id.*  In addition, the *Boss Control* panel found that merely

mentioning that a patent can be infringed either literally or under the doctrine of equivalents in

its briefing is not sufficient to present a reviewable issue.  *Id.*  Indeed, it is well established that a

party which fails to assert the doctrine of equivalents in any meaningful way waives the

argument.[20]

      Simple waived their argument of infringement under the doctrine of equivalents because

they failed to: (1) address it in their motion for summary judgment of infringement; (2) raise it in

their opposition to CA's motion for summary judgment of non-infringement; (3) provide any

evidence of infringement under the doctrine of equivalents; and (4) provide any relevant analysis

as to how CA's accused products infringe the patents in suit under the doctrine of equivalents.

For instance, Simple's Fourth and Fifth Supplemental Answers to CA's First Set of

Interrogatories do nothing more than state Simple's belief that some of CA's accused products

---

[20]*See Computer Docking Station Corp. v. Dell*, 2007 U.S. Dist. LEXIS 2419, *26-27
(W.D. Wis. Jan. 10, 2007) (finding that a plaintiff waived its claim for infringement under the
doctrine of equivalents because neglecting to discuss the issue in its briefs amounted to a failure
to develop the argument in any meaningful way); *see generally STMicroelectronics, Inc. v.
Sandisk Corp.*, 2006 U.S. Dist. LEXIS 42469, at *23-24 (E.D. Tex. Jun 22, 2006) (noting that
one of the reasons a plaintiff waived its argument for infringement under the doctrine of
equivalents was because it failed to plead the issue, raise it in any of its summary judgment
briefs, or address it in any meaningful way through expert testimony); *Hutchins v. Zoll Med.
Corp.*, 430 F. Supp. 2d 24, 35 n. 5. (D. Mass. 2006) (finding that the plaintiff waived its claim
for infringement under the doctrine of equivalents by failing to present any arguments on the
issue) (citing *Boss Control*); *Nystrom v. Trex Co.*, 2006 U.S. Dist. LEXIS 97594, at *7-10 (E.D.
Va. Jan. 25, 2006) (applying *Boss Control* to hold that a plaintiff waived his doctrine of
equivalents argument, in part, because he only raised the issue in his complaint); *Kim v. Dawn
Food Prods.*, 2004 U.S. Dist. LEXIS 20837, *28 (N.D. Ill. Oct. 12, 2004) (a patentee's failure to
argue the doctrine of equivalents on summary judgment results in waiver).

may infringe the patents in suit, literally or under the doctrine of equivalents.  (Dkt. No. 366, Ex. 66 at 2-3, Ex. 67 at 2).  Moreover, the expert report of James Maune offers little more than attorney argument and merely mentions infringement under the doctrine of equivalents as a legal standard.  (Dkt. 451, Ex. 2 at 12-13, 15-18.)  In short, Simple has failed to argue infringement under the doctrine of equivalents in any meaningful way.

Simple's assertion that they were unable to argue infringement under the doctrine of equivalents because the Claim Construction R&R was not issued is unavailing.  Were this truly the case, neither party would have been able to move for summary judgment on CA's affirmative defenses under anticipation and obviousness.  Nonetheless, Simple filed their motion for summary judgment with regards to those issues more than one year before the Claim Construction R&R was issued.  Moreover, in the time since the R&R on claim construction was issued, Simple took no steps to raise the doctrine of equivalents.  In sum, neither the relevant case law nor the evidentiary record support Simple's arguments.  What follows is the Court's ruling.

### C.      The Court's Ruling on Simple's Doctrine of Equivalents Claim

Simple has waived their argument for infringement under the doctrine of equivalents by failing to advance it in any meaningful way.

### III.    The Court Has Jurisdiction To Decide Whether Certain Claims in the Patents in Suit are Infringed

The parties do not dispute that the Court has jurisdiction to issue a declaratory judgment with respect to whether or not the accused CA products infringe the vast majority of the claims contained in the three patents at issue.  However, with respect to certain claims (to wit, claims 2, 6 and 10 of the '493 Patent and claims 3, 4, 11 and 15 of the '563 and '882 Patents (the

"jurisdictionally challenged claims")) Simple contends that the Court no longer has jurisdiction

because of the absence of a case or controversy.  It is to this issue that the Court now turns.  The

Court shall begin by summarizing both the Special Master's pertinent recommendations and the

parties' arguments.

### A.  The Special Master's Recommendation

According to the Special Master, the Court no longer has jurisdiction to declare that CA's

accused products do not infringe claims 2, 6 and 10 of the '493 Patent as well as claims 3, 4, 11

and 15 of the '563 and '882 Patents.  (R&R at 132.)  The Special Master noted that the parties'

initial pleadings called every claim of the patents in suit into question.  For instance, CA's initial

"pleadings request[ed] a declaration that its products do not infringe 'the 493, 563 and/or 882

Patents within the meaning of 35 U.S.C. § 271(a), (b) or (c),'" and for their part, Simple initially

asserted that CA "infringed and continues to infringe" the '493, '563, and '882 Patents.  (*Id.* at

130-31.)  Citing Belgard's expert report and Simple's opposition to CA's motion for summary

judgment of non-infringement, the Special Master reasoned that, except for their initial

allegations, "Simple no longer specifically assert[ed] claims 2, 6 or 10 of the '493 [P]atent . . .

[and] claims 3, 4, 11 or 15 of the '563 [and '882 P]atent[s] . . . against" CA.  (*Id.* at 131 (quoting

Dkt. No. 366, Ex. 36 ¶ 20).)  The Special Master recommended that "while there may have

initially been declaratory judgment jurisdiction, the situation . . . changed, and those claims are

no longer in controversy."  (*Id.* at 131, 132 ("Lacking any evidence [of] an 'actual controversy' .

. . the Court does not have jurisdiction to declare [those] claims . . . not infringed.  Accordingly,

the Special Master recommended that CA's motion for summary judgment insofar as it seeks a

judgment that those claims are not infringed should be DISMISSED as lacking subject matter

jurisdiction.").)  CA objects as described below.

**B.      The Parties' Arguments**

According to CA, the Special Master incorrectly recommended that its motion for summary judgment of non-infringement with respect to claims 2, 6 and 10 of the '493 Patent, as well as claims 3, 4, 11 and 15 of the '563 and '882 Patents be dismissed as lacking in subject matter jurisdiction.  (CA's Objections at 4.)  CA contends that the Court  still retains jurisdiction over the foregoing claims because Simple has not explicitly withdrawn them from the suit. (CA's Objections at 6; CA's Reply In Supp. at 3.)  In particular, CA maintains that "[t]here has been no affirmative act on the part of Simple to remove CA's reasonable apprehension of an infringement suit."  (CA's Objections at 6.)  CA also argues that under relevant case law such an affirmative act is required to deprive the Court of jurisdiction.

According to CA, "in cases where the Federal Circuit found no surviving controversy, the patentee *filed a covenant not to sue . . . or made an equivalent affirmative act of unequivocal disavowal*."  (CA's Reply In Supp. at 2.)  CA urges that the case at bar is analogous to *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1482-83 (Fed. Cir. 1998).  (CA's Objections at 6.) CA maintains that in *Fina Research*, the "Federal Circuit . . . concluded that the defendants had not sufficiently disavowed their threats to the extent needed to remove reasonable apprehension of suit," despite the fact that "defendant[']s counsel actually sent a letter purporting to disavow any intention to enforce the patent" at issue.  (*Id.* (citing *Fina Research*, 141 F.3d at 1482-83; *Infinitech, Inc. v. Vitrophage, Inc.,* 842 F. Supp. 332, 336 n.1 (N.D. Ill. 1994)).)  CA also argues that the case at bar is distinguishable from instances where courts have concluded that "no actual controversy remained for adjudication," such as *Spectronics Corp. v. H.B. Fuller Co., Inc.,* 940

F.2d 631, 635 (Fed. Cir. 1991), where "the patentee filed a covenant not to sue"; and *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1056 (Fed. Cir. 1995), where "the . . . patentee in its motion papers *unconditionally promised* not to sue the declaratory judgment counterclaimant for infringement 'as to any claim of the patents-in-suit based on the products currently manufactured and sold by [counterclaimant].'" (*Id.* at 6-7 (also citing *Amana Refrigeration, Inc. v. Quadlux, Inc.,* 172 F.3d 852, 855 (Fed. Cir. 1999)).

Simple urges that the Special Master correctly dismissed CA's motion for summary judgment of non-infringement regarding claims 2, 6 and 10 of the '493 Patent as well as claims 3, 4, 11 and 15 of the '563 and '882 Patents because: (1) the "Federal Circuit has expressly rejected covenants not to sue as the *only* means by which a patent holder may eliminate a reasonable apprehension of suit already in existence"; (2) they "never identified the unasserted claims of the" patents in suit "as a basis for . . . [their] counter claims"; and (3) the Court could, in its discretion, dismiss CA's motion for summary judgment of non-infringement regarding Simple's unasserted claims.  (Defs.' Resp. to CA's Objections to the R&R (Dkt. No. 589) ("Simple's Resp. to CA's Objections"), at 3-4 .)  Having summarized the parties' arguments, the Court will provide its own analysis below.

### C.      Analysis

#### 1.      Legal Standard

In articulating the legal standard governing whether it retains declaratory judgment jurisdiction over claims 2, 6 and 10 of the '493 Patent as well as claims 3, 4, 11 and 15 of the '563 and '882 Patents, the Court begins with controlling Federal Circuit precedent.

### a.  Federal Circuit Precedent

A party claiming declaratory judgment jurisdiction has the burden of establishing "that such jurisdiction existed at the time the claim for declaratory relief was filed and that it has continued since."  *Benitec Austl., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007).

> [I]n order for a court to have jurisdiction over a declaratory judgment action [the Supreme Court requires that]: the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.  Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Benitec*, 495 F.3d at 1344 (brackets in original) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764, 771 (2007)).  "'If a party has actually been charged with infringement of the patent, there is, necessarily, a case or controversy adequate to support jurisdiction' at that time." *Id.* at 1344 (quoting *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 96 (1993)); *see also Cardinal Chem.*, 508 U.S. at 99-100 ("A company once charged with infringement must remain concerned about the risk of similar charges if it develops and markets similar products in the future.").  Moreover, if the initial jurisdictional burden has been met, it will continue, "absent further information."  *Benitec*, 495 F.3d at 1344-45.  Although the "burden of bringing forth such further information may logically rest with the party challenging jurisdiction, . . . the actual burden of proof remains with the party seeking to invoke jurisdiction."  *Id.* at 1345 (internal citation omitted).

Recent Federal Circuit precedent has shed further light into what does and does not

constitute "further information" sufficient to divest a district court of jurisdiction to issue a declaratory judgment.  In *Sandisk Corp.  v. STMicroelectronics, Inc.*, 480 F.3d 1372 (Fed. Cir. 2007), the Federal Circuit held that even the statement of STMicroelectronics NV's ("ST's") "vice president of intellectual property and licensing that 'ST has absolutely no plan whatsoever to sue SanDisk' did not eliminate the justiciable controversy created by ST's actions." *Benitec*, 495 F.3d at 1347 (discussing *Sandisk*, 480 F.3d at 1382).  The Federal Circuit reasoned that this outcome was warranted by the fact that "ST had engaged in a course of conduct that showed a willingness to enforce its patent rights despite its vice-president's statement." *Id.* (discussing *Sandisk*).  In particular, ST: (1) "sought a right to a royalty under its patents based on specific, identified activity by SanDisk"; (2) "gave SanDisk a packet of materials, over 300 pages in length, containing, for each of ST's fourteen patents under discussion, a copy of the patent, reverse engineering reports for certain of SanDisk's products, and diagrams showing a detailed infringement analysis of SanDisk's products"; and (3) "communicated to SanDisk that it had made a studied and determined infringement determination and asserted the right to a royalty based on this determination." *Sandisk*, 480 F.3d at 1382.  In light of these actions, the Federal Circuit found that the words of ST's vice president of intellectual property failed to eliminate a case in controversy.  *Id.* (citing *MedImmune,* 127 S. Ct. at 774 n.11.)

In *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 995-96 (Fed. Cir. 2007), "Honeywell withdrew some independent claims from the litigation" but did not divest the district court of  jurisdiction  with respect to the withdrawn claims because Honeywell also chose to continue asserting associated dependent claims which covered the same display technology. In affirming the district court's holding that it retained jurisdiction, the Federal Circuit observed

that "infringement of a dependent claim also entails infringement of its associated independent claim." *Id.*  Notably, the district court maintained jurisdiction despite the fact that Honeywell made a written representation "of its present and future intent not to pursue infringement of certain previously asserted claims." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 288 F. Supp. 2d 638, 644 (D. Del. 2003), *aff'd*, 488 F.3d at 995-96; *see also generally Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 2009 U.S. App. LEXIS 2825, *3, *13-14, *17 (Fed. Cir. Feb. 13, 2009) (finding that a covenant not to sue that was limited to "activities and/or products made, used, or sold on or before the dismissal of [the] action " did not divest a court of jurisdiction when the alleged infringer already had "in storage a quantity of the product that it sold before and wishe[d] to sell again").

The *Honeywell* court distinguished *Grain Processing Corp. v. American Maize-Prods. Co.*, 840 F.2d 902, 905 (Fed. Cir. 1988), wherein the district court was found to be divested of jurisdiction over certain claims.  *Honeywell*, 488 F.3d at 996.  "In *Grain Processing*, the patentee agreed not to assert an entire group of process claims that had initially formed a basis for the complaint, leaving at issue only the four asserted product claims." *Id.*  According to the Federal Circuit, while the patentee in *Grain Processing* made a "blanket withdrawal" of an entire set of claims directed to claimed subject matter, Honeywell took no such step.  *Id.*

Although a covenant not to sue may not be the only way in which a patentholder can eliminate a case in controversy, the Federal Circuit has recognized that actions which divest a court of jurisdiction must fall under a "narrow[ly]" construed exception.  *See Fina Research*, 141 F.3d at 1484.  Otherwise, as the Federal Circuit points out, a patentholder could "'attempt[] extra-judicial patent enforcement' with scare-and-run tactics that the Declaratory Judgment Act

was intended to forestall."  *Id.* (quoting *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846

F. Cir. 1988), *overruled on other grounds by MedImmune,* 127 S. Ct. at 771);

*see also Cardinal Chem.*, 508 U.S. at 96 ("Merely the desire to avoid the threat of a 'scarecrow'

patent, in Learned Hand's phrase, may therefore be sufficient to establish jurisdiction under the

Declaratory Judgment Act.").  For example, if district courts could easily be divested of

jurisdiction, a patentholder could threaten suit with certain patent claims, have those claims

declared invalid and non-infringed, and then threaten suit again with other claims in the same

patent covering substantially similar subject matter.[21]  *See Arrowhead*, 846 F.2d at 734-35.

Having discussed some of the broader guidelines provided by the Federal Circuit, the Court will

---

[21] The Federal Circuit expressly detailed the type of tactics it sought to prevent by implementing a strict test for circumstances which could divest a court of jurisdiction.

> This appeal presents a type of the sad and saddening scenario that led to enactment of the Declaratory Judgment Act (Act), 28 U.S.C. § 2201.  In the patent version of that scenario, a patent owner engages in a *danse macabre*, brandishing a Damoclean threat with a sheathed sword.  *See Japan Gas Lighter Ass'n v. Ronson Corp.*, 257 F. Supp. 219, 237 (D.N.J. 1966).  Guerrilla-like, the patent owner attempts extra-judicial patent enforcement with scare-the-customer-and-run tactics that infect the competitive environment of the business community with uncertainty and insecurity.  *See* E. Borchard, Declaratory Judgments 803-04 (2d ed. 1941).  Before the Act, competitors victimized by that tactic were rendered helpless and immobile so long as the patent owner refused to grasp the nettle and sue.  After the Act, those competitors were no longer restricted to an in terrorem choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests.  The sole requirement for jurisdiction under the Act is that the conflict be real and immediate, i.e., that there be a true, actual 'controversy' required by the Act.

*Arrowhead*, 846 F.2d at 734-35 (italicization added).

look to analogous district court opinions for further guidance.

### b.   Relevant District Court Authority

In addition to the authority cited above, the recent *Lear Auto. Dearborn, Inc. v. Johnson Controls, Inc.*, 528 F. Supp. 2d 654, 668-69 (E.D. Mich. 2007) decision is also relevant.  In *Lear*, the court held that it retained jurisdiction to decide the validity of claim 1 of one of the patents in suit (the "Roddy patent"), despite Lear's contention that it "had not 'actively pursue[d this claim]' in the course of . . . litigation as . . . evidenced by its interrogatory responses" and expert report.  528 F. Supp. 2d at 668-69.  Notably, Lear also filed covenants not to sue for infringement of claim 1 of the Roddy patent during this period.  *Id.* at 669.  The *Lear* court held that it was not divested of jurisdiction because: (1) the alleged infringer explicitly challenged the validity of claim 1 in its counterclaim; (2) a covenant not to sue or a voluntary dismissal of certain if not all claims at issue does not necessarily preclude a decision on validity; and (3) the record was lacking in further information which would divest the court of jurisdiction.  *Id.* at 668-74.  Each of these reasons is discussed in further detail below.

A central factor in the *Lear* court's decision to retain jurisdiction was the fact that Johnson Controls, Inc. ("JCI"), the alleged infringer, explicitly challenged the validity of claim 1 of the Roddy patent in its counterclaim.  *Id.* at 669.  According to the *Lear* court, those "unamended pleadings, standing alone, indisputably confer[ed] . . . jurisdiction to address JCI's challenges to the validity of claim 1."  *Id.*  The *Lear* court held that Lear's attempts to execute covenants not to sue were unavailing because they only encompassed claim 1 of the Roddy patent while Lear's complaint alleged that JCI infringed all thirteen claims of the Roddy patent. *Id.* at 671-72.  The *Lear* court pointed to various decisions which held that "a covenant not to sue

61

or a voluntary dismissal encompassing less than all of a patent's claims . . . [did] not divest . . . [a] court of jurisdiction over a counterclaim of patent invalidity."  *Id.* at 672.

The *Lear* court cited to the Federal Circuit's holding in *Shelcore, Inc. v. Durham Industries, Inc.*, 745 F.2d 621 (Fed. Cir. 1984) and *Jervis B. Webb Co. v. Southern Sys. Inc.*, 742 F.2d 1388 (Fed. Cir. 1984).  *Shelcore* held that a plaintiff "'could not unilaterally remove the validity issue' as to claim 13 of the patent-in-suit by voluntarily dismissing with prejudice its charge of infringement . . . [relating to that] claim, where the defendant's 'counterclaim put [the] validity of all the claims in issue.'"  *Lear*, 528 F. Supp. 2d at 672-73 (discussing *Shelcore*, 745 F.2d at 624).  *Jervis B. Webb Co.* held that although "jurisdiction was lacking over a counterclaim challenging the validity of claims that the plaintiff had not asserted or litigated," a court could still issue declaratory judgment "'that all claims are valid or invalid in response to, *inter alia*, . . . the filing of a declaratory judgment counterclaim asserting the invalidity of all of patentee's claims in response to a complaint that asserted the infringement of all of the claims.'"  *Id.* at 673 (citing *Jervis B. Webb Co.* 742 F.2d at 1399 & n.8).

The *Lear* court also reasoned that the plaintiff's attempts to point to developments (further information) in the record which would divest it of jurisdiction to decide the validity of claim 1 were "far too indefinite."  528 F. Supp. 2d at 673.  Lear pointed to what it purported were "various indicia during discovery that it was not 'actively pursuing' any claim that JCI's HomeLink system infringe[d] claim 1," such as: (1) statements in their expert's report; (2) interrogatory responses; and (3) an opinion letter.  *Id.*  Rejecting these items as too indefinite, the *Lear* court pointed out that there "are customary ways to remove such a claim from further judicial consideration -- *e.g.,* a motion under *Fed. R. Civ. P.* 15(a) to amend the complaint, or a

motion for voluntary dismissal under *Fed. R. Civ. P.* 41(a)(2)" and that Lear did not pursue "these available avenues at any time."  *Id.* at 770.

### 2.      The Court Has Not Been Divested of Jurisdiction

The Court retains jurisdiction to determine whether claims 2, 6, and 10 of the '493 Patent as well as claims 3, 4, 11 and 15 of the '563 and '882 Patents are infringed by CA's accused products because Simple has not expressly disavowed any claim that CA's accused products infringe the foregoing claims and sufficient "further information" has not surfaced in order to divest the Court of jurisdiction.  Additionally, judicial economy favors a disposition of matters already dealt with by the Court.

CA commenced this action seeking a declaratory judgment that its accused products do not infringe any of the patents in suit.  Indeed CA's Third and Second Amended Complaints state this very claim.  (Pl.'s 3d Am. Compl.(Dkt. No. 631) at ¶ 1, 21; Pl.'s 2d Am. Compl. (Dkt. No. 366) at Ex. 49 ¶ 14.)  This action was commenced after Simple sent CA a letter, which included a draft complaint to be filed in the Eastern District of Virginia, accusing it of infringement.  As the patentholder, Simple cannot unilaterally seek to withdraw a group of patent claims from consideration when an alleged infringer's counterclaim, or declaratory judgment claim, calls them into question for purposes of invalidity or non-infringement.  *See Shelcore*, 745 F.2d at 624; *Jervis B. Webb Co.*, 742 F.2d at 1399 & n.8.

Simple has not expressly disavowed their intent to sue CA for infringement of the jurisdictionally challenged claims.  For example, Simple could easily have stated, in their own objections to the R&R, or even in opposition to CA's objections, that they expressly disavowed any claim that CA's accused products infringed the jurisdictionally challenged claims.

Nevertheless, they chose not to.  Moreover, in their Response to CA's Third Amended

Complaint ("Third Response"), Simple reiterated their denial of CA's contention that the patents

in suit were not infringed and then asserted three counterclaims which maintained that the '493,

'563, and '882 Patents were infringed by CA's "Portal Products."  (Defs.' Answer to Pl.'s 3d.

Am. Compl. (Dkt. No. 644), at ¶ 1 & Countercl. ¶¶ 14, 19, 24.)  This is relevant for two reasons.

First, Simple could easily have listed specific claims of the patents in suit in its Counterclaims

but opted not to.  Second, Simple's Third Response was filed on November 7, 2006, while their

claim charts, Fourth and Fifth Supplemental Answers to CA's First Set of Interrogatories, expert

reports and summary judgment memoranda were filed in 2004.[22]  Consequently, although Simple

argues that the foregoing claim charts, Interrogatory answers and expert reports never identified

the jurisdictionally challenged claims as infringed, they still indiscriminately asserted, ***at a later***

***date***, that the patents in suit were infringed by CA.  Consequently, there have not been enough

factual and procedural developments to eliminate a case in controversy over the jurisdictionally

challenged claims.

Nor has sufficient further information surfaced to divest the Court of jurisdiction.  The

Court finds that Simple's claim charts, Fourth and Fifth Supplemental Answers to CA's First Set

of Interrogatories, expert reports and summary judgment memoranda are far too indefinite to

remove any case in controversy regarding the jurisdictionally challenged claims.  *Cf.  Lear*, 528

---

[22](*Compare* Third Response at 13 *with* Defs.' 4th Supplemental Answer to Pl.'s 1st
Interrogs.(Dkt. No. 366, Ex. 66 at 4), Defs.' 5th Supplemental Answer to Pl.'s 1st Interrogs.(Dkt.
No. 366,  Ex. 67 at 3), Defs.' Expert Report (Dkt. No. 366., Ex. 36 at 88), Defs.' 1st
Supplemental Expert Report (Dkt 366, Ex. 37), Defs.' Infringement Claim Charts (Dkt. No. 366,
Ex. 36 Appx. D, Ex. 37 Appx. A), Defs.' Reply to Pl.'s Mot. Summ. J. on Infringement (Dkt.
No. 381 at 31), Defs.' Mot. Summ. J. on Infringement (Dkt. No. 395 at 34) *and* Defs.' Reply in
Supp. of Summ. J.(Dkt. No. 395, Attach. 17 at 15.)

F. Supp. 2d at 673.  Moreover, the portions of the record cited by Simple are even less concrete than instances where the Federal Circuit has found that a district court retained jurisdiction.  For instance, in *Sandisk*, an oral promise not to pursue infringement claims did not eliminate a "justiciable controversy" when the patent holder's actions indicated an intent to sue.  480 F.3d at 1382.  In *Honeywell*, merely withdrawing some independent claims from an infringement suit did not divest a court of jurisdiction because certain associated dependent claims remained at issue.  488 F.3d at 995-96.  Indeed, even a covenant not to sue or a written agreement covering only part of the asserted subject matter will not divest a court of jurisdiction when other claims covering similar subject matter remain at issue.  *See Honeywell*, 288 F. Supp. 2d at 644; *see also FieldTurf USA, Inc. v. Sports Const. Group, LLC*, 507 F. Supp. 2d 801, 807-08 (N.D. Oh. 2007).  In the case at bar, Simple has yet to put forth a covenant not to sue or even an offer to forego a claim of infringement against CA's accused products based on the jurisdictionally challenged claims.  *See Revolution Eyewear*, 2009 U.S. App. LEXIS 2825 at *15-17 (discussing cases where properly executed covenants not to sue lead to a finding that there was an "absence" of a "continuing case or controversy").

Instead, by maintaining that "[i]n essence, CA wants this Court to give it the 'freedom to infringe,'" Simple reinforces the Court's finding that their claim charts, Supplemental Answers, expert reports, and memoranda fail to remove a case in controversy regarding the jurisdictionally challenged claims.  (*See* Simple's Resp. To CA's Objections at 4.)  Simple has given no indication that they will not, after the Court issues its Memorandum and Order on Infringement, sue CA for infringement of the jurisdictionally challenged claims.  Rather, Simple's objections to the R&R indicate a belief that CA infringes the jurisdictionally challenged claims.  *See*

*generally Sandisk*, 480 F.3d at 1382 (district court was not divested of jurisdiction despite an

oral representation by the patent holder that it would not sue because the patentholder's actions

indicated a willingness to pursue infringement claims).  As such, by deciding not to rule on

whether CA's accused products infringe the jurisdictionally challenged claims, the Court would

risk allowing Simple to engage in the very "scare-and-run tactics that the Declaratory Judgment

Act was intended to forestall."  *Fina Research*, 141 F.3d at 1484; *see also Arrowhead*, 846 F.2d

at 735.  In light of the parties' behavior and the evidentiary record, there is insufficient further

information to divest the Court of jurisdiction over the jurisdictionally challenged claims.  The

Court will now consider whether the interests of judicial economy counsel against a divestiture

of jurisdiction.

A consideration of judicial economy further supports the conclusion that the Court retains

jurisdiction.  *Cf Silicon Graphics*, *Inc. v. ATI Techs.*, *Inc.*, 573 F. Supp. 2d 1108, 1113 (W.D.

Wis. 2008) (allowing a patent case to proceed on additional claims even after the

infringement claims had been decided in favor of the alleged infringer).  CA has filed for

declaratory judgment that its accused products do not infringe the patents in suit.  A review of

the case docket shows that the parties, the Special Master and the Court have expended a

considerable amount of energy on the claim construction, validity, and infringement issues

associated with the '493, '563, and '882 Patents.[23]  For instance, the parties have moved for

---

[23] CA has already moved for summary judgment over whether
- "Claims 1, 3, 4, 5, 7, 9, 11, 12, and 13 of the '493 Patent; 1, 2, 5, 6, 7, 8, 9, 10, 12, 14, 16, and 17 of the '882 Patent; and Claims 1, 2, 5, 6, 7, 8, 9, 10, 12, and 14 of the '563 Patent" are anticipated by the Meininger Reference,
- "Claims 1, 3, 4, 5, 7, 9, 11, and 13 of the '493 Patent; 1, 2, 5, 6, 7, 8, 9, 10, 12, 14, 16, and 17 of the '882 Patent; and Claims 1, 2, 5, 6, 7, 8, 9, 10, 12, and 14 of the '563 Patent" are anticipated by the Visual DHTML Reference, and

summary judgment on each of the foregoing issues, the Special Master painstakingly submitted approximately 1,000 pages of analysis in his Reports and Recommendations on the foregoing issues, and the Court has addressed the parties' voluminous objections to the Special Master's Reports and Recommendations in great detail.

Moreover, the parties have already briefed, and the Court has already addressed, the dispositive issue regarding infringement of the patents in suit.  Namely, the Court has already found that none of CA's accused products infringe *any* of the claims of the patents in suit because they do not contain window objects that act independently of other content.  *Every* claim of the '493, '563, and '882 Patents requires at least one window object.  As such, no further briefing is necessary on the issue of infringement.  Indeed, it would be a waste of judicial resources to find that CA's accused products do not contain window objects, an element of every claim in the '493, '563, and '882 Patents, and then issue a partial finding of non-infringement in CA's declaratory judgment claim.

### D.	The Court's Ruling

The Court grants CA's objection to the Special Master's finding that the Court lacks jurisdiction to decide whether claims 2, 6, and 10 of the '493 Patent and claims 3, 4, 11, and 15 of the '563  Patent and '882 Patents are infringed by CA's accused products.  Since none of CA's products contain window objects, they do not infringe *any* of the claims in the '493, '563, and '882 Patents.

---

- "Claims 1, 3, 4, 5, 7, 8, 9, 11, 12, and 13 of the '493 Patent; 1, 2, 5, 6, 7, 8, 9, 10, 12, 13, 14, 16, and 17 of the '882 Patent; and Claims 1, 2, 5, 6, 7, 8, 9, 10, 12, 13, and 14 of the '563 Patent" are anticipated by the JavaScript Bible.

(*See* Anticipation & Obviousness R&R at 11 (citations omitted).)

**CONCLUSION**

The Court grants CA's motion for summary judgment of non-infringement with regard to every claim in the '493, '563, and '882 Patents because the record bears uncontroverted evidence that the none of CA's products contain window objects that act independently of other content. The Court also finds that Simple has waived its claim for infringement under the doctrine of equivalents by failing to advance that argument in any meaningful way.

**SO ORDERED.**

Dated: Central Islip, New York
        March 5, 2009

/s/_____
Denis R. Hurley
Senior District Judge

68