UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CA, INC.,

                        Plaintiff,

           - against -

SIMPLE.COM, INC., WIRED
SOLUTIONS, LLC., a revoked Nevada LLC,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM & ORDER**
02 Civ. 2748 (DRH) (MLO)
<u>UNDER SEAL</u>

**APPEARANCES:**

**COVINGTON & BURLING**
Attorneys for Plaintiff
One Front Street
San Francisco, California 94111
By: Samuel F. Ernst, Esq., Robert D. Fram, Esq., Michael M. Markman, Esq., & Leonard Joseph Martiniak, Esq.

**FARRELL FRITZ, P.C.**
Attorneys for Defendants
EAB Plaza
West Tower-14th Floor
Uniondale, New York 11556
By: John P. McEntee, Esq. & David A. Scheffel, Esq.

**FULBRIGHT & JAWORSKI LLP**
Attorneys for Defendants
225 South Sixth Street, Suite 4850
Minneapolis, Minnesota 55402
By: John E. Lynch, Esq. & Joseph P. Zammit, Esq.

**RIVKIN RADLER LLP**
Attorneys for Defendants
EAB Plaza
Uniondale, New York 11556
By: Celeste M. Butera, Esq. & Stephen J. Smirti, Jr., Esq.

**GALE R. PETERSON, ESQ.**
Special Master
112 E. Pecan Street
Suite 1800
San Antonio, Texas 78205

**HURLEY, Senior District Judge**

## INTRODUCTION

Plaintiff CA Inc. ("CA"), formerly known as Computer Associates International Inc., commenced this action seeking a declaratory judgment that three patents owned by Defendants Simple.com, Inc. and Wired Solutions, LLC (collectively "Simple") are invalid, unenforceable, and not infringed by CA. Simple has counterclaimed for infringement. Presently before the Court are the parties' objections to the Report and Recommendation Regarding Anticipation and Obviousness (the "R&R") (Dkt. Nos. 591 & 592) of Special Master Gale Peterson. For the reasons set forth herein, the parties' objections are denied in part and granted in part.[1]

## BACKGROUND

### I.     The Patents at Issue

A complete factual recitation regarding this matter is contained in this Court's Claim Construction Memorandum & Order, dated March 5, 2009 ("Claim Constr. Mem."), familiarity with which is presumed. For present purposes it suffices to state that the three patents at issue

---

[1] Some portions of the R&R have not been objected to or argued against by the parties. As to those, unless expressly stated otherwise, the Court's review has been for clear error and, having found none, those portions are adopted. *See Benicorp Ins. Co. v. Nat'l Med. Health Card Sys.*, 447 F. Supp. 2d 329, 331 (S.D. N.Y. 2006) (citing Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 149 (1985)); *see also Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999) (" If no objection or only partial objection is made, the district court judge reviews those unobjected portions for clear error.") (citing *Goffman v. Gross*, 59 F.3d 668, 671 (7th Cir. 1995); *Campbell v. U.S. Dist. Court*, 501 F.2d 196, 206 (9th Cir. 1974)).

relate to computer technology, and are U.S. Patent Nos. 6,272,493, 6,434,563, and 6,535,882

(the '493, '563, and '882 Patents respectively).  In general, the subject matter claimed in the

'493, '563, and '882 Patents is meant to provide, what the patentee terms, a windowed content

manifestation environment ("CME").  An exemplary CME is displayed below in **Figure 1**.[2]

(Figure 1 herein is a reproduction of Figure 2B of the '493 Patent).

**Figure 1:**



FIG. 2B

According to the patentee, this was an improvement over preexisting technology because

---

[2] The Court attempted to ensure that the figures reproduced herein are clear images. Nonetheless, many of the figures contained in this Memorandum are best viewed electronically, *i.e.* on a computer screen, as certain features and colors may not be easily perceptible when reproduced in black and white.

the claimed invention lets one open, view, resize, minimize, move and otherwise use multiple

window objects on the same web browser screen, without: (1) triggering a refresh;[3] (2) having to

go back and forth from one web page to another; or (3) requiring the use of another web browser.

For example, a user could open, resize, move, close or otherwise manipulate the "NEWS" and

"TRAVEL" windows, shown above, without forcing the entire CME to be refreshed.  Having

briefly described the technology at issue, the Court will summarize the Special Master's

recommended disposition regarding anticipation and obviousness.

## II.     The Special Master's Recommendation

Generally speaking, the Special Master recommended that the Court deny both CA's

motion for summary judgment of invalidity under § 102(a) of the Patent Act and Simple's

motion for summary judgment dismissing CA's affirmative defenses of anticipation and

obviousness under §§ 102 and 103 of the Patent Act.  ( R&R at 2, 95, 177, 205, 244, 263, 305.)

The Special Master recommended denial of CA's motion for summary judgment primarily

because he found genuine issues of material fact as to whether any of the prior art references

discussed therein disclosed a window object as contemplated by the patents in suit.  The Special

Master recommended that Simple's motion for summary judgment be denied because he found

that the record evidence created a genuine issue of material fact as to whether the '493, '563, and

'882 Patents were anticipated or obvious.

## III.    The Objections In General

Both parties have filed objections to the R&R.  In their objections, Simple maintains that

_____

[3] "Refresh" means updating "the displayed web page with the newest content."  (Claim
Construction R&R (Dkt. No. 559), at 173.)

the Special Master incorrectly: (1) applied the wrong summary judgment standard; (2) denied their motion for summary judgment on anticipation regarding the DHTML WindowMaker simulation ("Meininger reference" or "Meininger web page"), Visual DHTML reference, JavaScript Bible, and United States Patent No. 5,877,766 ("Bates Patent") as there are at least two elements of each asserted claim in the '493, '563, and '882 Patents, which are not present in these references; (3) denied their motion for summary judgment on CA's obviousness defense by ignoring "the requirement that evidence of a motivation to combine must be 'clear and particular,' and may not be the result of hindsight reasoning"; and (4) overlooked the fact that CA did not produce clear and convincing evidence that one of its prior art references was "disseminated to the public." (Defs.' Mem. In Supp. of Their Objections to the Special Master's Report and Recommendation Regarding Anticipation and Obviousness, Dkt. No. 602. 1-2 ("Simple's Objections").) For its part, CA argues that: (1) the Special Master failed to recognize that its prior art references anticipate each element of the independent patent claims at issue; (2) it is entitled to a judgment of invalidity on all patent claims asserted by Simple; (3) the Court should summarily adjudicate matters found to be without material issues of fact; and (4) it should be granted summary judgment regarding the date each of the 37 printed references it offered as prior art were available to the public. (CA's Objections to Special Master's Report and Recommendation Regarding Anticipation and Obviousness (Dkt. No. 606), at 1-2, 25 ("CA's Objections").) The parties' objections will be discussed in further detail below. First, the Court shall summarize the legal standards applicable to the case at bar.

**APPLICABLE LAW**

## I.     Review of the R&R

The Court's Order appointing the Special Master specifically states that a "[r]eview of and appeal from all orders and recommendations, as well as the appropriate standard of review shall be governed by Federal Rule of Civil Procedure 72 and the associated case law." (Dkt. No. 152 at 4.)  If objected to, both findings of fact and legal conclusions, including evidentiary rulings, recommended by the Special Master will be reviewed *de novo*.  *See* Fed. R. Civ. P. 72(b); *Thomas E. Hoar v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d Cir. 1990); *see also* Fed. R. Civ. P. 53(f)(3), (4).  Otherwise, the Special Master's findings of fact or legal conclusions will not be overturned unless clearly erroneous.  *See Benicorp Ins.*, 447 F. Supp. 2d at 331 (citing Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 149 (1985)).

## II.     Summary Judgment

The standard for summary judgment in a patent case is the same as in any other case.  *See Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998); *Union Carbide Corp. v. Am. Can Co.*, 724 F. 2d 1567, 1571 (Fed. Cir. 1984).  Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  *See Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984).   The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuinely triable factual issue

6

exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the nonmovant, that no rational jury could find in the nonmovant's favor. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)). The moving party bears the burden of "informing the district court of the basis for its motion" and identifying the matters that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to withstand a motion for summary judgment, the nonmoving party must then put forth evidence setting forth specific facts that show there is a genuine issue of material fact to be tried. *Anderson,* 477 U.S. at 248. "In ruling on a motion for summary judgment, . . . [a court must] view the evidence presented in a light most favorable to the nonmoving party and . . . draw all reasonable inferences in favor of the nonmoving party." *C.R. Bard, Inc. v. Advanced Cardio. Sys., Inc.*, 911 F.2d 670, 672 (Fed. Cir. 1990).

In considering a motion for summary judgment, a court must also take into account the evidentiary standard of proof that pertains to the trial on the merits. *Anderson,* 477 U.S. at 252-53. Since patent claims enjoy a presumption of validity under § 282 of the Patent Act, the party seeking to prove invalidity must do so by clear and convincing evidence. *Abbott Labs. v. Baxter Pharm. Prods.*, 471 F.3d 1363, 1367 (Fed. Cir. 2006) (citing *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir. 1993)). "Clear and convincing" evidence is that which gives the finder of fact "an abiding conviction that the truth of [the proponent's] factual contentions [is] 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (citation omitted). "[A] moving party seeking to invalidate a patent at summary judgment must submit

clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Eli Lilly & Co. v. Barr Lab. Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001). On the other hand, a party wishing to have its patent held not invalid on summary judgment, must show that no reasonable jury could find that the record contains clear and convincing evidence of invalidity. *See Med. Instrumentation & Diag. Corp. v. Elekta AB*, 344 F.3d 1205, 1220-21 (Fed. Cir. 2003); *Eli Lilly*, 251 F.3d at 962.

"Anticipation is a question of fact and obviousness is a question of law based on underlying facts." *Med. Instrumentation*, 344 F.3d at 1220 (citations omitted); *see also KSR Int'l Co. v. Teleflex Inc.*, 530 U.S. 398, 127 S. Ct. 1727, 1745 (2007) ("The ultimate judgment of obviousness is a legal determination.") (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)); *Beckson Marine v. NFM Inc.,* 292 F.3d 718, 725 (Fed. Cir. 2002) ("Obviousness is a legal conclusion based on underlying findings of fact.). Nevertheless, a court may rule on both when a motion for summary judgment has been made. *See Telemac Cellular Corp. v. Topp Telecom., Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001) (internal citations omitted) ("Although anticipation is a question of fact, it may still be decided on summary judgment . . . .").

A court that is presented with cross-motions for summary judgment regarding anticipation under § 102 is obviously not compelled to rule for either party. Rather, when both parties move for summary judgment, each motion must be evaluated on its own merits. *See McKay v. United States*, 199 F.3d 1376, 1380 (Fed. Cir. 1999); 10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 2720, at 335-36 (1998) (footnote omitted) (Each motion must be ruled on separately while the court determines "for each side, whether a judgment may be entered in accordance with the *Rule 56* standard."). If both parties fail to meet

their respective burdens of proof, the Court must deny both motions. *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1302 (Fed. Cir. 2005) (quoting *Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed. Cir. 1998)). Having summarized the relevant standards of review, the Court now turns to the general substantive legal standards for determining whether a patent is invalid under §§ 102 and 103 of the Patent Act.

## III.     Summary of Substantive Law

### A.     Anticipation Under §§ 102(a) and 102(e)(2)[4]

A patent claim is anticipated if a single prior art reference contains each and every limitation of the claimed invention. *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1363 (Fed. Cir. 1998); *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987); 35 U.S.C. § 102(a). Pursuant to § 102(a) of the Patent Act, one is entitled to a patent unless "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a). The foregoing knowledge, use, description or patenting of the claimed invention are included in what is termed prior art. Moreover, although § 102(a) uses the term "invention," anticipation inquiries proceed on a "claim-by-claim basis." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008) (citing *Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313, 1319 (Fed. Cir. 2007)). Section 102(e)(2) provides that one is entitled to a patent unless "the invention was described in . . . a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent."

_____

[4] CA's motion for summary judgment of anticipation is premised upon §§ 102(a) and 102(e) and hence these subsections shall be the focus of the Court's discussion.

35 U.S.C. § 102(e)(2).  Notably, for a prior art reference to be anticipatory under any subparagraph of § 102, it must meet the criteria set out below.

Anticipation is a multifaceted determination.  First, a court must determine whether the allegedly invalidating reference qualifies as prior art.  Next, a court must determine whether every element of a patent claim is expressly or inherently disclosed in the prior art reference at issue.  *See Celeritas Techs. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998).  In addition, the prior art reference must: (1) contain a "disclosure of all elements of a claimed invention arranged as in the claim" and (2) enable the claimed subject matter so as to place it in the possession of the public domain.  *Finisar*, 523 F.3d at 1334-35 (*quoting Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) (citation and emphasis omitted)); *see Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F .2d 1471, 1479 (Fed. Cir. 1986).

Having broadly summarized the anticipation standard under § 102, the Court will apply specific case law as needed in its analysis.

**B.**    **Obviousness**

Section 103 of the Patent Act proscribes the issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been ***obvious*** at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103 (emphasis added).  Obviousness "must be evaluated on a claim-by-claim basis."  *DyStar Textilfarben GmbH & Co. Deutschland KG v. C. H. Patrick Co.*, 464 F.3d 1356, 1372 (Fed. Cir. 2006).  In order to determine whether a patent is obvious, courts must conduct an objective analysis by considering both the primary and secondary considerations articulated by the Supreme Court.

*See KSR*, 127 S. Ct. at 1734 (*discussing Graham*, 383 U.S. 17-18 and *Hotchkiss v. Greenwood*, 52 U.S. 248 (1851)).  The primary obviousness considerations entail resolving "the level of ordinary skill in the pertinent art," determining the scope and content of the relevant prior art and comparing it to the claims at issue.  *KSR*, 127 S. Ct. at 1734 (quoting *Graham*, 383 U.S. at 17-18); *see also Dystar*, 464 F.3d at 1360.  Although the primary factors are most important, courts must also consider secondary factors such as "commercial success, long felt but unsolved needs, failure of others, etc."  *KSR*, 127 S. Ct. at 1734 (*quoting Graham*, 383 U.S. at 17-18); *see also Dystar*, 464 F.3d at 1360.  Indeed, these secondary factors are used to guard against the hindsight application of the "teachings of the invention in issue" into prior art.  *Graham*, 383 U.S. at 36.

Some obviousness guidelines have been forged through years of precedent.  For example, it is well established that a patent for "'a combination which only unites old elements[, according to familiar methods,] with no change in their respective functions'" or a patent for two or more elements "in combination" which would do "no more than they would in separate sequential operation" are obvious.  *KSR*, 127 S. Ct. at 1739 (*quoting Great Atl. & Pac. Tea Co. v. Supermkt. Equip. Corp.*, 340 U.S. 147, 152 (1950)).  On the other hand, an invention which combines elements that prior art teaches against combining, or an invention which combines familiar elements but yields exceptionally unexpected results, will usually be non-obvious.  *KSR*, 127 S. Ct. at 1739 (citing *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 60-62 (1969)).  Additionally, a patent "can be proved obvious . . . by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims."  *KSR*, 127 S. Ct. at 1742.

Although equipped with certain bedrock principles, courts must still apply a flexible approach to obviousness determinations. *See id*. at 1739; *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1256-57 (Fed. Cir. 2007); *see also DyStar,* 464 F.3d at 1367. For instance, "the Supreme Court suggests, [that] a flexible approach to the [teaching, suggestion, or motivation test ("TSM test")] prevents hindsight and focuses on evidence before the time of invention . . . without unduly constraining the breadth of knowledge available to one of ordinary skill in the art during the obviousness analysis." *Translogic*, 504 F.3d at 1260 (citation omitted); *see Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) ("[A] flexible TSM test remains the primary guarantor against a non-statutory hindsight analysis."). Under the TSM test, a patent can be proven obvious "if 'some motivation or suggestion to combine the prior art teachings' can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art." *KSR*, 127 S. Ct. at 1734 (quoting *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323-1324 (Fed. Cir. 1999)). Such a motivation to combine need not be explicit and must be analyzed under the lens of one skilled in the art. *See KSR*, 127 S. Ct. at 1740-41.

When determining obviousness, a court must also consider the analytical prowess of one skilled in the art rather than confining its analysis to explicit teachings in prior art. A "patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 127 S. Ct. at 1741.

> [Indeed, it will often] . . . be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

*Id.* at 1740-41; *Med. Instrumentation*, 344 F.3d at 1221-22. Although they are significant, courts must not overemphasize "the importance of published articles and the explicit content of issued patents." *KSR*, 127 S. Ct. at 1741. In fact, to find a patent obvious, a court "need not seek out precise teachings directed to the specific subject matter of the challenged claim." *Id.* Rather, "a court can [also] take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 127 S. Ct. at 1741; *see also Dystar*, 464 F.3d at 1361 (quoting *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1472 (Fed. Cir. 1997) ("[T]here is no requirement that the prior art contain an express suggestion to combine known elements to achieve the claimed invention. Rather, the suggestion to combine may come from the prior art, as filtered through the knowledge of one skilled in the art.").

Having broadly articulated the obviousness standard under § 103, the Court will apply specific case law as needed in its analysis.

## DISCUSSION

In its analysis of the parties' objections, the Court will initially focus on claim 1 of the '493 Patent. Claim 1 is representative of the subject matter claimed by the patents in suit and if a prior art reference anticipates or renders claim 1 obvious, the same result will likely apply to the other independent claims of the patents in suit.[5] Where necessary, the Court's analysis will directly address the other patent claims at issue. In order to assist its analysis, the Court has divided claim 1 into nine elements, shown below by the bracketed letters added by the Court.

---

[5] This is often termed a "representative claim" in the parlance of patent litigation. *See*, *e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200 (Fed. Cir. 2008) (focusing the analysis of a patent based on one "representative" claim).

1. A system for facilitating a windowed content manifestation environment within a web browser, comprising:

**[A]** a server system configured to transmit a software system and associated content via an electronic data network; and

**[B]** a web browser client operating within a data processing system that is coupled to said server system via the electronic data network and having a content manifestation environment, **[C]** said web browser client operative to receive said software system and said associated content from said server system via the electronic data network, **[D]** to process said software system and said associated content to produce window objects solely contained within said content manifestation environment, **[E]** each window object of said window objects is associated with a set of controllable attributes and is configured to statically or dynamically manifest at least a portion of said associated content therein, **[F]** said controllable attributes configured to affect manifestation of said each window object by said web browser client within said content manifestation environment, **[G]** wherein said each window object executes within and is directly controlled by said web browser client which operates within said data processing system, **[H]** and said controllable attributes associated with said each window object permit said each window object to be controlled as a result of performing at least one of a moving operation, a resizing operation, a minimizing operation and a maximizing operation within said content manifestation environment and **[I]** without requiring said web browser client to refresh said content manifestation environment.

When necessary, the Court will refer to a certain claim element by the designation shown above rather than repeating the relevant claim language. For example, instead of stating that a prior art reference does not disclose a window object that is ". . . solely contained within said content manifestation environment," the Court will state that the reference does not disclose element 1D of the '493 Patent.

The Court now turns to the parties' objections, addressing first the objections with respect to anticipation and then those related to obviousness.

# I.   Anticipation

## A.   Preliminary Objections

The heart of the parties' objections to the Special Master's recommendations on anticipation relate to the following contested prior art references:  the Meininger reference, the Visual DHTML reference, the JavaScript Bible, and the Bates Patent.  Prior to addressing those objections, the Court will address two preliminary objections raised by the parties.  They are: (1) Simple's objections to the Special Master's standard of review; and (2) CA's objection to the admission of a supplemental expert declaration submitted by Simple in support of their objections to the R&R.

### 1.   The Special Master Identified and Applied the Correct Summary Judgment Standard

According to the Special Master, it would be inappropriate to grant either of the parties' motions for summary judgment if a reasonable jury ***could*** rule in favor of the nonmoving party. (*See*  R&R at 4 (citing *Celotex*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 247-48; Fed. R. Civ. P. 56(c)).)

As the following analysis will show, the Special Master applied the correct standard to the parties' motions for summary judgment.  In analyzing its motion for summary judgment on anticipation, the Special Master stated that in order for CA to prevail it must demonstrate that the relevant prior art references clearly and convincingly disclose each element of the relevant claims with no "genuine issue of material fact."  (R&R at 63 (stating "it is CA's burden to prove invalidity, . . . [its] evidence must meet the clear and convincing standard with respect to every

15

limitation of the disputed claims "), 94-95, 177, 204-05, 244).  For instance, in denying CA's

motion with respect to the Meininger reference, the Special Master found that "there remain

unresolved genuine issues of material facts in dispute."  (*See* R&R at 95; *see also id.* at  177,

204-05, 244 (denying CA's motion for summary judgment of anticipation regarding the Visual

DHTML, JavaScript Bible and Bates Patent because there remained genuine issues of material

fact as to whether certain elements of the '493 Patent were anticipated).)  The Special Master

also correctly stated that in order to prevail on their motion, Simple bore the burden of

demonstrating that no reasonable jury could find that the record contains clear and convincing

evidence of invalidity.  (*See* R&R at 251-52 (*applying Med. Instrumentation*, 344 F.3d at 1220);

*see also id.* at 263, 272, 288, 297, 302, 304, 305.)  Applying that standard, the Special Master

found that, although  issues of material fact precluded summary judgment in its favor, CA had

put forth enough evidence such that a reasonable jury ***could*** find that the patents in suit were

clearly and convincingly anticipated, thereby mandating denial of Simple's motion.

　　　Simple's argument that they should be granted summary judgment merely because CA's

motion failed leaves the Court underwhelmed.  As the following excerpt from *Eli Lilly* shows,

this exact issue has been addressed by the Federal Circuit and remains far from a mystery.

> [A] moving party seeking to invalidate a patent at summary judgment
> must submit such clear and convincing evidence of invalidity so that no
> reasonable jury could find otherwise. Alternatively, ***a moving party
> seeking to have a patent held not invalid at summary judgment must
> show that the nonmoving party, who bears the burden of proof at trial,
> failed to produce clear and convincing evidence on an essential element
> of a defense upon which a reasonable jury could invalidate the patent.***
> In determining whether a genuine issue of material fact exists, the court
> views the evidence in the light most favorable to the nonmoving party and
> resolves all doubts in its favor.

*Eli Lilly*, 251 F.3d at 962; *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 249 F. Supp.2d at 231

(W.D.N.Y. 2003); *Med. Instrumentation*, 344 F.3d at 1220-21; *see also generally Freedman*, 420

F.3d at 1364.  In short, to defeat Simple's motion for summary judgment in on its invalidity

defense, CA need only show that a reasonable jury **could** find that it put forth clear and

convincing evidence of invalidity.  Indeed, Simple's argument misconstrues the entire point of

cross-motions for summary judgment.[6]

　　　As a subsidiary argument, Simple claims that the quality of CA's evidence is insufficient

to defeat Simple's motion for summary judgment.  According to Simple, CA's evidence of

anticipation was conclusory in nature and not sufficiently detailed to raise a genuine issue of

fact.

　　　Putting aside for now the level of evidence in support of the Meininger, Visual DHTML,

JavaScript Bible, and Bates Patent references, which will be discussed in great detail later on, the

Court agrees with the Special Master's determination that the evidence submitted in support of

the remaining references is sufficient to create a material question of fact.  As shown in excerpt

below, the Special Master analogized the case at bar to the fact pattern in  *Medical*

*Instrumentation*, 344 F.3d at 1220, and found that the evidence submitted by CA created

genuine issues of material fact as to the validity of the '493, '563, and '882 Patents.  (R&R at

251-52.)

> Given the large number of asserted prior art references, Mr.
> Goodman's approach to summarizing the invalidity contentions
> with respect to those references is not improper, and is sufficiently

---

[6] Simple reiterates their objection to the Special Master's summary judgment standard in
its objections regarding the Visual DHTML reference, JavaScript Bible and Bates Patent.  For
the reasons discussed above, the Court denies those objections as well.

particular to raise a genuine issue of material fact whether those references anticipate the claims at issue. *See Medical Instrumentation and Diagnostics Corporation v. Elekta AB*, 344 F.3d 1205, 1220 (Fed. Cir. 2003) ("Elekta's expert testimony in this case is not of the type that we have found to be insufficient as a matter of law to raise a genuine issue of invalidity in the past. Rather than leaving the trial judge to 'search through lengthy technologic documents for possible evidence,' *Biotec Biologische Naturverpackungen v. Biorcorp, Inc.*, 249 F.3d 1341, 1353 (Fed. Cir. 2001), Elekta's expert quoted the particular portions of the references that were relevant for each of the claim limitations. Furthermore, the expert did not simply make a conclusory statement that, in his opinion, the claims were invalid. *See id.* ('It is well established that conclusory statements of counsel or a witness that a patent is invalid do not raise a genuine issue of fact.'). Rather, for each claim limitation, he connected it with disclosures in the prior art that he believed taught each particular limitation.").

(R&R at 251-52.)

The Court, like the Special Master, finds that the case at bar is analogous to *Medical Instrumentation* and, contrary to Simple's contention, CA's evidence of anticipation is not conclusory. In fact, CA provides hundreds of pages of analysis and numerous exhibits regarding its invalidity claims. (*See, e.g.*, Invalidity Expert Report of Danny Goodman (Dkt. No. 362) ("Goodman Invalidity Rpt.").) Like the expert in *Medical Instrumentation*, CA's expert, Danny Goodman, cited to specific pages, sections, and portions of prior art references and linked them to the asserted claim elements he believed they invalidated. (*See, e.g.*, Goodman Invalidity Rpt. at Ex. D (a claim chart listing the elements of the patents in suit and citing to specific pages in CA's prior art which purportedly invalidate them).) Having reviewed Goodman's extensive invalidity analysis, the Court, like the Special Master, finds CA's evidence sufficient to raise a material issue of fact.

18

Simple's objection to the R&R on the ground the Special Master applied the wrong summary judgment standard is denied.

### 2. Simple's Supplemental Expert Declaration Will Be Admitted Into Evidence

The Court now turns to CA's objection to Simple's use of a supplemental expert declaration.

CA provided a supplemental expert declaration and accompanying video demonstrations by Danny Goodman together with its objections to the R&R.  (*See* Decl. of Danny Goodman In Supp. Of CA International, Inc.'s Objection to the Special Master's Report and Recommendations as to CA's Mot. For Summ. J. of Anticipation (Dkt. No.607) ("First Goodman Supp. Decl.").)  Simple followed suit and submitted a supplemental declaration and accompanying video demonstration from their own expert witness, Richard Belgard.  (*See* Dkt. No. 613 ("Belgard Supp. Decl.").)  CA then submitted a second supplemental expert declaration.  (*See* Dkt. No. 620 ("Second Goodman Supp. Decl.").)

CA now argues that, while its own supplemental evidence should be considered, Simple's supplemental expert evidence should not, because rather than "providing new support for existing opinions" Simple provides "entirely new opinions."  (CA's Reply in Supp. of its Objections to Special Master's Report and Recommendation Regarding Anticipation and Obviousness (Dkt. No. 619) ("CA's Supp. Reply"), at 1-3.)  According to CA, it has been unfairly "blindside[d]" by these entirely new opinions, in contravention of Federal Rule of Civil Procedure 26.  (*Id.* at 2-3.)

For the reasons set forth below, CA's objection is denied and the Court will consider Simple's supplemental evidence.

As noted earlier, because the Special Master is acting in the place of the magistrate judge, his reports and recommendations are governed by Federal Rule of Civil Procedure 72. (*See* Dkt. No. 152 at 4.) Pursuant to Rule 72(b)(3), "a district judge may . . . receive further evidence" while resolving objections to a magistrate judge's report and recommendations. Fed. R. Civ. P. 72(b)(3); *see also Hynes v. Squillace*, 143 F.3d 653, 656-57 (2d Cir. 1998) (finding that a district court did not abuse its discretion in considering supplemental evidence presented on an objection to a magistrates's report and recommendation); *Perez v. Hewitt*, 2008 U.S. Dist. LEXIS 22980, *9-12 (S.D.N.Y. Mar. 21, 2008) (considering supplemental evidence in reviewing a magistrate's report and recommendations); *Kendall v. Vives*, 2007 U.S. Dist. LEXIS 22414, *13-14 (S.D.N.Y. Mar. 29, 2007) (same).

The facts at hand are highly analogous to instances in which other courts have properly exercised their discretion in considering additional evidence under Rule 72(b)(3). For instance, in *Perez*, the district court considered additional evidence when reviewing a magistrate's report and recommendations because: (1) there was no indication that the evidentiary submission was a "dilatory tactic" or timed in order to gain a "strategic advantage"; (2) there was no indication that the new evidence lacked reliability; and (3) the new evidence was "highly relevant." 2008 U.S. Dist. LEXIS 22980, *9-12. As CA was able to submit a second supplemental expert declaration in response, Simple has gained no strategic advantage by waiting until they responded to CA's objections to the R&R to present Belgard's supplemental declarations. Nor is there an indication that the timing of Belgard's report was dilatory in nature. Belgard's supplemental declaration is also particularly relevant because it contains pictorial and video

demonstrations directly relating to issues raised by the R&R. *See Perez*, 2008 U.S. Dist. LEXIS 22980 at *11-12 (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

There is no question of CA "being blindsided by another party with new opinions never before discussed." *Cary Oil Co. v. MG Refining & Mktg., Inc.*, 2003 WL 1878246, *4 (S.D.N.Y. Apr. 11, 2003). In this case, (1) Belgard's report addressed points raised in CA's prior supplemental expert report on the same topic; (2) Belgard had already discussed most of the opinions and arguments he raised in his supplemental report in his rebuttal report submitted in August of 2004; and (3) CA was able to counter Belgard's supplemental testimony with yet another supplemental report of their own, ensuring that Simple's supplemental evidence would not go unaddressed.

Nor does the case law cited by CA compel exclusion of the supplemental declaration. For instance, *Transclean Corp. v. Bridgewood Servs., Inc.*, 77 F. Supp. 2d 1045, 1060-61 (D. Minn. 1999), is distinguishable because the sanctioned party in that case used its supplemental expert reports to raise obviousness and non-infringement arguments for the first time at the summary judgment stage. Similarly, *Revlon Consumer Products Corp. v. Estee Lauder Cos., Inc.*, 2003 U.S. Dist. LEXIS 13004, *11-15 (S.D.N.Y. July 30, 2003) and *Cary Oil*, 2003 WL 1878246 at *4, fail to advance CA's argument because here, unlike those cases: (1) the opinions expressed in the supplemental declaration are not new arguments that CA was unaware of, and (2) CA was able to submit its second supplemental declaration in rebuttal. In sum, the Court will exercise its discretion under Federal Rule of Civil Procedure 72(b)(3) and consider the supplemental evidence put forth by CA and Simple.

Having addressed the preliminary objections, the Court now turns to the heart of the parties' objections, determining whether the Meininger, Visual DHTML, JavaScript Bible, and Bates Patent references anticipate the patents in suit. The Court will address each of the references separately. In determining whether each of these references anticipates the '493, '563, and '882 Patents, the Court will first describe the reference in question, summarize the Special Master's recommendations and the parties' objections thereto, and finally set forth its own analysis and ruling. The Court will begin with an analysis of the Meininger reference.

**B.      The Meininger Reference**

**1.      Overview of the Meininger Reference**

The Meininger reference is a web page which simulates a windowed content manifestation environment.[7] (R&R at 15.) Shown below in **Figure 2**, is a screen shot of the Meininger reference from the Invalidity Expert Report of Danny Goodman. (Goodman Invalidity Rpt. at 30.) The Court will limit its discussion to those aspects of the Meininger reference which relate directly to the parties' objections.

---

[7] The Court will use the term "windowed content manifestation environment" to describe the patented subject matter as well as the prior art. However, the use of similar terminology, in this and other instances, is not a determination that the prior art and the claimed subject matter are identical for the purposes of invalidity. Where the Court finds that the relevant prior art is anticipatory under § 102 or invalidating under § 103 of the Patent Act, it will make an explicit statement to that affect.

**Figure 2:**



As **Figure 2** shows: the "upper left quadrant of the screen" contains "a [WindowMaker] menu with various buttons," the "upper right quadrant of the screen" contains three elements stacked on top of each other, the bottom left hand quadrant contains a window entitled "What is it?," and the bottom right hand quadrant contains a set of tiled items. (R&R at 26-27, 30-33.) If a user were to click any of the buttons in WindowMaker menu found in the upper left quadrant of the screen, a corresponding window would appear. For example, the bottom most button on the menu is labeled "Other Stuff." Consequently, if a user were to click on this button, a window labeled "Other Stuff" would appear on screen and could be manipulated by the user. In this context, manipulation includes moving, closing, restoring, and minimizing. (*See* R&R at 30-33.)

Notably, the windows in the Meininger reference can be dragged outside their content manifestation environments. As such, the windows in the Meininger reference can be analogized to the draggable modules ("DMODs") disclosed in the '493, '563, and '882 Patents and the screen in the Meininger reference could be analogized to the content manifestation environment described by the patents in suit. (*See* Claim Constr. Mem. at 22-24 (describing DMODs).) The "What is it?" window can be moved around the content manifestation environment of the Meininger reference. However, unlike the claimed subject matter of the patents in suit, certain windows in the Meininger reference can be dragged off the computer screen. (*See* R&R at 87; Decl. of Nitin Subhedar in Support of Plaintiff's Motion for Summary Judgment of Invalidity (Dkt. No. 332-2) ("Subhedar Decl."), at Ex. 43, Confidential Rebuttal Report of Richard A. Belgard ¶90 (pointing out that the windows in the Meininger reference could be dragged entirely off the web browser screen).) Additionally, when windows in the Meininger reference are minimized, they are made invisible and can only be restored when the user clicks on the corresponding button in the separate WindowMaker menu. Having described the Meininger reference, the Court will summarize the Special Master's recommendations most relevant to the parties' objections.

## 2.      The Special Master's Recommendations

Overall, the Special Master found that the Meininger reference was admissible prior art but that there were material issues of fact relevant to whether it anticipated the '493, '563, and '882 Patents.

### a. The Special Master Found that the Meininger Reference Was Admissible Prior Art

First, the Special Master addressed whether the Meininger reference was admissible prior art under § 102(a) of the Patent Act. (R&R at 58.)  Applying the "rule of reason" analysis, "under which all pertinent evidence is examined when determining the credibility of an inventor's testimony," the Special Master found that: "(1) Meininger's testimony, (2) date-stamped computer files, (3) email and (4) an online article about Meininger's website," were sufficient to establish that the Meininger reference was a printed publication, which was known or used by others in the United States prior to January 21, 1999.  (R&R at 36-58 (citation omitted).)

Specifically, the Special Master found that Meininger's testimony was corroborated by substantial physical evidence.  According to the Special Master, the computer generated date stamps on a CD containing the Meininger reference (the "archive CD") established that the Meininger reference was "created in May of 1998." (*Id.* at 43.)  This finding, along with Meininger's testimony, was corroborated by a series of emails sent between Meininger and others who used the Meininger reference before January, 21, 1999. (*Id.* at 44-53.)  The Special Master found that an email sent by Meininger, describing the Meininger reference and soliciting feedback from a community of web developers was admissible under Federal Rule of Evidence 801(d)(1)(B), "at least," to rebut a charge of improper motive. (*Id.* at 48.)  With regards to the emails sent from others who used the Meininger reference, the Special Master found that they were "clearly admissible" because: (1) they were not offered for the truth of their contents, but rather "to show that others accessed and viewed the" Meininger reference; and (2) even if they

were hearsay, they would be admissible under Federal Rules of Evidence 803(1) and 803(2) as presence sense impressions and excited utterances. (*Id.* at 48, 52-53.)

As the following excerpt shows, based in part on the addresses associated with some of the emails offered to corroborate Meininger's testimony, the Special Master reasoned that certain emails were sent from within the United States, indicating that the Meininger reference was used domestically:

> Some of the foregoing emails bear addresses that are clearly foreign, such as "fatal@pc23-c801.uibk.ac.at" (Austria) and "nv96wgzg@Katedral.SE" (Sweden), but others are of clearly domestic origin. The email "wkoffel@MIT.EDU," for example, obviously refers to a Massachusetts Institute of Technology email server, and suggests that Meininger's website was not only known in the United States, but also used in the United States. *See Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1369 (Fed. Cir. 2000) ("A presentation indicative of the state of knowledge and use in this country therefore qualifies as prior art for anticipation purposes under §102."). Likewise, "kilpatds@erols.com" refers to the server run by the Erols Internet Company, which was a domestic company internet services provider at the time. Also, CA provides a printout of the personal website of "CmdrTaco," aka Rob Malda, which indicates that "CmdrTaco" was born, raised and still lives in the United States, and launched and presently serves as the editor-in-chief of www.slashdot.org. *See* (Martiniak Decl.), Exh. 3 (printout from http://cmdrtaco.net/rob.shtml).

(R&R at 55 (footnotes omitted).) The Special Master also reasoned that the Meininger reference was used in the United States because: (1) it formed a complete system over a network once it was accessed by a user and (2) Meininger benefitted by gaining publicity every time the Meininger reference was accessed by a remote user. (*Id.* at 56-57 (citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005)).

Next, the Special Master found that Meininger's testimony was corroborated by an article found on the Internet (the "Slashdot article"), which praised the Meininger reference as "excellent" and provided users with a "link" to it.  (*Id.* at 53-54.)[8]  Previously, users could click on this "link" to access the Meininger reference.  According to the Special Master, the Internet article was not hearsay because it was not offered for the truth of its contents but merely to show that the Meininger reference was known and used prior to January 21, 1999.  (R&R at 54.)  In view of the foregoing, the Special Master concluded that the Meininger reference was a publicly accessible printed publication as of May, 1998.  (*Id.* at 57-58 (citing *Eolas Techs., Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1791 (Fed. Cir. 2005)).)  Having found that the Meininger reference was admissible prior art, the Special Master then addressed whether it anticipated the '493, '563, and '882 Patents.

> **b.** **The Special Master Found Genuine Issues of Material Fact Regarding Whether the Meininger Reference Anticipates the Patents In Suit**

The Special Master focused his anticipation analysis on claim 1 of the '493 Patent, and determined that CA's motion for summary judgment on the grounds of anticipation, as it pertained to the Meininger reference, should be denied because there were material issues of fact regarding whether the Meininger reference disclosed the: (1) "acts independently" requirement of a window object; (2) multiple window objects requirement of element 1D of the '493 patent;

---

[8] In this context, the term "link" is a term of art in the realm of computer programming. The Internet article provides as follows: "Gambit32 sent us This link to an excellent WindowMaker page."  The underlined words "This link" indicate to a reader of the web page, that she can place her mouse over the text, click on it, and be taken to another web page.  In this instance, the other web page would be the Meininger reference.

and (3) without refresh requirement of element 1I of the '493 Patent.  (*Id.* at 81-82, 84, 94-95.)[9]

In particular, the Special Master found that CA's evidence did not compel the conclusion that the

window elements in the Meininger reference, which it claimed were window objects, acted

independently of "all of the 'other content'" in its respective HTML document.  (R&R at 81-82.)

Specifically, the Special Master stated:

> Mr. Goodman did not, however, demonstrate that the "What is it?"
> element could be "dropped" to cover the left-side menu or
> demonstrate that the "What is it?" element could be dragged and
> dropped over the right-side stack of elements. Thus, while Mr.
> Goodman demonstrated that the "What is it?" element "acts
> independently" with respect to the block of four elements in the
> middle of the CME, it is not clear that the "What is it?" element
> may do so with respect to all of the "other content" of the CME.
> . . . There remains a genuine issue of material fact, therefore,
> whether the "What is it?" element qualifies as a "window object."
> . . . In other words, the foregoing demonstration is not sufficient to
> compel the conclusion that the element acts independently of all
> "other content."

(*Id.*)  The Special Master found issues of material fact as to whether the Meininger reference

could simultaneously host multiple window elements because CA's invalidity demonstration

only opened the "What is it?" window element.  (*Id.* at 84.)  Finally, the Special Master found

issues of material fact as to whether the Meininger reference satisfied the "without . . . refresh"

limitation of element 1I of the '493 Patent because there was a question as to whether the web

browser content manifestation environment was updated with content from the "web cache,"

---

[9]Although the Special Master found that the Meininger reference anticipated elements
1A, 1B, and 1C of the '493 Patent, he cautioned that his finding that the Meininger reference
anticipated elements 1E, 1F, 1G and 1H of the '493 Patent was based on an assumption
("*arguendo*") that the windows in the Meininger reference were window objects as described by
the patents in suit.  (*See* R&R at 70, 88, 90, 95.)  The Special Master also applies the same
qualification to his findings regarding the Visual DHTML reference and JavaScript Bible.  (*See
id.* at 162, 169, 173-77, 196, 199-203.)

which could be located on a user's personal computer. (*Id.* at 92-93.) Since each of the claims CA asserted were anticipated by the Meininger reference required at least one window object and included the without refresh limitation, the Special Master found that there were unresolved genuine issues of material fact. (*Id.* at 95.) Nevertheless, the Special Master did find that if a jury determined that the Meininger reference contained window objects and satisfied the without refresh requirement on element 1I, it would anticipate claim 1 of the '493 Patent. The Court will now summarize the parties' objections to these recommendations.

### 3. Simple's Objections

In essence, Simple seeks to have their motion for summary judgment, dismissing CA's invalidity (anticipation and obviousness) defenses, granted. To that end, Simple has put forth numerous objections dealing with, evidentiary issues, whether CA proffered enough evidence to evade summary judgment, and whether the relevant prior art actually anticipates the '493, '563, and '882 Patents.

Simple argues that the Special Master incorrectly denied their motion for summary judgment regarding the Meininger reference because CA failed to offer sufficient evidence to show that the Meininger reference predated the patents in suit or that it disclosed every limitation of the claimed inventions. (Simple's Objections at 4.) According to Simple, Jeff Meininger's ("Meininger") oral testimony, offered to invalidate the '493, '563, and '882 Patents, is uncorroborated because its only support comes either from physical evidence not made contemporaneously with the Meininger reference or inadmissable hearsay. (*Id.* at 5-8.) To that point, Simple challenges the corroborative value and admissibility of the following evidence offered by CA: (1) a compact disc containing an archived package of the software necessary to

create the Meininger reference, the archive CD; (2) an email from Meininger sent in May of 1998 making members of the public aware of his allegedly anticipatory web page (the "Meininger email"); (3) emails from users who accessed the Meininger reference over the Internet during May of 1998 (the "reply emails"); and (4) an Internet article about the Meininger reference dated May 11, 1998 (the "Slashdot article"). (*Id.*) Thus, according to Simple, "Meininger's oral testimony alone cannot provide the clear and convincing evidence required to invalidate the" patents in suit. (*Id.* at 4.)

Simple further maintains that their motion for summary judgment on anticipation regarding the Meininger reference should be granted regardless of whether the Court admits CA's corroborative evidence as the Meininger reference fails to disclose every limitation of the patents in suit. (*Id.* at 8.) According to Simple, since "there is no dispute" that window elements in the Meininger reference can be moved outside their content manifestation environments, the "solely contained within" requirement of element 1D of the '493 Patent is not satisfied. (*Id.* at 8-9.) Simple also argues that they are entitled to summary judgment dismissing CA's anticipation defense regarding the Meininger reference because the Special Master concluded that CA failed to clearly and convincingly demonstrate, with no genuine issue of material fact that the "window object" and "refresh" limitations are disclosed by the Meininger reference. (*Id.* at 9.)

### 4. CA's Objections

CA's objections can be summarized in the following syllogism: (1) its expert opinion and arguments were based on the best and most relevant evidence, the source code of each applicable reference; (2) this evidence supports the conclusion that there is no question of material fact regarding whether the reference in question anticipates the patents in suit; and (3) even if there

were any issues of fact, its supplemental evidence removes any doubt as to whether or not the '493, '563, and '882 Patents are anticipated. (*See* CA's Objections at 1-2.) CA applies this same logic to its objections regarding the Special Master's recommendations on the Visual DHTML and JavaScript Bible references as well. (*Id.*) With regards to the Meininger reference, CA: (1) objects to the Special Master's recommendation that there are genuine issues of material fact as to whether the record evidence clearly and convincingly shows that window elements in the Meininger reference (a) act independently of other content, (b) satisfy the multiple window objects requirement of element 1D of the '493 Patent, and (c) satisfy the without refresh requirement of element 1I of the '493 Patent; and (2) argues that the window elements in the Meininger reference meet the solely contained within requirement of the of element 1D of the '493 Patent. (CA's Objections at 1-8, 14-17, 22-23.)

### 5. Analysis

#### a. Admissibility of the Meininger Reference as Prior Art Under Section 102(a) of the Patent Act

Before addressing whether it anticipates the patents in suit, the Court must determine whether the Meininger reference is in fact admissible prior art under § 102(a). According to Simple, the only admissible evidence offered to establish when the Meininger reference was publicly available was the uncorroborated testimony of Jeff Meininger, an interested witness.

In order to address Simple's objections, the Court must determine whether Jeff Meininger's oral testimony was sufficiently corroborated by evaluating the admissibility and probative value of the: (1) the archive CD; (2) the Meininger email; (3) the reply emails; and (4) the Slashdot article.

### (1) Meininger's Oral Testimony Is Sufficiently Corroborated Under a Rule of Reason Analysis

Because oral testimony, even from an allegedly uninterested party must be sufficiently corroborated when used to invalidate a patent, *Juicy Whip v. Orange Bang*, 292 F.3d 728, 742 (Fed. Cir. 2002), the first issue the Court will consider is whether Jeff Meininger's oral testimony is sufficiently corroborated to establish that the Meininger reference is admissible prior art under § 102(a) of the Patent Act.

In patent cases, courts have long used the *Reuter* factors, listed below, when evaluating the credibility of oral statements:

> (1) delay between event and trial, (2) interest of witness, (3) contradiction or impeachment, (4) corroboration, (5) witnesses' familiarity with details of alleged prior structure, (6) improbability of prior use considering state of the art, (7) impact of the invention on the industry, and (8) relationship between witness and alleged prior user.

*In re Reuter*, 670 F.2d 1015, 1021 & n.9 (C.C.P.A. 1981). Corroboration is the most relevant factor at issue and will be given the lion's share of analysis.

Corroboration is assessed under the "rule of reason" analysis, which requires the evaluation of all pertinent evidence in order to gauge the credibility of a particular witness. *Juicy Whip*, 292 F.3d at 741; *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996). Not surprisingly, the Federal Circuit favors corroboration in the form of physical records "made contemporaneously with the alleged prior invention" or use. *Juicy Whip*, 292 F.3d at 743. Additionally, the "requirement of independent knowledge remains key to the corroboration inquiry." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1170 (Fed. Cir. 2006).

What follows is the Court's determination of the admissibility of the archive CD, Meininger email, reply emails, and Slashdot article.

### (a) The Archive CD Is Admissible and Highly Corroborative

Simple argues that the archive CD has no corroborative value because it was not made contemporaneously with the Meininger reference and its electronic date stamps could have been manipulated. (Simple's Objections at 5; Summ. J. Hr'g Tr. 233:8- 235:5.) In other words, Simple questions the authenticity of the archive CD. (Summ. J. Hr'g Tr. 233:8- 235:5.) Accordingly, the Court must determine whether it has been properly authenticated under Federal Rule of Evidence 901.

Federal Rule of Evidence 901(a) provides that "authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This requires little more than a prima facie showing of authenticity: it "does not erect a particularly high hurdle." *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001) (citations omitted). Indeed, "the proponent of the evidence is not required 'to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be.'" *Id.* Rather, a court may find proper authentication merely upon a showing that "a reasonable juror could find in favor of authenticity or identification." *Id.*; *see United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 2001); *see generally United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999); 5-901 Weinstein's Federal Evidence § 901.02[3].

Rule 901(b) works in tandem with Rule 901(a) and provides examples of how evidence can be authenticated. Rule 901(b)(1) provides:

(b) Illustrations. ***By way of illustration only, and not by way of limitation***, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) ***Testimony of witness with knowledge***. Testimony ***that a matter is what it is claimed to be***

. . .

(9) Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result. . . .

Fed. R. Evid. 901(b) (emphasis added). Accordingly, the testimony of a witness with knowledge that the matter is what it is claimed to be, or evidence describing the process of how date stamps are produced and that they are accurate, is sufficient to authenticate the date stamps on the archive CD. Having established the standard for authentication, the focus shifts to evaluating the reliability of machine generated time stamps.

Computer generated time stamps are mechanical traces that can be used to prove the occurrence of an event. A time stamp is considered a "mechanical trace" for the purposes of admissibility. *L.A. News Serv. v. CBS Broad.*, *Inc.*, 305 F.3d 924, 936 (9th Cir. 2002) (likening "a postmark or a time stamp" to a mechanical trace not subject to the hearsay rule because it is not an assertion). This is critical because "[a] 'mechanical trace' [can be used] . . . to show that at some previous time a certain act was or was not done." *United States v. Snow*, 517 F.2d 441, 443-44 (9th Cir. 1975) (citing WIGMORE §§ 25, 148-57 (3rd ed. 1940)). Just as importantly, absent proof of alteration, computer generated data, such as a time stamp attached to a file when it is saved, is generally admissible and taken as true. *See* 5-900 Weinstein's Federal Evidence § 900.07[1][a].

Computer-generated data, which includes metadata, . . . are extrajudicial statements that are not hearsay. In these circumstances, there is no declarant making a statement. The computer is itself performing the transaction at issue. Thus, a

> hearsay foundation is unnecessary and the evidence can be
> admitted upon a proper authentication foundation under Rule
> 901(b)(9).
>
> The authenticity of computer-generated data may be challenged if
> it has been altered. . . . However, some evidence is required to
> justify excluding metadata. A conclusory or speculative allegation
> that the metadata has been altered is insufficient.

*Id.*; *Snow*, 517 F.2d at 443; *L.A. News Serv.*, 305 F.3d at 936.[10] Accordingly, a party opposing

computer generated data must put forth more than mere assertions of tampering. *See*

*Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs.*, 2008 U.S. Dist. LEXIS 8263, at *36-37

(D.N.J. Feb. 4, 2008) (noting that since there was not even a "shred" of evidence that the

computer files were in any way manipulated, the proffered documents were reliable) (quoting

*United States v. Bonallo*, 858 F.2d 1427, 1436 (9th Cir. 1988)); *United States v. Steiger*, 2006

U.S. Dist. LEXIS 89832, *68-69 (M.D. Ala. Sept. 7, 2006) ("Absent specific evidence of

tampering, allegations that computer data has been altered goes to its weight, not admissibility.")

(citing *Bonallo*, 858 F.2d at 1436).

The archive CD and the time stamps therein are sufficiently authenticated under Rule 901

and corroborate Meininger's testimony regarding the availability and features of the Meininger

reference. Jeff Meininger is a witness with knowledge of the archive CD. In fact, he created it.

(Meininger Dep. (Dkt. No. 402- 3) ("Meininger Dep."), at 62.) According to Meininger, he

personally copied the files used to create the Meininger reference onto the archive CD and

---

[10] Generally, metadata is defined as "data about data." WordNet® 3.0, © 2006 by
Princeton University, at http://dictionary.reference.com/browse/metadata. In this context,
metadata is a technical term which includes computer generated date stamps. These time stamps
provide data (the date and time a file was created and edited) about date (files) stored in a
computer or storage medium like a CD.

"preserve[d] the date stamps on those files as they were in . . . [his] storage system." (*Id.*) Meininger further testified that the dates on the archive CD "reflected the last modification time" of the files used to create the Meininger reference. As such, CA has authenticated the archive CD under Rules 901(1) and (9) with the testimony of a witness with knowledge that the matter in question is what it is claimed to be and evidence describing the process used to produce an accurate result. *See* Fed. R. Civ. P. 901(b)(1) & (9). For their part, Simple has offered no evidence to the contrary. As such, their unsupported allegations of tampering do nothing to detract from the admissibility of the archive CD. *See Floorgraphics*, 2008 U.S. Dist. LEXIS 8263 at *36-37; *Steiger*, 2006 U.S. Dist. LEXIS 89832 at *68-69.

The time stamps accompanying the archive CD files are highly reliable because they were automatically entered by a computer the last time a file was modified. *See Snow*, 517 F.2d at 443; *L.A. News Serv.*, 305 F.3d at 936; *Davison v. Eldorado Resorts LLC*, 2006 U.S. Dist. LEXIS 12598, *17-19 (D. Nev. Mar. 10, 2006). The screen shots displayed below in **Figures 3 and 4** are directory listings taken directly from the archive CD. The directory listings indicate the name of a file or folder used to create the Meininger reference as well as other relevant data, such as when a particular file was last modified.[11] As shown below, one of the fields to the right of the file or folder "Name" is the "Date Modified" field. The "Date Modified" field indicates the time a file was last modified and is entered by a computer when a user saves a file. (*See generally* Meininger Dep. at 64 (stating that the time stamps in the archive CD reflect the last time its files were modified).)

---

[11] A folder can contain other folders as well as one or more files.

**Figure 3:**



**Figure 4:**



Indeed, the date stamps found in the archive CD are analogous to a mechanical punch card used by employees to clock in and clock out when they enter and leave a building. Both are automated time entry steps performed by a machine. Consequently, both enjoy a higher presumption of validity than manually entered data. *See Snow*, 517 F.2d at 443; *L.A. News Serv.*, 305 F.3d at 936; *Davison*, 2006 U.S. Dist. LEXIS 12598 at *17-19. In short, the computer generated stamps of the "Date Modified" field in the Archive CD are a "mechanical trace" that can be used to show that the Meininger reference was last edited in May of 1998. *See Snow*, 517 F.2d at 443; *L.A. News Serv.*, 305 F.3d at 936.

Based on the foregoing, the Court easily finds that the archive CD is what Meininger claims it to be, a CD containing the Meininger reference as it functioned in May of 1998. Absent proof of alteration, computer generated data, like the time stamps on the archive CD, are generally admissible. *See, e.g.*, 5-900 Weinstein's Federal Evidence § 900.07[1][a]. In this

instance, Simple has not proffered any evidence to show that the archive CD or its datestamps were tampered with.  Instead, Simple merely alludes to the notion that "you never can tell what's going on with, you know, young folks." (Sum. J. Hr'g  Tr. 233:8- 235:5.)

The mere theoretical possibility that the archive CD could have been altered does not make it inadmissable, rather the possibility of tampering may only be considered when weighing the archive CD's corroborative value.  *E.g.*, *Steiger*, 2006 U.S. Dist. LEXIS 89832 at *68-69 ("Absent specific evidence of tampering, allegations that computer data has been altered goes to its weight, not admissibility.").  In light of the fact that Simple has put forth nothing more than bare assertions that the archive CD ***could*** have been altered, the Court finds the archive CD to be highly corroborative of Meininger's oral testimony.

In sum, the archive CD is admissible and serves as corroborative evidence of the features and availability of the Meininger reference.  Accordingly, Simple's objection to its admissibility is denied.  The focus now shifts to the emails regarding the Meininger reference.

> **(b)     The Email Sent By Meininger In May of 1998 As Well As Reply Emails From Users Who Accessed the Meininger Reference Are Admissible**

CA offered, as additional corroboration of Meininger's oral testimony, an email sent by Meininger in May of 1998 as well as certain reply emails he received.  The Special Master recommended that the Meininger email be admissible under Rule 801(d)(1)(B), to rebut Simple's charge that Meininger testified from an improper motive, and that the reply emails be admitted because they are not hearsay and contain "a range of responses to Meininger's web page, and bear dates of early May 1998."  (R&R at 48, 53.)  The Special Master also recommended that even if the reply emails were hearsay, they would be admissible under Federal Rules of Evidence

39

803(1) and 803(2) as present sense impressions and excited utterances.  (R&R at 53.)  In their

objections, Simple argues the Meininger emails and subsequent reply emails are inadmissible

hearsay.  (*See* Simple's Objections at 5-8.)

When proffering emails as evidence, parties have to contend with hearsay objections, just

as they would with hand written correspondences.  5-900 Weinstein's Federal Evidence §

900.07; *see also* Fed. R. Evid. 802 (the hearsay rule); Gregory P. Joseph, Internet and Email

Evidence, SM078 ALI-ABA 247, ALI-ABA Course of Study Materials,  Trial Evidence in

the Federal Courts: Problems and Solutions, Course Number SM078, March 2007

[hereinafter Joseph].  "An email offered for the truth of its contents is hearsay and must satisfy

an applicable hearsay exception."  Joseph; Fed. R. Evid. 801(c) (defining hearsay as a

"statement, other than one made by the declarant while testifying at the trial or hearing, offered

in evidence to prove the truth of the matter asserted.").

The Meininger email is not hearsay because it is not being offered for the truth of its

contents.  The Meininger email contains statements claiming that the Meininger web page: (1) is

"a REAL use for DHTML"; (2) behaves just like "windowmaker"; (3) is "ALL done with

javascript and DHTML"; and (4) is "VERY graphics intensive," etc.  (R&R at 44 (producing a

copy of the Meininger email).)  However, the Meininger email is not being offered to prove the

veracity of the foregoing statements.  *See United States v. Dupre*, 462 F.3d 131, 136-37 (2d Cir.

2006).  Rather, it is offered to show that the Meininger web page was available in May of 1998

because it was disseminated to members of the public.  As the email is not hearsay, it is

unnecessary for the Court to consider whether the email is admissible under any exception to the

hearsay rule.  Simple's objection to the admissibility of the email is denied.

The Court similarly concludes that the reply emails are not hearsay because they are not being submitted for the truth of their contents. Rather, they are being submitted to show that others accessed, used and were ***aware of*** the Meininger reference. Fed. R. Evid. 801(c); 5-900 Weinstein's Federal Evidence § 801.11 (citing *Dupre*, 462 F.3d at 136-37).

Simple's objections to the Meininger email and reply emails are denied. What remains is for the Court to address the admissibility of the Slashdot article.

### (c)　　　The Slashdot Article Is Admissible

The Slashdot Article is a web page print out containing a post from an individual identified as "CmdrTaco" which reads: "Gambit 32 sent us <u>This link</u> to an excellent WindowMaker page. And I mean excellent. You need a browser that can handle it: it uses layers and JavaScript to simulate the popular WM within your browser. Complete with asclock. Very clever." Simple does not question the authenticity of the Slashdot article but objects on the grounds that it is layered hearsay. (*See* Simple's Objections at 8.)

As the Special Master aptly found, the Slashdot article is not hearsay because it is not being offering for the truth of the assertion therein, to wit that the WindowMaker page is "excellent" or that it "uses layers." Instead, it is being offered to show knowledge and use of the Meininger reference in May of 1998. *See, e.g., Univ. of Kansas v. Sinks*, 565 F. Supp. 2d 1216, 1230-31, n.24 (D. Kan. 2008) (citing *Harvey Bennett Inv. v. Shidler*, 338 F.2d 1125, 1130 n.4 (10th Cir. 2003)). It corroborates Meininger's testimony regarding the first use of the Meininger reference. Simple's objection to the admissibility of the Slashdot article is denied because the Special Master correctly admitted it for the limited purpose of showing that the Meininger reference was available in May of 1998. Having ruled on Simple's evidentiary objections

regarding the Meininger reference, the Court will now determine if Meininger's testimony is sufficiently corroborated under the rule of reason analysis.

### (2) Analyzing the *Reuter* Factors And Applying the Rule of Reason Analysis

In light of the archive CD, Meininger's email, the reply emails, and the Slashdot article, the Court is left with little doubt that the Meininger reference qualifies as prior art and that Meininger's testimony should be given significant probative value. Indeed, this is borne out by applying the *Reuter* factors to Meininger's testimony and by analyzing the corroborative evidence submitted by CA, under a "rule of reason" analysis.[12]

The delay between the creation and publication of the Meininger reference in May of 1998, and April 20, 2004, the date of Meininger's deposition, does not undermine the value of Meininger's testimony or the viability of the Meininger reference as prior art because the archive CD, relevant emails and Slashdot article all provide strong memory aides. *Juicy Whip*, 292 F.3d at 741. Indeed, the crux of Meininger's testimony entailed describing how the Meininger reference worked. This was done by accessing the Meininger reference itself over the Internet. (Meininger Dep. at 12,15.) As such the concern over a "delay between event and" testimony does not apply in the case at bar.

---

[12] The *Reuter* factors are listed below:
> (1) delay between event and trial, (2) interest of witness, (3) contradiction or impeachment, (4) corroboration, (5) witnesses' familiarity with details of alleged prior structure, (6) improbability of prior use considering state of the art, (7) impact of the invention on the industry, and (8) relationship between witness and alleged prior user.

*Reuter*, 670 F.2d at 1021 n.9; *see* page 32 *supra*.

The remaining *Reuter* factors all weigh in favor of attributing a high probative value to Meininger's testimony. Meininger's testimony is not tainted by any supposed interest in the outcome of the case at bar because he is a subpoenaed third party with no financial interest in the outcome of this litigation. In this regard, Meininger cannot be compared to the witnesses in *Juicy Whip*, who were either involved in business dealings or friendships with the party offering their testimony as proof of invalidity. 292 F.3d at 743. Simple has put forth no evidence to impeach Meininger's credibility, and Meininger seems to have displayed a high degree of familiarity with the Meininger reference in his deposition testimony. Moreover, the creation of the Meininger reference does not seem all that improbable in light of the state of the art in 1998 and 1999. Indeed, it is not out of the realm of possibilities for young software developers to create new applications. *See*, *e.g.*, *Universal City Studios v. Corley*, 273 F.3d 429, 437 (2d Cir. 2001) ("In September 1999, Jon Johansen, a Norwegian teenager, collaborating with two unidentified individuals he met on the Internet, reverse-engineered a licensed DVD player" and successfully foiled a DVD encryption protocol.); *A&M Records v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) (a college student named Sean Fanning founded Napster, a revolutionary computer based file sharing system).

Under the rule of reason test, Meininger's testimony is highly credible as an unbiased witness whose testimony is well corroborated. In this regard, Meininger's testimony is similar to the testimony in *Mahurkar*, 79 F.3d at 1577-79. The inventor in *Mahurkar* supplemented his testimony with the testimony of an uninterested party and letters from two other individuals contemporaneous with the date of the invention. Similarly, Meininger provided a date stamped archive CD, numerous emails from uninterested third parties sent within days of his email, and a

web page posting which is still available on the Internet. *Cf. Mahurkar*, 79 F.3d at 1578-79. In fact, this level of corroboration exceeds that provided by the inventor in *Mahurkar*.

To summarize, Simple's objection to the admissibility of the Meininger reference as prior art is denied because there is an abundance of unrefuted evidence which proves that the Meininger reference was publicly known and available in the United States before January 21, 1999. Having determined that the Meininger reference qualifies as admissible prior art, the Court now turns to whether the Meininger reference invalidates the '493, '563, and '882 Patents under § 102(a) of the Patent Act.

> **b.    The Meininger Reference Does Not Anticipate the Patents In Suit**

In order to resolve the parties' relevant objections, the Court must determine whether the Meininger reference clearly and convincingly, with no genuine issue of material fact, teaches and embodies the: (1) acts independently; (2) solely contained within; and (3) without refresh requirements of the patents in suit. (*See* CA's Objections at 1-8, 14-17, 22-23; Simple's Objections at 8-9.)[13] Each claim element will be discussed below.

> **(1)    The Meininger Reference Fails to Anticipate Window Objects that Act Independently of Other Content**

The parties' dispute regarding the acts independently requirement can be summarized as whether either the "What is it?" or the square "DockTile" window elements found in the

---

[13] Since the Meininger reference fails to disclose window objects, it is irrelevant that CA has shown that it is capable of hosting multiple windows in its content manifestation environment. (*See* CA's Objections at 9 n.12 (arguing that CA has shown on multiple occasions that the Meininger reference discloses a content manifestation that can host multiple window objects); First Goodman Supp. Decl. at 8-12 (showing that the Meininger reference contains more than one window element).)

Meininger reference's content manifestation environment act independently of other content. In other words, can a user manipulate these elements without being constricted by other content in the same HTML document. Two issues must be resolved: (1) whether the "What is it?" window elements can be *restored* independently of other content and (2) whether the DockTile window elements in the Meininger reference can be *moved* independently of other content.

**(a)    The "What is it?" Window Element Cannot Be Restored Independently of Other Content**

The Meininger reference fails to teach and embody the acts independently limitation of the patents in suit because a user's control, specifically the ability to restore, the "What is it?" window is restricted by the necessity to interact with a *separate* "WindowMaker" menu item.[14] The Court has defined "independently of other content" to mean that a window object can act "independently" so long as its actions are not constricted by other content in the HTML document. (Claim Constr. Mem. at 47-48.) However, the Court also recognized that window objects can be impacted by other content in the HTML document and remain "independent[]" within the context of the patents in suit. (Claim Constr. Mem. at 46-47.) Due to this functional definition, a window object can be made to pop-up and display other content while remaining "independent[]" of other content within an HTML document, because its own subsequent actions

_____

[14] CA has shown by clear and convincing evidence, that the "What is it?" window can be moved anywhere in its content manifestation environments regardless of other content. (*See* First Goodman Supp. Decl. at 5-8; Decl. of Danny Goodman. in Supp. of Pl.'s Mot. Summ. J. of Invalidity (Dkt. No. 332-3) ("Goodman Invalidity MSJ Decl.") at ¶¶ 14, 135, (stating that absolutely positioned elements contain an attribute that allows them to be stacked on top of other layers, giving a user the impression that one element on the screen is actually closer to them and on top of other screen elements).) Were the acts of a window object limited to movement, CA's evidence would suffice to show that the Meininger reference anticipates the acts independently requirements of the patents in suit. They are not so limited however.

are not constricted by that other content.[15]  For example, although actions in one window object may cause content to appear in another window object, a user can still manipulate (move, resize, minimize, restore, etc.) the window object which received the new content without being constricted by other content or window objects.  In the Meininger reference, however, the user's ability to restore the "What is it?" window is constricted by other content because she must click on the separate WindowMaker menu to make the "What is it?" window visible again. Consequently the Meininger reference fails to teach a window object whose actions are not restricted by other content in an HTML document.

The Court is unpersuaded by CA's assertion that "when a window element in [the] Meininger [reference] . . . opens or 'restores,' that act only depends on its own content – the change to its own 'visibility' attribute – and not on 'other content.'" (CA's Supp. Reply at 4.) While the "visibility" attribute is not other content, it is clear that the WindowMaker menu used to change it, is other content.  This distinction is crystalized when one observes that: (1) the "What is it?" window is already present and merely made visible when a user activates it by clicking on the *separate* "What is it?" button on the WindowMaker menu and (2) both the WindowMaker menu and the "What is it?" window can appear simultaneously within the content manifestation environment of the Meininger reference as shown above in **Figure 2**, *supra* at 23, but cannot be used at the same time.

_____

[15] When a window/window object in any of the patents in suit or prior art reference is first instantiated (created/opened), it is an act of the operation system, content manifestation environment or program hosting the window/window object.  Nowhere in the specifications of the patents in suit is it required that a window object create itself or cause itself to pop-up.  To the contrary, the specifications of the patents in suit actually mention that window objects can be made to pop up based on actions in other window objects or portions of the content manifestation environment.

Indeed, the fact that windows in the Meininger reference turn invisible once they are minimized is further proof that they do not act independently of other content. If window elements in the Meininger reference actually did act independently of other content, a user would only be able to make them visible again by blindly guessing where the now invisible window last appeared on screen. The following illustration highlights the implausibility of CA's contention.

If the "What is it?" window in the Meininger reference actually acted independently of other content, a user would have to click on the "What is it?" window to restore it after it was minimized. However, since the "What is it?" window would be invisible, the user would not know where to click. As such, when the user clicks on the *visible* WindowMaker menu item to restore the *invisible* "What is it?" window, she is actually using *other visible* content. Consequently, the Court finds no evidence which proves that windows in the Meininger reference, which are made invisible when minimized, can be restored independently of other content.

### (b) The DockTiles Cannot Be Moved Independently of Other Content

The Court turns to Simple's arguments regarding whether the DockTile windows in the Meininger reference are window objects as defined by the patents in suit. DockTiles are the square elements in the bottom and top right quadrants of **Figure 2**. *See supra* at 23.

As Simple correctly maintains, DockTiles are not window objects because their movements are restricted to conform to a grid. (Simple's Reply in Supp. of Obj. to R&R (Dkt. No. 617), at 4 (DockTiles are "square window elements [that] are each aligned with an invisible grid, thus their movement is affected by other content within the HTML document and also are not independent according to the Special Master's construction of "acts independently.")

47

("Simple's Supp. Reply").) As CA concedes that DockTiles are "iconic element[s] whose movement[s are] . . . partially restricted such that each tile is aligned with an invisible grid," there is no question that DockTiles are not window objects because their movement is constricted by other content in the same HTML document. (First Goodman Supp. Decl. ¶¶ 4, 7.) In sum, the Meininger reference fails to disclose windows that act independently of other content.

The Court now turns to the solely contained within requirement.

### (2) The Meininger Reference Fails to Anticipate the Solely Contained Within Requirement

The Court declines to adopt the Special Master's recommendation regarding the solely contained within requirement as it pertains to the Meininger reference. The solely contained within requirement means that "a window object cannot be moved from or displayed, in whole or in part, outside a content manifestation environment." (Claim Constr. Mem. at 90.) Given that windows in the Meininger reference can be moved off screen, the Meininger reference fails to anticipate the solely contained within requirement of element 1D of the '493 Patent and claim 16 of the '882 Patent. (*See id.*)

CA's argument that windows in the Meininger reference meet the solely contained within requirement because they do not *appear* outside of their content manifestation environment overemphasizes visual perception and contradicts the proper interpretation of the phrase. (CA's Objections at 22.) The moment a window in the Meininger reference is removed from its content manifestation environment, it is no longer solely contained within it.

Moreover, CA's reliance on its expert testimony is misplaced. Goodman, CA's expert, loaded the Meininger reference and dragged the "What is it?" window outside its content

48

manifestation environment.  Goodman then expanded the Netscape web browser, thereby enlarging the Meininger references' content manifestation environment, and was able to show that the "What is it?" window reappeared in the newly expanded content manifestation environment.  (First Goodman Supp. Decl. at 12-17; *see also id.* ¶ 33 (stating "A window object can be moved beyond the visible portion, yet the object remains a full "citizen" of the CME, complete with controllable attributes that allow further operations on it, even when it is out of view.").)

Nevertheless, in light of the Court's definition of "solely contained within," this demonstration is nothing more than a slight of hand.  Goodman's demonstration worked because he only moved the window slightly outside the content manifestation environment of the Meininger reference.  None of the diagrams in pages 13 to 17 of the First Goodman Supplemental Declaration contain a content manifestation environment that takes up the entire computer monitor screen.  In fact, Goodman failed to move any of the Meininger reference windows completely off the viewable area within the computer screen in any of his examples.  Perhaps this is because, as Simple has demonstrated, doing so would make the windows irretrievable without the use of a refresh command.  (Belgard Supp. Decl., Ex. 1.)

In a video demonstration accompanying the Belgard Supplemental Declaration, Simple was able to show that dragging a window from the Meininger reference made it irretrievable without refreshing the content manifestation environment.  Accordingly, it is clear that the Meininger reference does not disclose window objects solely contained within said content manifestation environment" as required by element 1D of the '493 Patent and claim 16 of the '882 Patent.

Further, CA presents what can best be characterized as an argument based on wordplay.[16] CA maintains that claim 1 of the '493 Patent requires "only that window objects be *produced* only within the" content manifestation environment. (CA's Objections at 23 n.23 (emphasis in original).) However, in claim 1 of the '493 Patent, the phrase solely contained within directly follows and modifies the term window object, not merely the manner in which a window object is produced. The relevant claim language reads: ". . . to process said software system and said associated content to produce ***window objects solely contained within*** said content manifestation environment . . . ." *See, e.g.*, '493 Patent Cl. 1 (emphasis added). In this context, the phrase solely contained within clearly modifies the term window objects.

The Court's interpretation of claim 1 is squarely supported by the rules of grammar. According to the rule of the last antecedent, "a limiting clause or phrase . . . should ordinarily be

_____

[16] The Court acknowledges that CA's argument is correct when applied to most of the other independent claims of the patents in suit. Indeed, claims 1 and 6 of the '563 and '882 Patents as well as claim 17 of the '882 Patent require that a window object be produced ***within*** a content manifestation requirement but do not require that a window object be solely contained within a content manifestation environment like claim 1 of the '493 Patent and claim 16 of the '882 Patent. However, the absence of the solely contained within limitation in other independent claims does not evince the "contrary intent" necessary for CA's arguments to prevail with regards to element 1D of the '493 Patent. Rather: (1) it cuts directly against CA's wordplay by showing that the patentee used different wording when it was undesirable to apply the solely contained within limitation to a window object, as opposed to where it was produced, and (2) it merely reflects an effort by the patentee to broaden the claim scope of the patents in suit.

In addition, the Court will focus its analysis on the independent claims of the patents in suit because prior art that does not invalidate an independent claim will not invalidate an associated dependent claim which adds at least one more limitation or variation. In general, independent claims are broader (claim more subject matter) and easier to invalidate while dependent claims are narrower (claim less subject matter) and are more difficult to invalidate. For example, if a prior art reference does not anticipate claim 1 of the '563 Patent, it will not anticipate claims 2 through 5 of the '563 Patent which all depend from claim 1. However, if a prior art reference is found to invalidate an independent claim, the Court will then analyze whether or not it invalidates any associated dependent claims.

read as modifying only the noun or phrase that it immediately follows" in the absence of "other indicia of meaning." *Barnhart v. Thomas*, 540 U.S. 20, 26 (U.S. 2003). The grammatical "rule of the last antecedent," has been: (1) prescribed by the Supreme Court when interpreting statutes; (2) used by the Federal Circuit in anticipation determinations and statutory analysis; and (3) used by other courts in infringement determinations. *See*, *e.g.*, *id.*; *Finisar*, 523 F.3d at 1335-37; *Anhydrides & Chemicals, Inc. v. United States*, 130 F.3d 1481, 1483 (Fed. Cir. 1997); *Felix v. Am. Honda Motor Co.*, 2007 U.S. Dist. LEXIS 78564 at *8-9 (D. Kan. Oct. 19, 2007). In light of this precedent, the Court finds it appropriate to apply the rule of the last antecedent when determining whether the phrase "solely contained within" only modifies the term window objects in the absence of any contrary intent. *See Felix*, 2007 U.S. Dist. LEXIS 78564 at *8-9.

The intrinsic evidence before the Court bears no indication that window objects were meant to be removed from a single content manifestation environment screen. In fact, a touted improvement of the claimed subject matter over prior art is that it allows users to have multiple window objects **within** a single content manifestation environment. *See*, *e.g.*, Response and Amendment to Application No. 09/234,297 (Dkt. No. 366), at Ex. 4 at SIM006243; *see also* '493 Patent col.2. ll. 46-51. Indeed, this intent is reinforced by the position of the phrase solely contained within in claim 1 of the '493 Patent. With no contrary intent, the Court is compelled to find that the phrase solely contained within is meant to modify the term window objects rather than limiting the modifier to the process in which window objects are made.

Since the windows in the Meininger reference can be moved off screen, the Meininger reference fails to meet the solely contained within requirement of claim 1 of the '493 Patent and claim 16 of the '882 Patent. Accordingly, while CA's motion for summary judgment is properly

denied, the Court also finds that no reasonable jury could determine that the Meininger reference anticipates Claim 1 of the '493 Patent or Claim 16 of the '882 Patent.

### (3) The Meininger Reference Satisfies the Without Refresh Requirement

Based on the record evidence, CA has provided clear and convincing evidence to support a finding that window elements featured in the Meininger reference "can be moved and minimized without a refresh" from the web browser's cache.[17]  (*See* CA's Objections at 14; CA's Supp. Reply at 5; First Goodman Supp. Decl. at 17-26.)  CA first illustrates this by way of a technical explanation from Mr. Goodman and then provides a visual demonstration as confirmation.

Goodman's invalidity declaration establishes that window elements in the Meininger reference could be manipulated without triggering a refresh.  In his invalidity declaration, Goodman explains that a layer created by using the Dynamic HTML ("DHTML") programming language can be moved, minimized or otherwise controlled without  "sending requests to the server."[18]  (Decl. of Danny Goodman in Supp. of Pl.'s Opp'n. to Defs.' Mot. for Summ. J. (Dkt. No. 362) ("Goodman Invalidity Decl."), at ¶¶ 39-40.)  For instance, no new information is needed from the server or web browser cache when a window, like the "What is it?" element in the Meininger reference, is minimized or restored because such an action merely alters the visibility attribute of the window.  (Goodman Invalidity Rpt. at 31.)  This is significant because

---

[17] Notably, Simple does not counter CA's arguments on this point with regards to the Meininger, Visual DHTML and JavaScript Bible references.

[18] The "What is it?" window in the Meininger reference is a layer created by the DHTML programming language.

web browsers in use when the Meininger reference was first disseminated allowed users to control the "position, size, and visibility of Dynamic HTML layers without . . . [triggering a refresh of] the browser window."  (*Id.*)  Nevertheless, the Special Master found that CA had not shown by clear and convincing evidence, with no genuine issue of material fact, that windows in the Meininger reference could be manipulated without triggering a refresh of the local web browser cache.

Since the parties did not object to the Special Master's definition of "refresh" and the Court has not found it to be clearly erroneous, CA was required to show that windows in the Meininger reference can be moved and minimized without requiring a "refresh from either the server or the [local] browser caches."  (First Goodman Supp. Decl. at 17-26.)  CA met its burden with the First Goodman Supplemental Declaration.  That declaration contains a step by step demonstration in which Mr. Goodman:

(1)     explained the source code and programming functions required to create the Meininger reference and why they did not require a refresh from the server or local web browser cache when a window was manipulated (*see id.* ¶ 38 "Moving is accomplished solely by adjusting the coordinate position of the window object in response to mouse event coordinates, and therefore, there is no need to retrieve new content to carry out these acts");

(2)     proved that the web browser cache was cleared by showing their file content directories;

(3)     loaded the Meininger reference from his server onto a "client computer";

(4)     disabled his Internet connection;

(5)     moved windows around the Meininger reference content manifestation environment;[19]

_____

[19] The following excerpt from the First Goodman Supplemental Declaration details how Mr. Goodman demonstrated that he was able to move window elements around the Meininger reference's content manifestation environment with an empty cache and without the use of a refresh.

By disconnecting the client computer from the network, and with the Netscape caches empty, there are no server, disk cache, or

(6)  minimized windows found in the content manifestation environment of the Meininger reference (*id.* ¶ 47 (stating "After those minimizing actions, I once again updated and viewed the disk and memory caches, which remained empty, as shown in the following two illustrations.")); and

(7)  once again demonstrated that the server and browser caches were not involved in any of the foregoing user actions by showing that the file content directory in the web browser cache was still empty.

In light of the foregoing, CA has shown by clear and convincing evidence, with no genuine issue of material fact, that the Meninger reference satisfies the without refresh requirement of the patents in suit.  *E.g.*, '493 Patent, Cl. 1; '563 Patent Cl. 1; '882 Patent, Cl.1.

Having addressed the parties' objections regarding the Meininger reference, the Court will issue its rulings.

### 6.  The Court's Rulings Regarding the Meininger Reference

The Court grants Simple's motion for summary judgment dismissing CA's anticipation defense, as it pertains to the Meininger reference, because no reasonable jury could find that the Meininger reference discloses the acts independently requirement of the patents in suit.  Since all window objects must act independently of other content in the same HTML document, and every claim at issue requires a window object, there is no way in which the Meininger reference can anticipate any of the claims in the '493, '563, or '882 Patents.  In addition, no reasonable jury could interpret the record evidence to find that the Meininger reference meets the solely

---

memory cache copies of the files from which the browser can refresh the CME. I moved (dragged and dropped) multiple window objects within the CME . . . .

(First Goodman Supp. Decl. ¶ 44).  In other words, Goodman disconnected his computer from the Internet and deleted every relevant file in the browser cache so that no data could be retrieved from either the local or server caches.

contained within requirement of element 1D of the '493 Patent. The Court does, however, grant CA's objection with regards to the without refresh requirement of element 1I of the '493 Patent and finds that it is disclosed and embodied in the Meininger reference. Having determined that the Meininger reference does not anticipate the patents in suit, the Court turns to the parties' objections regarding the Visual DHTML reference.

## C. The Visual DHTML Reference

As it did with the Meininger reference, the Court will describe the Visual DHTML reference prior to discussing the Special Master's associated recommendations on anticipation and the parties' corresponding objections. What follows is a summary of the Visual DHTML reference.

### 1. Overview of the Visual DHTML Reference

The Court's overview of the Visual DHTML reference will include a summary of the technology used to create it, a description of how some of the window elements therein operate and a description of its content manifestation environment. In many respects, the Visual DHTML reference is quite similar to the Meininger reference. For instance, both are web pages that utilize the DHTML and JavaScript programming languages. (R&R at 15-33, 95-98.) The Visual DHTML reference serves as a demonstration tutorial and web authoring tool. (*Id*. at 96.) After accessing the Visual DHTML reference/web page over the Internet, users can scroll down and click on the "Visual DHTML" hyperlink on the lower left portion of the display shown below in **Figure 5**. (R&R at 95-98.) This will cause the launch of a new "Visual DHTML (beta)" window as shown below.

A user can launch new windows within the Visual DHTML (beta) window by clicking on the menu icons on the top of the screen.  (*Id.* at 99-100.)  "For example, clicking on the '[N]ew' button cause[s] the appearance of the 'New Page' window . . . and clicking on the '[W]idgets' button cause[s] the appearance of the 'Components Palette' window."  (*Id.* at 100-01.)

**Figure 5:**



The "New Page" and "Components Palette" windows in the Visual DHTML reference are similar to the "What is it?" window in the Meininger reference because all three are "absolute-positioned elements" and have various controllable attributes which can be altered without requiring a refresh.  (R&R at 101 (citations omitted).)  Moreover, the absolutely positioned elements in the Visual DHTML reference can be moved freely, much like their counterparts in the Meininger reference.  (*See* First Goodman Supp. Decl. at 27-30 (illustrating how window elements in the Visual DHTML reference can be moved anywhere within their content manifestation environment).)  However, unlike their counterparts in the Meininger reference, window elements in the Visual DHTML reference are automatically made invisible before they are moved five or more pixels from their content manifestation environments.[20] (Second Goodman Supp. Decl. at 9-10.)  In addition, like their counterparts in the Meininger reference, the window elements of the Visual DHTML references are made invisible when they are minimized and made visible when they are launched/activated or restored.  (CA's Objections at 10; Second Goodman Supp. Decl. ¶¶ 27-28; Belgard Supp. Decl. Ex. 1.)

Turning to the content manifestation environment of the Visual DHTML reference, it encompasses the entire "framed area" beneath the title bar, which reads "Visual DHTML (beta) - Netscape," shown in the foreground window of **Figure 6** below. (R&R at 163.)  The content manifestation environment of the Visual DHTML reference includes various "absolute

---

[20] A pixel is the "the smallest element of an image that can be individually processed in a video display system."  pixel. Dictionary.com. Dictionary.com Unabridged (v 1.1). Random House, Inc. http://dictionary.reference.com/browse/pixel (accessed: June 26, 2008).  Pixels are also "generally arranged in rows and columns" to form a picture on what a user may see on a computer screen.  *See* pixel. Dictionary.com. The American Heritage® Science Dictionary. Houghton Mifflin Company. http://dictionary.reference.com/browse/pixel (accessed: June 26, 2008).

positioned elements," such as: (1) a "menu bar and its drop-down menus"; (2) the tool bar, just beneath the menu bar, and its buttons, such as "'[N]ew,' '[W]idgets,' '[I]mage,' '[L]ink' and '[T]ext'"; and (3) a "status bar." (R&R at 163-65.)

**Figure 6:**



"[A]ll of the text and 'absolute positioned elements' within the . . . [content manifestation environment of the Visual DHTML reference] . . . constitute 'other content within a particular HTML document' as called for in" the relevant claim language. (*Id.* (citations omitted).)[21]

Other technical aspects of the Visual DHTML reference will be discussed in further detail below

---

[21] The Special Master determined that "all of the text and 'absolute positioned elements' within the" Visual DHTML content manifestation environment qualified as "content" because it was sent from a server. However, the Court's definition of "content" includes content from any source. '493 col. 8, ll. 57-59; '563 Patent col. 8, ll. 30-37; '882 Patent col. 8, ll. 57-59.

as necessary. Having described the Visual DHTML reference, the Court will summarize the Special Master's recommendations, which are most relevant to the parties' objections.

### 2. The Special Master's Recommendations

Overall, the Special Master found that the Visual DHTML reference was admissible prior art but that there were genuine issues of material fact as to whether it anticipated the '493, '563, and '882 Patents.

### a. The Special Master's Evidentiary Recommendations

The Special Master began his analysis of the Visual DHTML reference by denying Simple's objections to its eligibility as prior art. (R&R at 105-60.) In particular, the Special Master found that CA's evidence was sufficiently authenticated and not subject to the hearsay exclusion. This included an extensive analysis of the relevance and admissibility of two categories of evidence: (1) the deposition testimony of David Flanagan and Paul Dreyfus and (2) documentary evidence which included source "code, screenshots and articles." (*Id.* at 106.) What follows is a summary of the Special Master's analysis of the admissibility of each category of evidence.

### (1) The Testimony of Messrs. Dreyfus and Flanagan

The Special Master used Dreyfus' testimony to establish that the Visual DHTML reference was publicly available in 1998 and used Flanagan's testimony as corroborative evidence. (R&R at 106-18.) Dreyfus was a former editor for Netscape's "DevEdge Online website" and helped to produce a CD containing a link to the Visual DHTML reference (the "Visual DHTML CD"). (Decl. of Chris Martiniak in Supp. of Pl.'s Reply in Supp. of. Mot. for Summ.J. (Dkt. No. 402-6) ("Dreyfus Dep."), Ex. 4 at 9:5-11.) Dreyfus stated that, in February of

1998, Gary Smith, the author of the source code used to generate the Visual DHTML reference, sent him a link to the Visual DHTML reference. (Dreyfus Dep. at 22:3-9; R&R at 118; Goodman Invalidity Decl. Ex. 8 at CA 1002765.) Dreyfus also claimed to have "inspected" this link to verify its functionality prior to including it in the Visual DHTML CD. (Dreyfus Dep. at 22:3-9; R&R at 114.) On or before June of 1998, the Visual DHTML CD was sent to Flanagan and at least 50,000 other programmers throughout the world, about half of whom were in the United States. (R&R at 107-08; *see also* Dreyfus Dep. at 13:11-14, 22-25, 14:16-25, 15:4-12, 19-25, 16:7-18.) For his part, Flanagan testified that in June of 1998 he received a copy of the CD produced by Dreyfus and others. (R&R at 107-08 (citing and discussing Decl. of Chris Martiniak in Supp. of Pl.'s Reply in Supp. of Mot. For Summ.J. (Dkt. No. 402-7 ), Ex. 5.)

The Special Master recommended that Flanagan's testimony could be used to corroborate Dreyfus' assertion that the Visual DHTML reference was publicly available on or before June of 1998. Although the Special Master found that it was unclear as to when Flanagan accessed and used, as opposed to received, the Visual DHTML reference, he found that Flanagan's testimony did in fact corroborate Dreyfus' testimony under the *Reuter* factors and a rule of reason analysis. (R&R at 116-17 (applying *Reuter*, 670 F.2d at 1021 & n.9; *Juicy Whip*, 292 F.3d at 741, 743).)[22] The following factors were critical to the Special Master's recommendation: (1) Dreyfus and

---

[22] The *Reuter* factors are listed below:

> (1) delay between event and trial, (2) interest of witness, (3) contradiction or impeachment, (4) corroboration, (5) witnesses' familiarity with details of alleged prior structure, (6) improbability of prior use considering state of the art, (7) impact of the invention on the industry, and (8) relationship between witness and alleged prior user.

*Reuter*, 670 F.2d at 1021 n.9; *see* page 32 *supra*.

Flanagan had no apparent relationship; (2) Flanagan has no apparent interest in the present litigation; (3) Flanagan's deposition testimony was "approximately six years" after he received the CD with the Visual DHTML link and page; (4) the record was bare of any evidence which contradicted either Dreyfus or Flanagan; (5) the CD labels in evidence directly supported Dreyfus and Flanagan; (6) both Dreyfus and Flanagan appeared to be "quite familiar with the subject matter of the patents in suit"; and (7) CA also "proffered several DHTML and JavaScript references to explain the knowledge of a person skilled in the art" and to serve as prior art references as well. (R&R at 117.) In sum, the Special Master found that Flanagan's testimony was "sufficiently independent" of Dreyfus' to corroborate when Visual DHTML was created and distributed to the public. (*Id.* (citing *Medichem*, 437 F.3d at 1170 for the proposition that "The requirement of independent knowledge remains key to the corroboration requirement.").) The Court now turns to the Special Master's analysis of CA's documentary evidence.

### (2)     CA's Documentary Evidence

As the Special Master observed, CA corroborated the testimony of Flanagan and Dreyfus with documentary evidence. (*Id.* at 118.) CA's documentary evidence, spanning Bates-numbers CA 1002764-1002773, CA 1108971-1108976 and CA 130056-130074, falls "into three categories: (1) Visual DHTML source code; (2) Visual DHTML screenshots; and (3) articles discussing Visual DHTML." (*Id.* at 157.)[23] The Special Master admitted the foregoing evidence because he found that it was properly authenticated by a witness with knowledge and that Simple

---

[23] The Special Master excluded CA 1002764 and CA 1108971 because they were nothing more than "'placeholders,'" which CA failed to describe.

failed to submit any evidence sufficient to raise any question as to the authenticity of this

evidence.  (*See* R&R at 118-60.)

In making this authenticity determination, the Special Master established a chain of

custody, *i.e.*, that the CD provided by Dreyfus during his deposition was in fact the same one

used by Goodman when he conducted his analysis of the Meininger reference.

> In his video demonstration, Mr. Goodman testified that he inserted
> the CD into his computer, reviewed and copied the files from the
> CD of Exhibit 7A (from Mr. Dreyfus' deposition) to his computer,
> expanded a .zip archive of those files, and noted that the dates of
> those files were April 3, 1998 or earlier.  Mr. Goodman further
> testified that he stored the Visual DHTML files on his server in the
> same way that Mr. Dreyfus testified the files were stored on the
> Netscape server in April of 1998.  Mr. Goodman thus had
> knowledge of the files comprising Visual DHTML, as well as
> knowledge of the operation of Visual DHTML and access to the
> Internet.  Simple does not challenge Mr. Goodman's technical
> capabilities or the procedures that he employed in copying the
> contents of that CD to his server.  Nor does Simple challenge the
> accuracy or reliability of the foregoing evidence, or assert that the
> evidence is anything other than what it purports to be.

(*Id.* at 157-58.)  The Special Master then determined that Goodman actually relied upon exhibits

CA1002765-1002773, CA1108972-1108976, CA130056-130074 and reviewed the very same

CD provided by Dreyfus in his initial deposition.

> With respect to CA1002765-1002773, CA1108972-1108976,
> CA130056-130074, however, Mr. Goodman expressly discussed
> and relied on those documents (whether as Bates-numbered or as
> appearing in the video demonstration) in support of his invalidity
> analysis, as set out above in his Invalidity Report, Opposition
> Declaration and Invalidity Declaration, as well as in the claim
> charts and video demonstration accompanying that testimony.  *See*,
> *e.g.*, Goodman Decl., Exh. 8: claim chart for '493:1 at 2, 4-6, 8, 11
> & 16; '882:1 at 1 & 3; '882:6 at 4-5.  Mr. Goodman may not have
> mentioned every single Bates-numbered page (for example, Mr.
> Goodman only referenced a page or two of "Visual DHTML"
> article from DevEdge Online Archive (CA130061-65)), but Mr.

> Goodman's testimony nevertheless encompasses those documents.
> Goodman therefore has knowledge of the matters of which he
> testifies, and that is sufficient to authenticate those documents under
> FED. R. EVID. 901(b)(1). Simple's objections to those documents
> are therefore not well-taken.

(R&R at 158). Having found that Visual DHTML qualified as prior art, the Special Master went

on to analyze whether it anticipates the patents in suit.

### b.      The Special Master's Recommendations on Anticipation

The Special Master recommended denial of CA's motion for summary judgment on

anticipation regarding the Visual DHTML reference because there was a genuine issue of

material fact as to whether the Visual DHTML reference anticipated the window objects and

without refresh limitations of the patents in suit. (*Id.* at 177.) Nonetheless, the Special Master

also recommended denial of Simple's motion for summary judgment because he found that they

failed to put forth sufficient evidence such that no reasonable juror could find that their patents

were invalid. (*See id.* at 263.) Once again, the Court will focus on the claim elements germane

to the parties' objections, such as the window object and "solely contained within said content

manifestation environment" requirements found in element 1D of the '493 Patent as well as the

without refresh limitation found in element 1I.[24]

Based on his finding that there was a question of fact as to whether the window elements

found in the Visual DHTML reference acted independently of all of the "other content within an

HTML document," the Special Master recommended that the Visual DHTML reference did not

anticipate the window objects requirement of element 1D. (*Id.* at 169.) According to the Special

Master, Goodman's video demonstration of the Visual DHTML reference: (1) demonstrated very

---

[24] The Court's nine element breakdown of claim 1 can be found at page 14 *supra*.

little movement; (2) did not demonstrate whether window elements, such as the "New Page" or "Components Palette" windows shown above in **Figure 5**, *supra* at 56, could be moved "over the menu bar, status bar or toolbar"; and (3) did not clearly show the "window elements are truly independent of . . . [other] content."  (R&R at 169.)  The Special Master did, however, note that "when opened, the '[C]omponents [P]alette' window element rested over the toolbar, and the '[N]ew [P]age' window element could be dragged over the toolbar (but was not dropped)."  (*Id.*)

The Special Master also observed that after a user minimized any of the window elements found in the Visual DHTML reference, she would have to click on a corresponding button in the tool bar to "restore" them.  (*Id.* at 170.)  As the Special Master noted, Goodman's video demonstration of the Visual DHTML reference showed that the "[N]ew [P]age" and "[C]omponents [P]alette" window elements could be minimized and then restored to their place on screen before being minimized.  (*Id.* at 170.)  However, as the Special Master pointed out, in order to restore these window elements, Goodman was required to click on the "[N]ew" and "[W]idgets" buttons in the Visual DHTML reference tool bar.  (*Id.* at 170.)

Finally, the Special Master concluded that it was unclear whether or not the Visual DHTML reference satisfied the without refresh limitation of element 1I in the '493 Patent because CA failed to show that the content manifestation environment was not "updated with content from the [local] web cache" while a user manipulated various window elements.  (*Id.* at 177.)  Having summarized the Special Master's recommendations presently at issue, the Court will list the parties' objections.[25]

_____

[25] With regards to the other elements of claim 1 of the '493 Patent, the Special Master found that it was clear that: (1) elements 1A, 1B and 1C were disclosed by the visual DHTML reference; (R&R at 162) (2) the "process said software system and said associated content" and

64

### 3. The Parties' Objections

Once again, Simple puts forth numerous objections dealing with evidentiary issues and whether CA proffered sufficient evidence to evade summary judgment. To begin with, Simple maintains that CA failed to establish that the Visual DHTML reference is eligible as prior art under Section 102(a) because there is insufficient evidence to prove that it was publicly available before January 21, 1999. According to Simple, the uncorroborated testimony of Paul Dreyfus was insufficient to establish that Visual DHTML was posted on the Internet by February of 1998, regardless of whether Dreyfus is a disinterested third party. (*See* Simple's Objections at 9 (citing *Finnigan Corp. v. International Trade Comm.*, 180 F.3d 1354, 1366 (Fed. Cir. 1999)); Simple's Supp. Reply at 12.) Simple further asserts that CA failed to "establish that Dreyfus had the requisite personal knowledge" to authenticate the publication date of the Visual DHTML reference as February of 1998. (Simple's Supp. Reply at 13.) Finally, Simple argues that since the Special Master concluded that CA "had not proved that [the] Visual DHTML [reference] discloses: (1) 'window objects;' and (2) the 'without refresh' limitation . . . no reasonable jury could conclude that [the] Visual DHTML [reference] renders any claim" of the '493, '563, and '882 Patents invalid. (Simple's Objections at 12-13.) In sum, Simple argues that their motion for summary judgment dismissing CA's anticipation defense regarding the Visual DHTML reference should be granted.

---

solely contained within portions of element 1D were satisfied even though there were genuine issues of material fact as to whether window objects were disclosed; (*id.* at 162-72); (3) elements 1E, 1F and 1G were anticipated by the Visual DHTML reference (*id.* at 172-75); and (4) it was not clear whether claim elements 1H and 1I were anticipated because of CA's inability to show that the without refresh requirement was anticipated (*id.* at 175-77).

CA objects to the Special Master's recommendation that its motion for summary judgment on anticipation regarding the Visual DHTML reference be denied.  In particular, CA: (1) objects to the Special Master's recommendation that there are genuine issues of material fact as to whether the record evidence clearly and convincingly shows that window elements in the Visual DHTML reference (a) act independently of other content, and (b) satisfy the without refresh requirement of element 1I of the '493 Patent; and (2) argues that the window elements in the Visual DHTML reference meet the solely contained within requirement of the of element 1D of the '493 Patent.  (*See* CA's Objections at 9-11, 17-20; *see also* Second Goodman Supp. Decl. at 3-10.)

### 4. The Visual DHTML Reference Does Not Anticipate the Patents In Suit

Preliminarily, the Court must determine whether the Visual DHTML reference is admissible prior art.  After addressing that issue, the Court will turn to the parties' objections over whether it anticipates the patents in suit.

### a. The Visual DHTML Reference is Admissible Prior Art

The Court finds Simple's objections to the Special Master's recommendation on the eligibility of the Visual DHTML reference as prior art unpersuasive.  Simple does not attack the credibility of any of CA's witnesses involved or provide any evidence to contradict either their testimony or the documentary evidence associated with the Visual DHTML reference.  Rather, Simple merely insists that CA has failed to put forth clear and convincing evidence, that the Visual DHTML reference was publicly available prior to the filing date of the '493 Patent, January 21, 1999.  The Court does not agree.  It would serve no purpose for the Court to undertake an extensive analysis of CA's evidence in light of the painstaking and detailed review

66

conducted by the Special Master, given the Court's agreement with both his reasoning and recommendation.

The Court adopts the Special Master's evidentiary findings as well as his reasoning regarding the eligibility of the Visual DHTML reference and its associated documentation as prior art. (*See* R&R at 105-60.) The Special Master correctly found that: (1) the testimony of Messrs. Dreyfus and Flanagan was well corroborated, unrefuted, and could be used to establish that the Visual DHTML reference was admissible prior art under Section 102(a) of the Patent Act and (2) CA's documentary evidence associated with the Visual DHTML reference was properly authenticated under Federal Rule of Evidence 901(b)(1) by a witness with knowledge that the documents were what CA claimed them to be. Simple's objections to the contrary are denied.

> **b.** **The Visual DHTML Reference Does Not Anticipate the Patents in Suit**

Having determined that the Visual DHTML reference constitutes eligible prior art, the Court must now determine whether it anticipates the: (1) act independently; (2) solely contained within; and (3) without refresh requirements of the patents in suit. (*See* CA's Objections at 9-11, 17-20; Simple's Response To CA's Objections (Dkt. No. 612), at 8-10.) Each claim element will be addressed *ad seriatim*.

**(1)    The Visual DHTML Reference Does Not Disclose
Window Objects Because It Fails to Disclose Window
Elements That Act Independently of Other Content**

Once again, the parties' dispute regarding the acts independently requirement centers

upon whether window elements in the Visual DHTML reference can be restored independently

of other content.[26]

Inasmuch as a user must click on a button in the tool bar to restore window elements in

the Visual DHTML reference once they have been minimized, Simple is correct that window

elements in the Visual DHTML reference do not act independently of all other content within

their content manifestation environment.  (Simple's Response To CA's Objections at 8-9.)  For

example, if a user were to minimize either the "Components Palette"or "New Page" window

element, shown above in **Figure 6**, *supra* at 58 she would not be able to restore them unless she

clicked on the"Widget" or "New" buttons shown in the tool bar of the Visual DHTML

reference's content manifestation environment. (*See* Belgard Supp. Decl. at 7-8.)

Due to the fact that the "Components Palette"or "New Page" window elements of the

Visual DHTML reference cannot be restored without the use of a ***separate*** tool bar in the same

content manifestation environment, a user's control and manipulation of these window elements

is restricted by other content.  (Belgard Supp. Decl. ¶¶ 20-25; *see also* Second Goodman Supp.

Decl. ¶¶ 27-28.)  The Court defines "independently of other content" to mean that a window

object can act "independently" so long as its motions and actions are not constricted by other

---

[26] CA has shown by clear and convincing evidence, with no genuine issue of material
fact, that window elements in the Visual DHTML reference can be moved independently of all
other content in the content manifestation environment.  (First Goodman Supp. Decl. at 27-30.)
Indeed, Simple does not even question CA's evidence on this point.

content in the HTML document, although it can still be impacted by other content in the HTML document. As such, a window object can be made to pop up and display other content while remaining "independent" of other content within an HTML document because once it is initiated or made to display data, the users control of said window object is not constricted by other content. However, in the Visual DHTML reference, the user's ability to restore the "Components Palette"or "New Page" windows is constricted by other content because she must click on the "New" or "Widget" tool bar buttons to make the either window visible again. Accordingly, the Visual DHTML reference does not disclose window elements that act independently of other content and thus fail to disclose window objects as defined by the patents in suit.

The Court is unpersuaded by CA's argument that "when a window element in [the] . . . Visual DHTML [reference] . . . opens or 'restores,' that act only depends on its own content – the change to its own 'visibility' attribute – and not on 'other content.'" (CA's Supp. Reply at 4.) While the "visibility" attribute is not other content because it is directly associated with and cannot be separated from its associated window element in the Visual DHTML reference, it is clear that the separate and distinct tool bar region of the Visual DHTML reference is other content. Indeed, as the Special Master correctly pointed out, the tool bar is other content, a distinct region of the Visual DHTML reference's content manifestation environment. (*See* R&R at 163-65.) As the Court noted in its discussion of CA's objections regarding whether the Meininger reference satisfied the acts independently requirement, the distinction between the *visible* tool bar and the *invisible* window element, which must be restored with the use of other content, is further proof that window elements in the Visual DHTML reference fail to act

independently of other content.  *See supra* § I.B.5.b.(1).(a), at 45-47.  Having determined that the Visual DHTML reference does not disclose window objects, the Court now turns to whether it satisfies the solely contained within requirement.

**(2)      The Visual DHTML Reference Satisfies the Solely Contained Within Requirement**

Window elements in the Visual DHTML reference remain solely contained within their content manifestation environments as required by element 1D of the '493 Patent.  Simple argues that the Visual DHTML reference fails to teach the solely contained within requirement of element 1D of the '493 Patent because window elements can be dragged entirely outside their content manifestation environments.  (Simple's Response To CA's Objections at 9-10.) However, an analysis of the source code behind the Visual DHTML reference proves otherwise.

When a user tries to move a window element in the Visual DHTML reference more than five pixels outside its content manifestation environment, the window element being dragged is hidden and a new "operating-system-level window" is opened outside the web browser hosting the Visual DHTML reference.  (Second Goodman Supp. Decl. ¶¶ 22-25.)  This is significant because a window element within the content manifestation environment of the Visual DHTML reference is distinguishable from a separate "operating-system-level window."  An "operating-system-level window" is actually a separate web browser such as Netscape's Navigator or Microsoft's Internet Explorer.  Accordingly, while  a web browser (an "operating-system-level window") can contain multiple window elements, a window element cannot contain an operation level web browser.[27]

---

[27] It should also be remembered that a touted benefit of the subject matter claimed in the '493, '563, and '882 Patents is that it allows for the use of multiple ***window objects within a***

The following excerpt from the Second Goodman Supplemental Declaration explains

how the source code behind the Visual DHTML reference implements this behavior.

> 21. I have repeatedly referenced the `cDrag()` function (Bates CA1002770- 1002771) as the central code that controls dragging (moving) window objects in Visual DHTML. . . . The source code for that function is as follows:

```
function cDrag(e) {
      var x = window.innerWidth;
      var y = window.innerHeight;
      if(e.pageX > -5 && e.pageY > -5 &&
e.pageX < x && e.pageY < y) {
            d.cDragLayer.moveBy(e.pageX-
d.offX,e.pageY-d.offY);
      } else {
            if(d.cDragLayer.that.dialogMorph) {
                  cDragEnd(e);
                  dialogWinMorph(e, this);
            }
      }
d.offX = e.pageX;
d.offY = e.pageY;
d.dragged = true;

}
```

> 22. The `cDrag()` function simply moves a window object (inside the CME) to a coordinate associated with a mousemove event. ***As long as the coordinate is either inside the visible portion of the CME or no more than five pixels beyond those dimensions, the window object is simply moved to that new position. But if the event coordinate is outside that space, and the window object is one that is designed to be "morphed"*** (as the "New Page" and "Components Palette" window objects are), ***the function invokes two additional functions,*** `cDragEnd( )` and `dialogWinMorph()`.

> 23. ***Among the tasks of the*** `cDragEnd( )` ***function (CA1002771-1002772) is one that hides the window object being dragged. That is to say, the window object inside the CME is***

---

*single web browser* ("operating-system-level window").

> **merely hidden, as if a user had clicked the upper right button to minimize it.**
>
> 24. The `dialogWinMorph()` function (CA1002771) uses a built-in method of all scriptable browsers (`window.open()`) to **create a new operating-system-level window outside of the CME** . . . In the process of creating that window, the function also copies the contents of the hidden window object inside the CME to the newly created browser window outside of the CME.
>
> 25. Therefore, a person of ordinary skill in the art could clearly understand from the source code of Visual DHTML that window objects initially created inside the CME remain inside the CME, while other program code creates a completely separate, operating-system-level window outside of the CME when the user attempts to drag a window object beyond the five pixel margin of the CME.

(Second Goodman Supp. Decl. at 9-10 (emphasis added).)  The resultant new "operating-system-level" web browser is not a window element, and is not contained within the web browser hosting the Visual DHTML reference content manifestation environment.  The original window element, that was being dragged, although invisible, remains solely contained within its content manifestation environment.

In view of the foregoing, it is clear that the "Components Palette," "New Page," are never actually removed from their content manifestation environment.  Rather, they are hidden as soon as the user tries to move them more than five pixels outside the content manifestation environment of the Visual DHTML reference. (Second Goodman Supp. Decl. ¶¶ 22-25.)  After the window element being dragged is hidden, a new "operating-system-level window" is opened outside the browser featuring the Visual DHTML reference.  (Second Goodman Supp. Decl. ¶ 24.)  As such, the Court concludes that the Visual DHTML reference anticipates the solely contained within requirement.  The focus now shifts to the without refresh requirement.

72

**(3)    The Visual DHTML Reference Satisfies the Without
Refresh Requirement**

An analysis of the DHTML technology underlying the Visual DHTML reference as well

as the First Goodman Supplemental Declaration clearly demonstrate, with no genuine issue of

material fact, that a user can move and minimize window elements within the content

manifestation environment of the Visual DHTML reference without requiring a refresh of

content from the web cache.  The Court will first turn to an explanation of the technology

underlying the Visual DHTML reference.

Not surprisingly, the Visual DHTML reference is built upon DHTML technology.  This

is critical because the only way to initiate a "refresh" in DHTML enabled web browsers was

through an explicit command such as calling the "location.reload ( )" java method in an

application's source code.  (Goodman Invalidity Decl. ¶ 110.)  The source code behind the

Visual DHTML reference bears no indication of any such explicit refresh command based on the

movement, minimization or refreshing of a window element in its content manifestation

environment.  (CA's Objections at 18; *see also* Dkt. No. 332-10 (CA 1002765-73).)  Indeed, as

the following excerpt shows, DHTML scripting used in 1998 and 1999 "enabled users to drag

elements around . . . or resize . . . [them]" without having to refresh content.  (Goodman

Invalidity Rpt. at 17.)

> Although the Netscape Navigator 4 browser was unable to modify
> some style properties, both it and Internet Explorer 4 were able to
> get and set style properties related to positioned elements.
> Therefore, by virtue of the object models automatically provided to
> Web authors in those browsers, ***scripts were capable of adjusting
> position, size, visibility, cropping, and stacking order of any
> positioned element*** (whether or not scripts actually used those
> properties). Changes occurred in real time, just as in other
> application programs. ***The browser's contents did not have to be***

> *reloaded or refreshed to change an element's position, size,*
> *visibility, cropping, stacking order, or contents.* In concert with
> mouse events, scripters enabled users to drag elements around the
> page or resize elements by as much or as little as the user wished.

(Goodman Invalidity Rpt. at 17.)

The First Goodman Supplemental Declaration reinforces the foregoing analysis of the

Visual DHTML reference source code.  As he did with the Meininger reference, Goodman

detailed a step by step process which clearly and convincingly showed that window elements

could be minimized and moved within the Visual DHTML reference's content manifestation

environment without requiring a refresh from the web cache.  (First Goodman Supp. Decl. at 31-

37.)  Goodman's proof consisted of the following steps:

   (1)    clearing the local cache of all relevant files;
   (2)    disconnecting the client computer from the Internet;
   (3)    moving the "Components Palette" and "New Page" window elements within the
          content manifestation environment of the Visual DHTML reference;
   (4)    minimizing the "Components Palette" and "New Page" window elements; and
   (5)    showing that the client computer had an empty cache before, during and after
          these functions were being performed.

(*Id.*; *see also* Goodman Invalidity MSJ Decl.¶ 110; Goodman Invalidity Decl. ¶ 110; Goodman

Invalidity Rpt. at 17, 31, 32.)  In light of the foregoing, the Court finds that CA has clearly and

convincingly demonstrated that the Visual DHTML reference satisfies the without refresh

requirement of element 1I of the '493 Patent.  Having discussed the parties objections, the Court

will issue its rulings.

### 5.    The Court's Rulings Regarding the Visual DHTML Reference

The Court grants Simple's motion for summary judgment dismissing CA's anticipation

defense, as it pertains to the Visual DHTML reference because no reasonable jury could find that

the Visual DHTML reference discloses the acts independently requirement.  Due to the fact that

every claim in the '493, '563, and '882 Patents requires a window object that acts independently of other content, the record evidence bears no indication that the Visual DHTML reference can anticipate any of the claims at issue. The Court does however grant CA's objections to the Special Master's recommendation that Visual DHTML reference does not disclose the solely contained within and without refresh requirements of elements 1D and 1I of the '493 Patent. The focus now shifts to the parties' objections regarding the JavaScript Bible.

**D.      The JavaScript Bible**

In addressing the parties' objections, as they relate to the JavaScript Bible, the Court will first provide an overview of the JavaScript Bible. The Court will then summarize the Special Master's pertinent recommendations as well as the parties' corresponding objections. Finally, the Court will put forth its own analysis and ruling. In that analysis, the Court will begin by determining whether the JavaScript Bible is enabling prior art. Next, the Court will address whether any of the claims of the '493, '563, and '882 Patents are anticipated by the JavaScript Bible. That discussion will entail: (1) determining which source code listings in the JavaScript Bible disclose a window object; (2) comparing the independent claims of the patents in suit to determine if there is any analytical overlap between them, for purposes of an anticipation determination; and (3) conducting an element by element analysis of the independent claims of the patents in suit in order to determine if they are anticipated by the JavaScript Bible. In view of its conclusion that the JavaScript Bible anticipates a content manifestation environment with a single window object, the Court's analysis will, of necessity, address the claims found in the '563 and '882 Patents.

### 1. Overview of the JavaScript Bible

The JavaScript Bible, third edition, is a 1,015 page reference manual for JavaScript version 1.2 written by Mr. Goodman, CA's expert witness. (R&R at 177; Simple's Objections at 13.) The JavaScript Bible discloses various content manifestation environments featuring Netscape layer elements. According to CA, chapters one and nineteen anticipate the patents in suit. (R&R at 177.) As such, the Court's references to the JavaScript Bible are confined to the disclosure of chapters one and nineteen.

Goodman explained and executed the various source code listings found in chapter 19 of the JavaScript Bible, which CA claims anticipate the patents in suit. The Court will detail each of the relevant listings in its analysis below. Generally speaking though, the source code examples in chapter 19 of the JavaScript Bible teach one skilled in the art to make web pages that employ certain features enabled by using the JavaScript programing language, in combination with the web browsers commonly utilized at the date of its publication, to create content manifestations environments featuring Netscape layer elements. What follows is a summary of the Special Master's recommendations which have been objected to.

### 2. The Special Master's Recommendations

Overall, the Special Master found that the JavaScript Bible was eligible as prior art but there were material issues of fact as to whether it anticipated the patents in suit.

#### a. The Special Master Found that the JavaScript Bible was Eligible Prior Art

The Special Master found that the JavaScript Bible qualified as prior art because its Copyright certificate provided prima facie evidence that it "was first published or distributed on March 3, 1998." (R&R at 180.) He also noted that, Simple failed to put forth any evidence to

contradict this finding.  (*Id.* at 180-81.)  Having established that the JavaScript Bible was available prior to the filing date of the '493 Patent, January 21, 1999, the Special Master addressed whether it enabled one skilled in the art to practice the subject matter claimed in the '493, '563, and '882 Patents.  (*Id.* at 181-94.)

After conducting a detailed analysis, the Special Master found it was "clear . . . that the [JavaScript Bible] . . . is enabled at least for what it discloses, *i.e.*, to at least the extent of the scripts and supporting text."  (*Id.* at 193-94.)  In support of his conclusion, the Special Master pointed out the undisputed fact that Goodman was able to execute the source code "scripts" disclosed within the JavaScript Bible and then manipulate the resulting content manifestation environments.  (R&R at 181-93.)  The Court now turns to the Special Master's analysis of whether the JavaScript Bible anticipates the patents in suit.

> **b.**     **The Special Master Found that there was a Genuine Issue of Material Fact as to Whether the JavaScript Bible Anticipates the Patents In Suit**

Although the Special Master found that the JavaScript Bible disclosed elements 1A, 1B, 1C, 1E, 1F, 1G and 1H of the '493 Patent, he found genuine issues of material fact regarding the window objects and without refresh requirements of elements 1D and 1I respectively.[28]  (*Id.* at 194-205.)[29]

According to the Special Master, CA failed to demonstrate that any of the "layers -which Mr. Goodman views as the claimed 'window objects' - in the screenshots resulting from the

---

[28] As he did with the Meininger and Visual DHTML references, the Special Master qualified his recommendations on elements 1E, 1F, 1G, and 1H by noting that for the purposes of his analysis, he assumed "arguendo" that the JavaScript Bible disclosed window objects.

[29] The Court's nine element breakdown of claim 1 can be found at page 14 *supra*.

[source code] scripts [disclosed in the JavaScript Bible] may 'act independently of other content within a[n] . . . HTML document.'" (R&R at 197-98.)  In particular, the Special Master found that CA was unable to meet its burden of proof in attempting to "describe how" window elements in the JavaScript Bible act with respect to "other content."  (*Id.* at 198.)

Further, although the Special Master found that the JavaScript Bible clearly disclosed window elements that could be "manipulated without retrieving information from the server," he recommended that CA failed to meet its burden of proof regarding whether manipulating the window elements in the Java Script Bible triggered a refresh from the "local" computer.  (*Id.* at 203-04.)  In his analysis, the Special Master made note of the fact that the ability to trigger a refresh in some of the source code listings disclosed by the JavaScript Bible was determined by code settings chosen by the programmer.  (*Id.* at 204.)  The Special Master also cited the following excerpt from Chapter 19 of the JavaScript Bible.

> As you experiment with the different feel for resizing and redrawing behavior, you will see that redrawing during resizing is a slow process due to the repetitive loading (from cache) needed each time.  On slower client machines, it is easy for the cursor to outrun the layer region, causing the layer to not get mouseOver events at all.  It may not be the best-looking solution, but I prefer to redraw after resizing the layer.

(Dkt. No. 332-25, at CA 1085580 ("JavaScript Bible").)  It appears that the Special Master interpreted this passage to mean that when a layer element disclosed in the JavaScript Bible is redrawn or resized, it relies on "repetitive loading" from the local cache.

Having found a genuine issue of material fact as to whether the JavaScript Bible disclosed window objects, or the "without refresh" requirement of element 1I of the '493 Patent, the Special Master recommended that the Court deny CA's motion for summary judgment of

anticipation, regarding the JavaScript Bible.  The Court will now summarize the parties' objections.

### 3.     Simple's Objections

Simple's objections focus on three issues: (1) the eligibility of the JavaScript Bible as enabled prior art; (2) whether the JavaScript Bible discloses "control sections" as described in the patents in suit; and (3) the Special Master's summary judgment standard.  (Simple's Objections at 13-15; Simple's Supp. Reply at 14-16.)  According to Simple, finding that the JavaScript Bible is enabling "is no different than saying that a dictionary would enable an author of ordinary skill to write a novel like *The Great Gatsby*, because it discloses all of the words used by F. Scott Fitzgerald."  (Simple's Objections at 13.)  In other words, Simple asserts that CA has not met its burden of clearly and convincingly showing that the JavaScript Bible offers sufficient guidance to enable one skilled in the art to practice the subject matter claimed in the patents in suit.  (Simple's Supp. Reply at 14-15 (citing *Aspex Eyewear, Inc. v. Concepts in Optics, Inc.*, 111 Fed. Appx. 582, 589 (Fed. Cir. 2004); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003)).)  Simple also argues that, while "the Special Master recognized that the JavaScript Bible does not disclose" the "'solely contained within,' 'window objects' and 'without refresh' limitations" of the patents in suit, "he failed to recognize that it also does not disclose a 'control section.'"  (Simple's Supp. Reply at 16.)  Finally, Simple argues that their motion for summary judgment should be granted because CA has not show by clear and convincing evidence, that the JavaScript Bible discloses every element of the patents in suit.

### 4. CA's Objections

According to CA, the Special Master incorrectly found genuine issues of material fact where none exist because the JavaScript Bible anticipates the patents in suit. (*See* CA's Objections at 11-14, 19-22.) Specifically, CA objects to the Special Master's recommendation that there were genuine issues of material fact as to whether the JavaScript Bible clearly teaches and embodies: (1) window elements that act independently of other content and (2) the without refresh requirement of element 1I of the '493 Patent.

### 5. The JavaScript Bible is Enabling Prior Art

As a preliminary matter, the Court must determine whether the JavaScript Bible is enabling prior art.

### a. Legal Standard

In order to anticipate claimed subject matter under Section 102 of the Patent Act, "a prior art reference must be enabling so that the claimed subject matter may be made or used by one skilled in the art." *Impax Labs., Inc. v. Aventis Pharms., Inc.*, 468 F.3d 1366, 1382 (Fed. Cir. 2006) (citations omitted). In essence, the prior art reference "must sufficiently describe the claimed invention to have placed the public in possession of it." *In re Donohue*, 766 F.2d 531, 533 (Fed. Cir. 1985). The public is in possession of a claimed invention "if one of ordinary skill in the art could have combined the publication's description of the invention *with his own knowledge* to make the claimed invention." *Id.* (emphasis added). Although disclosures in prior art patents are presumed to be enabled, an alleged infringer must show that non-patent prior art references enable the claimed invention. *See Amgen*, 314 F.3d at 1355.

It is important to recognize that the enablement requirements of Sections 102 and 112 of the Patent Act differ. *See Impax Labs.*, 468 F.3d at 1382. While the more stringent requirements of Section 112 mandate that a patent specification "enable one skilled in the art to '*use*' the invention," the enablement standard of Section 102 does not require actual performance. *Novo Nordisk Pharm., Inc. v. Bio-Technology Gen. Corp.*, 424 F.3d 1347, 1355 (Fed. Cir. 2005) (citations omitted) (emphasis added). Indeed, it is not even necessary that "an invention disclosed in a publication" have actually "been made in order to satisfy the enablement requirement" of Section 102. *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1379 (Fed. Cir. 2001); *see Novo Nordisk Pharm.*, 424 F.3d at 1355 ("'[A]nticipation does not require actual performance of suggestions in a disclosure. Rather, anticipation only requires that those suggestions be enabled to one of skill in the art.'").

If one skilled in the art must perform unduly extensive experimentation to produce the claimed subject matter, the prior art reference in question is not anticipatory. *See Novo Nordisk Pharm.*, 424 F.3d at 1355 (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005)); *PPG Indus. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1564 (Fed. Cir. 1996). However, even a considerable amount of experimentation is not unduly extensive if it is merely routine for the art in question. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). Rather, courts should analyze the following factual considerations when determining whether the level of experimentation is unduly extensive:

> "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims."

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1337 (Fed. Cir. 2005) (citing

*Wands*, 858 F.2d at 737).[30]  Having articulated the relevant legal standard, the Court will

determine whether the JavaScript Bible is sufficiently enabling.

> **b.**     **The JavaScript Bible Clearly Enables the Scripts and**
> **Supporting Text Contained Therein**

The Special Master Correctly found that the JavaScript Bible enables the subject matter it

discloses, "to at least the extent of the scripts and supporting text."  (R&R at 193-94.)  To wit,

chapters one and nineteen of the JavaScript Bible disclose source code that would allow one

skilled in the art to create a content manifestation environment with multiple Netscape layer

elements, tiled Netscape layer elements or Netscape layer elements that can be moved, resized,

or minimized without requiring a refresh from the server.  (Dkt. No. 332, Attachs. 25-35;

Goodman Invalidity MSJ Decl.¶¶ 136-47.)[31]  However, as discussed below, it is not clear that the

JavaScript Bible enables a combination of the foregoing embodiments in one content

manifestation environment.  *See generally Connell*, 722 F.2d at 1548; *Net Moneyin, Inc. v.*

*Verisign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008).

---

[30] These factors are commonly referred to as "the *Wands* factors" and are routinely used in enablement determinations.

[31] For example: listing 19-1 of the JavaScript Bible discloses source code which would enable one skilled in the art to create a content manifestation environment with multiple Netscape layer elements; listing 19-3 discloses source code which would enable one skilled in the art to create a content manifestation environment with tiled Netscape layer elements that are adjacent to but do not overlap each other;  listing 19-4 discloses source code which can create a content manifestation environment with a Netscape layer element capable of being resized and minimized without requiring a refresh from the server; listing 19-5 discloses source code which can be used to create a content manifestation environment with a Netscape layer element that can be moved, resized and minimized without requiring a refresh; and listing 19-11 discloses source code which can be used to create a content manifestation environment with movable window elements.  (*See* Goodman Invalidity MSJ Decl. ¶¶ 136, 138-40, 145.)

An analysis of the factual considerations laid out in *Wands* shows that the JavaScript Bible is, as the Special Master found, enabled "at least the extent of the scripts and supporting text." (*See* R&R at 194.) Specifically, the evidence before the Court indicates that: (1) one skilled in the art would not have to perform a great deal of experimentation to create the content manifestation environments disclosed in the JavaScript Bible because chapter nineteen expressly provides the necessary source code; (2) considering the nature of software and the technology associated with the patents in suit as well as the state of the prior art and its skill level, one skilled in the art could easily implement source code listings in the JavaScript Bible and then determine whether she has successfully constructed the embodiments described therein, *see* note 31 *supra*, and (3) the level of predictability in the field would make it easy for one skilled in the art to determine whether she has written software code which spanned the breath of the subject matter claimed in the '493, '563, and '882 Patents. Practically speaking, a computer programmer skilled in the art would only have to re-type or copy and then paste the source code found in the JavaScript Bible, as well as the CD-Rom which accompanies it, and make minor adaptations to create the subject matter disclosed therein. Having observed that the JavaScript Bible is sufficiently enabling to qualify as prior art under Section 102(a), the next task is to ascertain whether it is appropriate to combine the teachings of the source code listings disclosed therein when making an ***anticipation*** determination.

c. **Source Code Listings in the JavaScript Bible May Not Be Combined For Purposes of an Anticipation Determination**

For the reasons discussed below, when deciding whether to grant summary judgment of anticipation, the Court must evaluate each source code listing in the JavaScript Bible on an

individual basis, rather than as a unified combination which would rearrange separate elements found within a single prior art reference.

"Anticipation requires the presence in a single prior art disclosure of all elements of a claimed invention **arranged as in the claim**." *Connell*, 722 F.2d at 1548 (emphasis added); *see Net Moneyin*, 545 F.3d at 1371.  As the following excerpt states, prior art references which fail to describe an invention, as it is arranged in a patent claim, are better analyzed under a Section 103 obviousness inquiry.

> The [lower court] opinion says anticipation may be shown by less than "complete anticipation" if one of ordinary skill may in reliance on the prior art "complete the work required for the invention", and that "it is sufficient for an anticipation *'if the general aspects are the same and the differences in minor matters is only such as would suggest itself to one of ordinary skill in the art.'" Those statements relate to obviousness, not anticipation. Anticipation requires the presence in a single prior art disclosure of all elements of a claimed invention arranged as in the claim.* *Soundscriber Corp. v. U.S.*, 360 F.2d 954, 960, 148 USPQ 298, 301 (Ct.Cl. 1966). A prior art disclosure that "almost" meets that standard may render the claim invalid under § 103; it does not "anticipate."

*Connell*, 722 F.2d at 1548 (emphasis added); *Net Moneyin*, 545 F.3d at 1371.  Interestingly, the Federal Circuit recently clarified its interpretation of the phrase "as arranged in the claim" and helped identify the difference between anticipation and obviousness inquiries in *Net Moneyin*, 545 F.3d at 1368-71.

One of the claims at issue in *Net Moneyin*, claim 23 of U.S. Patent No. 5,822,737 (the "'737 Patent") was directed to an "Internet payment system comprising five 'links.'"  *Id.* at 1368-69 (quoting claim 23 of the '737 Patent).  The district court found that Claim 23 was anticipated because all five links were disclosed in two separate examples found in the relevant

prior art reference ("the iKP reference"). The Federal Circuit reversed and in explaining why, stressed the importance of linking and utilizing the elements in a prior art reference as they are in the claimed invention. *See Net Moneyin*, 545 F.3d at 1369-71.

According to *Net Moneyin*, "the hallmark of anticipation is **prior invention**" *Id.* at 1369 (citing *Connell*, 722 F.2d at 1548) (emphasis added). In particular, the *Net Moneyin* court stressed that, "the 'arranged as in the claim' requirement . . . refers to the need for an anticipatory reference to show all of the limitations of the claims arranged or combined in the same way as recited in the claims, not merely in a particular order." *Id.* at 1370. The Federal Circuit went on to expressly warn against treating patent "claims as mere catalogs of separate parts" without regard for the "part-to-part relationships set forth" therein. *Id.* (quoting *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1459 (Fed. Cir. 1984)). As stated in *Net Moneyin*, this "part-to-part" relationship defines the essence of an invention. *Net Moneyin*, 545 F.3d at 1370 (quoting *Lindemann*, 730 F.2d at 1459.) Accordingly, the bright line rule from *Net Moneyin* is that unless a prior art reference discloses "all of the limitations" in a patent claim "arranged or combined in the same way as recited in the claim," it fails to "prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102." *Id.* at 1371; *see also id.* at 1370-71 (stating that *Lindemann*, 730 F.2d 1452; *Ecolochem, Inc. v. Southern California Edison Co.*, 227 F.3d 1361 (Fed. Cir. 2000) and *Finisar*, 523 F.3d at 1334-37 all required that a "prior art reference . . . show the claimed invention arranged or combined in the same way as recited in the claim in order to anticipate.").

As a result, although the iPK reference described two protocols, which when taken together, disclosed all five links recited in claim 23 of the '737 Patent, it did not "anticipate the

system" claimed therein. *Net Moneyin*, 545 F.3d at 1371. Rather, the Federal Circuit stated that in order to find anticipation, all five links would have to be described in one single example/protocol. *Id.* In fact, the Federal Circuit went on to point out that the district court was "wrong to combine parts of the separate protocols shown in the iKP reference in concluding that claim 23 was anticipated" even though "there may be only slight differences between the protocols disclosed in the iKP reference and the system of claim 23." *Id.* According to the Federal Circuit, "differences between the prior art reference and a claimed invention, however slight, invoke the question of obviousness, not anticipation." *Id.*

The case at bar is highly analogous to *Net Moneyin*. Like the iKP reference, the JavaScript Bible contains various examples (listings) that are alleged to anticipate the patents in suit. Nevertheless, when making an anticipation determination, it would be inappropriate to combine multiple listings/examples of source code to meet the requirement of a single claim. Doing so would disregard the part-to-part relationship between the claim elements of the patents in suit. *Net Moneyin*, 545 F.3d at 1370. It is also irrelevant that the listings in the JavaScript Bible may be somewhat similar in appearance to the claimed subject matter of the patents in suit because even *slight* differences between prior art and a patent claim "invoke the question of obviousness, not anticipation." *Id.* at 1371. Rather, the essence of subject matter claimed in the '493, '563, and '882 Patents is the way it combines and arranges various elements already found in the prior art to make a content manifestation environment featuring window objects. At this point, an example may be helpful.

If listing 19-11 of the JavaScript Bible discloses a content manifestation environment featuring one window object and listing 19-12 discloses a content manifestation environment

86

that also features just one window object, the JavaScript Bible cannot necessarily be said to anticipate a content manifestation environment with multiple window objects, as required by element 1D of the '493 Patent. Rather, in this instance, the JavaScript Bible does not ***anticipate*** claim 1 of the '493 Patent because it does not disclose every element as arranged in the patent claim, namely a content manifestation environment featuring multiple window objects. In sum, if a single listing in the JavaScript Bible does not disclose every element of a claim as arranged in the patents in suit, the JavaScript Bible cannot be said to "prove prior invention of the thing claimed." *Id.* Having determined the degree to which the JavaScript Bible is enabled, the focus now turns to determining whether the JavaScript Bible anticipates any of Simple's asserted claims.

> **6.** **The JavaScript Bible Anticipates Some of the Claims in the '563 and '882 Patents**

Having determined that the JavaScript Bible is enabling prior art, the Court will now address whether it discloses: (1) a window object that acts independently of other content; (2) the without refresh and solely contained within requirements; and (3) a control section.

> **a.** **The JavaScript Bible Discloses a Window Object that Acts Independently of Other Content**

The record evidence shows that the JavaScript Bible discloses the acts independently requirement of the patents in suit. CA offers an explanation of the source code and DHTML technology disclosed in the JavaScript Bible as proof that the JavaScript Bible discloses window objects. (CA's Objections at 11-13.) First, CA correctly points out that the layer elements disclosed in the JavaScript Bible "are implemented using Netscape's 'layer' element with 'methods of absolute-positioned layers.'" (*Id.* at 12.) Accordingly, these layer elements each

exist on their "own physical plane." (*Id.*) As shown in the following excerpt, layers disclosed in JavaScript Bible must be specifically programmed to depend on other content, otherwise their behavior will not be constrained by other content.

> A person of ordinary skill in the art . . . would know that unless explicitly programmed to act otherwise, a Dynamic HTML absolute-positioned element can be relocated to any coordinate position (x, y or left, top) in a Content Manifestation Environment (CME) . . . . [T]here is no built-in or automatic "collision detection" mechanism that prevents an absolute-positioned element from being repositioned at any location within the CME, ***regardless of what other content may exist in the plane of the main document or what other absolute positioned elements may be stacked in front of, or behind, a given absolute-positioned element.*** By 'repositioned,' I mean not only temporarily located during, say, a drag operation, but also left in a new position after the user has released the mouse button of the drag operation (i.e.,'dropped' the element).

(First Goodman Supp. Decl. ¶ 68.) Accordingly, the First Goodman Supplemental Declaration. demonstrates that listings 19-11, 19-12 and 19-13 disclose window elements that perform all of their acts independently of other content.

CA also expressly showed that the source code in listing 19-11 enables a layer element that acts independently of other content. (*Id.* at 38- 41.) In a step-by-step demonstration, Mr. Goodman first dragged and dropped the layer element enabled by listing 19-11 over the top left portion of its content manifestation environment as shown below in **Figure 7**. (*Id.* at 39.) This, placed the layer element directly over text and a "horizontal rule element" found in the content manifestation environment. (*Id.* ¶ 72.)

**Figure 7:**



Next, Goodman dragged and dropped the layer element over the top middle portion of the

content manifestation environment shown in **Figure 7**.  (*See* First Goodman Supp. Decl. at 40.)

Once again, the layer element was dragged and dropped over the top left portion of the

horizontal rule element as shown above.[32]  (*Id.* at 40.)  Finally, Goodman dragged and dropped

the layer element over the top right portion of its content manifestation environment.  In all three

instances, the layer element could be moved independently of other content.[33]  Having

---

[32] The "horizontal rule element" is the straight line in the top portion of **Figure 7** that
scrolls across the content manifestation environment.

[33] In discussing the parties' objections regarding the Meininger and Visual DHTML
references, the Court gives only cursory mention of the fact that window elements disclosed
therein could be ***moved*** independently of other content.  Its reasons are twofold.  First, the issue
was uncontested.  Second, those elements, in addition to being movable, could be minimized,
and display content.  In contrast, listing 19-11 of the JavaScript Bible can only be moved and

established that listing 19-11 acts independently of other content, the Court will now address listings 19-12 and 19-13.

Listings 19-12 and 19-13 disclose a layer element that can be resized independently, "regardless of the other content within a particular HTML document" (*See* Claim Constr. Mem. at 47-48**.**) Since listing 19-12 incorporates the source code in listing 19-13, they will be addressed together as "listing 19-12." (*See JavaScript Bible* at CA 1085580-82 (providing the source code of listings 19-12 and 19-13).) While allowing for the fact that a layer can be impacted by other content because: (1) certain layers are used to display information and (2) actions in one module can lead to the display of information in a layer, the Court's definition of acts independently requires that a user be able to move, resize, close or otherwise act upon a layer regardless of other content. (Claim Constr. Mem. at 46, 48.) **Figure 8** below is an embodiment of the content manifestation environment enabled by listing 19-12.

---

display content.

**Figure 8:**



Goodman conducted a step-by-step demonstration, to show that a user could resize the blue box (layer), shown above, independently of other content so long as the "Never" button was selected. (First Goodman Supp. Decl. at 42-43.)

Simple's argument that listing 19-12 does not disclose a layer element that acts independently of other content fails to account for the knowledge of one skilled in the art. (Belgard Supp. Decl. ¶ 42.) Simple is correct in pointing out that a user cannot resize the layer element shown above in **Figure 8** if the "During resize" or "After resize" radio buttons are selected. (*Id.*) However, the record evidence indicates that one skilled in the art could easily use the source code disclosed in listing 19-12 to create an embodiment where the layer element acted independently of other content. *See Donohue*, 766 F.2d at 533 (The public is in possession of a

claimed invention "if one of ordinary skill in the art could have combined the publication's description of the invention **with his own knowledge** to make the claimed invention.") (emphasis added). In fact, doing so would involve little more than either: (1) selecting the "Never" radio button or (2) deleting or disabling certain lines of source code from listing 19-12 which are associated with the "During resize" or "After resize" radio buttons.[34] Indeed, deleting or disabling the source code associated with the "During resize" or "After resize" radio buttons is a trivial exercise for one skilled in the art since it would require little more than reading through approximately two pages of source code to identify the relevant functionality and then disabling or deleting it.[35] (*See* JavaScript Bible at CA 1085580-82 (disclosing the source code associated with listing 19-2.)) Having determined that there is no question that listings 19-11 and 19-12 clearly and convincingly disclose one window object that acts independently of other content, the focus now turns to the solely contained within requirement.

> **b.** **Unlike Listing 19-12, Listing 19-11 of the JavaScript Bible Does Not Disclose the Solely Contained Within Requirement**

The Special Master did not need to address whether the JavaScript Bible disclosed the solely contained within requirement of element 1D of the '493 Patent because he found that CA

---

[34] (*See* R&R at 204 ("'Three radio buttons let you choose whether and when the content should be region [or refreshed/redrawn] on to the layer . . . .' . . . Mr Goodman does not demonstrate or provide the screenshots resulting from [l]istings [1]9-12 and [1]9-13; nevertheless, that description suggests that whether and when to refresh may be set by the programmer.") (citations omitted and bracketed text added).)

[35] To put this in perspective, the Court points out that the source code used to create the Meininger reference spans 53 pages (*see* Dkt. No. 332-17) while the source code used to create the Visual DHTML reference spans at least 29 pages (*see* Dkt. No. 332-19).

did not meet its burden of proof regarding the window object requirement.[36]  Having concluded

otherwise, the Court must address whether listings 19-11 and 19-12 disclose the solely contained

within requirement.  Simple argues that listing 19-11 of the JavaScript Bible does not meet that

requirement because the sole layer element disclosed therein can be removed entirely from the

content manifestation environment.  (Belgard Supp. Decl. ¶¶ 33-35.)  For its part, CA maintains

that the requirement is met because when window objects are produced, they only appear inside

their content manifestation environments.  (CA's Supp. Reply at 8-9.)

CA's argument relies upon a visual construction of the term solely contained within,

which has been rejected by the Court.  Rather, in order to satisfy the solely contained within

limitation  "a window object cannot be moved from or displayed, in whole or in part, outside . . .

[its] content manifestation environment."  (Claim Constr. Mem. at 90.)  Because a user may

move the layer element from listing 19-11 outside its content manifestation environment, listing

19-11 fails to teach the solely contained within limitation.  On the other hand, there is no

question that listing 19-12, which discloses a stationary window object that can only be resized,

meets the solely contained within requirement of the patents in suit.

---

[36] As a point of clarification, the Court notes that the claim 1 of the '493 Patent requires
multiple window objects while the independent claims in the '563 and '882 Patents only require
one window object.

### c.     The JavaScript Bible Does Not Disclose Control Sections[37]

The JavaScript Bible does not disclose a control section. The term control section is a limitation found in claim 2 of the '563 and '882 Patents. A control section is a portion of a window object that facilitates user control. (*Id.* at 69-71.)

CA urges that the JavaScript Bible teaches control sections because "clicking anywhere on" the "entire surface" of the layer element disclosed in listing 19-11 allows a user to drag it. (Pl.'s Mot. Summ. J. on Invalidity (Dkt. No. 332) ("CA's Invalidity MSJ "), at 50.) Thus, according to CA, the control section and content display sections of the layer element disclosed in listing 19-11 are "coterminous." (*Id.*) This argument ignores the distinction between a layer and a module as contemplated by the patents in suit.

It is undisputed that a module is a "layer having (1) a control section, and (2) a related content display section which may be manifested within" a content manifestation environment. '493 Patent col 6, ll. 13-15. CA's proposed construction would eliminate the distinction between a control section and a content display section as well as the distinction between a layer and a module. A layer, as contemplated by the patents in suit, can be draggable. (Claim Constr. Mem. at 18.) Indeed, the patents in suit contemplate both a layer, that can be dragged but does not contain a control section, and a module, which is a layer, having a control section ***and*** a content display section, that can also be dragged. As such, a critical distinction between modules and layers is that modules are patterned after windows in standard windowed operating systems, where module type windows can only be dragged when a user clicks on the title bar region of

---

[37] Since the Special Master recommended that the JavaScript Bible did not contain window objects, it was not necessary for him to determine whether it disclosed control sections. Such a determination would have been moot under the circumstances.

their control sections.[38]  If anything, the layer element disclosed in the JavaScript Bible is analogous to the "layer" type window object contemplated by the patents in suit.  This is because both items can be dragged but do not contain a control section distinct from a content display area.  Were this not the case, there would be no difference between layers and modules.  As such, Simple is correct in arguing that the JavaScript Bible does not disclose "control sections."

### d. The JavaScript Bible Discloses the Without Refresh Requirement

The JavaScript Bible discloses the without refresh requirement.  The Special Master based his findings to the contrary on listing 19-12 of the Java Script Bible.  According to the Special Master,  not *every* aspect of the functionality disclosed therein could be implemented without a refresh.  However, as discussed below, one skilled in the art could easily implement listing 19-12 in a way that does not require a refresh from the server or cache.  In addition, listing 19-11 implements its functionality without requiring a refresh from the local cache.

One skilled in the art could easily implement listing 19-12 so that its operations do not force a refresh action.  *See generally Donohue*, 766 F.2d at 533.  As stated earlier, there are three radio buttons in listing 19-12, they are labeled as "Never," "During resize" and "After resize."  Only the "During resize" or "After resize" buttons trigger a refresh.  Consequently, one skilled in

---

[38] "[A]lmost every windowed operating system environment, including Microsoft Windows and the Apple Macintosh" allows a user to move a window by "placing the [mouse operated] cursor anywhere in the title bar region (other than on areas designated for other control actions, *e.g.*, for closing, or minimizing)," clicking and then dragging.  (Decl. of Danny Goodman in Supp. of Pl.'s Claim Construction Br.(Dkt. No. 326-22) ("Goodman Claim Construction Decl."), at ¶ 28; Pl.'s Claim. Construction Br. (Dkt. No. 326) ("CA's Claim Construction Br."), at 2, 5-6, 24.)  It is therefore critical to note that the foregoing windows are analogous to the modules claimed by the patents in suit because they contain both control sections and content display sections.  *See* '493 Patent col 6, ll. 13-15 (defining a module as a layer having a control section and a content display section).

the art could easily ensure that listing 19-12 meets the without refresh requirement by deleting or disabling the source code associated with the "During resize" or "After resize" radio buttons. This would be a trivial modification for one skilled in the art. Disabling these buttons would then limit the user to the "Never" button and ensure that she could act on the window object in listing 19-12 without triggering a refresh. Goodman illustrated this point via a step by step demonstration in which he: (1) implemented listing 19-12; (2) selected the "Never" radio button; (3) disconnected his browser from the internet; (4) emptied the "disk and memory caches"; and then (5) successfully resized the layer element within the content manifestation environment. (*See* First Goodman Supp. Decl. at 49-51.)

CA also demonstrated by clear and convincing evidence, with no genuine issue of material fact, that listing 19-11 of the JavaScript Bible teaches the without refresh requirement of element 1I. (*Id.* at 47-48.) Goodman, CA's expert, accomplished this in a step by step demonstration where he: (1) loaded the source code from listing 19-11; (2) disconnected his web browser from the Internet; (3) emptied the "disk and memory caches"; and then (4) successfully moved the layer element within the content manifestation environment. (*Id.*) In sum, it is clear that the JavaScript Bible discloses layer elements that can be moved or resized without forcing a refresh from the server or local cache. (*Id.* ¶¶ 90-92.) The Court now turns the multiple window objects requirement.

> e. **The JavaScript Bible Does Not Disclose Multiple Window Objects In One Content Manifestation Environment**

Simple maintains that listings 19-11 and 19-12 of the JavaScript Bible fail to disclose the multiple window objects required in element 1D of the '493 Patent. (Belgard Supp. Decl. ¶¶ 31, 36.) In fact, CA does not contest this point but argues that "many of the examples in the

Goodman book[, including listings 19-1, 19-3 and 19-7,] show multiple window objects." (CA's Supp. Reply at 7.) The issue thus turns on whether the layer elements disclosed in any of the source code listings in the JavaScript Bible, apart from listings 19-11 and 19-12, are actually window objects. The Court concludes they are not.

In order to be a window object as contemplated by the patents in suit, the layer elements described in the JavaScript Bible would either have to be layers or modules. Module type window objects require a control section as well as a content display section. Because, as discussed above, none of the layer elements disclosed by the JavaScript Bible contain a distinct control section, they cannot be module type window objects. *See supra* § II.D.6.c at 94-95. Accordingly, if they are to anticipate the window objects requirement, the Netscape layer elements disclosed in the JavaScript Bible would have to be layer type window objects as defined by the patents in suit. CA has failed to show by clear and convincing evidence that they are. In fact, the Special Master stated that CA failed to "demonstrate that *any* of the layers" which they claim are window objects, "act independently." (R&R at 197-98 (emphasis added).) As discussed in the following section, the source code contained in the JavaScript Bible merely shows that listings 19-1, through 19-8 and 19-10 disclose Netscape layer elements, which fail to anticipate the patents in suit. (JavaScript Bible at CA 1085548-50, 1085552-53, 1085566-68.)

### f. An Analysis of Whether Listings 19-1 Through 19-8 and Listings 19-10 Through 19-12 Anticipate the Patents In Suit

As the Court has found that the JavaScript Bible, in listings 19-11 and 19-12, discloses a content manifestation environment featuring a single window object, a more detailed analysis of listings 19-1 through 19-8 and 19-10 is needed to address CA's contention that these listings disclose window objects.

In its analysis below, the Court will first determine if the listings at issue, grouped and discussed according to their functionality, anticipate any of the independent claims of the patents in suit.  If so, the Court will then compare them to the dependent claims of the patents in suit. This approach is necessitated by the relationship between independent and dependent claims.  As a dependent claim contains at least one more limitation than the independent claim upon which it depends,[39] it cannot be invalid under § 102 of the Patent Act if the independent claim upon which it depends is not anticipated.  Nonetheless, it is possible for a prior art reference to invalidate an independent claim but not its dependent claims.  For example, if the JavaScript Bible does not anticipate claim 1 of the '563 Patent, dependent claims 2 through 5, which depend upon claim 1, cannot be anticipated by the JavaScript Bible.  On the other hand, if the JavaScript Bible anticipates claim 1 of the '563 Patent, the Court will have to determine whether dependent claims 2 through 5 are anticipated.

### (1)    Listing 19-1 Does Not Anticipate Any of the Independent Patent Claims At Issue

No reasonable jury could find that listing 19-1 anticipates any of the independent claims at issue because it does not disclose window objets that "act independently" of other content. According to CA's expert, listing 19-1 discloses a Netscape layer element, which can be moved above or below other layer elements by pressing on a button in the content manifestation environment.  (Goodman Invalidity MSJ Decl. ¶ 136.)  However, the layer element in listing 19-1 cannot perform any of the acts of a layer, as defined by the patents in suit, independently of

---

[39] 35 U.S.C. § 112 ¶ 4 ("[A] claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.").

other content.  Among other things, layers as defined by the patents in suit can be moved, minimized or resized.  (Claim Constr. Mem. at 46**.**)  Listing 19-1 merely swaps the stacking order of its layer elements on their "z" axis.  Although this qualifies as movement, CA has not clearly and convincingly shown that a user can actually drag or swap any of these layer elements without using separate buttons (other content), in contravention of the acts independently requirement.  The Court now turns to listings 19-2 and 19-3.

### (2) Listings 19-2 and 19-3 Do Not Anticipate Any of the Independent Patent Claims At Issue

No reasonable jury could find that listing 19-2 clearly anticipates any of the claims of the patents in suit.  According to the JavaScript Bible, listing 19-2 "defines one layer that features five buttons to change the background image of a second layer."  (JavaScript Bible at CA 1085550.)  This would make the two layers interdependent, in contravention of the acts independently requirement.  Consequently, listing 19-2 does not disclose window objects in accordance with the patents in suit.  In addition, element 1H of the '493 Patent as well as every other independent claim at issue requires that a "window object . . . be controlled as a result of performing at least one of a moving operation, a resizing operation, a minimizing operation, or a maximizing operation within said content manifestation environment . . . ."  *E.g.*, '493 Patent Cl. 1.  There is no indication that any of the foregoing can be performed on either of the layers disclosed in listing 19-2.

Similar to listing 19-2, listing 19-3 fails to meet the requirements of element 1H of the '493 Patent.  Listing 19-3 "teaches how to create . . . a palette of eight different colors across the top of the content display screen."  (Goodman Invalidity MSJ Decl. ¶ 138.)  According to CA, "each color is created as its own small layer - each is created with the Netscape <layer> tag and

each has been assigned initial properties for position and size." (*Id.*)  Even so, it is unclear whether listing 19-3 meets the acts independently requirement of a window object.  More importantly, the record evidence does not contain any proof that the Netscape layer elements disclosed in listing 19-3 can have their attributes altered as required in element 1H of the '493 Patent, namely the ability to be moved, resized, minimized, or maximized.  As the ability to have these attributes altered is found in every independent claim of the patents in suit, no reasonable jury could find that listing 19-2 and 19-3 anticipate any of the claims of the patents in suit.  The Court now turns to listings 19-4 through 19-6.

### (3)  Listings 19-4 Through 19-6 Do Not Anticipate Any of the Independent Patent Claims At Issue

No reasonable jury could find that listing 19-4 through 19-6 anticipates any claim at issue due to the fact that they fail to disclose a window object that acts independently of other content.

Listing 19-4 contains "one [Netscape] layer [element] that is adjustable by entering alternative values into six" text boxes contained within the same HTML document.  (JavaScript Bible at CA 1085554.)  Text boxes (other content) are, as their name indicates, distinct boxes in which the user may enter a numerical value to alter the properties of a separate Netscape layer element.  For example, one of the text boxes taught by listing 19-4 can be used to alter the height of the visible clip region, while another can be used to alter its width.  (*See* Goodman Invalidity MSJ Decl. ¶ 139.)  As a result, the ability to control the layer element is ***constricted*** by other content in the HTML document because a user must enter data in ***separate*** text boxes to alter the layer element's dimensions.  This is in direct contravention of the acts independently requirement.   Listings 19-5 and 19-6 also allow a user to change the properties of a Netscape layer element by entering values into separate text boxes found in the same content manifestation

environment. (*See id.* ¶ 140-41.) As a result of this interdependence, the ability to control the properties of a layer in these code listings is constricted by other content in the HTML document, namely separate text boxes. Thus, listings 19-5 and 19-6 also fail to disclose window objects that act independently of other content in an HTML document. In short, no reasonable jury could find that listings 19-4 through 19-6 anticipate any claims in the '493, '563, and '882 Patents.

### (4) Listings 19-7, 19-8 and 19-10 Do Not Anticipate Any of the Independent Patent Claims At Issue

Listings 19-7, 19-8 and 19-10 fail to anticipate any of the independent claims of the patents in suit.

Listing 19-7 "creates two [nested Netscape] layers . . . on the right side of the . . . [content manifestation environment] with some control buttons on the left." (Goodman Invalidity MSJ Decl. ¶ 142.) The Netscape layer elements in listing 19-7 can only be acted on, however, by separate control buttons, which constitute other content in the HTML document. (JavaScript Bible at CA 1085566-68.) Accordingly, they fail to satisfy the acts independently requirement which must be met in order to be considered window objects.

Similar to listing 19-7, listings 19-8 and 19-10 disclose content manifestation environments with a Netscape layer element on the right and control buttons on the left. (Goodman Invalidity MSJ Decl. ¶¶ 143-44.) Due to the fact that the layer elements on the right portion of the content manifestation environment cannot be acted upon without the use of the control buttons on the left (JavaScript Bible at CA 1085569-71, CA 1085574-75), listings 19-8 and 19-10 also fail to disclose layers which can be operated upon or manipulated independently

of other content in the HTML document. As a result, no reasonable jury could find that listings 19-7, 19-8 and 19-10 disclose window objects or anticipate any of the patent claims at issue.

### (5) Anticipation Analysis of Listings 19-11 and 19-12 of the JavaScript Bible

Having explained why listings 19-1 through 19-8 and 19-10 fail to anticipate any of the independent claims in the '493, '563, and '882 Patents, the Court can confine the remainder of its analysis to listings 19-11 and 19-12, as they are the only listings that disclose window objects. To that end, the Court will first determine which elements of claim 1 of the '493 Patent are anticipated by listings 19-11 and 19-12 of the JavaScript Bible. Next, the Court will compare the independent claims of the patents in suit to determine which elements of the '493 Patent are substantively indistinguishable from their counterparts in the '563 and '882 Patents. This will then allow the Court to analyze substantively indistinguishable elements together. The Court begins by identifying which elements of claim 1 of the '493 Patent are anticipated by the JavaScript Bible.

### (a) Listings 19-11 and 19-12 Anticipate Elements 1A, 1B, 1C, 1G and 1I of the '493 Patent

The Special Master recommended that the JavaScript Bible anticipates elements 1A, 1B and 1C of the '493 Patent. The parties have not objected to this recommendation and the Court finds that it is not clearly erroneous. In reviewing the parties' objections, the Court has found that there is no question as to whether the JavaScript Bible anticipates element 1I of the '493 Patent and discloses content manifestation environments that feature one window object. What remains to be settled is whether the JavaScript Bible discloses elements 1E through 1H of the '493 Patent. Elements 1E through 1H of the '493 Patent are important because, like most of the

102

elements in that claim, they appear in the independent claims of the '563 and '882 Patents. Each element will be discussed below in relation to listings 19-11 and 19-12.

Listing 19-11 does not fully anticipate element 1E of the '493 Patent. Element 1E provides:

> each window object of said window objects is associated with a set of controllable attributes and is configured to statically or dynamically manifest at least a portion of said associated content therein . . . .

Consequently, in order to anticipate this claim element, listing 19-11 would have to clearly disclose a layer: (1) with more than one attribute ("*attributes*") that could be altered (controllable"), such as size and location, *i.e.*, "a set of controllable attributes" and (2) that "statically or dynamically manifest[s] . . . content." Each limitation will be discussed below.

The source code of listing 19-11 shows that the layer type window object disclosed therein is associated with only one controllable attribute, the ability to be moved. (JavaScript Bible at CA 1085580-82.) This finding calls into question the Special Master's recommendation that the JavaScript Bible discloses the limitations of element 1E of the '493 Patent. The following portion of the R&R is of particular interest.

> As noted above in the discussion regarding enablement, Mr. Goodman executed several scripts disclosed in . . . [the JavaScript Bible]. For example, Mr. Goodman demonstrated a script for dragging a layer . . . [(listing 19-11)], a script for resizing a layer by entering clipping values . . . [(listing 19-4)], and a script for providing background content . . . [(listing 19-2)]. Assuming *arguendo* that the layers disclosed in . . . [those source code listings] correspond to the claimed 'window objects,' . . . [they would] disclose the ability to change layer characteristics that correspond to the claimed 'controllable attributes.'

(R&R at 199.)  Based on this excerpt, it seems that the Special Master combined the teachings of multiple source code listings (scripts) in the JavaScript Bible.  Otherwise, there would be no way in which the layer type window object disclosed in listing 19-11, which can only be moved, discloses the ability to have any other "controllable attribute" changed.[40]  (*See* JavaScript Bible at CA 1085578-79 (only disclosing source code that allows a user to "offset"/move a layer); *see also* R&R at 88, 173 (finding that the Meininger and Visual DHTML references satisfied the "set of controllable attributes" requirement because a user move **and** minimize window elements disclosed therein).)[41]

However, the Court has ruled, based on *inter alia* the Federal Circuit's recent decision in *Net Moneyin*, that the source code listings in the JavaScript Bible cannot be combined in the anticipation determination,[42] thereby rendering the Special Master's recommendation that listing 19-11 meets the "set of controllable attributes" requirement of element 1E clearly erroneous.

---

[40] Element 1H of the '493 Patent lists controllable attributes as "at least one of a moving operation, a resizing operation, a minimizing operation and a maximizing operation."  On the other hand, the prosecution history of the '493 Patent states that "claim 1 has been amended to include the feature that window objects may be operated upon based on operations corresponding to controllable attributes (e.g., minimizing, maximizing, resizing, moving, displaying or manifesting content, etc.), without requiring said web browser client to refresh said content manifestation environment."  (Dkt. No. 366, Ex. 4, Supplemental Amendment, SIM-006199.)  For present purposes, this difference is trivial because the textual content displayed in listings 19-11 and 19-12 cannot be changed or altered by the user in the context of a layer type window object.  As a result, displaying or manifesting content is not a controllable attribute.

[41] The Special Master's error is understandable since he was placed in the position of having to "assume" that the JavaScript Bible disclosed window objects and did not have the benefit of the Federal Circuit's guidance in *Finisar* and *Net Moneyin*.  In addition, the Special Master's recommendation to combine the teachings of multiple source code listings seems to impermissibly stretch his initial recommendation that  the JavaScript Bible "is enabled at least . . . to . . . the extent of the scripts and supporting text."  (R&R at 193-94.)

[42] *See supra* § II.D.5.c at 83-87.

According to the record evidence, listing 19-11 does however disclose the ability to "statically or dynamically display . . . content" transferred over an electronic data network, the latter part of element 1E of the '493 Patent. The textual content ("Drag me around the window") shown in the layer disclosed by listing 19-11 is contained within the source code file used to create listing 19-11. This is significant because, as the record evidence establishes, the source code file used to create listing 19-11 can itself be transferred over the Internet, an electronic data network. (JavaScript Bible at CA 1085161.) Accordingly, the instant a web browser displays the layer in listing 19-11; it also "statically or dynamically manifests at least a portion" of the content sent via an electronic data network as required by element 1E of the '493 Patent. Having addressed elements 1A through 1E and element 1I of the '493 Patent, the Court turns to elements 1F, 1G and 1H.

Elements 1F, 1G and 1H of the '493 Patent provide as follows:

> **[F]** said controllable attributes configured to affect manifestation of said each window object by said web browser client within said content manifestation environment, **[G]** wherein said each window object executes within and is directly controlled by said web browser client which operates within said data processing system, **[H]** and said controllable attributes associated with said each window object permit said each window object to be controlled as a result of performing at least one of a moving operation, a resizing operation, a minimizing operation and a maximizing operation within said content manifestation environment

In laymen's terms elements 1F and 1H require that a window object have "controllable attributes," *i.e.*, the ability to allow a user to at least: (1) move; (2) resize; (3) minimize; or (4) maximize it within its content manifestation environment. For its part, element 1G requires that a user only be able to interact with window objects via the single web browser hosting their content manifestation environment. For example, if a user can turn her window object into a

separate operation level web browser, it does not satisfy element 1G because it is no longer controlled by the original web browser client hosting its content manifestation environment.

Due to the fact that elements 1F and 1H refer to multiple control attributes, they are not anticipated by listing 19-11.  Accordingly, the Court does not adopt the Special Master's recommendation that the JavaScript Bible anticipates elements 1F and 1H of the '493 Patent.[43]

On the other hand, listing 19-11, which discloses a layer that does not become a separate operation level web browser, does meet, disclose and embody element 1G.  As such, the Court agrees with and adopts the Special Master's reasoning and recommendation with regards to element 1G.  (R&R at 200-01.)

Having analyzed listing 19-11 it is clear that: (1) the JavaScript Bible fails to disclose control sections; (2) listing 19-11 does not meet the solely contained within and multiple window objects requirements of element 1D of the '493 Patent; (3) listing 19-11 does not meet the set of control attributes requirement of elements 1E, 1F and 1H and (4) listing 19-11 anticipates the remaining elements of claim 1 of the '493 Patent, elements 1A, 1B, 1C, 1G and 1I.  The focus now turns to listing 19-12.

Listing 19-12 of the JavaScript Bible is very similar to listing 19-11.  These similarities make it possible for both listings to disclose many of the same claim elements of the patents in suit.  By the same token, their differences make it possible for listing 19-11 to anticipate certain claims that listing 19-12 cannot and vice versa.  For example, while both listings disclose a

---

[43] The Special Master's recommendation is based on his finding that the JavaScript Bible anticipated element 1E.  However, the Special Master's conclusion is not completely erroneous since the JavaScript Bible does anticipate any claims that would relate to just one control attribute or just one window object.

content manifestation environment with a single layer type window object, the layer disclosed in listing 19-12 is resizable but cannot be moved. Conversely, the layer disclosed in listing 19-11 is movable, but cannot be resized. As such, listing 19-12 discloses the solely contained within requirement of element 1D of the '493 Patent while listing 19-11 does not.

The focus now turns to element 1E of the '493 Patent. Listing 19-12 anticipates only the portions of element 1E of the '493 Patent that listing 19-11 does. (*See* R&R at 198-200.) To begin with, it is clear, with no genuine issue of material fact, that the window element disclosed in listing 19-12 is only resizable and therefore has just *one* controllable attribute. Accordingly, as was the case with listing 19-11, listing 19-12 fails to meet the multiple controllable attributes requirement of element 1E. Next, an analysis of the source code disclosed in listing 19-12 shows that the layer type window object disclosed therein manifests content as required by element 1E of the '493 Patent. To that point, listing 19-12 displays the textual content and implements the source code in another file, listing 19-13. (*See* JavaScript Bible at CA 1085581.)[44] This is clearly illustrated by **Figure 8**, the screen shot corresponding to listing 19-12, which displays the text from listing 19-13 ("Resize me by dragging the lower right corner"). *See* page 91 *supra*. As a result, the instant a web browser displays the layer in listing 19-12, and it also "statically or dynamically manifests at least a portion" of the content sent via an electronic data network. '493 Patent Cl. 1; *see also* JavaScript Bible at CA 1085200 (indicating that JavaScript files can be

---

[44] In this instance the source code "document.myLayer.load("list19-13.htm")" loads another document, listing 19-13, into listing 19-12. As a result, listing 19-12 displays the textual content from listing 19-13. It is known to one skilled in the art that this document can be sent from a remote server over the Internet as well as from a local source. (*See JavaScript Bible* at CA 1085200, 1085574-75.)

sent over an electronic data network such as the Internet). The Court will now address whether

listing 19-12 anticipates elements 1F through 1H of the '493 Patent.

Like listing 19-11, listing 19-12 is only associated with one controllable attribute, in this

case, the ability to be resized. (JavaScript Bible at CA 1085580-82 (only disclosing source code

which resizes a layer type window object).) In addition, the window object in listing 19-12 is

created by source code that can be downloaded and processed by the web browser and cannot be

removed from its content manifestation environment. Consequently, while listing 19-12 does

not disclose or embody the requirements of elements 1F and 1H of the '493 Patent, which

require multiple controllable attributes, it does anticipate element 1G clearly and convincingly

with no genuine issue of material fact.[45]

The foregoing analysis demonstrates that listings 19-11 and 19-12 fail to disclosed the:

(1) *multiple* window objects requirement of element 1D of the '493 Patent; (2) the *set of* control

attributes requirement of elements 1E, 1F and 1H; and (3) control sections. It also demonstrates

that these listings anticipate the other elements of claim 1 of the '493 Patent, elements 1A, 1B,

1C, 1G and 1I. Having determined which elements of claim 1 of the '493 Patent are anticipated

by the JavaScript Bible, the Court can turn its attention to the '563 and '882 Patents.

> **(b)    Methodology and Comparison of the
>          Independent Claims at Issue**

Prior to ascertaining which claims of the patents in suit are anticipated by listings 19-11

and 19-12 of the JavaScript Bible, the Court will facilitate its analysis by comparing the

_____

[45] Element 1G provides "wherein said each window object executes within and is directly controlled by said web browser client which operates within said data processing system." (*See* R&R at 200-01.)

independent claims of the '493, '563, and '882 Patents on an element by element basis. For example, since elements 1A, 1B and 1C of the '493 Patent cover substantially the same subject matter as elements 1A and 1B of the '563 and '882 Patents, the Court will analyze those elements together and then move on to other claim element groupings that cover substantively analogous subject matter. As it discusses each grouping of related claim elements, the Court will be able to determine whether or not they are anticipated by the JavaScript Bible. For example, if the Court finds that elements 1A, 1B and 1C of the '493 Patent are disclosed by the JavaScript Bible and indistinguishable from elements 1A and 1B of the '563 and '882 Patents, it would follow that the JavaScript Bible anticipates the foregoing claim elements across all three patents in suit.

The Court's comparison of the independent claims in the '493, '563, and '882 Patents is presently for the purpose of facilitating its anticipation analysis of the JavaScript Bible. Where the Court wishes to extend this analysis to other issues in the case at bar, it will do so explicitly. The following analysis will discuss the functional groupings of claim elements from the patents in suit, how they relate to each other, and whether they are anticipated by the JavaScript Bible. The Court will begin by comparing elements 1A, 1B and 1C of the '493 Patent with elements 1A and 1B of the '563 and '882 Patents.

i) **For the Purposes of Determining Anticipation, Elements 1A, 1B and 1C of the '493 Patent are Substantively Indistinguishable from Elements 1A and 1B of the '563 and '882 Patents**

To help frame its analysis, the Court will provide Claim 1 of the '563 and '882 Patents below. Claim 1 of the '563 Patent is directed to:

1. A network client configured to operate within a data processing system and to receive content from a remote server system to facilitate a windowed content manifestation environment, comprising:

      **[A]** a content retrieval module configured to receive content from a network server system via an electronic data network; and

      **[B]** a processing engine coupled to said content retrieval module configured to provide a content manifestation environment within the data processing system,

      **[C]** to process said content to produce at least one corresponding window object within said content manifestation environment,

      **[D]** said at least one corresponding window object configured to manifest at least a portion of said content therein without requiring said content manifestation environment to be refreshed,

      **[E]** said at least one corresponding window object is associated with a controllable attribute,

      **[F]** said controllable attribute configured to permit said at least one corresponding window object to be controlled as a result of performing at least one of a moving operation, a resizing operation, a minimizing operation, or a maximizing operation within said content manifestation environment.

'563 Patent Cl. 1 (bracketed text and formatting added to facilitate analysis). Claim 1 of the '882

Patent is directed to:

1. A network client configured to operate within a data processing system and to receive content from a remote server system to facilitate a windowed content manifestation environment, comprising:

      **[A]** a content retrieval module configured to receive content from a network server system via an electronic data network; and

      **[B]** a processing engine coupled to said content retrieval module configured to operate a content manifestation environment within the data processing system,

      **[C]** to process said content to produce at least one window object within said content manifestation environment,

**[D]** said at least one window object configured to manifest at least a portion of said content therein,

**[E]** said at least one window object corresponding to at least one executable program object and being controlled by said processing engine without requiring said content manifestation environment to be refreshed,

**[F]** said at least one window object is associated with a controllable attribute,

**[G]** said controllable attribute configured to permit at least one window object to be controlled as a result of performing at least one of a moving operation, a resizing operation, a minimizing operation, or a maximizing operation within said content manifestation environment.

'882 Patent Cl. 1 (bracketed text and formatting added to facilitate analysis). The following is a side by side comparison of elements 1A through 1C of the '493 Patent with elements 1A and 1B of the '563 and '882 Patents. Certain text has been emphasized to point out analogous claim language as well as the important distinctions between the claims at issue.

| **Claim 1 of the '493 Patent** | **Claim 1 of the '563 Patent** | **Claim 1 of the '882 Patent** |
|---|---|---|
| 1. A system for facilitating a windowed content manifestation environment within a ***web browser***, comprising: | 1. A ***network client*** configured to operate within a data processing system and to receive content from a remote server system to facilitate a windowed content manifestation environment, comprising: | 1. A ***network client*** configured to operate within a data processing system and to receive content from a remote server system to facilitate a windowed content manifestation environment, comprising: |
| **[A]** a server system configured to transmit a software system and associated content via an electronic data network; and | **[A]** a content retrieval module configured to receive content from a network server system via an electronic data network; and | **[A]** a content retrieval module configured to receive content from a network server system via an electronic data network; and |

| | | |
|---|---|---|
| **[B]** a web browser client operating within a data processing system that is coupled to said server system via the electronic data network and having a content manifestation environment, | **[B]** a processing engine coupled to said content retrieval module configured to provide a content manifestation environment within the data processing system, | **[B]** a processing engine coupled to said content retrieval module configured to operate a content manifestation environment within the data processing system, |
| **[C]** said web browser client operative to receive said software system and said associated content from said server system via the electronic data network, | | |

For the purposes of determining anticipation, elements 1A through 1C of the '493 Patent are substantively indistinguishable from elements 1A and 1B of the '563 and '882 Patents. The record evidence presents the Court with three observations that lead to this conclusion. First, since all these claim elements relate to transferring data files to a computer over an electronic data network, they involve nothing more than a server system linked, over an electronic data network, to a web browser operating on its host processor. Second, from the perspective of one skilled in the art, there is no substantive difference in transferring an entire software system or just a portion thereof over an electronic data network. Finally, web browsers available when the '493 Patent was filed already contained the processing engines called for in the '563 and '882 Patents. Consequently, it is evident that prior art which anticipates elements 1A through 1C of the '493 Patent will anticipate its counterparts in the '563 and '882 Patents. Each of these observations is explained in detail below.

For purposes of anticipation, elements 1A, 1B, and 1C of the '493 Patent are substantively indistinguishable from elements 1A and 1B of the '563 and '882 Patents because

they all require a server system connected to an electronic data network, and a web browser operating within a data processing system connected to that network. To that point, while the "content retrieval module" referred to in element 1A of the '563 and '882 Patents must be capable of receiving content over an electronic data network, the "processing engine" referred to in element 1B of the '563 and '882 Patents is responsible for generating and providing a windowed content manifestation environment. This is significant because elements 1A, 1B and 1C of the '493 Patent and elements 1A and 1B of the '563 and '882 Patents all build their functional capabilities upon web browsers/network clients which not only retrieve content over an electronic data network, but contain the equivalent of a processing engine. The focus now turns to describing exactly how a network client provides both a content retrieval module and a processing engine.[46]

The parties and the Special Master agree that web browsers in use when the '493 Patent was filed contained content retrieval modules. *See* note 46 *infra*. This is a critical point of agreement because, like the Special Master, the Court interprets the term "network client" to mean a web browser. In the context of the '563 and '882 Patents, a network client is a web browser that can be customized as described by the relevant claim language. (*See* Claim Constr. Mem. at 80.) Accordingly, the only substantive difference between element 1A of the '493 Patent, which calls for a web browser, and element 1A of the '563 and '882 Patents, which call for a network client, is that the '493 Patent requires the transfer of an entire software system over

---

[46] Both parties seem to agree that web browsers contain content retrieval modules and processing engines. CA argues this point in its motion for summary judgment of anticipation. (*See*, *e.g.*, CA's Invalidity MSJ at 15-16.) Simple also asserts the same in their infringement claim charts. (*See* Dkt. No. 366 Ex. 36 Apx. Charts: '493 and BrightStor, v. 1.0 at 1 -3; '563 and BrightStor, v. 1.0 at 1, 6; '882 and B[r]ightStor, v. 1.0 at 1-2, 6.)

an electronic data network such as the Internet, whereas the '563 and '882 Patents require that part of the software system already be loaded onto the web browser while only a portion of it (*ie* certain HTML and JavaScript files) be transferred over an electronic data network. *Compare* '493 Patent col. 8, ll. 1-20 *with* '563 Patent col.7, ll. 40-60 *and* '882 Patent col. 8, ll. 1-20. As discussed further below, this distinction has no substantive impact on an anticipation determination.

In light of the knowledge of one skilled in the art, a reference that discloses the transfer of an entire software system over an electronic data network, by default, also discloses the transfer of portions of a software system or certain files over the Internet. In other words, if one skilled in the art is able to transfer one file or a group of files that comprise a software system, as called for in the '493 Patent, such a person can also transfer one file or certain files that would only constitute a portion of a software system, as called for in the '563 and '882 Patents. In laymen's terms: (1) if a pizza shop can deliver three pizzas to one address, it can also deliver two pizzas to the same address or (2) if a cargo ship can be used to transport 5 cars to a certain port, it could also be used to transport just 3 cars to the same port. Having established that prior art web browsers satisfy the "content retrieval module" requirement of element 1A of the '563 and '882 Patents, the focus shifts to the "processing engine" limitation of element 1B.

When considering claim 1 of the '563 and '882 Patents, it is critical to note that: (1) "every scriptable browser" available at the time the '493 Patent was filed (*i.e.* Netscape's Navigator and Microsoft's Internet Explorer) had a "built in" JavaScript interpreter and (2) JavaScript files can be loaded onto a local hard disk and/or transferred over an electronic data network as a software system or as portions thereof. (*See* JavaScript Bible at CA 1085161.) In

114

short, the JavaScript interpreter performs the same tasks and is equivalent to the "processing engine" referred to in element 1B of the '563 and '882 Patents. As the record evidence shows, both the JavaScript interpreter and the processing engine referred to in the '563 and '882 Patents are loaded onto the web browser client and process files that are either, already loaded onto the web browser, or sent over an electronic data network. (*See* JavaScript Bible at CA 1085200; '493 Patent Cl. 1; '563 Patent Cl. 1; '882 Patent Cl. 1.) These files can then be processed to generate the content manifestation environment claimed in the '493, '563, and '882 Patents. It is also clear that one skilled in the art could either load some JavaScript files directly onto the web browser without using the Internet or, transfer the same JavaScript files over the Internet as a software system. (JavaScript Bible at CA 1085200, 1085566; *see also* Dkt. No. 366 Ex. 36 Apx. Charts: '493 and BrightStor, v. 1.0 at 1 -3; '563 and BrightStor, v. 1.0 at 1 and 6; '882 and B[r]ightStor, v. 1.0 at 1-2, 6 (stating that the Internet Explorer and Netscape Navigator web browsers contain processing engines).)

Accordingly, at the time the '493 Patent was filed, one skilled in the art could create a processing engine according the '563 and '882 Patents, download an entire software system over an electronic data network according to the '493 Patent, and customize a web browser so that only certain software files needed to be sent across an electronic data network to create a windowed content manifestation environment. In other words, the JavaScript Bible anticipates elements 1A through 1C of the '493 Patent and elements 1A and 1B of the '563 and '882 Patents. The focus now shifts to elements 1D through 1F of the '493 Patent and its counterparts in Claim 1 of the '563 and '882 Patents.

ii)     **For the Purposes of Determining Anticipation, Elements 1D, 1E and 1F of the '493 Patent are Substantively Indistinguishable from Elements 1C, 1D and 1E of the '563 Patent and Elements 1C Through 1F of the '882 Patent**

For the purposes of determining anticipation, elements 1D, 1E and 1F of the '493 Patent are substantively indistinguishable from elements 1C through 1E of the '563 Patent and elements 1C through 1F of the '882 Patent.  A side by side comparison of these claim elements is provided below.  Certain text has been emphasized to point out analogous claim language and important distinctions.

| **Claim 1 of the '493 Patent:** | **Claim 1 of the '563 Patent:** | **Claim 1 of the '882 Patent:** |
|---|---|---|
| **[D]** to process said software system and said associated content to produce ***window objects solely contained within*** said content manifestation environment, | **[C]** to process said content to produce ***at least one corresponding window object within*** said content manifestation environment, | **[C]** to process said content to produce ***at least one window object within*** said content manifestation environment, |
| **[E]** each window object of said window objects is associated with a ***set of controllable attributes*** and is configured to ***statically or dynamically manifest*** at least a portion of said associated ***content*** therein, . . . <br> **[I]** ***without requiring*** said web browser client to ***refresh*** said content manifestation environment. | **[D]** said at least one corresponding window object configured to ***manifest*** at least a portion of said ***content*** therein ***without requiring*** said content manifestation environment to be ***refresh***ed, | **[D]** said at least one window object configured to ***manifest*** at least a portion of said ***content*** therein, <br><br> **[E]** said at least one window object corresponding to at least one executable program object and being controlled by said processing engine ***without requiring*** said content manifestation environment to be ***refresh***ed, |

116

| [F] *said controllable attributes* configured to affect manifestation of said each window object by said web browser client within said content manifestation environment, | [E] said at least one corresponding window object is associated with *a controllable attribute*, | [F] said at least one window object is associated with *a controllable attribute*, |
|---|---|---|

The Court will begin by comparing element 1C of the '563 and '882 Patents with element 1D of the '493 Patent.

Element 1C of the '563 and '882 Patents requires that a web browser's processing engine process content received from a server to produce *at least one window object* within a content manifestation environment. This is very similar to element 1D of the '493 Patent, which requires that a web browser client process content received from a server to produce *window objects solely contained within* a content manifestation environment. In all three claims, content is being processed to create at least one window object. However it is critical to note that while element 1D of the '493 Patent claims *multiple* window objects that must be *solely contained within* a content manifestation environment, element 1C of the '563 and '882 Patents claims a content manifestation environment with *at least one* **window object** that must be *produced within* a content manifestation environment *but need not be solely contained within it*. As such, while the JavaScript Bible does not anticipate element 1D of the '493 Patent,[47] it anticipates element 1C of the '563 and '882 Patents.

---

[47] As discussed earlier, *see supra* § II.D.6.e at 96-97, the JavaScript Bible failed to anticipate element 1D of the '493 Patent because listings 19-11 and 19-12 disclosed content manifestation environments featuring one single window object (as opposed to the *window objects* called for in element 1D).

Similar to element 1E of the '493 Patent, element 1D of the '563 and '882 Patents requires that the claimed window object be configured to manifest a portion of the content received over an electronic data network. They differ however, as element 1E of the '493 Patent contains the "set of controllable attributes" requirement while element 1D of the '563 Patent and elements 1D and 1E of the '882 Patent do not. Also, element 1D of the '563 Patent differs from element 1D of the '882 Patent because it contains the without refresh requirement. This distinction is illusory as the without refresh requirement is found in element 1E of the '882 Patent.[48] As a result, the record evidence shows that although the JavaScript Bible does not anticipate element 1E of the '493 Patent (the multiple controllable attributes and statically or dynamically manifest content requirements), it anticipates element 1D of the '563 Patent (manifest content and without refresh requirements) and elements 1D and 1E of the '882 Patent (manifest content and without refresh requirements).[49]

Element 1F of the '493 Patent is similar to elements 1E of the '563 Patent and 1F of the '882 Patent, which claim a single window object associated with a single control attribute. Notably though, element 1F of the '493 Patent is more difficult to anticipate because it claims *multiple* window objects with *multiple* control attributes as opposed to elements 1E of the '563 Patent and 1F of the '882 Patent, which only require *a single* window object associated with "*a controllable attribute.*" Element 1F of the '493 Patent requires multiple control attributes

[48] These minor differences between the '563 and '882 Patents have no impact on anticipation determinations, as the manifest content and without refresh limitations are still found in claim 1 of both patents.

[49] *See supra* §§ II.D.6.f.(5).(a) at 102-08, II.D.6.d at 95-96, discussing why the JavaScript Bible meets the manifests content and without refresh requirements.

because element 1E of the '493 Patent requires a "set of controllable attributes."  In light of the

foregoing, the record evidence is clear that the JavaScript Bible anticipates elements 1E of the

'563 Patent and 1F of the '882 Patent despite failing to anticipate element 1F of the '493 Patent.

> **iii)** **For the Purposes of Determining Anticipation, Elements 1G and 1I of the '493 Patent are Substantively Indistinguishable from Element 1E of the '882 Patent**

Elements 1G and 1I of the '493 Patent as well as element 1E of the '882 Patent can be

anticipated by the same prior art reference.  Shown below is a chart comparing elements 1G and

1I of the '493 Patent with element 1E of the '882 Patent.

| Claim 1 of the '493 Patent | Claim 1 of the '882 Patent |
|---|---|
| **[G]** wherein said each window object executes within and is ***directly controlled by said web browser client*** which operates within said data processing system, . . . **[I]** ***without requiring*** said web browser client to ***refresh*** said content manifestation environment. | **[E]** said at least one window object corresponding to at least one executable program object and being ***controlled by said processing engine*** [ <br><br> ]***without requiring*** said content manifestation environment to be ***refresh***ed, |

Element 1G of the '493 Patent requires that each claimed window object execute within

and be directly controlled by its ***web browser*** client while element ***1I*** contains the ***without***

***refresh*** requirement.  Similarly, the first portion of element 1E of the '882 Patent requires that a

single window object be an executable "program object" controlled by the claimed ***processing***

***engine*** first mentioned in element 1B of the '882 Patent.  The processing engine mentioned in

element 1E of the '882 Patent is actually part of a network client.  This is important to note

because, in the context of the patents in suit, a "network client" is defined as a web browser.

Hence, element 1G of the '493 Patent and element 1E of the '882 Patent both require that a window object be controlled by the web browser hosting its content manifestation environment. Moreover, like the later part of element 1E of the '882 Patent, element 1I of the '493 Patent contains the without refresh requirement. In short, for the purposes of an anticipation determination, elements 1G and 1I of the '493 Patent and element 1E of the '882 Patent: (1) essentially claim a window object controlled by its web browser that can be acted upon without triggering a refresh and (2) are anticipated by the JavaScript Bible.

iv) **For the Purposes of Determining Anticipation, Element 1H of the '493 Patent is Substantively Indistinguishable from Element 1F of the '563 Patent and Element 1G of the '882 Patent**

For the purposes of determining anticipation, element 1H of the '493 Patent, element 1F of the '563 Patent and element 1G of the '882 Patent are indistinguishable. A side by side comparison of these claim elements is provided below.

| **Claim 1 of the '493 Patent** | **Claim 1 of the '563 Patent** | **Claim 1 of the '882 Patent** |
|---|---|---|
| **[H]** and said ***controllable attributes*** associated with said each window object permit said each window object to be controlled as a result of performing ***at least one of a moving*** operation, a ***resizing*** operation, a ***minimizing*** operation and a ***maximizing*** operation within said content manifestation environment and | **[F]** said ***controllable attribute*** configured to permit said at least one corresponding window object to be controlled as a result of performing ***at least one of a moving*** operation, a ***resizing*** operation, a ***minimizing*** operation, or a ***maximizing*** operation within said content manifestation environment. | **[G]** said ***controllable attribute*** configured to permit at least one window object to be controlled as a result of performing ***at least one of a moving*** operation, a ***resizing*** operation, a ***minimizing*** operation, or a ***maximizing*** operation within said content manifestation environment. |

While element 1H of the '493 Patent claims **multiple** controllable attributes associated with **multiple** window objects, elements 1F of the '563 Patent and 1G of the '882 Patent claim a **single** control attribute associated with a **single** window object. In addition, all three elements require that a controllable attribute allow a user to move, resize, minimize or maximize a window object within a content manifestation environment. In light of these similarities, the record evidence clearly shows that elements 1F of the '563 Patent and 1G of the '882 Patent are anticipated by the JavaScript Bible, which discloses a content manifestation environment featuring one window object with one controllable attribute (either the ability to be moved or the ability to be resized), while element 1H of the '493 Patent is not.[50]

In sum, while the JavaScript Bible does not anticipate claim 1 of the '493 Patent, it does anticipate claim 1 of the '563 and '882 Patents. The focus now shifts to claim 6 of the '563 and '882 Patents.

> **v)** **For the Purposes of Determining Anticipation, Claims 1 and 6 of the '563 Patent are Substantively Indistinguishable from Claim 1 of the '493 Patent**

The following claim chart contains formatted versions of claim 1 of the '493 Patent along with claims 1 and 6 of the '563 Patent. Certain text has been emphasized to highlight the relevant similarities and differences between the claims.

---

[50] *See supra* § II.D.6.f.(5).(a) at 102-08, discussing why element 1H of the '493 Patent is not anticipated by the JavaScript Bible.

| Claim 1 of the '493 Patent | Claim 1 of the '563 Patent | Claim 6 of the '563 Patent |
| --- | --- | --- |
| 1. A system for facilitating a windowed content manifestation environment within a web browser, comprising: | 1. A network client configured to operate within a data processing system and to receive content from a remote server system to facilitate a windowed content manifestation environment, comprising: | 6. A network client configured to operate within a data processing system and to receive content from a remote server system to facilitate a windowed content manifestation environment therein, comprising: |
| **[A]** a server system configured to transmit a software system and associated content via an electronic data network; and | **[A]** a content retrieval module configured to receive content from a network server system via an electronic data network; and | **[A]** a content retrieval module configured to receive content from a network server system via an electronic data network; and |
| **[B]** a web browser client operating within a data processing system that is coupled to said server system via the electronic data network and having a content manifestation environment, | **[B]** a processing engine coupled to said content retrieval module configured to ***provide*** a content manifestation environment within the data processing system, | **[B]** a processing engine coupled to said content retrieval module configured to ***instantiate*** a content manifestation environment within the data processing system, |
| **[C]** said web browser client operative to receive said software system and said associated content from said server system via the electronic data network, | | |
| **[D]** to process said software system and said associated content to produce ***window objects solely contained within*** said content manifestation environment, | **[C]** to process said content to produce ***at least one corresponding window object within*** said content manifestation environment, | **[C]** to process said content to produce ***at least one corresponding window object within*** said content manifestation environment, |

| | | |
|---|---|---|
| **[E]** each window object of said window objects is associated with *a set of controllable attributes* and is configured to *statically or dynamically manifest* at least a portion of said associated *content* therein, . . . **[I]** *without requiring* said web browser client to *refresh* said content manifestation environment | **[D]** said at least one corresponding window object configured to *manifest* at least a portion of said *content* therein *without requiring* said content manifestation environment to be *refresh*ed, | **[D]** said at least one corresponding window object associated with *a set of at least one controllable attribute* and configured to *manifest* at least a portion of said *content* therein, |
| **[F]** said *controllable attributes* configured to affect manifestation of said *each window object* by said web browser client within said content manifestation environment, | **[E]** said at least one corresponding window object is associated with *a controllable attribute*, | **[E] [1]** said *set of at least one controllable attribute* configured to affect manifestation of said *at least one corresponding window object* by the network client within said content manifestation environment by . . . |
| **[G]** wherein said each window object executes within and is *directly controlled by said web browser client* which operates within said data processing system, . . . **[I]** *without requiring* said web browser client to *refresh* said content manifestation environment | | **[E][1]** said set of at least one controllable attribute configured to affect manifestation of said at least one corresponding window object by the network client within said content manifestation environment **[2]** by . . . **[3]** *without requiring* said content manifestation environment to be *refresh*ed. |

123

| | | |
|---|---|---|
| **[H]** and said ***controllable attributes*** associated with said each window object permit said each window object to be controlled as a result of performing ***at least one of a moving*** operation, a ***resizing*** operation, a ***minimizing*** operation and a ***maximizing*** operation within said content manifestation environment and | **[F]** said ***controllable attribute*** configured to permit said at least one corresponding window object to be controlled as a result of performing ***at least one of a moving*** operation, a ***resizing*** operation, a ***minimizing*** operation, or a ***maximizing*** operation within said content manifestation environment. | **[E].[1]** said ***set of at least one controllable attribute*** configured to affect manifestation of said at least one corresponding window object by the network client within said content manifestation environment **[2]** by permitting said at least one corresponding window object to be controlled as a result of performing at least one of a ***moving*** operation, a ***resizing*** operation, a ***minimizing*** operation, or a ***maximizing*** operation within said content manifestation environment **[3]** ***without requiring*** said content manifestation environment to be ***refresh***ed. |

As the chart above demonstrates, claims 1 and 6 of the '563 Patent are nearly identical to each other and highly analogous to claim 1 of the '493 Patent. All these claims are directed to a content manifestation environment featuring at least one window object. They differ, however, in that Claim 1 of the '493 Patent requires multiple window objects associated with multiple controllable attributes that remain solely contained within their content manifestation environment, while claims 1 and 6 of the '563 Patent only require a window object (elements 1C and 6C) associated with a single controllable attribute (elements 1F and 6E). Further, the difference between claims 1 and 6 of the '563 Patent is that element 6B requires a "processing engine coupled to said content retrieval module configured to ***instantiate*** a content manifestation environment within the data processing system" while element 1B requires a "processing engine coupled to said content retrieval module configured to ***provide*** a content manifestation

environment within the data processing system." This distinction is insubstantial due to the fact that web browsers in use when the patents in suit were filed contained built in JavaScript interpreters which served as the processing engines used to produce the content manifestation environment disclosed by the JavaScript Bible. In other words, claims 1 and 6 of the '563 Patent are equivalent for the purposes of anticipation because they both utilize a web browser to ***provide/instantiate*** a content manifestation environment by processing JavaScript files. Consequently, while the JavaScript Bible does not anticipate claim 1 of the '493 Patent,[51] it anticipates claims 1 and 6 of the '563 Patent. Having compared claim 1 of the '493 Patent with the independent claims of the '563 Patent, the focus now shifts to the '882 Patent.

> **vi)** **For the Purposes of Determining Anticipation, Claims 1 and 6 of the '882 Patent are Substantively Indistinguishable from Claim 1 of the '493 Patent**

As a preliminary matter, the Court notes that claim 6 of the '882 Patent oscillates between requiring multiple control attributes, as in elements 6D and 6E, and requiring a single control attribute as in elements 6G and 6H. Accordingly, prior to comparing claim 6 of the '882 Patent to claim 1 of the '493 and '882 Patents, the Court must address this apparent error.

---

[51] As discussed earlier, the JavaScript Bible failed to anticipate claim 1 of the '493 Patent because, while claim 1 requires multiple window objects associated with multiple controllable attributes, the JavaScript Bible only discloses content manifestation environments featuring one window object associated with one controllable attribute. *See supra* §§ II.D.6.e at 96-97, II.D.6.f.(5)(a) at 102-08.

a)     The Court Will Correct a Minor
Typographical Error in Claim 6 of
the '882 Patent

The Court has formatted Claim 6 of the '882 Patent below and highlighted certain

portions to show to show the oscillation between a multiple controllable attribute*s* and a single

controllable attribute.

> 6. A network client configured to operate within a data processing system and to receive content from a remote server system to facilitate a windowed content manifestation environment therein, comprising:
>
>> **[A]** a content retrieval module configured to receive content from a network server system via an electronic data network; and
>>
>> **[B]** a processing engine coupled to said content retrieval module configured to instantiate a content manifestation environment within the data processing system,
>>
>> **[C]** to process said content to produce at least one window object within said content manifestation environment,
>>
>> **[D]** said at least one window object associated with a set of ***controllable attributes*** and configured to manifest at least a portion of said associated content therein,
>>
>> **[E]** said ***controllable attributes*** configured to affect manifestation of said at least one window object by said the network client within said content manifestation environment,
>>
>> **[F]** said at least one window object corresponding to at least one executable program object and being controlled by said processing engine without requiring said content manifestation environment to be refreshed,
>>
>> **[G]** said at least one window object is associated with a ***controllable attribute***,
>>
>> **[H]** said ***controllable attribute*** configured to permit at least one window object to be controlled as a result of performing at least one of a moving operation, a resizing operation, a minimizing operation, or a maximizing operation within said content manifestation environment.

'882 Patent Cl. 6.  In light of this error, the Court must determine whether it can correct the

relevant claim language.

In circumstances where an "error is evident from the face of the patent," a district court may retroactively correct it. *Group One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1302-03 (Fed. Cir. 2005) (citing *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003)). In particular, a "district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus.*, 350 F.3d at 1357.

Instances where courts may permissibly change relevant claim language usually involve little more than typographical errors where the face of the patent or its prosecution history clearly points one to the relevant error. For example, in *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1203 & n.3 (Fed. Cir. 1992), the Federal Circuit "permitted [the] correction of a patent by inserting the word 'toy' in a claim where the patent on its face was clearly directed at a toy trackway rather than an actual trackway." *Group One*, 407 F.3d at 1303 (citing *Lemelson*, 968 F.2d at 1203 & n.3). Similarly, in *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005), one of the claims referred to a claim 38, even though no such claim existed in the issued patent. However, the prosecution history clearly demonstrated that when renumbering the allowed claims in preparation for printing, the examiner failed to correct the internal reference. *Id.* The Federal Circuit found that this was the type of harmless and obvious administrative error trial courts were permitted to correct. *Id.*; *see also Blackboard, Inc. v. Desire2Learn, Inc.*, 2007 U.S. Dist. LEXIS 56680, *34-35 (E.D. Tex. Aug. 3, 2007) (correcting the phrase "redefined characteristics" to read as "predefined characteristics" since such a correction was obvious based on relevant claim language and the "Summary of the Invention"); *Transamerica Life Ins. Co. v.*

*Lincoln Nat'l Life Ins. Co.*, 550 F. Supp. 2d 865, 976 (N.D. Iowa 2008) (correcting the "erroneous insertion of the plus sign" in the relevant claim language where the typographical error was "evident from the face of the patent").

On the other hand, when the there is more than one possible way to correct the error in question, or the error is not obvious, courts should not correct a patent claim. *See Southwest Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1291, 1296 (Fed. Cir. 2000) (refusing to correct an error involving missing pages of software code); *LG Elecs., Inc. v. Quanta Computer Inc.*, 2008 U.S. Dist. LEXIS 16669 *19 (W.D. Wis. Mar. 4, 2008) (citing *Novo Indus.*, 350 F.3d at 1357 ("refusing to correct 'a' to 'and' because other possibilities for correction existed")); *Fargo Elecs., Inc. v. Iris Ltd., Inc.*, 2005 U.S. Dist. LEXIS 34493, *15 (D. Minn. Nov. 30, 2005) (declining to correct a patent claim because doing so would require the court "to engage in conjecture"). For example, in *Group One*, the Federal Circuit affirmed a district court's refusal to add claim language to correct a patent because although the prosecution history indicated that the "missing language was required to be added by the examiner as a condition for issuance" one would not be able to "discern what language . . . [was] missing simply by reading the patent." 407 F.3d at 1302-03.

Since correcting the typographical error in independent claim 6 of the '882 Patent requires little more than referring to some of its dependent claims, claims 12 through 15, the Court will change elements 6G and 6H to refer to multiple controllable attributes. *E.g., Group One,* 407 F.3d at 1302-03. At first blush, it might appear that there are two possible outcomes to correcting claim 6: (1) altering elements 6D and 6E of the '882 Patent to refer to a single controllable attribute or (2) altering elements 6G and 6H to refer to multiple controllable

128

attributes.  This dilemma is resolved, however, by consulting dependent claims 12 through 15, all of which require multiple "controllable attributes."[52]

As dependent claims contain every limitation found in the independent claim upon which they depend as well as at least one more limitation, it is critical to note that claims 12 through 15 require multiple control attributes ("said control attributes").  In patent parlance, the phrase "***said control attributes***" found in claims 12 through 15 of the '882 Patent refers back to claim 6 and explicitly indicates that claim 6 requires multiple control attributes.[53]  As a result, one skilled in the art, without resorting to conjecture, would be able to deduce that claims 6, 12, 13, 14 and 15 all require multiple controllable attributes.  *Group One*, 407 F.3d at 1302-03 (if an "error is

---

[52] Claims 12 through 15 provide as follows.

> 12. The network client according to claim 6, wherein ***said controllable attributes*** associated with said at least one window object permit said at least one window object to be moved within said content manifestation environment.

> 13. The network client according to claim 6, wherein ***said controllable attributes*** associated with said at least one window object permit said at least one window object to be resized within said content manifestation environment.

> 14. The network client according to claim 6, wherein ***said controllable attributes*** associated with said at least one window object permit said at least one window object to be minimized within said content manifestation environment.

> 15. The network client according to claim 6, wherein ***said controllable attributes*** associated with said at least one window object permit said at least one window object to be maximized within said content manifestation environment.

'882 Patent Cls. 12-15.

[53] This is due to the fact that claims 12 though 15 depend from claim 6.

evident from the face of the patent," a district court can retroactively correct it).  The focus now shifts to facilitating the Court's anticipation determination by identifying the similarities between claim 1 of the '493 Patent and claim 6 of the '882 Patent.  Accordingly, the Court shall correct elements 6G and 6H to refer to multiple controllable attributes.

<b>b)      A Comparison of the Claims</b>

The following claim chart contains formatted versions of claim 1 of the '493 Patent and claims 1 and 6 of the '882 Patent.  Certain text has been emphasized to highlight the relevant similarities and differences between the claims.  In particular, the underlined text reflects the Court's correction of the typographical error in the '882 Patent.

| **Claim 1 of the '493 Patent** | **Claim 1 of the '882 Patent** | **Claim 6 of the '882 Patent** |
| --- | --- | --- |
| 1. A system for facilitating a windowed content manifestation environment within a web browser, comprising: | 1. A network client configured to operate within a data processing system and to receive content from a remote server system to facilitate a windowed content manifestation environment, comprising: | **6**. A network client configured to operate within a data processing system and to receive content from a remote server system to facilitate a windowed content manifestation environment therein, comprising: |
| **[A]** a server system configured to transmit a software system and associated content via an electronic data network; and | **[A]** a content retrieval module configured to receive content from a network server system via an electronic data network; and | **[A]** a content retrieval module configured to receive content from a network server system via an electronic data network; and |
| **[B]** a web browser client operating within a data processing system that is coupled to said server system via the electronic data network and having a content manifestation environment, | **[B]** a processing engine coupled to said content retrieval module configured to ***operate*** a content manifestation environment within the data processing system, | **[B]** a processing engine coupled to said content retrieval module configured to ***instantiate*** a content manifestation environment within the data processing system, |

| | | |
|---|---|---|
| **[C]** said web browser client operative to receive said software system and said associated content from said server system via the electronic data network, | | |
| **[D]** to process said software system and said associated content to produce *window objects solely contained within* said content manifestation environment, | **[C]** to process said content to produce *at least one window object within* said content manifestation environment, | **[C]** to process said content to produce *at least one window object within* said content manifestation environment, |
| **[E]** each window object of said window objects is associated with *a set of controllable attributes* and is configured to *statically or dynamically manifest* at least a portion of said associated *content* therein, … **[I]** *without requiring* said web browser client to *refresh* said content manifestation environment | **[D]** said at least one window object configured to *manifest* at least a portion of said *content* therein, <br><br> **[E]** said at least one window object corresponding to at least one executable program object and being controlled by said processing engine *without requiring* said content manifestation environment to be *refresh*ed, | **[D]** said at least one window object associated with a *set of controllable attributes* and configured to *manifest* at least a portion of said associated *content* therein, |
| **[F]** said *controllable attributes* configured to affect manifestation of said *each window object* by said web browser client within said content manifestation environment, | **[F]** said at least one window object is associated with *a controllable attribute*, | **[E]** said *controllable attributes* configured to affect manifestation of said *at least one window object* by said the network client within said content manifestation environment, |

| | | |
|---|---|---|
| **[G]** wherein said each window object executes within and is ***directly controlled by said web browser client*** which operates within said data processing system, . . . **[I]** ***without requiring*** said web browser client to ***refresh*** said content manifestation environment | **[E]** said at least one window object corresponding to at least one executable program object and being ***controlled by said processing engine*** [   ]***without requiring*** said content manifestation environment to be ***refresh***ed, | **[F]** said at least one window object corresponding to at least one executable program object and being ***controlled by*** said ***processing engine without requiring*** said content manifestation environment to be ***refresh***ed, |
| **[H]** and said ***controllable attributes*** associated with said each window object permit said each window object to be controlled as a result of performing ***at least one of a moving*** operation, a ***resizing*** operation, a ***minimizing*** operation and a ***maximizing*** operation within said content manifestation environment and **. . . .** | **[G]** said ***controllable attribute*** configured to permit at least one window object to be controlled as a result of performing ***at least one of a moving*** operation, a ***resizing*** operation, a ***minimizing*** operation, or a ***maximizing*** operation within said content manifestation environment. | **[G]** said at least one window object is associated with a ***<u>set of controllable attributes</u>***, **[H]** said ***<u>controllable attributes</u>*** configured to permit at least one window object to be controlled as a result of performing at least one of a ***moving*** operation, a ***resizing*** operation, a ***minimizing*** operation, or a ***maximizing*** operation within said content manifestation environment. |

As the claim chart above demonstrates, claims 1 and 6 of the '882 Patent are similar to each other and analogous to claim 1 of the '493 Patent. All these claims are directed to a content manifestation environment featuring at least one window object. They differ, however, in that claim 1 of the '493 Patent requires multiple window objects associated with multiple controllable attributes while claim 1 of the '882 Patent only requires a single window object (element 1C) associated with a single controllable attribute (element 1F) and claim 6 of the '882 Patent requires a single window object (element 6C) associated with multiple controllable attributes (element 6E). There is only one more minor difference between claims 1 and 6 of the

'882 Patent.  Element 6B of the '882 Patent requires "a processing engine coupled to said content retrieval module configured to ***instantiate*** a content manifestation environment within the data processing system," while element 1B is directed to "a processing engine coupled to said content retrieval module configured to ***operate*** a content manifestation environment within the data processing system."  This difference is inconsequential for purposes of this anticipation discussion because both claims utilize a web browser to ***instantiate/operate*** a content manifestation environment.  In other words, both claims require that a web browser be used to produce a content manifestation environment.  Consequently, while the JavaScript Bible does not anticipate claim 1 of the '493 Patent or claim 6 of the '882 Patent because they require multiple controllable attributes, it does anticipate claim 1 of the '882 Patent.[54]  The Court will now turn its attention to claims 16 and 17 of the '882 Patent.

---

[54] As discussed earlier, the JavaScript Bible failed to anticipate claim 1 of the '493 Patent because, while claim 1 requires multiple window objects associated with multiple controllable attributes, the JavaScript Bible only discloses content manifestation environments featuring one window object associated with one controllable attribute.  *See supra* §§ II.D.6.e at 96-97, II.D.6.f.(5)(a) at 102-08.

A side by side comparison of claim 1 of the '493 Patent with claims 16 and 17 of the '882 Patent is provided below. Once again, the relevant text has been emphasized to highlight the similarities and differences between the claims.

| Claim 1 of the '493 Patent | Claim 16 of the '882 Patent | Claim 17 of the '882 Patent |
|---|---|---|
| 1. A system for facilitating a windowed content manifestation environment within a web browser, comprising: <br><br> **[A]** a server system configured ***to transmit a software system*** and associated content via an electronic data network; and | **16.** A system for facilitating a windowed content manifestation environment within a web browser, comprising: <br><br> **[A]** a server system configured ***to transmit a software system*** and associated content via an electronic data network; and | **17.** Apparatus for facilitating a windowed content manifestation environment, comprising: <br><br> **[A]** a server system configured ***to serve a software system*** and associated content, |
| **[B]** a web browser client operating within a data processing system that is coupled to said server system via the electronic data network and having a content manifestation environment, | **[B]** a web browser client operating within a data processing system that is coupled to said server system via the electronic data network and having a content manifestation environment, | |
| **[C]** said web browser client operative to receive said software system and said associated content from said server system via the electronic data network, | **[C]** said web browser client operative to receive said software system and said associated content from said server system via the electronic data network, | |

| | | |
|---|---|---|
| **[D]** to process said software system and said associated content to produce window objects solely contained within said content manifestation environment, | **[D]** to process said software system and said associated content to produce a window object solely contained within said content manifestation environment, | **[B]** said *software system executable* to produce a window object within said content manifestation environment, |
| **[E]** *each window object of said window objects* is associated with a *set of controllable attributes* and is configured to *statically or dynamically manifest* at least a portion of said associated content therein, | **[E]** *said window object* is associated with *a controllable attribute* and is configured to *manifest* at least a portion of said associated content therein, | **[C]** said *window object* being associated with *a controllable attribute* and being configured to *manifest* at least a portion of said associated content therein, |
| **[F]** said *controllable attributes* configured to affect manifestation of said each window object by said web browser client within said content manifestation environment, | **[F]** said *controllable attribute* configured to affect manifestation of said window object by said web browser client within said content manifestation environment, | **[D]** said *controllable attribute* configured to affect manifestation of said window object within said content manifestation environment, |
| **[G]** wherein said each *window object executes within and is directly controlled* by said web browser client which operates within said data processing system, | **[G]** wherein said *window object executes within and is controlled by* said web browser client which operates within said data processing system, and | |

| | | |
|---|---|---|
| **[H]** and said ***controllable attributes*** associated with said each window object permit said each window object to be controlled as a result of performing ***at least one of a moving*** operation, a ***resizing*** operation, a ***minimizing*** operation and a ***maximizing*** operation within said content manifestation environment and | **[H]** said ***controllable attribute*** associated with said window object permitting said window object to be controlled as a result of performing ***at least one of a moving*** operation, a ***resizing*** operation, a ***minimizing*** operation and a ***maximizing*** operation within said content manifestation environment and | **[E]** said ***controllable attribute*** permitting said window object to be controlled as a result of performing ***at least one of a moving*** operation, a ***resizing*** operation, a ***minimizing*** operation and a ***maximizing*** operation within said content manifestation environment and |
| **[I]** ***without requiring*** said web browser client to ***refresh*** said content manifestation environment. | **[I]** ***without requiring*** said web browser client to ***refresh*** said content manifestation environment. | **[F]** ***without requiring*** said content manifestation environment to be ***refresh***ed. |

As the chart above shows, the only significant difference between claim 1 of the '493 Patent and claim 16 of the '882 Patent is that the former claims multiple window objects associated with multiple control attributes, while the latter only requires a single window object associated with a single controllable attribute. Accordingly, the JavaScript Bible, which discloses a single window object associated with a single controllable attribute, anticipates claim 16 of the '882 Patent.

Turning to claim 17 of the '882 Patent, it contains far fewer requirements than either claim 16 of the '882 Patent or claim 1 of the '493 Patent. Although the term "[a]pparatus" in claim 17 may be unfamiliar, it is insignificant for the purposes of determining anticipation because, all three claims use a web browser to provide a content manifestation environment featuring a window object. The use of the phrase "serve a software system" in element 17A of the '882 Patent is indistinguishable from the use the phrase "transmit a software system" because both entail sending a software system over an electronic data network. Most importantly, claim

136

17 of the '882 Patent, like claim 16 of the '882 Patent, requires one window object associated with one controllable attribute. As such, claim 17 of the '882 Patent is also anticipated by the JavaScript Bible.

In light of the foregoing analysis, the record evidence makes it clear that prior art which does not anticipate claim 1 of the '493 Patent may still anticipate the independent claims in the '563 and '882 Patents.

**(d)**      **The Claims of the '493 '563 and '882 Patents Cover Similar Subject Matter and Can Be Anticipated by the Same Prior Art Reference**

Having conducted an element by element comparison of the independent claims at issue, the Court will now determine whether any of the remaining claims in the '493, '563, and '882 Patents are anticipated by listings 19-11 and 19-12 of the JavaScript Bible.[55] The Court will confine its analysis to those specific claims which CA asserts are anticipated by the JavaScript Bible and which have not yet been addressed by the Court, to wit: Claims 3, 4, 5, 7, 8, 9, 11, 12, and 13 of the '493 Patent; claims 2, 5, 7, 8, 9, 10, 12, 13 and 14 of the '563 Patent and claims 2, 5, 7, 8, 9, 10, 12, 13 and 14 of the '882 Patent. (*See* CA's Invalidity MSJ at 42.)

In determining which claims of the patents in suit are anticipated by listings 19-11 and 19-12 of the JavaScript Bible, the Court's analysis will proceed as follows on a patent by patent basis. In sequence, for each independent claim, the Court will address the associated dependent claims. This approach is warranted by the relationship between independent and dependent claims, given that a dependent claim contains at least one more limitation than the independent

---

[55] *See supra* §§ I.D.6.f(1)-(4) at 98-102, observing that listings 19-1 through 19-8 and 19-10 of the JavaScript Bible do not anticipate any of the independent claims at issue.

claim upon which it depends.  35 U.S.C. § 112 ¶ 4.  Consequently, a dependent claim cannot be

invalid under Section 102 of the Patent Act if the independent claim upon which it depends is

not anticipated.  *See RCA Corp. v. Applied Digital Data Sys., Inc.*, 730 F.2d 1440, 1446 (Fed.

Cir. 1984) (if prior art does not anticipate an independent claim, it cannot anticipate its

associated dependent claim); *Apple Computer, Inc. v. Burst.com, Inc.*, 2007 U.S. Dist. LEXIS

83099 (N.D. Cal. Nov. 7, 2007) (citing *Hartness Int'l, Inc. v. Simplimatic Eng'g Co.*, 819 F.2d

1100, 1108 (Fed. Cir. 1987) (if an independent claim is not invalidated, its corresponding

dependent claims cannot be invalidated)).  Conversely, it is possible for a prior art reference to

invalidate an independent claim but not any other claims which depend from it.  For example, if

the JavaScript Bible does not anticipate claim 1 of the '563 Patent, dependent claims 2 through

5, which depend from claim 1, cannot be anticipated by the JavaScript Bible.  On the other hand,

if the JavaScript Bible anticipates claim 1 of the '563 Patent, the Court will still have to

determine whether dependent claims 2 through 5 are anticipated.  The Court will begin with

claim 1 of the '493 Patent and its associated dependent claims.

> **i)    The JavaScript Bible Does Not Anticipate
> Claim 1 of the '493 Patent or Any of Its
> Dependent Claims**

Claim 1 is the sole independent claim of the '493 Patent; all other claims of the '493

Patent depend from it.  As the JavaScript Bible fails to anticipate claim 1, it cannot anticipate

any other claims of the '493 Patent.  Accordingly, dependent claims 2 through 13 of the '493

Patent are not anticipated by the JavaScript Bible under Section 102 of the Patent Act.  The

Court now turns to whether claims in the '563 and '882 Patents are invalidated by listings 19-11

and 19-12.

a)    **Independent Claim 1: the JavaScript Bible Does Not Anticipate Claim 2 of the '563 Patent but Anticipates Claim 5**

As previously discussed, the JavaScript Bible anticipates independent claim 1 of the '563 Patent.  As such, the Court must address whether dependent claims 2 and 5 are anticipated as well.[56]

As shown below, claim 2 of the '563 Patents adds to claim 1 the requirement that the window object described therein contain a control section.  Claim 2 of the '563 Patent is provided below.

> 2. The network client according to claim 1, wherein said processing engine is further configured to process said content to produce a ***control section*** and a content display section within said at least one corresponding window object, said content display section configured to manifest at least a portion of said content therein, said ***control section*** including a set of at least one control corresponding to a set of attributes which operate to affect manifestation of said at least one window object and at least a portion of said content within said content display section.

In light of the record evidence which makes clear that the JavaScript Bible does not disclose control sections, no reasonable jury could find that claim 2 of the '563 Patents is clearly anticipated by the JavaScript Bible.

Claim 5 of the '563 Patent claims "[t]he network client according to claim 1, wherein said content retrieval module is configured to receive said content via the Internet."  The only difference between claims 1 and 5 is that the network client in the latter must be specifically

---

[56] CA has not questioned the validity of claims 3 and 4 of the '563 Patent, which also depend from claim 1.

configured to receive content via the Internet as opposed to ***any*** electronic data network.[57] Accordingly, all that needs to be determined is whether listings 19-11 and 19-12 of the JavaScript Bible clearly discloses a content retrieval module that can receive content from the Internet.

The JavaScript Bible contains multiple references to using the Internet to implement its source code listings. (*See*, *e.g.*, JavaScript Bible at CA 1085186, 1085200.) Although the JavaScript Bible states that one need not be connected to the Internet to test the scripts found therein, the Court agrees with the Special Master's conclusion, unobjected to by Simple, that this "counterexample" suggests that scripts can be "transferred from a server over the Internet to a [w]eb browser for testing." (Claim Construction R&R at 196 (citing JavaScript Bible at CA 1085200).) As such, the record clearly establishes that listings 19-11 and 19-12 can be implemented over the Internet. Accordingly, it is clear, with no genuine issue of material fact, that the JavaScript Bible anticipates claim 5 of the '563 Patent.

---

[57] The Patents in suit define an "Electronic Data Network" as "any type of network environment from which at least one coupled computer or computing system is configured to receive content such as HTML and related WWW content and to process the same to produce an appropriate output." *E.g.*, '493 Patent col. 5, ll. 58-63.

**b)** **Independent Claim 6: the JavaScript Bible Anticipates Claims 7, 8, 9, 12 and 13 of the '563 Patent, but Not Claim 14 and There are Issues of Fact Regarding Claim 10**

**1)** **The JavaScript Bible Anticipates Claim 7 of the '563 Patent**

Claim 7 of the '563 Patent merely adds, to claim 6, the limitation that the window object described therein execute "within the network client." Claim 7 of the '563 Patent provides:

> 7. The network client according to claim 6, wherein said at least one corresponding window object executes ***within the network client***.

(emphasis added). As the analysis below will show: (1) the parties do not dispute that the JavaScript Bible discloses the "executes within" requirement and (2) the record evidence clearly indicates that a proper interpretation of the phrase "executes within" leads to the conclusion that the JavaScript Bible anticipates claim 7 of the '563 Patent.

The Court agrees with and neither party has objected to the Special Master's finding that the JavaScript Bible discloses the "executes within" requirement found in element 1G of the '493 Patent. Element 1G of the '493 Patent requires in relevant part that "each window object execute[] within and [be] directly controlled by" its web browser client. The "executes within" limitation of element 1G of the '493 Patent is equivalent to the execute within limitation found in claim 7 of the '563 Patent. (*See* Claim Construction R&R at 161-62.) As such, the record evidence clearly indicates, with no genuine issue of material fact, that the window objects disclosed in the JavaScript Bible "execute within and are directly controlled by the web

browser." (R&R at 201.) Accordingly, the JavaScript Bible anticipates claim 7 of the '563 Patent.

Further support of the anticipation of claim 7 of the '563 Patent is found in the Court's construction of the term executes within. The Court adopted the Special Master's interpretation of the phrase "executes within." (Claim Constr. Mem. at 93-95.) As such, both the Special Master and the Court found that the phrase "executes within . . . clearly does not refer to where a window object appears on the web browser screen." (Claim Construction R&R at 161.) Rather, the term means to run inside the web browser client. The following excerpt from the Claim Construction R&R is particularly instructive.

> The phrase "executes within," . . . is recited in the context of a "web browser client," *e.g.*, "wherein said each window object executes within and is directly controlled by said web browser client which operates within said data processing system" called for in claim 1 of the '493 patent. ***See also, e.g., '563 patent, claim 7 ("The network client according to claim 6, wherein said at least one corresponding window object executes within the network client.").*** "Execute," in the context of computers, simply means "run," "perform" or "operate." *See* COMPUTER & INTERNET DICTIONARY at 200 and 488 (defining "execute" as "[s]ame as RUN. *Execute* means to perform an action, as in executing a program or a command;" defining "run" as "1. To execute a program. 2. To operate."); MICROSOFT COMPUTER DICTIONARY at 173 (defining "execute" as "to perform an instruction"). Essentially, ***the web browser client causes, i.e., processes some set of instructions or performs some action***, the window object to be manifested within the . . . [content manifestation environment]. In other words, the window object runs within the "web browser client" or "network client," as the case may be.

(*Id.* at 161-62 (emphasis added).) Accordingly, claim 7 of the '563 patent is anticipated if the source code listings disclosed by the JavaScript Bible execute within the web browser program. As it has already been established that in fact the source code files in listings 19-11 and 19-12

are processed by a web browser in order to produce a content manifestation environment, the

record evidence makes clear that claim 7 is anticipated.[58]

### 2) The JavaScript Bible Anticipates Claim 8 of the '563 Patent

Proceeding to Claim 8, the Court notes that it merely adds to claim 6 the requirement that

at least one window object in a content manifestation environment be "derived based on

instructions processed by . . . [the] processing engine" mentioned in element 6B.

> 8. The network client according to claim 6, wherein said at least one corresponding window object is derived based on instructions processed by said processing engine.

'563 Patent, Cl. 8.  The record evidence establishes that: (1) the processing engine referenced in

element 6B of the '563 Patent is anticipated by the built in JavaScript interpreter found in

scriptable web browsers commonly used when the patents in suit were filed and (2) this

JavaScript interpreter is used to process source code to produce the content manifestation

environment and layer elements of listings 19-11 and 19-12 of the JavaScript Bible.  (*See supra*

§§ II.D.6.f.(5)(b).i at 109-15, II.D.6.f.(5).(b).v at 121-25.)  In other words, the JavaScript Bible

discloses a processing engine (JavaScript interpreter) that processes instructions to produce a

window object.  As a result, it is clear, with no genuine issue of material fact, that the JavaScript

Bible anticipates claim 8 of the '563 Patent.  The Court now turns to claim 9 of the '563 Patent.

---

[58] It is irrelevant that the layer element disclosed in listing 19-11 of the JavaScript Bible can be dragged outside of its content manifestation environment so that it cannot be seen.  This is because a window object will not run as a separate application on the operating system, but rather will continue to run inside its host web browser.  (*See* Claim Constr. Mem. at 93-94.) Moreover, even assuming *arguendo*, that the ability of the window object in listing 19-11 to be dragged outside its content manifestation environment precludes its anticipating the executes within requirement, that requirement is still disclosed by listing 19-12, which features a stationary window object that meets the solely contained requirement.

In essence, claim 9 adds to claim 6 of the '563 Patent, the requirement that a window object display content from an address provided as "a network content source."  Claim 9 of the '563 Patent provides:

> 9. The network client according to claim 6, wherein said content includes at least one address of ***a network content source*** that is configured to download information to said data processing system via said electronic data network, said information to be manifested within said at least one corresponding window object within said content manifestation environment.

The following chronology helps explain claim 9 of the '563 Patent: (1) a web browser receives content; (2) this content includes the address or location of a "a network content source"; (3) the web browser within the "data processing system" then connects to and "download[s] information" from the "network content source" via an electronic data network such as the Internet; and (4) at least one window object in the claimed content manifestation environment then "manifest[s]" this information.

Listing 19-12 discloses how one skilled in the art at the time the '493 Patent was filed could: (1) process content that includes the "address of a network content source" and then (2) retrieve and display content from the network content source within a window object.  (*See* § II.D.6.f.(5).(a) at 103-06 *supra*.)  According to the JavaScript Bible, content "for a layer may come from within the document that defines the layer or from an external source, such as" another file.  (JavaScript Bible at CA 1085566.)  The JavaScript Bible discloses the "layer.load ( ) method" as a way in which one skilled in the art could "put new content into a layer" from another file.  (*Id.*)  This separate file can be located on the same computer or even on a remote

144

server accessible over an electronic data network. Notably, the source code in listing 19-12 uses this functionality to load and display content from an external source, listing 19-13. (*Id.* at CA 1085581; *see also* CA 1085580-82.)

One of the relevant lines of source code in listing 19-12 provides: "document.myLayer.load("lst19-13.htm")." (*Id.* at CA 1085580-82.) "lst19-13.htm" is the file that contains listing 19-13. Accordingly, one skilled in the art would know that this line of source code loads the content and source code of listing 19-13 into listing 19-12. Indeed, as **Figure 5**, *supra* at 56, shows, the layer window object enabled by listing 19-12 displays the textual content in listing 19-13. It is also clear that one skilled in the art would know that it was possible to replace "lst19-13.htm" with another file name or web address located across an electronic data network. (*See id.* at CA 1085566.) In sum, it is clear that listing 19-12 anticipates the requirement of claim 9 that a window object display content from an address provided as a network content source.

In contrast, listing 19-11 does not anticipate claim 9 of the '563 Patent. This is because listing 19-11 does not utilize any of the methods disclosed in the JavaScript Bible which would allow one skilled in the art to (1) processes content that includes the "address of a network content source" and then (2) retrieve and display content from the network content source within a window object. (*See* § II.D.6.f.(5).(a) at 108-09 *supra*.)

**4)    There is a Question of Fact as to Whether the JavaScript Bible Anticipates Claim 10 of the '563 Patent**

The difference between claims 9 and 10 of the '563 Patent is that claim 10 adds the requirement that the content retrieved from a network content source be "dynamically and continuously manifested."  The chart below contains a comparison of claims 9 and 10 of the '563 Patent with emphasis added to show where they differ.

| '563 Patent, Claim 9 | '563 Patent, Claim10 |
|---|---|
| The network client according to claim 6, wherein said content includes at least one address of a network content source that is configured to download information to said data processing system via said electronic data network, | The network client according to claim 6, wherein said content includes at least one address of a network content source that is configured to download information to said data processing system via said electronic data network, |
| said information to be manifested within said at least one corresponding window object within said content manifestation environment. | said information to be *dynamically and continuously manifested* within said at least one corresponding window object within said content manifestation environment. |

Although it is clear that the layer window object disclosed in listing 19-12 can be resized without requiring a refresh, merely altering a window object does not equivocate to "*dynamically and continuously*" manifesting content.[59]  Rather, in the context of the patents in suit, dynamic manifestation of content within a window object can, for example, involve the delivery of "full motion video," audio content, images that change over time, streaming text or text that can be altered and redrawn within a window object, without requiring a refresh.  ('563

---

[59] As listing 19-11 does not anticipate claim 9 of the '563 Patent, it cannot anticipate claim 10 and the Court will confine its discussion to listing 19-12.

Patent col. 3, ll. 46-52, col. 12, ll. 37-44; Dkt. No. 366 at Ex. 4 ('493 Patent Prosecution History Supplemental Amendment and Accompanying Remarks, SIM 006209).)[60]

Listing 19-12 does not clearly disclose the dynamic and continuous manifestation of content in a window object. Listing 19-12, shown below in **Figure 9**, only discloses a layer window object which statically manifests one sentence of text.

**Figure 9:**



---

[60] The relevant passage from the prosecution history of the '493 Patent provides as follows:

> [C]laim 1 has been amended to include the feature that an instantiated window object may statically manifest content as in the case of a single server download or local data, or dynamically as a result of a continuous data feed that may result from a plurality of server/network downloads, continuous local feeds, local data loads, etc. Dynamic manifestation may be utilized when full motion video is to be viewed within a movable window object in accordance with the present invention, for example.

'493 Patent Prosecution History Supplemental Amendment and Accompanying Remarks at SIM 006209.

Moreover, the only embodiment of listing 19-12 which discloses text that can be dynamically redrawn fails to disclose a window object. Although the JavaScript Bible discloses the use of the "SRC" attribute and the "layer.load ( ) method" to display content, and other prior art, such as the Visual DHTML reference, indicate that the SRC attribute can be used to link dynamic content from an external source, the record does not present clear and convincing that the JavaScript Bible discloses the ability to display dynamic content in one of its layer type window objects. (JavaScript Bible at CA 1085201, CA 108 5545-46, CA 1085550-51, CA 1085566-68, CA 1085574-75, CA 1085580-82; Dkt. No. 332-3 at Ex. 4 ("2004 Invalidity Decl. DVD") (showing how the Visual DHTML reference can display content that changes over time by using the SRC attribute).) As a result, there is a question of fact as to whether the JavaScript Bible anticipates claim 10 of the '563 patent. The Court now turns to claim 12 of the '563 Patent.

**5)**      **The JavaScript Bible Anticipates Claim 12 of the '563 Patent**

Claim 12 of the '563 Patent incorporates claim 6 and places the additional limitation that at least one window object in a content manifestation environment be movable.[61] Claim 12 of the '563 Patent provides:

> 12. The network client according to claim 6, wherein said set of controllable attributes associated with said at least one corresponding window object *permit said at least one corresponding window object to be moved* within said content manifestation environment.

---

[61] As shown above, the only difference between the two claims is the word "corresponding" in claim 12 of the '563 Patent.

148

(emphasis added).  In light of record evidence which clearly shows, with no genuine issue of material fact, that the layer type window object disclosed in listing 19-11 can be moved, the Court finds that the JavaScript Bible anticipates claim 12 of the '563 Patent.  The Court now turns to claim 13 of the '563 Patent.

**6)     The JavaScript Bible
Anticipates Claim 13 of the
'563 Patent**

Claim 13 of the '563 Patent builds upon claim 6 by adding the limitation that a window object within the claimed content manifestation environment be resizable.  Claim 13 of the '563 Patent provides:

> 13. The network client according to claim 6, wherein said set of controllable attributes associated with said at least one corresponding window object ***permit said at least one corresponding window object to be resized*** within said content manifestation environment.

(emphasis added.)  Since listing 19-12 of the JavaScript Bible discloses a resizable layer, it clearly, with no genuine issue of material fact, anticipates claim 13 of the '563 Patent.  The Court now turns to claim 14 of the '563 Patent.

**7)     CA Has Not Clearly Shown
that the JavaScript Bible
Anticipates Claim 14 of the
'563 Patent**

Claim 14 of the '563 Patent also builds upon claim 6.  It adds the limitation that a user must be able to minimize at least one window object in the claimed content manifestation environment.  Claim 14 of the '563 Patent provides:

> 14. The network client according to claim 6, wherein said set of controllable attributes associated with said at least one corresponding window object ***permit said at least one***

> **_corresponding window object to be minimized_** within said content
> manifestation environment.

(emphasis added).  CA has argued that: (1) listing 19-5 of the JavaScript Bible discloses a

technique for minimizing a window object by setting its "'clipping' attributes . . . to values such

that no portion of" it would remain visible and (2) listing 19-8 discloses a technique for

minimizing a window object by altering its "visibility" attribute to make it invisible.  (CA's

Invalidity MSJ at 48-49.)  Even so, neither listing 19-5 nor listing 19-8 disclose window objects.

The only listings in the JavaScript Bible that disclose window objects are listings 19-11 and 19-

12 but the layer type window objects disclosed in those listings cannot be minimized.  In other

words, CA has not shown that the JavaScript Bible discloses every element of claim 14 as

arranged in the '563 Patent.  *See Net Moneyin*, 545 F.3d at 1371; *Finisar*, 523 F.3d at 1334-35;

*Connell*, 722 F.2d at 1548.  As such, no reasonably jury could find that the JavaScript Bible

clearly anticipates claim 14 of the '563 Patent.

To summarize, the JavaScript Bible anticipates claims 1, 5, 6, 7, 8, 9, 12 and 13 of the

'563 Patent.  It does not anticipate claims 2 and 14 and there are issues of fact regarding whether

it anticipates claim 10.  The Court now turns to the '882 Patent.

### iii) The '882 Patent

#### a) Independent Claim 1: the JavaScript Bible Does Not Anticipate Claim 2 of the '882 Patent but Anticipates Claim 5

As the previously discussed, the JavaScript Bible anticipates independent claim 1 of the '882 Patent. As such, the Court must address whether dependent claims 2 and 5 are anticipated as well.[62]

As shown below, claim 2 of the '882 Patent adds to claim 1 the requirement that the window object described therein contain a control section. Claim 2 of the '882 Patent is provided below.

> 2. The network client according to claim 1, wherein said processing engine being further configured to process said content to produce a ***control section*** and a content display section within said at least one window object, said content display section configured to at least a portion of said content therein, said ***control section*** including a set of controls corresponding to a set of attributes which operate to affect manifestation of said at least one window object and at least a portion of said content within said content display section.

In light of the record evidence which clearly shows that the JavaScript Bible does not disclose control sections, no reasonable jury could find that claim 2 of the '882 Patent is clearly anticipated by the JavaScript Bible. The Court now turns to claim 5 of the '882 Patent.

Claim 5 of the '882 Patent claims "[t]he network client according to claim 1, wherein said content retrieval module is configured to receive said content via the Internet." The only difference between claims 1 and 5 is that the network client in the latter must be specifically

---

[62] CA has not questioned the validity of claims 3 and 4 of the '882 Patent, which also depend from claim 1.

configured to receive content via the Internet as opposed to *any* electronic data network. Accordingly, all that needs to be determined is whether listings 19-11 and 19-12 of the JavaScript Bible clearly disclose a content retrieval module that can receive content from the Internet. As discussed in connection with claim 5 of the '563 Patent, which is identical to claim 5 of the '882 Patent, the record clearly establishes that listings 19-11 and 19-12 can be implemented over the Internet. (*See* § II.D.6.f.(5).(d).ii).a) at 139-40 *supra*.) Accordingly, it is clear, with no genuine issue of material fact, that the JavaScript Bible anticipates claim 5 of the '882 Patent. The Court now turns to claim 6 and its dependent claims.

        **b)**        **Independent Claim 6: the JavaScript Bible Does Not Anticipate Claims 7 through 15 of the '882 Patent**

Since the JavaScript Bible does not anticipate independent claim 6 of the '882 Patent, it cannot anticipate any claims which depend from it. Accordingly, claims 7 through 15 of the '882 Patent, which depend from claim 6 and require multiple controllable attributes, are not anticipated by the JavaScript Bible.

        **c)**        **Independent Claims 16 and 17 Are Anticipated by the JavaScript Bible**

As discussed above, the record evidence clearly establishes that the JavaScript Bible anticipates independent claims 16 and 17 of the '882 Patent. There are no claims which depend upon these claims.

In sum, while the JavaScript Bible anticipates claims 1, 5, 16 and 17 of the '882 Patent, it does not anticipate claim 2 or claims 6 through 15.

### 7.     The Court's Ruling on the JavaScript Bible

The Court grants CA's objections to the Special Master's recommendation that the JavaScript Bible does not disclose the acts independently and without refresh requirements of the patents in suit.  As a result, Simple's motion for summary judgment dismissing CA's anticipation defense regarding the JavaScript Bible is denied in part, and CA's motion for summary judgment of anticipation is granted in part, because the record evidence clearly shows, with no genuine issue of material fact, that the JavaScript Bible anticipates claims 1, 5, 6, 7, 8, 9, 12, and 13 of the '563 Patent as well as claims 1, 5, 16 and 17 of the '882 Patent.  On the other hand, no jury could reasonably find that the JavaScript Bible anticipates any of the claims in the '493 Patent, claims 2 and 14 of the '563 Patent or claims 2, 6, 7, 8, 9, 10, 12, 13, and 14 of the '882 Patent.  Finally, there are material issues of fact regarding whether the JavaScript Bible anticipates claim 10 of the '563 Patent.  Having addressed the parties' objections regarding the JavaScript Bible, the Court turns its attention to the Bates Patent.

### E.     The Bates Patent

Simple argues that their motion for summary judgment dismissing CA's anticipation defense should be granted with regards to the Bates Patent.  For its part, CA is conspicuously silent.  In addressing Simple's objections, the Court will: (1) describe the Bates Patent; (2) summarize the Special Master's associated recommendations as well as Simple's corresponding objections; and (3) provide its own analysis and rulings.

### 1.     Overview of the Bates Patent

The Bates Patent is entitled "Multi-Node User Interface Component and Method Thereof For Use in Accessing a Plurality of Linked Records," was filed for on August 15, 1997 and

issued on March 2, 1999. In essence, the Bates Patent claims a graphic interface (*e.g.*, a display on a computer screen) that allows a "user to access data stored in a computer" while providing her with a "map display" that "graphically" (visually) represents individual records and how they may be related (*e.g.*, directories and subdirectories). Bates Patent col.1, ll. 19-22, col. 6, ll. 26-36. The Bates Patent refers to components of its map display as "node display elements" and "link display elements." Node display elements "represent individual records" while link display elements are used to graphically depict the relationship between these records in a user friendly format. *Id.* Within the context of the Bates Patent, an example of a "record" could be a document, a file used to store data, or even information taken directly from a private database, such as a telephone directory. Having provided a general overview of the technology claimed in the Bates Patent, the Court will describe some embodiments disclosed therein.

### 2. Embodiments of the Subject Matter Claimed by the Bates Patent

**Figure 10**, a copy of Figure 10 from the Bates Patent, is shown below and illustrates "an exemplary map display," represented as item 90. *Id.* col. 15, ll. 60-61. Map displays are the heart of the invention described in the Bates Patent. Item 92 represents a node display element (an individual record/document) and item 94 represents a link display element (a depiction of the relationship between documents). *See id.* col. 15, l. 60 - col. 16, l.11. In addition, the Bates Patent provides that "at least one browser window (not shown in . . . [Figure 10) that] is opened to display the contents of the document associated with root node display element 92."[63] *Id.* col. 15, ll. 62-67. Item 96, shown in **Figure 10**, is a "slider" which corresponds "to the region of the

---

[63] In this instance, the "root node display element" is the primary document to which all other documents are linked.

document currently displayed in node display element 92." *See* Bates Patent col. 15, l. 60 - col.

16, l.11E.

**Figure 10:**



The slider, item 96, allows users to scroll and navigate the contents of the record or

document associated with the node display element in item 92. *See id.* col. 7, ll. 11-15. For

example, if a user were to place a mouse over the slider, item 96, and drag it to the right, the

browser window displaying the document or record would scroll to show the user a different

portion of the associated document or record. In addition, the slider elements can be used "to

navigate to different documents, e.g., by dragging the slider to another node display element,

either by passing through adjacent elements . . . or by dragging directly to the desired node

display element." *Id.* col. 7, ll. 20-24.

**Figure 11**, a copy of Figure 1 from the Bates Patent, is shown below and illustrates a

map display representing various documents and separate browser windows displaying the

contents of certain records or documents associated with node display elements. Although

**Figure 11** depicts the map display as a "window-type component," it should also be noted "that

the map display may be implemented as a panel or other type of display container or component"

such as "a separate frame or region of a browser window."  Bates Patent col. 10, ll. 10-13.  The

following is an explanation of some of the items shown in **Figure 11**.

**Figure 11:**



Item 60 shown above is a map display containing multiple node display elements, each

corresponding to a certain document stored on a computer.  Of particular interest are the node

displays depicted in items 62a, 62b and 62c.  As shown above, each of these node display elements has an active slider.  Node display element 62a is associated with slider 68a, node display element 62b is associated with slider 68b, and node display element 62c is associated with slider 68c.  Since sliders "are typically associated with an active window" which displays "the contents of the document associated with a node display element" it follows that "Browser 1," item 50a, is used to display the content of the record associated with node display element 62a.  Bates Patent col.11, l. 54 - col. 12, l. 2.  Similarly, "Browser 2," item 50b, is used to display the content of the document associated with node display element 62b and "Browser 3," item 50c, is used to display the content of the document associated with node display element 62c.  *Id.*  Having described the invention claimed in the Bates Patent, the Court will summarize the Special Master's recommendations regarding whether it anticipates the patents in suit.

### 3.	The Special Master's Recommendations

The Court will confine its discussion of the Special Master's recommendations to those which have been objected to by Simple.  Generally speaking, the Special Master denied the parties' motions for summary judgment regarding the Bates Patent because he found that there were genuine issues of material fact over whether portions of elements 1D through 1I of the '493 Patent were anticipated.  (R&R at 221-37, 240-44.)  For present purposes, the Special Master's recommendations regarding element 1D of the '493 Patent is the most relevant.

According to the Special Master, there are questions of fact as to whether the Bates Patent discloses the window objects required by element 1D because it can only process software to produce "frames."  (*Id.* at 237.)  The Special Master reasoned that frames cannot be window objects because they are not distinct entities, a requirement of a window object, but merely are a

part of a browser content manifestation environment.  (R&R at 237.)  Having summarized the Special Master's relevant findings, the Court turns to Simple's objections.

### 4.        Simple's Objections

Simple argues that their motion dismissing CA's anticipation defense based on the Bates Patent should be granted because: (1) the Special Master concluded that Bates Patent did not meet some of the limitations of the patents in suit and (2) the "Special Master failed to recognize that the Bates Patent does not disclose the limitation 'said web browser client operative to receive said software system and said associated content from said server system via the electronic data network.'" (*Simple's Objections* at 15.)  Accordingly, Simple urges that "no reasonable jury could conclude that the Bates Patent renders any claim of the" '493, '563, and '882 Patents invalid.  (*Id*.)  The Court will now address Simple's objections.

### 5.        Analysis: No Reasonable Jury Could Find that the Bates Patent Anticipates the Patents In Suit

The Court's analysis need only address one critical issue: whether the Bates Patent discloses window objects.  This matter is dispositive because every claim in the '493, '563, and '882 Patents requires at least one window object.  As a result, if the record evidence establishes that no reasonable juror could find that the Bates Patent discloses window objects, Simple is entitled to summary judgment and their remaining objections need not be discussed.

No reasonable jury could find that the Bates Patent discloses window objects.  The record evidence indicates that the Bates Patent discloses map displays that either: (1) launch separate operation system level web browsers (*see*, *e.g.*, **Figure 11** *supra*) or (2) feature a "frame or region" within a browser, neither of which are window objects.

There is no dispute that a separate operation level web browser is not a window object. The following excerpt from the Bates Patent clearly states that browsers are separate operation level applications and are not solely contained within the content manifestation environment of the map display.

> [A] suitable ***browser may be based upon the Navigator web browser from Netscape . . . , or the Internet Explorer web browser from Microsoft***. In addition, each browser . . . may be a separate application, or may be a separate window of a single application, as is well known in the art.  Generally, ***a browser . . . is open for each active slider*** . . . on the active map display . . . for the client.

Bates Patent col. 9, ll. 13 -22; *see also id.* col. 15, ll. 62-67 ("Moreover, at least one browser window (not shown in . . . [Figure 10]) is opened to display the contents of the document associated with root node display element 92, and a slider 96, corresponding to the region of the document currently displayed in node display element 92, is displayed therein.").[64]  Moreover, there is no dispute that a separate operational lever web browser is not a window object. Accordingly, it is clear that the separate operation level browsers used to facilitate map displays disclosed in the Bates Patent cannot be window objects.  What remains to be determined is whether a "separate frame or region" in a web browser constitutes a window object.

CA's argument that map displays are window objects because they "'may be represented by a separate frame or region of a browser window'" is incorrect for two reasons.  (Dkt. 513 at 7-8 ("Goodman Bates Decl.") (quoting Bates Patent col. 10, ll. 11-13, col. 14, l. 64- col. 15, l. 2).) First, as the Special Master correctly pointed out, frames are based on HTML technology and

---

[64] Figure 10 as referenced in Bates Patent col. 15, ll. 62-67 is reproduced herein as **Figure 10** *supra* at 155.

cannot be window objects. Second, there is no record evidence that the frames referred to in the Bates Patent are even meant to be window objects. Each reason will be discussed in greater detail below.

The use of the term "frames" in the Bates Patent is proof that it does not disclose window objects. As the Special Master pointed out, "'frames' . . . were defined in the HTML 4.0 specification in effect in 1999, and were distinct from . . . 'window objects.'" (R&R at 237.) In the context of HTML 4.0 "'frames' would be part of the browser's . . . [content manifestation environment] not a separate 'window object' within the . . . [content manifestation environment]." (*Id.*) In addition, the '493, '563, and '882 Patents were claimed to be an improvement over the relevant prior art because they described a content manifestation environment which *did not contain frames or tables* like certain prior art references which would require that an entire HTML document be refreshed anytime one specific "pseudo-window" was acted upon. (*See* Claim Constr. Mem. at 9-10, 24-25 (citations omitted).)**65**

---

[65] This is born out in the prosecution history of the '493 Patent.

> The amended claims . . . [present] an additional feature of multiple window objects in a content manifestation environment and each window object can be individually resized, minimized or dragged without refreshing the browser. The cited prior art Mynetscape.com fails to teach multiple window objects as claimed. Specifically, *the cited prior art does show multiple windows, however they are not individually run* and any resizing or maximizing or minimizing . . . requires refreshing the browser which is different from the claimed invention.

Examiner's Reasons For Allowance (Dkt. No. 366), Ex. 4, SIM-006225 (emphasis added); *see also* Patentee's Response and Amendment at SIM-006244-45.

CA fails to point to any record evidence which indicates that the "separate frame or region" of a web browser, which it claims is a window object, is capable of acting independently of other content. (*Compare* Goodman Bates Decl. at 6-8 *with* R&R at 228-37.) As the Special Master pointed out, it is not enough for CA to merely allege that both DHTML and the ability to create independent window objects was known to the inventor of the Bates Patent. (R&R at 236 (citation omitted).) CA was required to submit evidence thereof and it did not. The Bates Patent only uses the terms "frame" and "region," neither of which are understood to behave independently of other content like window objects.

As every independent claim of the '493, '563, and '882 Patents requires at least one window object, the absence of a window object in the Bates Patent is dispositive.

### 6. The Court's Ruling Regarding the Bates Patent

The Court grants Simple's motion for summary judgment denying CA's anticipation defense based on the Bates Patent because no reasonable jury could find that it discloses window objects.

Having ruled on the parties' objections regarding anticipation, the Court now turns to the objections regarding the Special Master's recommendation on Simple's motion for summary judgment dismissing CA's obviousness defense.

## II. Obviousness[66]

In addressing Simple's objections to the Special Master's recommendation on their motion to strike CA's obviousness defense, the Court will first summarize the Special Master's

---

[66] The Court notes that CA did not move for summary judgment of obviousness before the Special Master. CA later so moved before me; that motion will be addressed in a subsequent memorandum and order.

pertinent recommendations as well as Simple's corresponding objections and then put forth its own analysis and ruling.

## A.    The Special Master's Recommendations

In general, the Special Master recommended that the Court find that, at the very least, CA raised genuine questions of fact as to whether the patents in suit were obvious and therefore recommended that Simple's motion for judgment dismissing CA's obviousness defense be denied.  (*See* R&R at 289-302.)  In addition, the Special Master recommended against granting Simple's objection to the admissibility of Reference 114, finding instead that there was a "genuine issue of material fact regarding whether" it disclosed "at least part of the claimed invention."  (*Id.* at 304.)

### 1.    CA's Level of Proof Regarding it's Obviousness Defense

In his discussion of Simple's motion, the Special Master, after providing a detailed analysis of the evidence set forth by CA went on to evaluate whether that evidence was sufficient to evade summary judgment of non-obviousness and whether it constituted hindsight reasoning. (*Id.*)

To begin with, the Special Master found that CA's obviousness defense was supported by more than mere conclusory statements and was sufficient to raise a genuine issue of material fact regarding validity.  (*Id.* at 289-97.)  According to the Special Master, CA established the level of skill and motivation of one skilled in the art, explained such a person's motivation to combine the prior art references cited in the Goodman Invalidity Report and sufficiently explained why that prior art could render the patents in suit obvious.  (*Id.*)  In support of this recommendation, the Special Master cited to portions of the Goodman Invalidity Report, which urged that one

162

skilled in the art would have known about DHTML technology and sought to exploit its functionality in the new web browsers already available at the time the '493 Patent was filed. (R&R at 291-92 (extensively quoting Goodman Invalidity Rpt. at 137-38).)[67]  The Special Master also reasoned that CA "identified the asserted prior art references, identified which elements [of the '493, '563, and '882 Patents] those references did or did not have, identified combinations of those references, and set out several sufficiently detailed motivations to combine those references consistent[] with the Federal Circuit's teachings in" *Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*, 411 F.3d 1332 (Fed. Cir. 2005) and *Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1276-77 (Fed. Cir. 2004).  (R&R at 297.)  In addition the Special Master concluded that there was no way in which CA's proof of obviousness could be considered "conclusory" given the number of prior art references cited and discussed in the Goodman Invalidity Rpt.  (*Id.*)  The Special Master then turned to Simple's argument that CA's obviousness contentions were based on "'improper hindsight reasoning.'"  (*Id.* (citation omitted).)

The Special Master found that, "at the very least," there were genuine issues of material fact regarding the motivation to combine CA's prior art references.  (*Id.* at 297-302.)  The following excerpt explains the basis for the Special Master's recommendation that CA was able to articulate the knowledge of one skilled in the art as well as that person's motivation to combine CA's prior art references.

> Mr. Goodman has identified the specific knowledge a person
> skilled in the art would have, as well as several motivations to

---

[67] In 1997, more then one year prior to the date the '493 Patent was filed, Netscape and Microsoft both released their version 4.0 web browsers.  (Goodman Invalidity Rpt. at 137-38.)

combine the asserted prior art references. Mr. Goodman stated, for example, that new features of the "version 4 browsers" allowed developers to "simulate for the first time the behavior and interaction of a standalone software program" and was thus a "major attraction." Mr. Goodman pointed to the "scriptable properties" and DHTML generally as specific technological bases to support a motivation to combine. Mr. Goodman also testified that the references were all from the "same field of art" and were "readily accessible."

(R&R at 298.) In other words, according to the Special Master, Goodman pointed out that version 4.0 web browsers contained new capabilities that would allow programmers to use DHTML, JavaScript and other programming languages to simulate the behavior of desk top level applications ("standalone software program[s]") on their web browsers. Thus, according to the Special Master, CA's obviousness contentions were not based on improper hindsight reasoning.

The Special Master distinguished the case at bar from the case law cited by Simple. In particular, he found that: (1) CA provided more than conclusory assertions and pointed to "specific facts in support of a motivation to combine"; and (2) there was "no 'marked tendency' in Mr. Goodman's testimony to 'pick and choose' among 'disparate' and 'widely-varying types' of references." (*Id.* at 300 (distinguishing *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys.*, 101 F. Supp. 2d 1257 (N.D. Cal. 1999)).)

Turning to the obviousness standard, the Special Master noted that "it is important to bear in mind that the statutory standard of obviousness/non-obviousness is whether . . . the claimed invention, 'would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" (*Id.* (citing 35 U.S.C. § 103(a)).) "As a result, the motivation analysis requires no express teaching or suggestion for a

proposed combination." (*Id.* (citations omitted).) In support of his reasoning, the Special Master

cited to, *inter alia*, the following passage from *Kahn*:

> In considering motivation in the obviousness analysis, the problem examined is not the specific problem solved by the invention but the general problem that confronted the inventor before the invention was made. * * * [citing cases] Therefore, the 'motivation-suggestion-teaching' test asks not merely what the references disclose, but whether a person of ordinary skill in the art, possessed with the understandings and knowledge reflected in the prior art, and motivated by the general problem facing the inventor, would have been led to make the combination recited in the claims. * * * From this it may be determined whether the overall disclosures, teachings, and suggestions of the prior art, and the level of skill in the art—*i.e.*, the understandings and knowledge of persons having ordinary skill in the art at the time of the invention—support the legal conclusion of obviousness.

(R&R at 302 (quoting *Kahn*, 441 F.3d at 988).) Based on the foregoing, the Special Master

recommended that Simple's motion for summary judgment dismissing CA's affirmative defense

of obviousness be denied.

## 2. Reference 114

Turning to Reference 114, the Special Master found that there was a "genuine issue of

material fact regarding whether" it disclosed "at least part of the claimed invention" and denied

Simple's request to "foreclose this reference as a basis for CA's" obviousness defense. (*Id.* at

304.) Reference 114 is identified as the "Eureka Portal Product and Development Materials."

(Goodman Invalidity Rpt., Ex. C at 22.) CA describes the Eureka Portal Product ("Eureka") as

"a server-based software system that creates a World Wide Web portal environment." (*CA's

Reply to Simple's Anticipation and Obviousness Objections* at 19.) When using Eureka, a user

"can specify how many window regions are displayed on the Eureka "desktop," control the

layout, and designate specific websites or applications to be displayed in distinct window

regions." (*Id.*) Reference 114 "is approximately 270 pages long and comprises emails, installation instructions, functional specifications, design specifications, and more." (R&R at 303.) Notably, portions of Reference 114 are marked "confidential" or "highly confidential" indicating that they were either trade secrets or not publicly circulated. Having provided an overview of Reference 114, the Court will summarize the Special Master's recommendations on its admissibility.

The Special Master found that Reference 114 provided "substantial information regarding Eureka that could support" CA's "obviousness contentions." (R&R at 304.) Relying on *Lockwood v. American Airlines*, 107 F.3d 1565 (Fed. Cir. 1997), for the proposition that a publicly used or sold software package can be invalidating prior art, even if portions of it are kept secret, the Special Master admitted the non-confidential portions of Reference 114 as prior art. (R&R at 304 (quoting *Lockwood*, 107 F.3d at 1570).) Having summarized the Special Master's recommendations on obviousness, the Court turns to Simple's objections.

## B. Simple's Objections

Simple's objections focus on two arguments: (1) their motion for summary judgment should be granted because CA failed to put forth clear and convincing evidence of a motivation to combine the references used in the Goodman Invalidity Report and (2) CA cannot rely on Reference 114 as prior art because a large portion of it was designated as "confidential" or "highly confidential." (Simple's Objections at 16-19.) According to Simple, the Special Master incorrectly denied their motion for summary judgment because CA failed to set forth any "*particular findings* about why a person of ordinary skill in the art would have selected" its prior references and also failed to identify any "*clear and particular* . . . motivation to combine" them.

166

(*Id.* at 17.)  Turning to Reference 114, Simple argues that it cannot be prior art for the purposes of an obviousness determination because CA "designated a large portion of the documents [therein] . . . 'confidential' or 'highly confidential'" and those portions so designated would be "trade secrets" which were "maintained in confidence."  (Simple's Objections at 19.)  Having summarized Simple's relevant objections, the Court will provide its analysis.

### C.    Analysis

The Court must address whether the Special Master properly recommended denial of Simple's motion for summary judgment dismissing CA's obviousness defense and whether Reference 114 is admissible prior art.

### 1.    Obviousness

With regards to obviousness, the Court must determine whether the Special Master applied the proper standard of law and whether his ultimate recommendation to deny Simple's motion for summary judgment was indeed correct.[68]

### a.    The Special Master Correctly Applied a Flexible Obviousness Standard

The Special Master correctly applied a flexible approach to his obviousness determination, which took account of the analytical prowess of one skilled in the art without improperly requiring that there be an express motivation to combine CA's prior art references. *KSR*, 127 S. Ct. at 1741; *see also Dystar*, 464 F.3d at 1361; *Motorola*, 121 F.3d at 1472.  In fact, the "suggestion or motivation to combine references does not [even] have to be stated expressly;

---

[68] Simple once again raises the argument that the Special Master applied an inappropriate summary judgment standard.  As discussed above, the Court has found to the contrary.  *See* § I.A.1 at 15-19 *supra*.

rather it 'may be shown by reference to the prior art itself, to the nature of the problem solved by the claimed invention, or to the knowledge of one'" skilled in the art. *Med. Instrumentation*, 344 F.3d at 1221-22 (quotation omitted).[69]  In addition, both the Supreme Court and Federal Circuit have explicitly instructed courts to "take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 127 S. Ct. at 1741.[70]  As it is clear that CA need not point to an *explicit* motivation to combine its cited prior art references, Simple's objection to the Special Master's obviousness standard is denied.  The inquiry now turns on whether there is sufficient record evidence to create a genuine issue of material fact regarding the obviousness of the patents in suit.

---

[69] *See also Dystar*, 464 F.3d at 1360-61 (citing *In re Dembiczak*, 175 F.3d 994, 999 (Fed. Cir. 1999) (The motivation-to-combine inquiry, or "suggestion test" does not require that a motivation to combine be found directly in "the references sought to be combined, but may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself."); *Ruiz*, 234 F.3d at 665 ("The reason, suggestion, or motivation to combine may be found explicitly or implicitly: 1) in the prior art references themselves; 2) in the knowledge of those of ordinary skill in the art that certain references, or disclosures in those references, are of special interest or importance in the field; or 3) from the nature of the problem to be solved, 'leading inventors to look to references relating to possible solutions to that problem.'") (citations omitted); *Motorola*, 121 F.3d at 1472 (there is no "requirement that the prior art contain an express suggestion to combine known elements to achieve the claimed invention").

[70] *See also Translogic*, 504 F.3d at 1262 (applying *KSR*); *Dystar*, 464 F.3d at 1361, 1368 (the Federal Circuit has "repeatedly held that an implicit motivation to combine exists not only when a suggestion may be gleaned from the prior art as a whole, but when the 'improvement' is technology-independent and the combination of references results in a product or process that is more desirable, . . . or more efficient"); *see also Motorola*, 121 F.3d at 1472 ("the suggestion to combine may come from the prior art, as filtered through the knowledge of one skilled in the art").

**b.** **The Special Master Appropriately Denied Simple's Motion for Summary Judgment**

As discussed below, CA has, at the least, created a genuine issue of material fact as to whether the patents in suit are obvious.

**(1)** **A Reasonable Jury Could Find That One Skilled in the Art Would Be Able To Create the Subject Matter Claimed by the '493, '563 and '882 Patents After Combining CA's Prior Art**

Simple's motion for summary judgment on CA's obviousness defense is denied because CA has, at the least, shown that a reasonable jury *could* find that it put forth clear and convincing evidence of invalidity. (*See*, *e.g.*, Goodman Invalidity Rpt. at 137-94, App. G at 1 - 42; Goodman Invalidity Decl. at 3-5, 45-71, App.1, App. 2.) The Court's determination focuses on the hundreds of pages of analysis in the expert declaration and reports of CA's expert witness, Danny Goodman. As described below, this analysis shows that one skilled in the art would be motivated to create the subject matter claimed by the patents in suit.

Goodman began his obviousness analysis by pointing out that in 1997, new versions of Netscape's Navigator and Microsoft's Internet Explorer were released. (Goodman Invalidity Rpt. at 137.) According to Goodman, these new browsers were widely discussed and "[b]y the time the '493 Patent was filed, in January of 1999, a person of ordinary skill in the art had substantial exposure to the inherent features of DHTML as implemented in the Netscape and Microsoft version 4 browsers" and sought to exploit its new content delivery features. (*Id.* at 137-38; *see also generally Dystar*, 464 F.3d at 1368 ("the desire to enhance commercial opportunities by improving a product or process is universal . . . ").) In fact, as shown in the

excerpt below, Goodman's contention is consistent with the patents in suit, which define a "layer" in accordance with "DHTML standards."

> A Layer is a WWW browser content display section produced within a content manifestation environment (CME) including, but not limited to, any object within an HTML document that may be scaled, dragged, or otherwise operated upon such as an IMG object, a SPAN object, a DIV object, a form element, etc. and which may be associated with program logic such as within a script, etc. ***A layer has its own properties including, but not limited to, a name, etc. within an HTML rendition model such as those defined by DHTML standards***. Additionally, a layer acts independently of other content within a particular HTML document.

*E.g.*, '493 Patent col.5, l.65-col 6, l.8 (emphasis added). This detail is critical because window objects, which lie at the heart of the subject matter claimed by the patents in suit, must at least have the properties of a "layer" as defined above. According to Goodman, one skilled in the art would also know that the "version 4 browsers . . . received content . . . and software . . . from a server system via an electronic network, namely the Internet." (Goodman Invalidity Rpt. at 137.) Goodman's analysis would allow a reasonable jury to conclude that one skilled in the art would be motivated to create the subject matter claimed by the patents in suit because of her desire to take advantage of DHTML technology and the new content delivery capabilities introduced by "version 4" web browsers.

Goodman also provides the basis to determine ***how*** the claimed elements of the '493, '563, and '882 Patents were purportedly known and practiced by those skilled in the art before and at the time of the '493 Patent's filing. (*Id.* at 137-38.) To support his finding of obviousness, Goodman produced: (1) a chart detailing exactly which references would make various claims of the '493, '563, and '882 Patents obvious; (2) an explanation of why one skilled

in the art would be motivated to combine the relevant prior art references; and (3) an extensive

claim by claim obviousness analysis.  Goodman summarized his obviousness chart as follows:

> In Exhibit G, the asserted claim set forth in column A is obvious
> based on (a) the reference set forth in column B alone, (b) the
> reference in column B combined with the knowledge of a person of
> ordinary skill in the art, and/or (c) the reference in column B when
> viewed in light of one or more of the prior art references listed in
> column D.  For each claim, the element missing (if any) from the
> reference set forth in column B is set forth in column C.  The
> missing claim element(s) may be supplied by the knowledge of a
> person of ordinary skill in the art, and/or one or more prior art
> references listed in column D.  For example, Claim 1 of the '493
> Patent (column A) is obvious because: References #24 and #52 in
> (column B) are both missing element 1H (column C), but this
> missing element may be provided by the ordinary skill in the art,
> any of the references listed in column D, and/or any other prior art
> reference.

(Goodman Invalidity Rpt. at 139.)  Goodman then explained that one skilled in the art would be

motivated to combine the references he cited because:

> (a) each of these references is from the same field of art;
> (b) each of these references was readily and easily accessible to
> those of ordinary skill in the art and represents the type of material
> that one of ordinary skill in the art would normally consult when
> trying to solve a problem;
> (c) each of these references is generally directed to the same types
> of issues, including without limitation various aspects of
> generating within a client browser independently-controllable web
> content without requiring a server refresh;
> (d) the combinations suggested by the nature of the problem
> addressed by the patents in-suit and/or by the references
> themselves;
> (e) references 6, 7, 9, 12, 48, 49, 58, 63, 72, 76, 77, 87, 94, 98, 101
> (all), 105 (all), 106 (all), and/or 108 were known to be of special
> importance in the field and were widely relied upon by, readily
> available to, and/or openly discussed in online forums among,
> those of ordinary skill in the art;
> (f) many of the references cited below contain explicit cross-
> references to others of these references; and

> (g) some of the references cited below are part of the same website, textbook, compilation, or presentation as others of these references.

(*Id.* at 139-40.)  Finally, Goodman's detailed claim by claim obviousness analysis identified the claim elements he believed were disclosed in various prior art references and explained how one skilled in the art would know of and be motivated to combine various prior art references to create the subject matter claimed by the patents in suit.  *Translogic*, 504 F.3d at 1262 (applying *KSR* for the proposition that one skilled in the art can use her own analytical prowess to piece prior art references together).

For example, Goodman explained how "Reference 24," the "HTML Stylesheet Sourcebook" by Ian S. Graham, may have disclosed every element of Claim 1 of the '493 Patent with the exception of element 1H.  (Goodman Invalidity Rpt. at 140-41.)  Element 1H provides that a window object must contain controllable attributes that allow for "at least one of a moving operation, a resizing operation, a minimizing operation and a maximizing operation within . . . [a] content manifestation environment."  '493 Patent Cl. 1.  Goodman then explained that one skilled in the art "would have been previously aware of the requirements set forth in" element 1H and that element 1H was also disclosed in "several well-known references in the same field." (Goodman Invalidity Rpt. at 141.)  Goodman then went on to list 60 of these references, including the Meininger and Visual DHTML references as well as the JavaScript Bible.  (*Id.* at 141.)  Neither the Court nor the Special Master have found any question of material fact as to whether the Visual DHTML and Meininger references disclose element 1H of the '493 Patent. Moreover, although reference 24 is a rather extensive book, Goodman cited to specific pages found therein.  (*Id.* at 140.)  Last but not least, although "it does not follow that every technically

anticipated invention would also have been obvious," it is appropriate for the Court to apply Goodman's extensive ***anticipation*** analysis to his assertions that the patents in suit are ***obvious***. *See Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1364 (Fed. Cir. 2008) (stating that a claimed invention can be anticipated but need not be obvious as well). In short, not only could the record evidence lead a reasonable jury to find that one skilled in the art would have been motivated to combine the prior art references cited by CA, it could also lead a reasonable jury to find that the patents in suit are clearly obvious. Indeed, even the programming languages used to create Simple's claimed invention would lead one skilled in the art to combine CA's prior art references.

As the patents in suit specifically utilize and reference the JavaScript and DHTML programming languages, it is likely that one skilled in the art would look to the references cited by CA. For example, it is no leap of faith to assume that a programmer creating software using JavaScript would refer to the JavaScript Bible.[71] According to Goodman, the JavaScript Bible "was one of the two top-selling JavaScript-related books in wide distribution through retail and online bookselling channels." (Goodman Invalidity Rpt. at 42.) Among other things, the JavaScript Bible teaches programmers how to build web pages using Netscape version 4 browsers and it contains "Listing examples" which can be copied directly from a CD-ROM or retyped manually from its pages. The JavaScript Bible is just one example of widely distributed prior art cited by CA. Indeed, CA's prior art references also include various widely distributed books on the DHTML programming language. Although printed publications need not be

---

[71] Goodman refers to the JavaScript Bible as reference 94 in reason (e) mentioned above. (Goodman Invalidity Rpt. at 139-40.)

widely distributed to be eligible as prior art, the fact that many of CA's references are well known makes it all the more likely that one skilled in the art would be motivated to combine their teachings to practice the subject matter claimed in the '493, '563 and '882 Patents. *See*, *e.g.*, *In re Hall*, 781 F.2d 897, 899-900 (Fed. Cir. 1986) (affirming a decision by the Board of Patent Appeals and Interferences that a doctoral thesis in a German library was eligible prior art). Having determined that CA has put forth sufficient evidence to allow a reasonable jury to find that the '493, '563, and '882 Patents are obvious, the Court must ascertain whether Simple has put forth sufficient evidence to remove any genuine issue of material fact as to whether the patents in suit are obvious.

> **(2)      The Evidence Put Forth By Simple Fails to Remove All Genuine Issues of Material Fact Regarding CA's Obviousness Defense**

The testimony, analysis, and other evidence put forth by Simple, at best, creates a genuine issue of material fact regarding CA's obviousness defense. For the majority of his rebuttal, Belgard, Simple's expert, merely states that he disagrees with Goodman and that Goodman reaches his conclusions as a result of hindsight analysis. (*See e.g.* Belgard's Rebuttal Expert Report (Dkt. No. 366), at Ex. 38 ¶¶ 277-82.) At best, Simple has created an issue of fact as to whether one skilled in the art would look to and use the prior art references cited by CA. The focus now shifts to the claim elements of the patents in suit.

Simple also failed to demonstrate that a reasonable jury could not find that CA had shown by clear and convincing evidence that element 1D of the '493 patent, the window objects requirement, was rendered obvious. For instance, Simple's expert, Belgard, asserted that references 24, 52 and 114, the "HTML Stylesheet Sourcebook" by Ian S. Graham, U.S. Patent

No. 6,031,989, and the Eureka portal suite and its accompanying documentation, respectively fail to disclose window objects. (Belgard's Rebuttal Expert Report ¶¶ 291-93.) Even assuming *arguendo* that Belgard was correct, there is at the least, a genuine issue of material fact as to whether one skilled in the art would combine any of these references with other prior art cited by CA, such as the JavaScript Bible, the Menininger reference or the Visual DHTML reference, to create window objects or even the entirety of the subject matter claimed by the patents in suit. (*See*, *e.g.*, Goodman Invalidity Rpt. at 140-42, Ex. G at 3 (listing the JavaScript Bible, Meininger reference, and Visual DHTML reference as one of many references that could be combined with either reference 24, 54 or 114 to render claim 1 of the '493 Patent obvious).) As every independent claim of the patents in suit requires a window object, this issue is dispositive.

Moreover, as previously discussed, the JavaScript Bible discloses layer type window objects and anticipates many of claims in the '563 and '882 Patents. In addition, the Visual DHTML and Meininger references anticipate many of the claim elements of the three patents in suit. Accordingly, it is fairly evident that CA has, at the least, created a genuine issue of material fact regarding whether the patents in suit are invalid under § 103(a) of the Patent Act. Having determined that Simple failed to satisfy their burden of proof in seeking to dismiss CA's obviousness defense, the focus turns to the eligibility of Reference 114 as proof of obviousness.

### 2. Reference 114

Although certain portions of the documentation in Reference 114 contain trade secrets, the Court, like the Special Master, finds that the Eureka Software system is eligible prior art because it was publicly sold in the United States prior to the filing date of the '493 Patent. *See Lockwood*, 107 F.3d at 1570; *see also Netscape Communs. Corp. v. Konrad*, 295 F.3d 1315,

1323 (Fed. Cir. 2002). While, "there [presently] remains a genuine issue of material fact regarding whether this reference discloses at least part of the" subject matter claimed in the '493, '563, and '882 Patents, this does not weigh against the admissibility of Reference 114. (R&R at 304.) For the reasons discussed below, the Court adopts the Special Master's recommendations regarding Reference 114.

The fact that some documents regarding the production, specification and marketing of Eureka are confidential is immaterial because relevant members of the public were still able to access and use the software package. (*See* R&R at 303-04 identifying the confidential and non-confidential portions of Reference 114.) Indeed, the case at bar is highly analogous to *Lockwood*. In *Lockwood*, the Federal Circuit held that the prior, extensive use of a software program served as patent invalidating prior art despite the fact that certain "critical" aspects of the software program were kept secret. 107 F.3d at 1570. According to the Federal Circuit, the inquiry does not turn on enablement, rather all that is necessary is that the invention have been previously used in public. *See id.* at 1570 (citing *In re Epstein,* 32 F.3d 1559, 1567-68 (Fed. Cir. 1994) ("Beyond this 'in public use or on sale' finding, there is no requirement for an enablement-type inquiry.")); *see also Netscape*, 295 F.3d at 1323 (where the prior unmonitored use of a software package placed it "in the public's possession" despite arguments that none of the actual source code used to create the software was made available before the critical date).[72] Accordingly, it is irrelevant that certain aspects of Eureka software package may have been inaccessible to the public or that one skilled in the art may not have been able to reproduce every

---

[72] In *Netscape*, 295 F.3d at 1319 the critical date was one year prior to the earliest filing date the patentee was entitled to. *See* 35 U.S.C. § 102(b). The term "critical date" is significant in patent parlance, and in particular § 102of the Patent Act.

aspect of the Eureka Portal Product. In short, "the public need not have access to the 'inner workings' of a device for it to be considered 'in public use' or 'used by others' within the meaning of" § 102. *Lockwood,* 107 F.3d at 1570.

*Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1126, 1138 n.7 (E.D. Cal. 2002) and *Mass. Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985) ("*MIT*"), do not counsel against allowing CA to use portions of Reference 114 in its obviousness defense. Simple cited to *Chiron*, and *MIT*, for the proposition that "[u]npublished documents or private discussions not of common knowledge do not constitute 'prior art' within the meaning of section 103(a)." Nevertheless, as the *Chiron* court recognized, *MIT* holds that, for purposes of analyzing obviousness, the alleged prior art must be "disseminated or otherwise made available to the extent that persons interested and of ordinary skill in the subject matter or art, exercising reasonable diligence can locate it." Since Eureka was publicly sold and used in the United States, there is no doubt that one skilled in the art could have accessed it prior to the filing date of the '493 Patent.[73] In sum, no basis exists for removing the publicly available portions of the Eureka software package from the realm of admissible prior art.

### 3. The Court's Rulings

The Court denies Simple's objections to the Special Master's recommendations on obviousness. The Special Master properly denied Simple's motion for summary judgment dismissing CA's obviousness defense and properly recommended that the publicly available portions of Reference 114 be admissible as prior art in support of CA's obviousness defense.

---

[73] Simple does not contend that Eureka was not publicly sold and that it was not publicly available.

The Court now turns its attention to some general objections raised by CA.

**III.    General Objections**

Having addressed the parties' specific substantive objections, the Court will address CA's general objections.  Specifically, the Court will address CA's: (1) argument that it is entitled to summary judgment of invalidity on all asserted claims; (2) request for a summary adjudication of a variety of issues it alleges to be without a genuine issue of material fact; (3) request that the Court identify and summarily dispose of all matters found to be without a genuine issue of material fact;[74] and (4) argument that it is entitled to summary judgment regarding the date certain printed prior art references were publicly available.

**A.    CA is Not Entitled to Summary Judgment of Invalidity on All Asserted Claims**

CA argues that it is entitled to summary judgment of invalidity on all asserted claims because the Special Master "wrongly created disputes of fact where none exist."  (CA's Objections at 24.)  As the Court's rulings on the parties' objections have shown, CA is only entitled to summary judgment of anticipation on some of the claims in the '563 and '882 Patents.  As discussed above, while the Meininger reference, Visual DHTML reference, and Bates Patent fail to anticipate any of the claims in the patents in suit, the JavaScript Bible anticipates claims 1, 5 through 9, 12 and 13 of the '563 Patent, as well as claims 1, 5, 16, and 17 of the '882 Patent.

---

[74] The Court will defer summarily disposing of matters found to be without a genuine issue of material fact until after ruling on the parties': (1) objections to the Special Master's Report and Recommendation on Indefiniteness, Claim Construction, Anticipation and Obviousness, Infringement, and Damages and (2) motions for summary judgment on Unfair Competition and Obviousness.

Accordingly, the Court grants CA's motion for summary judgment for invalidity regarding those claims. The Court will now address CA's other requests for summary adjudication.

**B.  CA's Requests for Summary Adjudication on Various Issues are Granted in Part**

CA maintains that there is no genuine dispute over whether: (1) window objects that act independently are anticipated; (2) window objects in the JavaScript Bible act independently of other content; (3) its prior art references anticipate window objects that could be moved, minimized, resized, restored, and display content without requiring a refresh; (4) claim 7 of the '563 and '882 Patents is anticipated; (5) control sections are anticipated; (6) the prior art references it cites anticipate content manifestation environments with multiple window objects; (7) the window objects disclosed by its prior art references meet the solely contained within requirement; and (8) at least one of its prior art references anticipates every asserted claim.[75] (CA's Supp. Reply at 3-11).  With the exception of whether control sections are anticipated, the Court has already addressed each of CA's arguments.  As such, the Court shall now discuss whether the Meininger and Visual DHTML references disclose control sections.

The Meininger and Visual DHTML references anticipate control sections.  A control section is a distinct portion of a module type window object that facilitates user control.  (Claim Constr. Mem. at 70-71.)  A control section allows a user to move a window object by "placing the [mouse operated] cursor anywhere in the title bar region," clicking and then dragging. (Goodman Claim Construction Decl. ¶ 28.)  In addition, a user can, among other things,

---

[75] For the purposes of this discussion, the relevant prior art references will include: (1) the Meininger reference; (2) the Visual DHTML reference; (3) the JavaScript Bible; and (4) the Bates Patent.

minimize, maximize, restore or close a window object by clicking on module controls within its control section. (*See* Claim Constr. Mem. at 10-11, 22-24, 64-71**.**) The video demonstration accompanying the Belgard Supplemental Declaration clearly establishes, with no genuine issue of material fact, that the control sections in the window elements disclosed in the Meininger and Visual DHTML references could be used to drag them around their content manifestation environments. In addition, Simple's expert witness expressly stated that the Meininger and Visual DHTML references can be "minimize[d]" as a result of a user clicking on a module control within their control sections. (Belgard Supp. Anticipation and Obviousness ¶¶ 6, 22.) Consequently, the record evidence bears uncontroverted proof that the Meninger and Visual DHTML references disclose control sections. The Court now turns to CA's argument that it is entitled to summary judgment regarding the date certain printed references were deemed publicly available.

### C.    CA is Entitled to Summary Judgment Regarding the Date Certain Printed References are Deemed Publicly Available

CA argues that it is "entitled to summary adjudication under Rule 56(d) that each of the 37 prior art references for which copyright registration certificates have been submitted were publicly available prior to January 21, 1999." (CA's Supp. Reply at 11-12.) The Special Master did not address whether these 37 references were publicly available prior to January 21, 1999. The Special Master did, however, find that, based on its copyright certificate, the JavaScript Bible was publicly available prior art. Because the Special Master's reasoning with respect to the JavaScript Bible is instructive, the Court will summarize the Special Master's recommendation on the JavaScript Bible before providing its own analysis and ruling on the 37 prior art references at issue.

### 1. The Special Master's JavaScript Bible Recommendation

In his R&R, the Special Master found that the JavaScript Bible was admissible prior art that was "published as of March 3, 1998" based on the copyright certificate furnished by CA which states it was the initial publication date.  (R&R at 177.)  In deciding to accept the copyright certificate for that purpose, the Special Master first examined whether the document was self authenticating under Federal Rule of Evidence 902(1).  Pursuant to Federal Rule of Evidence 902(1) "[e]xtrinsic evidence of authenticity . . . is not required" for  "[a] document bearing a seal purporting to be that of the United States . . . or of a political subdivision, department, officer, or agency thereof, and a signature purporting to be an attestation or execution."  Fed. R. Evid. 902(1).  According to the Special Master, the JavaScript Bible's copyright certificate meets the requirements of Rule 902(1) because it bears: (1) a notice that it is "issued under the seal of the Copyright office . . . " and (2) the signature of the Register of Copyrights.  (R&R at 179 (citation omitted).)

Having established the authenticity of the copyright certificate, the Special Master went on to explain how the JavaScript Bible's copyright certificate proves that it was a publicly accessible "printed publication" (prior art) under Section 102 of the Patent Act.  (*Id.*)  The Special Master first noted that for a reference to be considered a prior art "printed publication," there must be "a satisfactory showing that such a document has been disseminated or otherwise made available to the extent that [interested] persons" of ordinary skill in the art could locate it through the exercise of "reasonable diligence."  (*Id.* at 179-80 (citing *In re Wyer*, 655 F.2d 221 (C.C.P.A. 1981).)  The Special Master then considered 17 U.S.C. § 410(c), which provides in

relevant part that "in any judicial proceeding" a "certificate of a [copyright] registration . . . shall constitute prima facie evidence . . . of the facts stated therein," and observed that the copyright certificate of registration associated with the JavaScript Bible: (1) provided the "date and nation of first publication . . . " and (2) warned an applicant to "complete this information ONLY if" the corresponding "work has been published." (R&R at 180 (citation omitted).) Thus, the Special Master concluded that the copyright certificate constitutes prima facie evidence that the JavaScript Bible is a printed publication under § 102 of the Patent Act. Finally, the Special Master noted that Simple neither put forth any evidence to the contrary, nor pointed to any evidence in the "record sufficient to raise a genuine issue of material fact regarding the [JavaScript Bible's] date of publication." (*Id.* at 180-81.)

## 2. The Court's Analysis and Ruling

The Court adopts the Special Master's recommendation with regards to the JavaScript Bible, and applies it to each of the 37 references for which a copyright registration certificate is available, because Simple has failed to put forth any evidence which would rebut the prima facie evidence that they are printed publications under § 102 of the Patent Act. *See Ex parte Research and Manufacturing Co. Inc.*, 1989 Pat. App. LEXIS 2, at *12-15 (Bd. Pat. App. & Interferences Mar. 9, 1989); *see also Source Search Techs., LLC v. Lending Tree, LLC*, 2008 U.S. Dist. LEXIS 52473, at *82-83 n.8 (D.N.J. July 8, 2008) ("When there is no question that the prior art references are printed publications under 35 U.S.C. § 102(b), then there is no requirement that additional evidence, beyond the copyright date, be presented as proof of publication for books, articles, or trade publications.") (citing *In re Omeprazole Patent Litig.*, 490 F. Supp. 2d 381, 517-522 (S.D.N.Y. 2007) as "accepting prior art references as printed publications without

additional evidence of their publication date")).  Indeed, the decision in *Ex parte Research and Manufacturing Co.* supports the Special Master's and the Court's conclusion.  *See* Pat. App. LEXIS 2, at *13-15.

In *Ex parte Research and Manufacturing Co.*, the Board of Patent Appeals and Interferences (the "Board") stated that:

> Since this certificate of registration "shall be admitted in any court as prima facie evidence of the facts stated therein", it is our conclusion that the certificate of registration of the Sorvall bulletin 26-69 is prima facie evidence of the publication thereof on June 2, 1969. The "date of publication" is defined in 17 USC § 26 (Copyright Act of 1909) as "the earliest date when copies of the first authorized edition were placed on sale, sold, or publicly distributed by the proprietor of the copyright or under his authority." Thus, the certificate of registration provides prima facie evidence that the Sorvall bulletin 26-69 was a "printed publication" under the provisions of 35 USC 102(b).
>
> However, this prima facie evidence may be rebutted by convincing factual evidence to the contrary.

*Id.* at *13-15.  Here, Simple has failed to put forth ***any*** evidence that the references in question were not published as of the dates on their copyright certificates.  Accordingly, CA's unrebutted prima facie evidence establishes that the 37 references for which it submitted a copyright registration certificate  were publicly available prior art before January 21, 1999.  (*See* Decl. of Nittin Subhedar in Supp. of Pl.'s Mot. Summ. J. (Dkt. No. 746), at Exs. 1-38 (listing the 37 prior art references in question and providing copies of their copyright certificates).)[76]  As such, CA's objection is granted.

---

[76] Each of the 37 copyright certificates state dates of publication prior to January 21, 1998.  *See* Decl. of Nittin Subhedar in Supp. of Pl.'s Mot. Summ. J. (Dkt. No. 746), at Exs. 1-38.

Having addressed the parties' objections, the Court shall summarize its conclusions.

## CONCLUSION

The Court adopts the portions of the R&R that have not been objected to, argued against or deemed by the Court to be clearly erroneous. Having reviewed the objected portions of the R&R *de novo*, rather than readdress each of the parties' objections the Court shall summarize its rulings as they pertain to the parties' motions for summary judgment.

The Court grants Simple's motion for summary judgment dismissing CA's anticipation defense with regard to the Meininger reference, Visual DHTML reference, and Bates Patent. As it pertains to the '493 Patent, claims 2 and 14 of the '563 Patent, as well as claims 2, 6, 7, 8, 9, 10, 12, 13, and 14 of the '882 Patent, the Court grants Simple's motion for summary judgment dismissing CA's anticipation defense with regard to the JavaScript Bible. CA's motion for summary judgment of anticipation is granted with regard to claims 1, 5, 6, 7, 8, 9, 12 and 13 of the '563 Patent as well as claims 1, 5, 16, and 17 of the '882 Patent in light of the JavaScript Bible. CA's motion for summary judgment of anticipation regarding the remainder of its prior art references is denied. The Court denies Simple's motion for summary judgment dismissing CA's obviousness defense. Finally, the Court grants CA's motion for summary judgment that the 37 references for which it provided a copyright registration certificate were publicly available prior art before January 21, 1999.

**SO ORDERED.**

Dated: Central Islip, New York
       March 5, 2009

/s/ _____
Denis R. Hurley
Senior District Judge

184