UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
CA, INC.,

                    Plaintiff,

            - against -

SIMPLE.COM, INC., WIRED
SOLUTIONS, LLC., a revoked Nevada LLC,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM & ORDER**
02 Civ. 2748 (DRH) (MLO)
<u>UNDER SEAL</u>

**APPEARANCES:**


**COVINGTON & BURLING**
Attorneys for Plaintiff
One Front Street
San Francisco, California 94111
By: Samuel F. Ernst, Esq., Robert D. Fram, Esq., Michael M. Markman, Esq., & Leonard Joseph
Martiniak, Esq.

**FARRELL FRITZ, P.C.**
Attorneys for Defendants
EAB Plaza
West Tower-14th Floor
Uniondale, New York 11556
By: Stephen J. Smirti, Jr., Esq., John P. McEntee, Esq., & Celeste M. Butera, Esq.

**FULBRIGHT & JAWORSKI LLP**
Attorneys for Defendants
666 Fifth Avenue
New York, NY 10103-3198
By: John E. Lynch, Esq. & Joseph P. Zammit, Esq.

**RIVKIN RADLER LLP**
Attorneys for Defendants
EAB Plaza
Uniondale, New York 11556
By: Celeste M. Butera, Esq. & Stephen J. Smirti, Jr., Esq.

**GALE R. PETERSON, ESQ.**
Special Master
112 E. Pecan Street
Suite 1800
San Antonio, Texas 78205

**HURLEY, Senior District Judge:**

## INTRODUCTION

Plaintiff CA Inc. ("CA), formerly known as Computer Associates International Inc. commenced this action seeking a declaratory judgment that three patents owned by Defendants, Simple.com, Inc. and Wired Solutions, LLC (collectively "Simple") are invalid, unenforceable, and not infringed by CA.  Simple has counterclaimed for infringement.  Presently before the Court is CA's Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 103(a).  (Dkt. Nos. 789 & 790 ("CA's Mot. for Summ. J. of Obviousness").)  For the reasons stated below, CA's motion is GRANTED.

## BACKGROUND

### I.    The Patents At Issue

A complete factual recitation regarding this matter is contained in this Court's Claim Construction Memorandum & Order, dated March 5, 2009 ("Claim Constr. Mem."), familiarity with which is presumed.  For present purposes it suffices to state that the three patents at issue relate to computer technology and are U.S. Patent Nos. 6,272,493, 6,434,563, and 6,535,882 (the '493, '563, and '882 Patents respectively).  In general, the subject matter claimed in the '493, '563, and '882 Patents is meant to provide, what the patentee terms, a windowed content manifestation environment ("CME").  An exemplary CME is displayed below in **Figure 1**, a copy of Figure 2B from the '493 Patent.

2

**Figure 1**[1]



According to the patentee, this was an improvement over preexisting technology because the

claimed invention lets one open, view, resize, minimize, move and otherwise use multiple

window objects on the same web browser screen, without: (1) triggering a refresh;[2] (2) having to

---

[1] The Court attempted to ensure that the figures reproduced herein are clear images. Nonetheless, many of the figures contained in this Memorandum are best viewed electronically, *i.e.* on a computer screen, as certain features and colors may not be easily perceptible when reproduced in black and white.

[2] "Refresh" means updating "the displayed web page with the newest content."  (Report and Recommendation Regarding Claim Construction (Dkt. No. 559) ("Claim Construction R&R"), at 173.)

3

go back and forth from one web page to another; or (3) requiring the use of another web browser.

For example, a user could open, resize, move, close or otherwise manipulate the "NEWS" and

"TRAVEL" windows, shown above without forcing the entire CME to be refreshed.

As a frame of reference the Court provides a formatted version of Claim 1 of the '493

Patent below, which breaks the claim down into nine elements.

> 1. A system for facilitating a windowed content manifestation
> environment within a web browser, comprising:

> > **[A]** a server system configured to transmit a software
> > system and associated content via an electronic data
> > network; and

> > **[B]** a web browser client operating within a data processing
> > system that is coupled to said server system via the
> > electronic data network and having a content manifestation
> > environment,
> > **[C]** said web browser client operative to receive said
> > software system and said associated content from said
> > server system via the electronic data network,
> > **[D]** to process said software system and said associated
> > content to produce window objects solely contained within
> > said content manifestation environment,
> > **[E]** each window object of said window objects is
> > associated with a set of controllable attributes and is
> > configured to statically or dynamically manifest at least a
> > portion of said associated content therein,
> > **[F]** said controllable attributes configured to affect
> > manifestation of said each window object by said web
> > browser client within said content manifestation
> > environment,
> > **[G]** wherein said each window object executes within and
> > is directly controlled by said web browser client which
> > operates within said data processing system,
> > **[H]** and said controllable attributes associated with said
> > each window object permit said each window object to be
> > controlled as a result of performing at least one of a moving
> > operation, a resizing operation, a minimizing operation and
> > a maximizing operation within said content manifestation
> > environment and

> **[I]** without requiring said web browser client to refresh said
> content manifestation environment.

When necessary, the Court will refer to a certain claim element by the designation shown above rather than repeating the relevant claim language.  For example, instead of stating that a prior art reference discloses a window object that is ". . . solely contained within said content manifestation environment," the Court will state that the reference discloses element 1D of the '493 Patent.  When necessary, the same technique will be applied to the other claims of the patents in suit.

## II.     The Context of the Present Motion

The Court's Memorandum & Order on Anticipation & Obviousness ("Anticipation & Obviousness Mem."), dated March 5, 2009, is of particular relevance to CA's motion for summary judgment of obviousness.  As there is a substantial degree of analytical overlap between the present Memorandum and the Anticipation & Obviousness Memorandum, the latter will be referenced repeatedly herein.  Familiarity with the Anticipation & Obviousness Memorandum is presumed.  In the Anticipation & Obviousness Memorandum the Court ruled directly on the parties' objections to the Special Master's Report and Recommendation Regarding Anticipation and Obviousness (Dkt. Nos. 591 & 592 ("Anticipation & Obviousness R&R")) and dealt with: (1) Simple's motion for summary judgment seeking to strike CA's defense of invalidity under §§ 102 (anticipation) and 103 (obviousness) of the Patent Act and (2) CA's motion for summary judgment of anticipation.[3]  In denying Simple's motion for summary

---

[3] As noted earlier, the Court has issued its Claim Construction Memorandum & Order.  In addition, on March 5, 2009, the Court issued a Memorandum & Order on Infringement ("Infringement Mem."), ruling on the parties' objections to the Special Master's Report and Recommendation Regarding Infringement (Dkt. No. 561 ("Infringement R&R")) and  a Memorandum & Order on the Written Description Requirement ruling on CA's objections to the

judgment seeking to strike CA's obviousness defense, the Court found that Simple failed to prove that no reasonable jury could find the patents in suit to be obvious. Consequently, this finding does not automatically foreclose granting CA's motion for summary judgment of obviousness, the subject of the present Memorandum. The question now before the Court is whether, as a matter of law, the patents in suit are obvious.

## III.    The Parties' Arguments

### A.    CA's Motion For Summary Judgment

According to CA, the patents in suit are obvious and do not claim anything new. In particular, CA asserts that "any one of the [following] . . . prior art references or combinations" thereof render the '493, '563, and '882 Patents obvious: (1) the Meininger reference; (2) the Meininger reference in combination with the *Inside Dynamic* HTML book written by Scott Isaacs; and (3) the Meininger reference in combination with the JavaScript Bible.[4]  (CA's Mot. for Summ. J. of Obviousness at 1.)  CA also maintains that from 1997 onwards, at least two years prior to the filing date of the '493 Patent, the "web-developer community" was in the midst of developing applications that utilized a new generation of web browsers introduced by Microsoft (Internet Explorer 4.0) and Netscape (Navigator 4.0).[5]  (*Id.* at 1, 3.)  CA asserts that web-developers looking to utilize the ability of these version 4.0 browsers created websites with

---

Special Master's Report and Recommendation Regarding Written Description (Dkt. No. 556). Familiarity with the foregoing memoranda is presumed.

[4] Although CA listed a total of six combinations of prior art references that allegedly invalidated the patents in suit, the Court need only address a combination of the Meininger reference, Visual DHTML reference, *Inside Dynamic* HTML book, and/or the JavaScript Bible. The JavaScript Bible can be found at Docket Number 332-25.

[5] Hereafter, Microsoft (Internet Explorer 4.0) and Netscape (Navigator 4.0) will be referred to collectively as "version 4.0 web browsers" or "version 4.0 browsers."

movable objects that could be used to display web based content and went on to create "several working examples of the systems . . . later claimed" in the patents in suit.  (CA's Mot. for Summ. J. of Obviousness at 1.)  CA also urges that during the "two years *prior* to the conception date of the patents-in-suit, there were many books and articles . . . explaining how to use DHTML to create the" window objects claimed by the '493, '563, and '882 Patents.  (*Id.* at 6.)  In sum, CA argues that not only were the patents in suit rendered obvious by its prior art, but one skilled in the art would have ample opportunity and motivation to combine various prior art references to create the subject matter claimed in the '493, '563, and '882 Patents.  Needless to say, Simple disagrees.

### B.   Simple's Counters to CA's Obviousness Arguments

Overall, Simple contends that CA's motion for summary judgment of obviousness should be denied because: (1) the Court has yet to construe the claim language of the patents in suit; (2) the Meininger reference is not eligible prior art; (3) CA fails to show that one skilled in the art would be motivated to use and combine its prior art references to create the subject matter claimed by the '493, '563, and '882 Patents; (4) an analysis of the primary and secondary obviousness factors counsel against a finding of invalidity; and (5) CA fails to meet its onerous burden of proof regarding every element of the patents in suit.  (*See* Defs.' Mem. in Opp'n to CA's Mot. for Summ. J. of Invalidity Under 35 U.S.C. § 103(a) (Dkt. No. 805) ("Simple's 103 Opp'n"), at 1-2, 6-9, 10, 16-21, 25-32, 32-35, 38-41, 42-50.)  Having summarized the parties' arguments, the Court shall provide a general articulation of the legal standards applicable to the case at bar.

## APPLICABLE LAW

### I.     Summary Judgment

The standard for summary judgment in a patent case is the same as in any other case.  *See Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed. Cir. 1998); *Union Carbide Corp. v. Am. Can Co.*, 724 F. 2d 1567, 1571 (Fed. Cir. 1984).  Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  *See Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984).  The moving party bears the burden of "informing the district court of the basis for its motion" and identifying the matters that "it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In ruling on a motion for summary judgment, . . . [a court must] view the evidence presented in a light most favorable to the nonmoving party and . . . draw all reasonable inferences in favor of the nonmoving party."  *C.R. Bard, Inc. v. Advanced Cardio. Sys., Inc.*, 911 F.2d 670, 672 (Fed. Cir. 1990).

In considering a motion for summary judgment, a court must also take into account the evidentiary standard of proof that pertains to the trial on the merits.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252-53 (1986).  Since patent claims enjoy a presumption of validity under § 282 of the Patent Act, the party seeking to prove invalidity must do so by clear and convincing evidence.  *Abbott Labs. v. Baxter Pharm. Prods.*, 471 F.3d 1363, 1367 (Fed. Cir. 2006) (citing *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir. 1993)).  "Clear and convincing" evidence is that which gives the finder of fact "an abiding conviction that the truth

8

of [the proponent's] factual contentions [is] 'highly probable.'"  *Colorado v. New Mexico*, 467

U.S. 310, 316 (1984) (citation omitted).  "[A] moving party seeking to invalidate a patent at

summary judgment must submit clear and convincing evidence of invalidity so that no

reasonable jury could find otherwise."  *Eli Lilly and Co. v. Barr Lab. Inc.*, 251 F.3d 955, 962

(Fed. Cir. 2001).

## II.    Obviousness

Section 103(a) of the Patent Act provides:

> A patent may not be obtained though the invention is not
> identically disclosed or described as set forth in section 102 of this
> title, if the differences between the subject matter sought to be
> patented and the prior art are such that the subject matter as a
> whole would have been obvious at the time the invention was
> made to a person having ordinary skill in the art to which said
> subject matter pertains. Patentability shall not be negatived by the
> manner in which the invention was made.

35 U.S.C. § 103(a).  "The ultimate judgment of obviousness is a legal determination," and

summary judgment is appropriate if "the content of the prior art, the scope of the patent claim,

and the level of ordinary skill in the art are not in material dispute, and the obviousness of the

claim is apparent in light of these factors."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S.Ct.

1727, 1745-46 (2007) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966)).

Courts must also consider the "secondary" factors discussed in *Graham*, which include

"'commercial success, long felt but unsolved needs, [and the] failure of others [to solve a

problem] . . . .'"  *KSR*, 127 S.Ct. at 1734 (quoting *Graham*, 353 U.S. at 17-18).  The secondary

factors can be used to negate a finding of obviousness.  *Lucent Techs. v. Microsoft Corp.*, 544 F.

Supp. 2d 1080, 1093 (S.D. Cal. 2008).  "Unlike anticipation, where a single reference must

disclose all claim elements, a party asserting obviousness may rely on the prior art as a whole."

9

*Lucent*, 544 F. Supp. 2d at 1093-94.  In other words, references may be combined to support a finding of obviousness.  *See id.*

The Supreme Court has cautioned against a rigid application of the "teaching suggestion or motivation" test.  *See KSR*, 127 S.Ct. at 1739.  Rather, a flexible approach which accounts for the analytical prowess of one skilled in the art is to be used.  *See id.*  Nevertheless, courts should still "identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does."  *Id.* at 1741.  "Any need or problem known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed."  *Id.* at 1742.  For instance, "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."  *Id.* at 1740.  Moreover, "if a combination of known elements was 'obvious to try' to address a recognized problem, the combination may" be obvious under § 103.  *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 2009 U.S. App. LEXIS 2257, *16 (Fed. Cir. Feb. 9, 2009) (discussing *KSR*, 127 S.Ct. at 1742).

Courts must also bear in mind that "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious."  *KSR*, 127 S.Ct. at 1740.  "A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art."  *Id.*  For instance, patented subject matter is likely nonobvious if its elements work together "in an unexpected and fruitful manner."  *Id.*  On the other hand, a patent is likely to be

obvious if it yields a predictable result obtained by substituting one element for another known in the field. *KSR*, 127 S.Ct. at 1740.

Obviousness determinations are not controlled by the "particular motivation" or "avowed purpose of the patentee." *Id.* at 1741-42. Rather, courts should determine whether the "objective reach of the claim" itself encompasses obvious subject matter. *Id.* at 1742. Having broadly articulated the obviousness standard under § 103, the Court will apply specific case law as needed in its analysis. What follows is the Court's discussion of the parties' arguments.

## DISCUSSION

In ruling on CA's motion for summary judgment of obviousness, the Court must resolve certain procedural, evidentiary and substantive issues. To begin with, the Court will determine whether the procedural posture and record evidence of the case at bar allow it to address the substantive merits of CA's motion. The Court will then ascertain, once again, the eligibility of the Meininger reference as prior art. Finally, the Court will determine whether the record contains undisputed evidence which clearly and convincingly shows that the '493, '563, and '882 Patents would be obvious to one skilled in the art before the '493 Patent was filed.[6]

## I.   CA's Motion is Appropriately Before the Court

In its Order dated June 11, 2008, the Court granted CA permission to move for summary judgment on obviousness and allowed both parties to supplement their expert reports with regard to the issue of obviousness. (*See* Dkt. No. 774 at 1.) Nevertheless, Simple now contends that the Court should not rule on the merits of CA's motion because: (1) it was not authorized by the

---

[6] As the '563 and '882 Patents depend from the '493 Patent, the constructive date of invention of the subject matter claimed in the patents in suit is January 21, 1999, the filing date of the '493 Patent. *See* note 11 *infra*.

11

Court, and (2) the Court has not construed the disputed claim terms.  (Simple's 103 Opp'n at 1-4.)  Both arguments fail for the reasons discussed below.

"District courts have wide latitude in how they conduct the proceedings before them, and there is nothing unique about claim construction that requires the court to proceed according to any particular protocol." *Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001).  Indeed, "as long as the trial court construes the claims to the extent necessary to determine whether the accused device infringes, the court may approach the task in any way that it deems best." *Id.*  Not only are trial courts given broad discretion as to how they conduct patent litigation, the Supreme Court has long recognized that the public interest is served when determinations on validity are made. *Cardinal Chem. Co. v. Morton Int'l*, 508 U.S. 83, 99-100 (1993); *Blonder-Tongue Lab.*, *Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 338 (1971).

In *Cardinal Chemical*, the Supreme Court noted that between infringement and patent validity, "validity has the greater public importance."  508 U.S. at 100 (citing *Sinclair & Carroll Co. v. Interchemical Corp.*, 325 U.S. 327 (1945).)  The Supreme Court has identified at least two reasons for this: "preserving the value of a declaratory judgment" that the "successful litigant" has obtained "at great effort and expense"; and avoiding situations in which prospective litigants will "decide that paying royalties under a license or other settlement is preferable to the costly burden of challenging" the validity of a patent.  *Id.* at 99-100; *Blonder-Tongue Lab.*, 402 U.S. at 338.[7]  This holds true because once a patent in found to be invalid, it can no longer be asserted

---

[7] The Court in *Blonder-Tongue Lab.*, 402 U.S. at 338, states as follows:

> In each successive suit the patentee enjoys the statutory
> presumption of validity, and so may easily put the alleged infringer
> to his expensive proof. As a consequence, prospective defendants
> will often decide that paying royalties under a license or other

against other parties whereas a finding of non-infringement that does not address the issue of validity leads to the uncertainty.  Having summarized the relevant precedent, the Court will apply it to the case at bar.

The Court will evaluate the merits of CA's Motion for Summary Judgment of Obviousness because it is well within its discretion to do so, *see Ballard Med.*, 268 F.3d at 1358; *see also Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1371 (Fed. Cir. 2004); *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1468 (Fed. Cir. 1998), the record is sufficiently developed to allow for such a determination, and it is in the public interest to do so.

The record evidence and procedural posture of the case at bar are sufficiently developed to allow the Court to determine whether or not the patents in suit are invalid.  The Special Master has issued an extensive set of reports and recommendations on the disputed claim terms, the validity of the patents in suit under § 102, infringement, and a host of other issues.  For its part, the Court has evaluated these reports and recommendations, ruled on the parties' relevant objections, and construed every claim term presently at issue.  The parties themselves have undergone "years of litigation and monumental discovery," at what is undoubtedly a significant cost.  (*See* Simple's 103 Opp'n at 12.)  In fact, the persuasiveness of Simple's present arguments is greatly undermined by the fact that they filed their motion for summary judgment with regards to CA's affirmative defenses under anticipation and obviousness more than one year before the Claim Construction R&R was issued.  In short, there is ample basis for the Court to proceed with its validity determination.  Doing so would be consistent with the public interest given the time

---

settlement is preferable to the costly burden of challenging the patent.

*Id.*

13

and effort expended by the parties and the Court.

For example, the Court's finding of non-infringement[8] would be of little value to CA if Simple could once again accuse it of infringement when CA releases a new line of web based "Portal" applications. *Cardinal Chem.*, 508 U.S. at 99-100 ("A company once charged with infringement must remain concerned about the risk of similar charges if it develops and markets similar products in the future."). Moreover, if the patents in suit are invalid, equitable concerns counsel against the possibility of allowing them to be used as a bargaining chip to extract licensing fees or a settlement from other parties at a later date. *Blonder-Tongue*, 402 U.S. at 338. Accordingly, the Court will evaluate the merits of CA's motion for summary judgment of obviousness, but first, Simple's evidentiary objections must be addressed.

## II.   The Meininger Reference is Eligible Prior Art

The Court is once again faced with the task of determining whether the Meininger reference is admissible prior art. In this instance, Simple raises the following issues: (1) whether there is sufficient proof that the Meininger reference was created prior to January 21, 1999, the date the '493 Patent was filed, and (2) whether it was "publicly accessible" before the filing date of the '493 Patent, which also serves as the constructive date of invention.

### A.   The Record Evidence Bears Sufficient Proof that the Meininger Reference was Created Prior to the Date of Invention of the Patents in Suit

The Court has already determined that the: (1) date stamped electronic files; (2) email sent by Meininger to a community of programmers; (3) corresponding emails received by Meininger about the Meininger reference; and (4) Internet posting about the Meininger

---

[8] The Court found that the patents in suit were not infringed by CA's accused products. (Infringement Mem. at 68.)

reference, referred to as the "Slashdot article," were admissible and provided sufficient evidence to corroborate Meininger's testimony and prove that the Meininger reference is eligible prior art under § 102(a) of the Patent Act.  (Anticipation & Obviousness Mem. at 31-44.)  Although they could have done so in their motion for summary judgment seeking the dismissal of CA's anticipation and obviousness defenses, their objections to the Anticipation and Obviousness R&R, or even their reply to CA's objections to the Anticipation and Obviousness R&R, Simple waited until now to point out that while "the Slashdot [article] . . . states 'that a link to Meininger's website was: 'Posted by CmdrTaco on ***Mon May 11, '98*** 5:15 AM,'" an email purportedly sent as a result of seeing the "link" to the Meininger reference on the Slashdot web page "is dated ***Sunday, May 10, 1998***, at 1:08 AM and states: 'I found a reference to [your WindowMaker page] on Slashdot.'"  (Simple's 103 Opp'n at 20 (emphasis added).)  According to Simple, "this physical impossibility . . . vividly underscore[s] why it would be erroneous to ignore the hearsay and unauthenticated nature of" CA's corroborative evidence.  (*Id.*)

In other words, Simple would have the Court ignore the plethora of evidence put forth by CA because an email received by Meininger ***about the Meininger reference*** is dated as of May 10, ***1998*** while a web page posting, also ***about the Meininger reference***, is dated May 11, ***1998***.  Although this alleged inconsistency is undeniable, there are three factors that counsel against finding that the Meininger reference was not available on the Internet prior to the January 21, 1999, filing date of the '493 Patent: (1) the email in question and the Slashdot article are both from May of 1998; (2) Simple does not contend that the Slashdot article was never available on the Internet; and (3) the Federal Circuit has allowed software programs as prior art under § 102 with less proof than that put forth by CA.  As the first two reasons have already been discussed

(*see* Anticipation & Obviousness Mem. at 31-44), the Court will focus its analysis on *Eolas Techs., Inc. v. Microsoft Corp.*, 399 F.3d 1325 (Fed. Cir. 2005).

The case at bar is analogous to *Eolas*, where the Federal Circuit allowed the use of archived software to corroborate testimony offered to show invalidity.[9]  *Id.* at 1329.  In *Eolas*, Microsoft asserted that a prior art web browser, Viola, was publicly used more than one year before Eolas' date of invention.  *Id.*  As proof, Microsoft offered the testimony of Pei-yuan Wei, the creator of the Viola web browser, and corroborated his testimony with the use of "a computer demonstration of an archived file . . . ."  *Id.*  While it did not question the admissibility of archived code as corroborative evidence, the district court found that Viola was "abandoned, suppressed or concealed," under Section 102(g) and ruled that its demonstration to engineers at Sun Microsystems was not a public use under Section 102(b) of the Patent Act.  *Eolas*, 399 F.3d at 1329-30.  The district court then prevented Microsoft from showing any evidence of the purportedly abandoned Viola web browser to the jury.  *Id.* at 1330.  On appeal, the Federal Circuit overturned the district court's ruling that Viola was "abandoned, suppressed or concealed" and remanded the issue to allow for consideration of the Viola browser as prior art. *Id.* at 1335.  While discussing Microsoft's inequitable conduct defense, the Federal Circuit stated "in respect to potential prior art software under section 102(b), this Court has explained that the software product constitutes prior art, not necessarily the later established abstract associated

---

[9] In fact, the United States Patent and Trademark Office has explicitly allowed the use of electronic records as evidence in interferences since at least 1998.  *Admissibility of Electronic Records in Interferences, Off. Gaz. Pat. Off.,* Mar. 10, 1998, at 14.  Pursuant to 37 C.F.R. § 1.671, electronic records are admissible in interferences before the Board of Patent Appeals and Interferences "to the same extent that" they are admissible under the Federal Rules of Evidence. Lisa A. Dolak, *Patents Without Paper: Proving A Date Of Invention With Electronic Evidence*, 36 Hous. L. Rev. 471, 477 (1999).

with that software product." *Eolas*, 399 F.3d at 1336.  In *Eolas*, the "software product" was the archived version of the Viola browser.  As such, *Eolas* indicates that archived source code is admissible and highly corroborative as to the eligibility and features of a prior art reference.

In light of *Eolas*, the Court finds that, even without the use of the disputed emails in question, Meininger's testimony is sufficiently corroborated to clearly and convincingly prove that the Meininger reference was publicly available in May of 1998.  *See generally id.* at 1329. There is no record evidence indicating that the archive CD containing the Meininger reference is not authentic or that it was subject to tampering.  Accordingly, Simple's argument that the purported inconsistency between the Slashdot article and one of the emails received by Meininger raises hearsay and authentication questions is not persuasive.  The Court now turns to Simple's argument that the Meininger reference was not publicly available prior art.

**B.      The Meininger Reference was a Publicly Accessible Printed Publication Before the Filing Date of the '493 Patent**

**1.      The Parties' Arguments**

According to Simple, the Meininger reference is not eligible as prior art because there is no evidence that it was used in the United States or disclosed in a publicly available printed publication as defined by Section 102 of the Patent Act.  (Simple's 103 Opp'n at 25-32.)[10] Simple attempts to analogize the case at bar to the Federal Circuit's recent decision in *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1190 (Fed. Cir. 2008), and argues that there is "no evidence" that the Meininger reference was publicized to the "'Web Developer' community

_____

[10] "Section 103 does not expressly define what sources must be looked to as 'prior art' to determine obviousness.  However, . . . [its] opening phrase clearly implies that the provisions of Section 102 are to be the guide."  Donald S. Chisum, Chisum on Patents § 5.03 (Matthew Bender & Co. 2007) (1998) (citations omitted) ("Chisum on Patents").

(which CA has described as the relevant field of art) but, at most, [was] publicized via a mailing list to those interested in a desktop software, [called] WindowMaker." (Simple's 103 Opp'n at 30-31.) In other words, Simple asserts that "a web developer, looking to solve the problem addressed in the [patents in suit] . . . could not reasonably be expected to find . . . [an] obscure personal web page[] addressed to wholly unrelated subject matter such as . . . interfaces for operating systems." (*Id.* at 30-32.) CA counters by arguing that: (1) it has "adduced four types of evidence in support of its showing that the Meininger reference was known and used in the United States prior to the January 21, 1999," and (2) there "is no dispute . . . that the Meininger Reference . . . was 'described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent.'" (CA's 103 Reply at 7-10.)

In order to address the parties' arguments, the Court will summarize the relevant case law and then apply it to the case at bar.

### 2.      Legal Standard

Although the Court is evaluating CA's motion for summary judgment of obviousness under § 103 of the Patent Act, § 102 still governs what constitutes admissible prior art. 35 U.S.C. § 103(a) ("A patent may not be obtained though the invention is not identically ***disclosed or described as set forth in section 102 of this title***, . . . .") (emphasis added); *see also* note 10 *supra*. Section 102(a) provides:

> A person shall be entitled to a patent unless--
>
> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent,
> . . .

35 U.S.C. § 102(a). "The statutory phrase 'printed publication' has been interpreted to mean that

before the critical date the reference must have been sufficiently accessible to the public interested in the art; dissemination and public accessibility are the keys to the legal determination whether a prior art reference was 'published.'" *In re Cronyn*, 890 F.2d 1158, 1160 (Fed. Cir. 1989).[11]  A reference is "publicly accessible" prior art "'upon a satisfactory showing that . . . [it] has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it.'" *SRI*, 511 F.3d at 1194 (quoting *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006)).  Notably, the "actual retrieval of a publication is not a requirement for public accessibility." *Id.* at 1197.  The "decision whether a particular reference is a printed publication must be approached on a case-by-case basis." *Id.* at 1194-95 (internal quotation marks omitted) (quoting *Cronyn*, 890 F.2d at 1161; citing *In re Hall*, 781 F.2d 897, 899 (Fed. Cir. 1986); *In re Wyer*, 655 F.2d 221, 227 (C.C.P.A. 1981)).

While "courts have found it helpful to rely on distribution and indexing as proxies for public accessibility," they have not done so "to the exclusion of all other measures of public accessibility." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004).  Rather the Federal Circuit has identified several factors which courts can look to, including: "(1) the length of time the reference was available; (2) the expertise of the target audience; (3) the existence (or lack) of reasonable expectations that the reference would not be copied; and (4) the simplicity with which the reference could have been copied."[12]  *SRI*, 511 F.3d at 1202 (Moore, J., dissenting) (citing *Klopfenstein*, 380 F.3d at 1350)).

_____

[11] In the case at bar, the critical date is January 21, 1999, the constructive date of invention the '493 Patent.

[12] These four factors will hereafter be referred to as the *Klopfenstein factors*.

Federal Circuit case law discusses public accessibility under § 102 "in one line of cases illustrating a lack of public accessibility and in another line of cases pointing out public accessibility." *SRI*, 511 F.3d at 1195. For instance, while *Application of Bayer*, 568 F.2d 1357 (C.C.P.A. 1978), *Cronyn* and *SRI*, point to instances where references may not have been eligible as prior art, *Bruckelmyer*, *Wyer*, *Hall*, *Mass. Inst. of Tech. v. Ab Fortia*, 774 F.2d 1104 (Fed. Cir. 1985) ("*MIT*"), and *Klopfenstein* involve instances where the reference in question was found to be eligible prior art. Both lines of cases are discussed below.

### a. Instances Where References Failed to Qualify as Prior Art

In *Bayer*, 568 F.2d at 1358-59, the Federal Circuit's predecessor court found that "a graduate thesis in a university library" was not a publicly accessible printed publication as required by § 102 because it was neither cataloged nor shelved and "[o]nly three faculty members even knew about" its existence. *SRI*, 511 F.3d at 1195. Under these circumstances, "a customary search would not have rendered the work reasonably accessible even to a person informed of its existence." *Id.* at 1196.

Under a similar set of circumstances, in *Cronyn*, the Federal Circuit found that a thesis document in a library, indexed only by the author's name, was not a publicly accessible prior art reference because "the only research aid in finding the theses was the student's name, which of course, bears no relationship to the subject of the student's thesis." 890 F.2d at 1161.

More recently, in *SRI*, the Federal Circuit found that there was a genuine issue of material fact as to whether an electronic document referred to as the "Live Traffic paper" was a publicly accessible printed publication. Responding to a call for papers from the Internet Society ("ISOC"), Phillip Porras, of SRI, emailed Dr. Matt Bishop, the ISOC's symposium chair, the

Live Traffic paper as well as its exact location on SRI's publicly accessible file transfer protocol ("FTP") server,[13] ftp://ftp.csl.sri.com/pub/emerald/ndss98.ps.  *SRI*, 456 F. Supp. 2d 623, 626 (D. Del. 2006) *vacated in part and remanded*, 511 F.3d 1186 (2008); *SRI*, 511 F.3d at 1188.  In his email, Porras stated that the Live traffic paper would be available on SRI's FTP server for a total of seven days.  *Id.* at 1195.

In finding the existence of an issue of fact, the Federal Circuit emphasized the following: (1) SRI's FTP server "did not contain an index or catalogue or other tools for customary and meaningful research"; (2) the FTP server did not contain a file that identified the location of the Live Traffic paper or explained the "the mnemonic structure for files" in any of its directories; and (3) "only one non-SRI person, Dr. Bishop, specifically knew about the availability of the Live Traffic paper."  *SRI*, 511 F.3d at 1196.  In light of the foregoing, the Federal Circuit concluded that "despite his knowledge of the field, FTP servers, and the paper, Dr. Bishop apparently would not have found the" Live Traffic paper "without Mr. Porras's precise directions."  *Id.*  The Federal Circuit also reasoned that it would be "doubtful that anyone outside the review committee looking for papers submitted to the . . . [ISOC's] Symposium would search a subfolder of an SRI FTP server."  *Id.*  In short, there was a genuine issue of material fact over whether one skilled in the relevant art would be able to locate the Live Traffic paper through the exercise of reasonable diligence.

### b.      Instances Where References Qualified as Prior Art

The focus now turns to instances where the Federal Circuit has found that a reference is eligible prior art.  In *Bruckelmyer*, two diagrams in a patent file wrapper were considered

---

[13] "FTP is a protocol for exchanging files over" a computer network like the Internet. *SRI*, 511 F.3d at 1188, 1195.

21

publicly accessible even though they were only available through the Canadian Patent Office. 445 F.3d at 1379.  In *Wyer*, the Federal Circuit held that an Australian patent application and appendix laid open for inspection were publicly accessible.  655 F.2d at 226.  The decisive factor in both cases was that the references in question were laid open to the public, abstracted, classified by subject matter, and indexed in a recognized system.  *See SRI*, 511 F.3d at 1196; *Bruckelmyer*, 445 F.3d at 1379.  In *Hall*, a reference located solely in a German library was deemed publicly accessible.  781 F.2d at 900.  According to the Federal Circuit, this was because it was catalogued, indexed and open to the general public before the critical date in question. *See SRI*, 511 F.3d at 1196.

In *MIT*, 774 F.2d at 1108-10, "a paper delivered orally to the First International Cell Culture Congress was considered a 'printed publication'" because "as many as 500 persons having ordinary skill in the art heard the presentation, and at least six copies of the paper were distributed."  *See Klopfenstein*, 380 F.3d at 1349.  "The key to the [*MIT*] court's finding was that actual copies of the presentation were distributed."  *Id.* (discussing *MIT*, 774 F.2d at 1108-10). Nevertheless, while the *MIT* "court determined [that] the paper in question . . . [was] a 'printed publication'" it "did not limit future determinations of the applicability of the 'printed publication' bar to instances in which copies of a reference were actually offered for distribution."  *Id.* (discussing *MIT*, 774 F.2d at 1108-10).

More recently in *Klopfenstein*, the Federal Circuit held that a "fourteen-slide presentation . . . printed and pasted onto posterboards," and displayed for "approximately three cumulative days" was a publicly accessible printed publication under § 102.  380 F.3d at 1347, 1350, 1352. Since the presentation was "was never distributed to the public" or "indexed," the Federal

22

Circuit articulated and applied the *Klopfenstein factors*[14] in order to determine "whether or not it was sufficiently publicly accessible in order to be considered a 'printed publication.'" *Klopfenstein*, 380 F.3d at 1350. In its analysis, the Federal Circuit noted that: (1) the presentation was on display for three days; (2) it was displayed to an audience that would easily qualify as skilled in the art; (3) no measures were taken to prevent anyone from copying the information from the slide presentation and "professional norms" under which it was displayed did not entitle its presenters "to a reasonable expectation that their display would not be copied"; and (4) the slides contained nothing more than concise bullet point sentences and graphs which could easily be copied and understood by an observer skilled in the art. *Id.* at 1350-52. Accordingly, the *Klopfenstein* panel held that the posterboard presentation in question was clearly a publicly accessible printed publication under § 102 of the Patent Act. *Id.* at 1352. Having articulated the legal standard for what constitutes a printed publication under § 102, the Court provides its analysis of the Meininger reference below.

### 3. Analysis

Although the Meininger reference was not necessarily indexed like the patent applications in *Bruckelmyer* and *Wyer*, or the thesis in *Hall*, it was sufficiently accessible to be considered a "printed publication" under § 102(a) of the Patent Act. To begin with, one skilled in the relevant field of web based software development would be able to locate the Meininger reference. In addition, the record evidence clearly indicates the Meininger reference was known or used in the United States prior to the constructive date of invention of the patents in suit.

---

[14] As stated above, the *Klopfenstein factors* include: (1) the length of time the reference was available; (2) the expertise of the target audience; (3) the existence (or lack) of reasonable expectations that the reference would not be copied; and (4) the simplicity with which the reference could have been copied. *See Klopfenstein*, 380 F.3d at 1350-51.

Finally, an analysis of the *Klopfenstein factors* compels the Court to conclude that the Meininger reference is eligible prior art because it is a printed publication under § 102(a).

> **a.**    **One Skilled in the Relevant Art Would Search For Prior Art that Involved Simulations of Windowed Operating Systems**

The Court is unpersuaded by Simple's argument that "a web developer, looking to solve the problem addressed in the [patents in suit] . . . could not reasonably be expected to find" the Meininger reference.  (Simple's 103 Opp'n at 30-32.)  Rather, as discussed below: (1) one skilled in the art seeking to solve the problem addressed by the patents in suit would be a web developer looking to take advantage of the new capabilities enabled by version 4.0 web browsers to create a windowed content manifestation environment capable of manifesting content and (2) the Meininger reference was not an "obscure" personal web page but was actually linked in a "popular" news site relevant to those skilled in the art and was clearly known or used in the United States prior to the date of invention of the patents in suit.

Generally speaking, the patents in suit claim a system, network client and apparatus configured to facilitate a "windowed content manifestation environment within a world wide web (WWW) browser client."  *E.g.*, '493 Patent, Abstract; '563 Patent Cl. 1; '882 Patent Cl. 17. According to the patentee, network surfers could use Simple's claimed invention, with a conventional or customized web browser, "to access a portal web site that delivers content in a format that is consistent with other software platforms that operate within a user's personal data processing system."  '493 Patent col. 3, ll. 60–64; *see also* '563 Patent col. 4, ll. 4-9; '882 Patent col. 3, ll. 63-67.  The patents in suit also stress that the subject matter claimed therein provides a "true *windowing* environment within the constraints of the Internet's infrastructure," which "will allow content providers (e.g., web site operators) to incorporate the present invention to further

enrich their sites and enhance the web usage experience." *E.g.*, '493 Patent col. 3, l. 65 - col. 4, l. 2 (emphasis added).  Accordingly, while Simple correctly points out that the patents in suit claim a new way to manifest content, the specifications of the patents in suit clearly establish that a windowed content manifestation, which emulates the behavior of a desktop environment on a web browser was a critical component of the subject matter claimed in the '493, '562 and '882 Patents.  *See*, *e.g.*, '493 Patent col. 8, ll. 25 - 45 (describing how window modules claimed by the patents in suit "act like any window such as those in a windows based operating system"), col. 9, ll. 1-6 ("Because module 118 may be a DMOD, a user may now freely move content display/manifestation windows within his browser's CME much like he does with program windows when viewing an operating system desktop environment (e.g., the WINDOWS 98[TM] desktop environment).", col 11, ll. 26-31 ("the WWW browser client will manifest the web site view in its CME to allow a user to operate upon received content within a windows based environment much like a windowed environment or shell of an operating system (e.g., much like the WINDOWS 95, 98, NT, UNIX X-WINDOWS . . . )").)  In fact, the patentee argued that window objects claimed in the '493 Patent were meant to behave "just like operating system window objects" while attempting to distinguish it from prior art web pages.  (Response and Amendment to Application No. 09/234,297 (Dkt. No. 366), Ex. 4 at SIM006246 ("the present invention . . . defines . . . a web browser client that facilitates execution of window objects . . . which are capable of being moved, resized, minimized, and maximized just like operating system window objects.").)  In light of this intrinsic evidence, it is clear that one skilled in the art looking to solve the problems addressed by the patents in suit would look for websites like the Meininger reference, which emulated a desktop environment within a web browser.

25

As one skilled in the art would be a web developer looking to take advantage of the new developments in version 4.0 browsers to display content in a web browser while emulating a windowed operating system, it is critical to note that such a person would not necessarily have to search for the Meininger reference by relying solely on Jeff Meininger's name.  Rather, she could search the Internet for a web based simulation of a windowed operating environment, such as WindowMaker, or even find the Meininger reference when reading a news site related to her field.  This is made clear by the record evidence which establishes that: (1) the Meininger reference seeks to mimic the WindowMaker desktop software on a web browser; (2) Meininger notified users of the "WindowMaker window manager" desktop program about the Meininger reference via email (the "Meininger email"); (3) news of the Meininger reference spread to a "popular news site called Slashdot.org" (the "Slashdot article");[15] and (4) the Slashdot article is presently available online in an archived format and was posted in May of 1998.  (Meininger Dep. (Dkt. No. 402-4), at 53-54 ).[16]  Accordingly, it is clear that one skilled in the art would be able to locate and use the Meininger reference.  At the very least, the record evidence makes clear, as a matter of law, that Jeff Meininger and Rob Malba ("CmdrTaco"), the editor of Slashdot.org, were aware of and/or used the Meininger reference before the constructive date of invention of the '493 Patent, January 21, 1999.  (*See* Anticipation & Obviousness Mem. at 39-44; *see also* Anticipation & Obviousness R&R at 36-58.)  Merely arguing that it was possible for

---

[15] At no point does Simple argue that Slashdot.org was not a popular news site among computer programmers.

[16] As discussed in the Anticipation and Obviousness Memorandum, the Meininger email is admissible to corroborate Meininger's testimony as to the date the Meininger reference was publicly available, as well as its functionality.  (Anticipation & Obviousness Mem. at 39-41.)  The Court also found that the Slashdot article is admissible.  (*Id.* at 41-42.)

Rob Malba or anyone sending emails to Meininger about his web page to have accessed the Meininger reference outside the United States is insufficient to raise a genuine issue of material fact as to whether the Meininger reference was known or used in the United States.  (*See generally* Meininger Dep. at 53-58 (testimony that the Meininger reference was featured on slashdot.org and "several" emails were received as a result of making the Meininger reference public in May of 1998 ), 122 (testifying to the receipt of an email from Rob Malba mentioning that he placed a link to the Meininger reference on slashdot.org); Anticipation & Obviousness R&R at 55 (explaining why certain email addresses and the personal web page of Rob Malba show that the Meininger reference was used domestically).)[17]  Even if Simple has created an issue of material fact as to whether the Meininger reference was *used* in the United States, that issue is not dispositive.  The matter turns on whether it was a publicly accessible printed publication before the constructive date of invention of the patents in suit and on that issue there is no question of fact.

> **b.**    **An Analysis of the *Klopfenstein F*actors and Federal Circuit Precedent Shows that the Meininger Reference was a Publicly Accessible Printed Publication under § 102 of the Patent Act**

An analysis of the *Klopfenstein factors* and relevant Federal Circuit precedent shows that the Meininger reference is eligible as prior art under § 102(a) because it is clearly a publicly accessible printed publication.

> **(1)    *Klopfenstein Factors***

The Court shall first address the *Klopfenstein factors* which include: (1) the length of time the reference was available; (2) the expertise of the target audience; (3) the existence (or

---

[17] According to his personal web page, Mr. Malba was born and raised in the United States, where he currently resides.  (*See* Dkt. No. 402-5 at 2.)

lack) of reasonable expectations that the reference would not be copied; and (4) the simplicity with which the reference could have been copied.  Each *factor* will be addressed *seriatim.*

Meininger's deposition testimony indicates that the Meininger reference was available on the Internet from some time in May of 1998 until at least, April 20, 2004, the date of Meininger's deposition.  (Meininger Dep. at 12-15.)  This length of time compares favorably to the posterboard presentation in *Klopfenstein*, 380 F.3d at 1350, that was found to be a publicly accessible printed publication despite the fact that it was only displayed for approximately three days, as well as the "ndss98.ps" file in *SRI*, 511 F.3d at 1195, which was posted on a server for just seven days.  Indeed, the Meininger reference is analogous to a document made available to the general public in a library since one skilled in the art could find it by using an Internet search engine, learn about it via an email sent by Meininger to a user group of programmers interested in the WindowMaker program, or find a link to it on the Slashdot article making it easily accessible over an extended period of time.  *See generally Hall*, 781 F.2d at 900.

The superficial changes in the appearance of Meininger reference noted by Simple are irrelevant under § 102 because they do not diminish the amount of time the Meininger reference was publicly displayed.  For example, while Meininger may have made certain changes to the textual content of certain window elements or removed a window that allowed users to send an email, this never impacted the underlying functionality of the Meininger reference.  (*See generally* Meininger Dep. at 81-87.)  Indeed, it is the underlying functionality of window elements in the Meininger reference that are most important in determining whether the patents in suit are invalid.  Having found that the Meininger reference was displayed for a sufficient length of time to be considered prior art, the Court turns to the expertise of the Meininger

reference's target audience.

Although the Meininger reference was publicly available to anyone with access to the Internet, it was targeted to software developers interested in the WindowMaker desktop software and computer programmers looking to emulate a desktop environment within a web browser.  To begin with, the Meininger email was sent to a community of developers interested in the WindowMaker program with the intent of telling them about the Meininger reference. Moreover, the fact that the Meininger reference was mentioned on Slashdot.org (the Slashdot article), a web page geared toward computer programmers and others interested in computer technology, further indicates that the Meininger reference's target audience includes those skilled in the art relevant to the patents in suit.

The foregoing is relevant because Netscape and Microsoft web browsers are equipped with a menu option that allows anyone to view the source code used to generate web pages.  One skilled in the art could easily have used this capability to view the source code used to create the Meininger reference.  (Meininger Dep. at 52.)[18]  In this respect, the case at bar is highly

---

[18] The following excerpt from page 52 of the Meininger deposition illustrates how easy it would be for one skilled in the art to view the source code used to create the Meininger reference.

> Q.      (By Mr. Martiniak) Now, was the code you used to create
>          your web page available to the public?
> A.      Yes.
> Q.      And how was it -- how was that made available to the
>          public?
> A.      A user that is viewing my web page can in their browser
>          select view, view source.
> Q.      Can you show us how that's done?
> A.      Sure.  In the Netscape Navigator menu bar, we have -- let
>          me see where that is.  In the view menu, there is a page
>          source option and when that's selected, you get a window
>          that contains the JavaScript code and the dynamic HTML

analogous to *Klopfenstein*, where the prior art reference was displayed directly to those skilled in the art, who could easily understand and retain its content.  380 F.3d at 1347, 1350.  As such, it is clear that the expertise of the Meininger reference's target audience weighs in favor of finding that it is a publicly accessible printed publication under § 102.

Turning to the third *Klopfenstein* factor, it is clear that the record contains no evidence that anyone, let alone Meininger, could reasonably expect that the source code used to create the Meininger reference would not be easily copied.  (*See* Meininger Dep. at 52.)  In fact, rather than keep it a secret, Meininger emailed a community of software developers and asked them to view and evaluate the Meininger reference.  (*Id.* at 53-54; *see also* Anticipation and Obviousness R&R at 44 (displaying a copy of the email sent by Meininger asking others to take a look at the Meininger reference).)  The Meininger reference was later described and praised in the Slashdot article, further reducing the likelihood that it would not be copied.  Indeed, none of the traditional protective measures such as "license agreements,  non-disclosure agreements, anti-copying software or even a simple disclaimer informing members of the viewing public that no copying" would be "countenanced," were present in the Meininger reference.  *Klopfenstein*, 380 F.3d at 1351.  As there was no expectation that those who viewed the Meininger reference would not copy it, the focus turns to the level of difficulty in copying the source code used to create the Meininger reference.

One skilled in the art would have no difficulty in copying the source code used to create the Meininger reference.  As noted above, viewing the source code required little more than clicking on a "view source" command.  One skilled in the art would only have to drag her mouse

---

that operates the simulation.

over the text of the disclosed source code and use a "Copy" command to create her own electronic copy of Meininger's source code.  (*See* Meininger Dep. at 52.)  Suffice it to say, the *Klopfenstein factors* overwhelmingly weigh in favor of finding that the Meininger reference was a publicly accessible printed publication under § 102.

**(2)  Under Federal Circuit Precedent the Meininger  
Reference Is Eligible Prior Art**

The facts surrounding the Meininger reference are distinguishable from cases like *SRI*, *Bayer* and *Cronyn* where the Federal Circuit found that the references in question may not be eligible prior art and compare favorably to the fact pattern in *MIT*, where the Federal Circuit found that a presentation qualified as a publicly available printed publication.[19]

In *SRI*, *Bayer* and *Cronyn* the references at issue were difficult to locate and known to few if any, besides their author.  *SRI*, 511 F.3d at 1196; *Bayer*, 568 F.2d at 1358-59; *Cronyn*, 890 F.2d at 1161.  In all three instances, one skilled in the art looking for information on a particular topic would not be able to find the prior art reference in question through the exercise of reasonable diligence.  Rather, such a person would have to know its exact location (*i.e.* ftp://ftp.csl.sri.com/pub/emerald/ndss98.ps), be on a thesis or symposium committee, or already know the subject matter ***and*** author of a graduate thesis in a university library.  *SRI*, 511 F.3d at 1190, 1196; *Cronyn*, 890 F.2d at 1160-61; *Bayer*, 568 F.2d at 1358-59.

The Meininger reference, on the other hand was, available on the Internet where anyone could access it, linked in a popular computer and software related web page (the Slashdot article), and publicized to a community of software developers interested in the WindowMaker

---

[19] In light of the Court's analysis of the *Klopfenstein factors*, it is clear that the Meininger reference compares favorably to the posterboard presentation at issue in that case.

31

software.  Unlike the references in *Cronyn*, and *SRI*, one skilled in the art would not have to

know that Jeff Meininger was the creator of the Meininger reference or have to type in its exact

web address.  Indeed, the Meininger reference's dissemination was more extensive than that of

the slide presentation in *MIT* which was found to be publicly accessible.  *See MIT*, 774 F.2d at

1108-09.  The Meininger reference was available on the Internet for at least six months before

the '493 Patent was filed and would be far easier to copy than an oral presentation made once

during a conference.  Indeed, the nature of the Internet is such that one skilled in the art could

access the Meininger reference at any hour of the day from the convenience of her own home

and then copy and paste the source code used to create it.  This level of dissemination is far

greater than that in *MIT*.  In sum, it is clear as a matter of law that the Meininger reference is a

publicly accessible printed publication under § 102(a).

Having dealt with the preliminary issues, the focus now shifts to the heart of the matter,

determining whether or not CA has proved clearly and convincingly, with no genuine issue of

material fact, that the patents in suit are invalid under § 103 of the Patent Act.

## III.    The Patents in Suit are Invalid as Obvious

In its obviousness discussion below, the Court will begin by summarizing the parties'

arguments and then provide its own analysis and ruling.

### A.    The Parties' Arguments

#### 1.    CA's Arguments

CA asserts that the subject matter claimed by the '493, '563, and '882 Patents would be

obvious to one skilled in the art prior to the filing date of the '493 Patent.[20]  CA begins by

---

[20] In the case at bar, the filing date of the '493 Patent is also the earliest date of invention
associated with the patents in suit.

arguing that one skilled in the art would be motivated to create the subject matter claimed by the patents in suit as a result of such a person's desire to take advantage of the new capabilities enabled by version 4.0 web browsers.  (CA's Mot. for Summ. J. of Obviousness at 1, 3-6; *see also* Anticipation & Obviousness Mem. at 169-74.)  CA goes on to argue that one skilled in the art would also be motivated to utilize some combination of the prior art references listed in the record , which include widely distributed texts frequently used in the field, to create the subject matter claimed by the patents in suit.  (*See*, *e.g.*, CA's Mot. for Summ. J. of Obviousness at 5-6, 28, 31.)  Finally, CA argues that even if one were to assume that its prior art references failed to anticipate the acts independently, solely contained within, and without refresh requirements, these claim elements would be rendered obvious to one skilled in the art in light of any number of prior art combinations, thereby invalidating the patents in suit.  (*See*, *e.g.*, CA's Mot. for Summ. J. of Obviousness at 17-27, 28-30, 30-33; Decl. of Danny Goodman in Supp. of CA's Mot. For Summ. J.of Invalidity Under 35 U.S.C. § 103(a), Dkt. No. 789-22 ("2008 Goodman 103 Decl."), ¶¶ 12, 16, 20, 23-25.)[21]  The Court now turns to Simple's counter arguments.

## 2.      Simple's Arguments

According to Simple, CA has failed to meet its burden of clearly and convincingly showing that the patents in suit are obvious because: (1) the record evidence contains an absence of a motivation to combine the relevant prior art references; (2) the primary and secondary factors "that control an obviousness inquiry under *Graham . . .* " actually suggest a finding of nonobviousness; and (3) CA's prior art does not teach the acts independently, without refresh

---

[21] In support of its motion for summary judgment, CA's cites to and discusses something called the "Malmer reference."  As the Court is able to resolve CA's motion for summary judgment without relying on or using the Malmer reference, it eschews a discussion of the issues related to this alleged prior art reference.

and solely contained within requirements of the patents in suit.  (Simple's 103 Opp'n at 33, 35, 41-50.)  Having summarized the parties' relevant arguments, the Court provides its own analysis below

### B.      Analysis

To start off the Court will determine whether there is any material dispute over the level of ordinary skill in the art, the scope of the prior art, and whether one skilled in the art would find the claimed invention obvious in light of the prior art (the primary *Graham* factors).  *See Graham*, 383 U.S. at 17.  Finally, the Court will determine whether the "secondary" factors discussed in *Graham*, counsel against a finding of obviousness.  *Id.* at 17-18.[22]

### 1.      The Level of Ordinary Skill in the Art

In ascertaining the level of ordinary skill in the art, the Court will proceed in two steps.  First, the Court will identify the qualifications and experience level of one skilled in the art.  The Court will then look to Federal Circuit precedent for guidance as to such a person's motivation to combine various prior art references and the steps her analytical prowess would lead her to take.

### a.      The Qualifications and Experience of One Skilled in the Art

Turning to the level of ordinary skill in the art, the Court notes that: (1) neither party objected to, and (2) the Court adopted the Special Master's recommendation on this issue when ruling on the parties' objections to the Special Master's Report and Recommendations Regarding Anticipation and Obviousness.  (*See* Anticipation & Obviousness R&R at 7-11; Anticipation &

---

[22] As discussed above, the primary factors articulated in *Graham* entail "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art." *KSR*, 127 S.Ct. at 1745-46 (citing *Graham*, 383 U.S. at 17)).  The secondary factors discussed in *Graham* include "'commercial success, long felt but unsolved needs, failure of others,'" and whether the prior art teaches away from the claimed invention.  *Id.* at 1734 (quoting *Graham*, 353 U.S. at 17-18).

Obviousness Mem. at 2, n.1.)  Simple has yet to explicitly counter the Special Master's pertinent

recommendation from the Anticipation & Obviousness R&R.  Moreover, Simple concedes, at

least for purposes of this motion, that one skilled in the art would have known of and used the

JavaScript programming language and DHTML in combination with version 4.0 web browsers

beginning some time between June and October of 1998 (Simple's 103 Opp'n at 36), up to a

year to a year and a half before the '493 Patent was filed.

As the Special Master noted, Simple conceded that one skilled in the art during the

relevant time period would have  "at least a bachelor's degree in computer science, and *two*

*years* experience in the computer industry, or equivalent experience."  (Anticipation and

Obviousness R&R at 9-10 (quotations omitted) (emphasis added).)  The Special Master then

pointed out that one skilled in the art would, at the least, be an "average website developer"

having "substantial familiarity" with DHTML when the '493 Patent was filed.  (*Id.* at 10

(quoting '493 Patent col. 5, l. 65 - col. 6, l. 8).)[23]  The Special Master also noted that the '563

Patent indicated that one skilled in the art would be familiar with the Microsoft Internet Explorer

---

[23] The relevant passage from the '493 Patent provides:

> A Layer is a WWW browser content display section produced
> within a content manifestation environment (CME) including, but
> not limited to, any object within an HTML document that may be
> scaled, dragged, or otherwise operated upon such as an IMG
> object, a SPAN object, a DIV object, a form element, etc. and
> which may be associated with program logic such as within a
> script, etc. *A layer has its own properties including, but not*
> *limited to, a name, etc. within an HTML rendition model such as*
> *those defined by DHTML standards.* Additionally, a layer acts
> independently of other content within a particular HTML
> document.

'493 Patent col. 5, l. 65 - col. 6, l. 8 (emphasis added).

OCX library which enabled network accessing and content rendering, as well as processing routines and engines.  (Anticipation and Obviousness R&R (quoting '563 Patent col. 11, ll. 22-25).)[24]

Turning to JavaScript, the parties do not dispute that one skilled in the art would have at least some experience with that programming language, likely two years or so.  (*See generally* Simple's 103 Opp'n at 38; Defs.' Resp. To CA's Separate Statement of Undisputed Facts in Supp. of Summ. J. of Invalidity Under 35 U.S.C. § 103(a), and Defs.' Additional Undisputed Material Material Facts in Opp'n to Summ. J. (Dkt. No. 805-1) ("Simple's Resp. to CA's SS"), at 37 (stating that "JavaScript: the Definitive Guide" was published in June of 1998).)  As Simple points out, ***two years*** in "'[I]nternet years' . . . was ages" and "certainly was enough time for Mr. Goodman's book, the JavaScript Bible, to reach its ***third edition***, and it was enough time for entire books to be written about DHTML programming for web browsers."  (Simple's 103 Opp'n at 38 (emphasis added).)  In other words, one skilled in the art was likely to learn a great deal about and use emerging technologies in her field (*e.g.*, version 4.0 web browsers, DHTML and JavaScript) in a relatively short period of time.  In addition, the Special Master found that one skilled in the art "would have been familiar with the Internet and World Wide Web."

---

[24] The relevant passage from the '563 Patent provides:

> [T]he programs contained in the attached Appendix along with the routines forming the MS OCX library make up the custom configured WWW browser provided by the present invention. ***The MS OCX library, in particular, provides network accessing routines along with content rendering, layout routines, HTML processing routines and engines, etc. which will be readily apparent to those skilled in the art.***

'563 Patent col. 11, ll. 22-25 (emphasis added).

36

(Anticipation and Obviousness R&R at 10-11 (citing '493 Patent col. 1, ll. 16-38).)  Having

established the qualifications and experience of one skilled in the art, the Court turns to that

person's motivation and analytical prowess.

> **b.    The Motivation and Analytical Steps Taken by One Skilled In the Art**

The Federal Circuit's recent analyses in *DyStar Textilfarben GmbH & Co. Deutschland
KG v. C.H. Patrick Co.*, 464 F.3d 1356 (Fed. Cir. 2006), *cert denied*, 127 S. Ct. 2937 (2007), and
*In re Translogic Tech., Inc.*, 504 F.3d 1249 (Fed. Cir. 2007), provides valuable insight into
examining the motivation and analytical prowess of one skilled in the art.  *DyStar* addresses
what may motivate one skilled in the art while *Translogic* provides guidance as to how one
skilled in the art can combine and supplement various sources and teachings in the prior art.

> **(1)    *DyStar***

In *DyStar*, the asserted patent in that case,  the "'992 Patent," claimed an improvement on

the process used for dyeing textile materials.  464 F.3d at 1359.  The improvement consisted of

eliminating two steps in a six step dying process.  *Id.*  The question before the Federal Circuit

was whether this more efficient process would have been obvious to one skilled in the art.

As the *DyStar* court pointed out, the Federal Circuit has "repeatedly held that an implicit

motivation to combine exists not only when a suggestion may be gleaned from the prior art as a

whole, but when the 'improvement' is technology-independent and the combination of

references results in a product or process that is more desirable, . . . or more efficient."  *DyStar*,

464 F.3d at 1368.  Accordingly, the *DyStar* court reasoned that, even if the relevant prior art did

not specifically mention the improvement claimed therein, the '992 Patent could be invalidated

as obvious.  *Id.*  The *DyStar* court found that the '992 Patent would be obvious to one skilled in

the art because "the desire to enhance commercial opportunities by improving a product or process is universal . . . and even common-sensical." *Id.* According to *DyStar*, in such instances, the Federal Circuit has found a "motivation to combine prior art references even absent ***any*** hint of suggestion in the references themselves." *Id.* (emphasis added). This is because the proper inquiry turns on whether "the ordinary artisan possesses knowledge and skills rendering him capable of combining the prior art references." *Id. DyStar* thus requires courts to take as a given that one skilled in the art routinely seeks to improve upon it. As the following analysis will show, the case at bar is highly analogous to *DyStar*.

Applying *DyStar* to the record evidence, it is clear that, when version 4.0 browsers were released in 1997, one skilled in the art would look to take advantage of their new functionalities to improve the state of the art and provide more efficient ways of manifesting content and emulating a windowed operating system within a web browser. (*See* Anticipation & Obviousness Mem. at 169-74 (citations omitted).) In order to do so, such a person would, at the least, utilize DHTML standards and the JavaScript programming language, both of which were in pervasive use prior to the filing of the '493 Patent. *See id.*; '493 Patent col.5, l.65-col 6, l.8 ("A layer has its own properties including, but not limited to, a name, etc. within an HTML rendition model such as those defined by DHTML standards."); Simple's 103 Opp'n at 38 (pointing out that the JavaScript Bible was in its third edition when the '493 patents was filed); Simple's Resp. to CA's SS at 39 ("more than 100,000 copies" of the JavaScript Bible were sold). Indeed, version 4.0 browser technology and the DHTML standard, at the least, allowed for the dynamic manifestation of content and the use of independent layer objects, which could be used to emulate windows and manifest content while independently operating on their own physical

38

planes.  (Dkt. 362-41 at CA 1109033; Dkt. No. 362-3 ("Goodman Invalidity Rpt."), at 16, 26, 29,

33, 38 (listing prior art references that CA claims dynamically display content in layers); Decl.

of Danny Goodman In Supp. of CA's Objection to the Special Master's Report and

Recommendations as to CA's Mot. For Summ. J. of Anticipation (Dkt. No. 607) ("First

Goodman Supp. Decl."), ¶ 68 ; Anticipation & Obviousness Mem. at 87-92 (finding that the

JavaScript Bible discloses layer type window objects); Dep. of Sandro Pasquali, (Dkt. No. 789-

3) ("Pasquali Dep."), at 139-57 (identifying various web pages that emulated windowed content

manifestation environments)).[25]  In view of the foregoing, it would seem "common-sensical" for

one skilled in art to try to dynamically manifest content using separate windows within a web

browser.  *See generally DyStar*, 464 F.3d at 1368.  As proof, one need only look to the

Meininger reference, Visual DHTML reference and JavaScript Bible, all of which disclose

window elements that move independently of other content and, at the least, appear similar to

windows in a windowed operating system.  (*See generally* Anticipation & Obviousness Mem. at

44-47 (taken by itself, the Meininger reference discloses window elements that are similar to but

---

[25] Goodman, CA's expert, asserts:

> A person of ordinary skill in the art . . . would know that unless
> explicitly programmed to act otherwise, a Dynamic HTML
> absolute-positioned element can be relocated to any coordinate
> position (x, y or left, top) in a Content Manifestation Environment
> (CME) . . . . [T]here is no built-in or automatic "collision
> detection" mechanism that prevents an absolute-positioned
> element from being repositioned at any location within the CME,
> ***regardless of what other content may exist in the plane of the***
> ***main document or what other absolute positioned elements may***
> ***be stacked in front of, or behind, a given absolute-positioned***
> ***element.***

(First Goodman Supp. Decl. ¶ 68 (emphasis added).)

not window objects), 68-74, (taken by itself, the Visual DHTML reference discloses window elements that are similar to but not window objects) 68 n. 26, 87-92 (individual source code listings in the JavaScript Bible disclose content manifestation environments featuring one window object); *see also* Pasquali Dep. at 139-57.)

What remains to be determined is whether the desire to improve the manifestation of content over the Internet in combination with the analytical prowess of one skilled in the art would render the subject matter claimed in the '493, '563, and '882 Patents obvious before January 21, 1999.  *See* 35 U.S.C. § 103(a); *Translogic*, 504 F.3d 1249.

### (2)    *Translogic*

In *Translogic*, the Federal Circuit affirmed the United States Patent and Trademark Office Board of Patent Appeals and Interferences' ("Board's") decision to uphold an examiner's rejection of the subject patent, the '666 Patent.  504 F.3d at 1251.  The '666 Patent claimed a multiplexer, "a type of electrical circuit . . . [that] has multiple inputs, one or more control lines and one output."  *Id.*  In upholding the examiner's obviousness determination, the Board found that one of two technical articles by Gorai or Tosser would invalidate the '666 Patent when read by one skilled in the art, in combination with a textbook written by Weste.  *Id.* at 1254.  In essence, the Federal Circuit found that one skilled in the art could derive the relevant subject matter claimed in the '666 Patent by reading the Gorai and Weste prior art references and then using her knowledge to combine their teachings.

On appeal, Translogic unsuccessfully argued that "the record show[ed] no motivation" to combine the prior art references at issue.  Applying, *KSR*, *DyStar* and other relevant precedent, the *Translogic* panel concluded that one skilled in the art could have combined the disclosures in

the Gorai article and the Weste textbook to create the multiplexer circuit claimed in the '666 Patent. *Translogic*, 504 F.3d at 1256-62.  Indeed, the only portion of the claimed invention that was not disclosed by the Gorai article was the use of transmission gate multiplexers ("TGMs") with certain multiplexers (circuits).  Even so, the Federal Circuit found that this gap was bridged by the Weste textbook which taught those skilled in the art that TGMs could indeed be used to transfer logic values from a circuit's input to its output.  *See id.  Translogic* teaches that a court can take into account: (1) the inferences and creative steps that a person skilled in the art would employ; (2) that one skilled in the art could easily supplement the teachings of a technical article with her background knowledge and/or the contents of a textbook.  In essence, *Translogic* reinforces the Supreme Court's rationale in *KSR*, that "in many cases a person of ordinary skill will be able to fit the teachings of multiple patents [or prior art references] together like pieces of a puzzle" and solve design needs by pursuing "known options within" such a person's "technical grasp."  *KSR*, 127 S. Ct. at 1742; *see also Translogic*, 504 F.3d at 1262.

Applying *Translogic* to the case at bar, it is clear that one skilled in the art would seek to fill in the technical gaps in the prior art with her own programming skill and knowledge, and be fully capable of combining the teachings of one or more prior art references.  For instance, if the Meininger Reference did not disclose window elements that could be minimized independently of other content, one skilled in the art would use her analytical prowess and other prior art references such as the JavaScript Bible to attempt to create a window element that could be minimized independently of other content.  *See KSR*, 127 S. Ct. at 1742; *Translogic*, 504 F.3d at 1262.  As another example, one skilled in the art would use her analytical prowess and desire to improve upon the state of the art to combine the boundary checking code in the Visual DHTML

reference with the JavaScript Bible and/or Meininger reference to produce window elements that remained solely contained within their content manifestation environments.  The Court will now determine whether the difference between the relevant prior art and the subject matter claimed by the '493, '563, and '882 Patents would have been obvious to one skilled in the art.  *See* 35 U.S.C. § 103(a).

### 2.    The Difference Between the Prior Art and the Scope of the Claimed Invention

In order to ascertain whether the patents in suit are invalid under § 103(a) of the Patent Act, the Court will first review its findings from the Anticipation & Obviousness Memorandum, and then determine whether the claims in the '493, '563, and '882 Patents which were not anticipated, would be obvious to one skilled in the art.  The following review of the Anticipation & Obviousness Memorandum will establish the state of the prior art and help narrow the focus of the Court's ruling on obviousness to the claim elements still at issue.

### a.    Summary of the Anticipation & Obviousness Memorandum

In its Anticipation & Obviousness Memorandum, the Court held that although the Meininger reference, Visual DHTML reference and Bates Patent fail to anticipate any of the claims at issue, the JavaScript Bible anticipates claims 1, 5, 6, 7, 8, 9, 12 and 13 of the '563 Patent as well as claims 1, 5, 16 and 17 of the '882 Patent.[26]  (Anticipation & Obviousness Mem.

---

[26] The Meininger reference is formally known as the DHTML WindowMaker simulation web page and is meant to simulate a windowed content manifestation environment. (Anticipation & Obviousness Mem. at 22-24.)  The Visual DHTML reference serves as a demonstration tutorial and web authoring tool.  (*Id.* at 55.)  Both the Meininger and Visual DHTML references utilize the DHTML and JavaScript programming languages.  (*Id.*)  The Bates Patent, United States Patent No. 5,877,766, claims a graphic interface that allows a "user to access data stored in a computer" while providing her with a "map display" that "graphically" represents individual records and how they may be related.  Bates Patent col.1, ll. 19-22, col. 6, ll. 26-36.  Finally, the JavaScript Bible is a 1,015 page reference manual for JavaScript version

at 184.)  The JavaScript Bible was found to anticipate any claim that required a single window object with a single controllable attribute but failed to anticipate claims or claim elements requiring multiple window objects, multiple controllable attributes, control sections or window objects that dynamically manifested content.[27]  (*See* Anticipation & Obviousness Mem. at 87-97.)  The later findings were based in part on the Court's determination that combining the source code found in various listings within the JavaScript Bible would be inappropriate when evaluating CA's motion for summary judgment of anticipation but would be appropriate in the context of obviousness.  (*Id.* at 83-87.)  The Meininger reference, Visual DHTML reference and Bates Patent all failed to anticipate any of the claims at issue because they did not disclose window objects that acted independently of other content.  (*See id.* at 45-48, 68-70, 158-61.)  Notably, the Visual DHTML reference does disclose source code which anticipated the solely contained within requirement of element 1D of the '493 Patent.  (*See id.* at 70-73.)  The Court also found that CA's prior art references, *i.e.* the Visual DHTML and Meininger references, disclose control sections.  (Anticipation & Obviousness Mem. at 179-80.)

Although Simple did not counter CA's objection to the Special Master's recommendation that the without refresh requirement of element 1I of the '493 Patent was not anticipated, they now argue that element 1I of the '493 Patents is not rendered invalid as obvious.  Accordingly, the Court will first address whether the CA's prior art teaches multiple window objects that have

_____

1.2 written by Danny Goodman, CA's expert witness. (*See* Anticipation & Obviousness Mem. at 76.)

[27] The JavaScript Bible anticipates elements 1A, 1B, 1C, 1G and 1I of the '493 Patent. (*See* Anticipation & Obviousness Mem. at 102-08.)  The JavaScript Bible does not anticipate: (1) element 1D of the '493 Patent because it's code listings only provided content manifestation environments with one window object and (2) elements 1E, 1F and 1H because it did not disclose window objects with multiple controllable attributes.  (*Id.* at 96-97, 102-08.)

43

multiple controllable attributes and are capable of refreshing independently of other content. This will decide the validity of claim 1 of the '493 Patent.  (*See generally* Anticipation & Obviousness Mem. at 96-97, 102-08 (the JavaScript Bible did not anticipate elements 1D, 1E, 1F and 1H of the '493 Patent because it's individual source code listings failed to teach content manifestation environments with multiple window objects with multiple controllable attributes).) Then, if necessary, the Court will determine the validity of the other claims in the '493, '563, and '882 Patents that are still at issue.

### b.      Claim 1 of the '493 Patent Is Invalid Under § 103(a)

As the following analysis demonstrates, the prior art of record, when viewed through the lens of one skilled in the art, renders claim 1 of the '493 Patent obvious as a matter of law.  The prior art makes content manifestation environments featuring multiple window objects with multiple controllable attributes obvious to one skilled in the art, rendering elements 1A through 1H of the '493 Patent obvious.  35 U.S.C. § 103(a).  The prior art also invalidates element 1I of the '493 Patent by making window objects that refresh independently of other content obvious to one skilled in the art.  *Id.*

### (1)      The Multiple Window Objects With Multiple Controllable Attributes Requirement

Element 1D of the '493 Patent,[28] which requires multiple window objects with multiple controllable attributes, that remain solely contained within their content manifestation environment would have been obvious to one skilled in the art before January 21, 1999, the date the '493 Patent was filed.  As discussed below, element 1D is rendered obvious in light of the

---

[28] As a point of reference, element 1D of the '493 Patent provides: "to process said software system and said associated content to produce window objects solely contained within said content manifestation environment."  '493 Patent Cl. 1.

JavaScript Bible in combination with the Visual DHTML reference, as well as a combination of the Meininger reference, Visual DHTML reference, and JavaScript Bible.

**(a)**      **One Skilled in the Art would Find Element 1D Obvious in Light of the JavaScript Bible and Visual DHTML Reference**

One skilled in the art could piece together the source code listings disclosed in the JavaScript Bible to create a content manifestation environment featuring multiple window objects, with multiple controllable attributes. *See generally KSR*, 127 S. Ct. at 1742 ("Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed."); *Translogic*, 504 F.3d at 1262 (citing *KSR* for the propositions that: (1) a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ and (2) one skilled in the art would solve a design need by pursuing known options within her technical grasp). She could then combine these teachings with the Visual DHTML reference to create window objects that remained solely contained within their content manifestation environments. More particularly, as set forth below, one skilled in the art could combine listing 19-11, which discloses a single draggable window object, with listing 19-12,[29] which discloses a stationary resizable window object, and other portions of the JavaScript Bible to create a content manifestation environment with multiple window objects, each of which can be dragged and resized. (*See* JavaScript Bible at CA 1085577-82.)

To begin with, one skilled in the art would identify how: (1) layer type window objects are created in the JavaScript Bible; (2) the window object in listing 19-11 is made draggable; and

---

[29] As listing 19-12 of the JavaScript Bible incorporates listing 19-13, the two will be referred to as listing 19-12. (JavaScript Bible at CA 1085580-82.)

45

(3) the window object in listing 19-12 is made resizable.  Upon isolating these portions of relevant source code, she could apply her knowledge and analytical skills to create a content manifestation environment featuring multiple window objects, each of which can be dragged and resized but remain solely contained within their content manifestation environment.

One skilled in the art could easily understand Chapter 19 of the JavaScript Bible and use it to create multiple layer type window objects.  The JavaScript Bible provides that the "content of an individual layer can be changed or replaced on the fly without affecting other layers; and the entire layer can be repositioned, resized, or hidden under script control."  (JavaScript Bible at CA 1085544.)  The JavaScript Bible goes on to provide numerous source code listings, some of which feature layers that qualify as window objects (*i.e.* listings 19-11 and 19-12) and others which do not.  (*See generally id.* at CA 1085545 (disclosing the source code used to create one primitive Netscape layer and then disclosing the source code used to create multiple "nested" layers.))  In other words, creating a content manifestation environment with multiple layer type window objects would be as easy as combining the source code from listing 19-11 with listing 19-12, a routine task for one skilled in the art.  The focus now turns to whether one skilled in the art could isolate and adapt the functionalities in the source code listings disclosed in the JavaScript Bible.

The JavaScript Bible states that the "`layer.moveTo( )` method" shown in listing 19-11 "lets you click and drag a layer around the screen."  (*Id.* at CA 1085577.)  As shown in the excerpt below, the JavaScript Bible also explains how the "`dragIt( )` function" disclosed therein can be used with the `layer.moveTo( )` method to create a moveable window object.

> During the drag `...`, the `dragIt( )` function checks whether
> the drag mode is engaged.  If so, the layer is moved to the page
> location calculated by subtracting the original downstroke offset
> from the mouseMove event location on the page.  When the user
> releases the mouse button, the mouseUp event turns off the drag
> mode `. . . .`

(JavaScript Bible at CA 1085578.)[30]  As such, one skilled in the art would be familiar with the

source code in listing 19-11 and capable of applying  the `layer.moveTo( )` method and the

`dragIt( )` function to another source code listing, *e.g.*, listing 19-12, as well as her own

software.  (*Id.* at CA 1085578-79.)  The focus now turns to determining whether one skilled in

the art could isolate the source code in listing 19-12, which makes a window object resizable.

The JavaScript Bible states that the "`layer.resizeBy( )` and `layer.resizeTo(`

`)` methods . . . control the size of the clipping region of [a] layer."  (*Id.* at CA 1085579.)  These

methods alter the length and or width of a layer type window object.  (*Id.* at CA 1085579 - 80.)

The source code in listing 19-12 expressly shows one skilled in the art how to implement these

"methods" to create a resizable layer type window object.  (*Id.* at CA 1085580-82.)  In fact, one

skilled in the art could also use the teachings of listings 19-4 and 19-5, which disclose techniques

for altering the size and location of a "layer" element, to make a window object resizable.[31]  (*See*

*Id.* at CA 1085554-61 ("The layer.clip property is itself an object . . . with six geographical

---

[30] In laymen's terms, the `dragIt( )` function keeps track of: (1) when a user places a
mouse cursor over a layer type window object; (2) clicks down on the mouse button; (3) drags
the mouse cursor and window object to a new location in the content manifestation environment;
and (4) releases the mouse button.  Once the mouse button is released, the window object will
cease to be dragged and lay to rest in its new location.

[31] In the context of listings 19-4 and 19-5, the "layer" elements disclosed therein are not
layer type window objects but one skilled in the art could still apply the teachings of those code
listings to the layer type window objects disclosed in listings 19-11 and 19-12 as well as other
prior art like the Meininger and Visual DHTML references.

properties defining the position and size of a rectangular area of a layer visible to the user.").)

To summarize, one skilled in the art could easily identify the source code disclosed within the

JavaScript Bible that is used to make a window object movable and/or resizable.  *Cf. KSR*, 127 S.

Ct. at 1742; *Translogic*, 504 F.3d at 1262.  The focus now turns to the Visual DHTML reference

because the Court must address whether the movable and resizable window objects taught by the

JavaScript Bible can be made to remain solely contained within their content manifestation

environment.

      The record evidence makes clear that the analytical prowess of one skilled in the art

would lead such a person to take the following source code from the Visual DHTML reference,

which checks to see whether a window element is being dragged outside its content

manifestation environment, and adapt it to implement a boundary checking algorithm.  (Dkt. No.

620 ("Second Goodman Supp. Decl."), at 9-10.)

```
function cDrag(e) {
      var x = window.innerWidth;
      var y = window.innerHeight;
      if(e.pageX > -5 && e.pageY > -5 &&
e.pageX < x && e.pageY < y) {
            d.cDragLayer.moveBy(e.pageX-
d.offX,e.pageY-d.offY);
      } else {
            if(d.cDragLayer.that.dialogMorph) {
                  cDragEnd(e);
                  dialogWinMorph(e, this);
            }
      }
```

(Second Goodman Supp. Decl. at 19-10.)  Moreover, the widely publicized book entitled

JavaScript: the Definitive Guide, provides a brief two page example of how to implement source

code which prevents a "Screen object" from moving outside its content manifestation

environment.  (2008 Goodman 103 Decl., ¶¶ 33, 39-40 & n.3; 2008 Goodman 103 Decl., Ex. 5,

Dkt. No 789-27, CA 1086434-35 ("JavaScript: the Definitive Guide").)  As the record evidence contains at least two examples of source code that one skilled in the art could easily implement to ensure that a window object remains solely contained within its content manifestation environment, it is clear that the solely contained within requirement was known to those skilled in the art prior to January 21, 1999.

To summarize, a combination of the JavaScript Bible and the Visual DHTML reference would render element 1D of the '493 Patent obvious to one skilled in the art because they teach a content manifestation environment featuring multiple window objects with multiple controllable attributes that remain solely contained within their content manifestation environment.  *Cf. KSR*, 127 S. Ct. at 1742; *Translogic*, 504 F.3d at 1262; *see also generally* Anticipation & Obviousness Mem. at 22-24, 55-59 (The fact that the Meininger and Visual DHTML references disclose content manifestation environments featuring multiple window elements is further proof that one skilled in the art would be capable of creating a content manifestation environment that satisfies element 1D of the '493 Patent.).  The focus now turns to the Meininger reference.

> **(b)** **One Skilled in the Art Would Find Element 1D Obvious When Considering the Meininger Reference in Light of the JavaScript Bible and Visual DHTML Reference**

The Meininger reference did not anticipate element 1D of the '493 Patent because it failed to disclose window objects that acted independently of other content and remain solely contained within their content manifestation environment.  (Anticipation & Obviousness Mem. at 48-50.)  As window elements in the Meininger reference turned invisible when they were minimized: (1) they could not be restored independently of other content and (2) could not be considered window objects, which must be able to perform their acts without being constricted

by other content in the same HTML document.  (Claim Constr. Mem. at 46-48; Anticipation &

Obviousness Mem. at 48-52.)  Moreover, as window elements in the Meininger reference could

be dragged outside their content manifestation environments, they failed to satisfy the solely

contained within requirement of element 1D of the '493 Patent.  (*Id.* at 47-52.)  In view of the

foregoing, the issue becomes whether one skilled in the art could apply her analytical prowess to

a combination of the Meininger reference, Visual DHTML reference and JavaScript Bible to

ensure that window elements in the Meininger reference can be restored independently of other

content and remain solely contained within their content manifestation environments.

One skilled in the art would be able to modify the window elements in the Meininger

reference so that they satisfied element 1D of the '493 Patent.  For example, she could make

window elements in the Meininger reference restore independently of other content by ensuring

that they are not made invisible when they are minimized.  (*See* Decl. of Danny Goodman In

Supp. of Pl.'s Opp'n to Defs.' Mot. for Summ. J. (Dkt. No. 362) ("Goodman Invalidity Decl."), ¶

25 (explaining that window elements in the Meininger reference are hidden when they are

minimized).)  To do this she would likely: (1) reduce the size of a window object; (2) make only

a portion of it invisible; or (3) in the context of module type window objects, which contain

controls sections and content display sections, hide their content display sections when a user

selects the minimize option from the control section.  Indeed, none of these solutions would lead

to a cumbersome experience for the user.  *Ball Aerosol*, 2009 U.S. App. LEXIS 2257 at *16

(*quoting KSR*, 127 S.Ct. at 1742) ("As explained in *KSR*, '[w]hen there is a design need or

market pressure to solve a problem and there are a finite number of identified, predictable

solutions, a person of ordinary skill has good reason to pursue the known options within . . . her

technical grasp.'"); *but see* Simple's 103 Opp'n at 40 (arguing that options used to make prior art window elements meet the requirements of element 1D of the '493 Patent would lead to a "cumbersome experience for the user").  These techniques are clearly disclosed by the JavaScript Bible in listing 19-12, which teaches how to resize a layer type window object, as well as listings 19-4 and 19-5 which also teach one skilled in the art how to adjust the visible areas of a window object.  (JavaScript Bible at CA 1085580-82, CA 1085554-61.)  In addition, as shown in the excerpt below, the JavaScript Bible teaches how to restore a window element to its previous size and location values.  (*Id.*)

> I preserve the initial values for a somewhat advanced set of functions that act in response to the Reveal Original Layer button. The goal of the button is to temporarily shrink the clipping area to nothing, and then expand the clip rectangle gradually from the very center of the layer. . . .
> To make sure the animation stops when the layer is at its original size, I check whether the clip.top and clip.left values are their original . . . values. . . .

(*Id.* at CA 1085557-58.)  One skilled in the art would also understand what portions of the source code found in listing 19-4 could be used to preserve to initial size and position coordinates of a window object that must be restored.  (JavaScript Bible at CA 1085555-57.)  In laymen's terms, the JavaScript Bible teaches one skilled in the art how to: (1) shrink a layer; (2) make portions of a layer invisible; (3) store the location and size of a layer in the computer's memory; as well as (4) how to enlarge and move a layer back to its original position before it was minimized/shrunk.  Accordingly, the record evidence establishes, as a matter of law, that one skilled in the art could combine the teachings of the Meininger reference and the JavaScript Bible to create window objects that could be restored independently of other content.  *Cf. Translogic*, 504 F.3d at 1256-62 (one skilled in the art would be able to fill the gap found in one

prior art article with the teachings of a prior art textbook); *KSR*, 127 S. Ct. at 1742 (one skilled in the art could use her analytical prowess to combine the teachings of multiple patents).[32]

### (c)     Elements 1E, 1F, and 1H Are Also Obvious

As element 1D of the '493 Patent would have been obvious to one skilled in the art during the relevant time period, it follows that elements 1E, 1F and 1H of the '493 Patent are also invalid.  The Court found that those claim elements were not anticipated because the JavaScript Bible failed to disclose multiple window objects with multiple controllable attributes in *one* source code listing.  (Anticipation & Obviousness Mem. at 96-97, 107-08.)  While it was inappropriate to combine the *distinct* source code listings in the JavaScript Bible in evaluating CA's motion for summary judgment of anticipation, it would be appropriate to do so when determining obviousness.  *See Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008).  Accordingly, upon considering the prior art as a whole, it is clear that elements 1D, 1E, 1F and 1H of the '493 Patent would be obvious to one skilled in the art.  Accordingly, the focus shifts to element 1I of the '493 Patent.

### (2)     The Without Refresh Requirement

To determine whether the record evidence clearly establishes that one skilled in the art would find element 1I of the '493 Patent to be obvious in light of the prior art of record, the Court starts with the following observations: (1) the window elements of the Meininger and

---

[32] The record evidence also makes clear that one skilled in the art could modify the window elements in the Visual DHTML reference so that they are not made invisible when they minimized.  Similar to the the Meininger reference, one skilled in the art could merely reduce the size of a window element in the Visual DHTML reference when it was minimized and then return it to its previous size and location when it was restored or hide its content display section when a user selects the minimize option and then make it reappear once a user selects the restore option from the same control section.

Visual DHTML references can statically display content, be moved, and be minimized without triggering a refresh of the content manifestation environment (*see* Anticipation & Obviousness Mem. at 52-54, 73-74); and (2) window objects in the JavaScript Bible can statically display content, be moved, and be resized without triggering a refresh (*see id.* at 95-96).  The question then becomes whether the prior art discloses a window object whose dynamic data content can be refreshed independently, as in, without triggering a refresh of the entire content manifestation environment.  (*See* Simple's 103 Opp'n at 43-44.)

The answer is clear and would be understood as a truism by one skilled in the art.  To wit, the JavaScript Bible points out that the "content of an individual layer can be changed or replaced on the fly without affecting the other layers; and the entire layer can be repositioned, resized, or hidden under script control."  (JavaScript Bible at CA 1085544, 1085566 ("Changes to the inner layer content affect only that layer. ").)  As demonstrated by the JavaScript Bible, one skilled in the art would know that the data content (images, text, sound, etc.) of a layer can be changed, updated and refreshed independently of other content (other layers, data content, etc.).

The question is whether that data content can be displayed dynamically.  Once again, the answer as a matter of law is yes.

The Goodman Invalidity Declaration cites to numerous prior art references that teach the dynamic display of content through the use of an external link by utilizing the "SRC" property of a layer.  (*E.g.*, Goodman Invalidity Dec. ¶¶ 31, 60, 81; *see also* Goodman Invalidity Rep. at 15-16 (describing how image content can be dynamically changed without triggering a refresh).)[33]

---

[33] The following is a sampling of some of the prior art references that teach one skilled in the art how to display dynamic content in a layer through the use of the "SRC" property.

The following passage from JavaScript: the Definitive Guide is particularly insightful.

> Because every layer contains an independent document, you can dynamically update the [data] contents of the layer with the `open ( )`, `write ( )`, and `close ( )` methods of the Document object . . . . In addition the `src` property of a Layer specifies the URL of the document that it displays.  By setting this property, you can force the browser to load an entirely new document for display in the layer.  The `load ( )` method is similar: it loads a new URL and changes the layer's width at the same time.  Because layers often contain dynamically generated content, you may find it convenient to use `javascript:` URLs with the `src` property and `load ( )` method.

(JavaScript: the Definitive Guide at CA 1086516; *see also* Goodman Invalidity Rep. at 49

("[T]he `src` property and `load()` method of a layer object, used to load external HTML

content into a layer element under script control.  By their very definition, elements that have src

attributes are designed to render their dynamic or static content in the browser ") (citations

omitted).)  CA's expert, Danny Goodman was also able to use the Visual DHTML reference to

dynamically display content.  (Exhibit 8A to the Decl. of Danny Goodman. in Supp. of Pl.'s

Mot. Summ. J. of Invalidity (Dkt. No. 332-18) ("Visual DHTML Claim Chart"), at 13-15 (14 to

16 of 85); *see also infra* § III.B.2.c.(1).(c) at 60-64.)[34]  In short, the record evidence makes clear

---

- "This method allows us to dynamically change the contents of the dynamic element." (JavaScript: the Definitive Guide at CA 1086519.)
- "The **SRC** property brings external content into a layer. **SRC**=*URL* indicates which Web address the layer should link to; all of the content that **SRC**=*URL* refers to to is brought into the layer." (Dkt. No. 362-46 ("DHTML Black Book"), at CA 1115868.)
- "A person of ordinary skill in the art would have experience with Web addresses delivering either static or dynamic content" (Goodman Invalidity Decl. ¶ 81 (citing U.S. Pat. No. 6,031,989 cols. 7-9 ("'989 Patent").)
- "src="http://www.msn.com/nestldoc.htm" will display that website within an 'i-frame'" 989 Patent col. 9 ll. 55-57, col. 10, ll. 14-16.

[34] The Visual DHTML Claim Chart uses pagination that resets itself every time its author addresses the validity of an independent claim and its associated dependent claims.  For

that the contents of a layer can be refreshed and dynamically updated independently of other content.

To summarize, the record evidence makes clear that claim 1 of the '493 Patent would be obvious to one skilled in the art before January 21, 1999. In other words, one skilled in the art, looking to take advantage of new technologies such as version 4.0 web browsers in combination with DHTML standards, and seeking to improve upon the state of the art would be motivated to and clearly capable of applying her analytical prowess to create the subject matter described in claim 1 of the '493 Patent.

### c.     The Remaining Claims at Issue

The Court now turns to the task of determining which of the remaining "asserted claims" at issue from the '493, '563, and '822 Patents are invalid under § 103(a). The asserted claims from the patents in suit include: "claims 1, 3-5, 7-9 and 11-13 of the '493 Patent; claims 1, 2, 5-10 and 12-14 of the '563 Patent; and claims 1, 2, 5-10, 12-14 and 16-17 of the '882 Patent." (Simple's 103 Opp'n at 1 n.1.)[35] However, as the Court has already found that claims 1, 5, 6, 7, 8, 9, 12 and 13 of the '563 Patent as well as claims 1, 5, 16 and 17 of the '882 Patent are invalid as anticipated, the present analysis need only address whether: claims 3-5, 7-9 and 11-13 of the '493 Patent, claims 2, 10 and 14 of the '563 Patent as well as claims 2, 6-10 and 12-14 of the '882 Patent would be obvious to one skilled in the art before January 21, 1999. (*See*

example, the following citation, "***Visual DHTML Claim Chart at 11*** (12 of 85)" corresponds to Goodman's discussion of claim 4 of the '493 Patent. The parenthetical "(***12 of 85***)" is numbered to correspond to the electronic format of this exhibit which contains 85 total pages and was added to avoid confusion.

[35] Although the parties disputed which claims were at issue in their objections to the Infringement R&R, they do not do so here. As such, the Court need not address the validity of every claim addressed in its Infringement Memorandum.

Anticipation & Obviousness Mem. at 184.)

For purposes of determining whether the remaining claims at issue are invalid, the Court adopts and applies its analysis from the Anticipation & Obviousness Memorandum comparing the independent claims of the patents in suit.  (*Id.* at 108-37; *see also id.* at 137-38 (describing the relationship between independent and dependent claims).)  Suffice it to say, prior art that is capable of rendering claim 1 of the '493 invalid under either § 102 or 103 of the Patent Act will also invalidate the remaining claims at issue.[36]

To help shorten the remainder of this discussion, the reader must bear in mind that the record evidence already establishes that every independent claim of the patents in suit is invalid. Accordingly,  the Court's obviousness determination turns on whether the limitation/(s) added by the dependent claim at issue would have been obvious to one skilled in the art.  As the validity of every other element of the claim would have been discussed, there would be no need to repeat that analysis.

### (1)      Claims 3-5, 7-9 and 11-13 of the '493 Patent

The following analysis will address the validity of the remaining claims in the '493 Patent *seriatim*.

### (a)      Claim 3 of the '493 Patent is Invalid

Claim 3, like claims 2 through 13 of the '493 Patent, depends from claim 1.  Claim 3 is directed to the "system according to claim 1, wherein said at least one window object is derived based on *instructions* processed by said web browser client."  '493 Patent Cl. 3 (emphasis added).  In laymen's terms, claim 3 contains every limitation from claim 1 *and* requires that at

---

[36] This includes claims in the '563 and '883 Patents.

least one of the window objects referred to in claim 1 be *created* by the web browser hosting its content manifestation environment. *See generally* 35 U.S.C. § 112 ¶ 4 (describing the relationship between dependent claims and independent claims).  The *creation* occurs when a web browser processes source code instructions found in a data stream and/or source code files. (Visual DHTML Claim Chart at 11 ("These *instructions* can be found in the software system and/or content that is downloaded from the server system.").)

The record evidence clearly establishes that claim 3 of the '493 Patent is obvious.  The following excerpt from the Visual DHTML Claim Chart provides but one example of how the Visual DHTML reference creates a window object by processing instructions from a source code file.

> For example, the "Visual DHTML" website creates its window objects through the JavaScript modules props.js and dialog.js. Examples of the window objects resulting from processing of the source code instructions can be seen at pages CA130057, 130067, 130068, and CA1108976.[37]

(*Id.* at 11 (12 of 85).)  One skilled in the art would also know that the source code listings disclosed in the JavaScript Bible can be processed, by a web browser, to create content manifestation environments featuring one or more window objects.  (*See* JavaScript Bible at CA 1085161, CA 1085200, CA 1085577; Anticipation & Obviousness Mem. at 111-15, 143;  *see also generally* DHTML Black Book at CA 1115494.)  Since, the record evidence clearly establishes that one skilled in the art would be able to create window objects "based on *instructions* processed by said web browser client," the record evidence makes clear that claim 3

---

[37] Although the Court did not find that the Visual DHTML reference disclosed window objects, a combination of the Visual DHTML reference with the JavaScript Bible discloses window objects.

of the '493 Patent is invalid under § 103(a).   '493 Patent Cl. 3 (emphasis added).

**(b)      Claim 4 of the '493 Patent Is Invalid**

The focus now turns to claim 4 of the '493 Patent, which is directed to:

> The system according to claim 1, wherein said associated content includes ***at least one address of a network content source*** that is configured ***to download information*** to said data processing system via said electronic data network, ***said information to be manifested within*** said ***at least one window*** within said content manifestation environment.

'493 Patent Cl. 4 (emphasis added).   The following chronology helps place claim 4 in laymen's terms: (1) a web browser receives content; (2) this content includes the address or location of a "network content source"; (3) the web browser then connects to and "download[s] information" from the "network content source" via an electronic data network such as the Internet; and (4) at least one window object in the claimed content manifestation environment then "manifest[s]" this information.   (*See generally* Anticipation & Obviousness Mem. at 144-45 (discussing how claim 9 of the '563 Patent, which is very similar to claim 4 of the '493 Patent, is anticipated by the JavaScript Bible).)   Generally speaking, the only difference between claims 1 and 4 of the '493 Patent is that claim 4 requires that the content displayed by "***at least one window***" in the claimed content manifestation environment be from an external network content source.   Having placed claim 4 in context, the Court turns to whether its claimed subject matter would be obvious to one skilled in the art.

For claim 4 to be obvious, the record evidence would have to teach the functionality which loads content from an external data source into a window object.   At the least, both the JavaScript Bible and Visual DHTML reference accomplish this task.   As discussed in the Anticipation & Obviousness Memorandum, listing 19-12 of the JavaScript Bible discloses the

58

"`layer.load ( )`method" as a way in which one skilled in the art could "put new content into a layer" type window object from another file, including an external "***network content source***." (Anticipation & Obviousness Mem. at 144-45; JavaScript Bible at CA 1085566, CA 1085580-82.) The following excerpt describes how the Visual DHTML reference teaches one skilled in the art to draw the content of a layer from an external "***network content source***."

> The *associated content* includes the *address of a network content source*, e.g., CA130069-71. ***A user may directly input a URL address to identify the network content source when using the "Visual DHTML" online tool*** to create his own DHTML web page.
>
> A user could select the type of page he wanted to create from the "New Page" menu, then select "Layer" from the "Components Palette" (opened when "Widgets" is clicked). ***Doing so opens an input form that enables users to assign the "URL=http://www.yahoo.com," among other of the layer's controllable attributes***. CA1108975. This ***URL specified the address of a network content source***, in this example the Yahoo! home page, that was ***configured to download information that manifests static content within a window object***. "Visual DHTML" has created a layer element, which is absolute positioned and has a network content source that downloads information from a server.
> . . .
>
> The information is displayed (*manifested*) within a *window object* that is rendered within the content display window (*content manifestation environment*). The *network content source* for the *window object* includes at least one *address* as identified on CA1108975. As shown on page CA1108976, the Yahoo home page is displayed (*manifested*) within a *window object* within the *content manifestation environment*. This window object was created using the "Visual DHTML" web-authoring tool.

(Visual DHTML Claim Chart at 11-12 (12-13 of 85) (***emphasis added*** *and in original*)[38]; *see*

---

[38] The Court added emphasis to text it felt was relevant by placing it in ***bold and italic*** font while the Visual DHTML Claim Chart emphasized text by *italicizing* it.

*also* CA 1108976; discussion *supra* § III.B.2.b.(2) at 52-55 (citing JavaScript: the Definitive

Guide at CA 1086516; Goodman Invalidity Rep. at 49; Goodman Invalidity Dec. ¶¶ 31, 60, 81;

DHTML Black Book at CA 1115868; 989 Patent cols. 7-9, col. 9 ll. 55-57, col. 10, ll. 14-16).)

Although the content layer in the Visual DHTML reference displaying Yahoo!

("***URL=http://www.yahoo.com,***") is not a window object, it is clear that this can be combined

with the teachings of the JavaScript Bible and Meininger reference to display content from an

external network content source in a window object as required by claim 4.  In view of the

foregoing, claim 4 of the '493 Patent is obvious.

### (c)       Claim 5 of the '493 Patent Is Invalid

Turning to Claim 5, the Court notes that it is very similar to claim 4 of the '493 Patent.  It

is also invalid for many of the same reasons.

| Claim 4 | Claim 5 |
| --- | --- |
| The system according to claim 1, wherein said associated content includes at least one address of a network content source that is configured to download information to said data processing system via said electronic data network, said information to be manifested within said at least one window within said content manifestation environment. | The system according to claim 1, wherein said associated content includes at least one address of a network content source that is configured to download information to said data processing system via said electronic data network, said information to be ***dynamically and continuously*** manifested within said at least one window ***object*** within said content manifestation environment. |

'493 Patent, Cls. 4, 5.  As the emphasized text above indicates, the only difference between

claims 4 and 5 is that claim 5 requires that the data content retrieved from the "network content

source" be "***dynamically and continuously*** manifested" within a window object.  '493 Patent Cl.

5.  Since the record evidence already establishes that the prior art discloses the ability to

"***dynamically and continuously***" display content from an external network content source in a

window object, it is clear that claim 5 of the '493 Patent is invalid under § 103(a).  (*See* discussion *supra* § III.B.2.b.(2) at 52-55 & n. 33; Goodman Invalidity Rpt. at 45 ("By their very definition, elements that have src attributes are designed to render their dynamic or static content in the browser."); Decl. of Danny Goodman in Supp. of Pl.'s Mot. Summ. J. of Invalidity, Ex. 11A (Dkt. No. 332-24) ("JavaScript Bible Claim Chart"), at 12 (13 of 86) ("The SRC attribute could be assigned to any URL . . . the content would [be] downloaded [and] dynamically and continuously manifested . . . .").)[39]  The Court reinforces its conclusion with visual evidence.

The following sequence of figures provides one example of how the Visual DHTML reference teaches one skilled in the art to load dynamic content onto a window object.  In **Figure 2**, a screen shot from a DVD exhibit provided by CA in support of its motion for summary judgment of invalidity under § 102(a), Goodman begins by setting the SRC attribute to http://dpreview as the source URL.  (Dkt. No. 332-3, Ex. 4 ("2004 Invalidity Decl. DVD"); Dkt. No. 362-9 at CA 1108974-76.)

---

[39] In other words, one skilled in the art could, among other options, easily use the "SRC" attribute to create a window object that "***dynamically and continuously***" manifests data content from an external network content.

**Figure 2**



The Visual DHTML reference then launches what CA purports to be a window object that displays the Digital Photograph Review web page.  As **Figures 3 and 4** below show, the data content of the Digital Photograph Review web page changes over time but is still continuously displayed.

**Figure 3**



**Figure 4**



In particular, the image of a data chip or memory drive in **Figure 3** is dynamically changed to a checkered flag in **Figure 4**. In light of the irrefutable proof that the SRC attribute of a window object can be utilized to link and display dynamic content, it is clear that claim 5 of the '493 Patent is invalid under § 103(a). The focus now turns to claims 7, 8 and 9 of the '493 Patent.

(d)     **Claims 7, 8 and 9 of the '493 Patent Are Invalid**

Claims 7, 8 and 9 of the '493 Patent will be addressed together because they are relatively similar in that they involve a controllable attribute associated with a window object. '493 Patent Cls. 7-9.  In addition, all three controllable attributes have already been discussed. (Discussion *supra* §§ III.B.2.b.(1).(a) - (b) at 45-52.)  Claim 7 is directed to "[t]he system according to claim 1, wherein said controllable attributes associated with said at least one window object permit said at least one window object to be ***moved*** within said content manifestation environment."  '493 Patent Cl. 7 (emphasis added).  In laymen's terms, claim 7 of the '493 Patent requires that at least one window object in the claimed content manifestation environment be movable.  As the following chart shows, claims 8 and 9 are very similar but are directed to the users ability to ***resize*** and ***minimize*** a window object.

| Claim 7 | Claim 8 | Claim 9 |
|---|---|---|
| The system according to claim 1, wherein said controllable attributes associated with said at least one window object permit said at least one window object to be ***moved*** within said content manifestation environment. | The system according to claim 1, wherein said controllable attributes associated with said at least one window object permit said at least one window object to be ***resized*** within said content manifestation environment. | The system according to claim 1, wherein said controllable attributes associated with said at least one window object permit said at least one window object to be ***minimized*** within said content manifestation [environment]. |

'493 Patent, Cls. 7-9 (emphasis added).  Since the record evidence clearly establishes that: (1) the Java Script Bible teaches one skilled in the art to create a content manifestation with multiple window objects, one of which is movable and/or resizable (discussion *supra* § III.B.2.b.(1).(a) at 45-49; *see generally* Anticipation & Obviousness Mem. at 87-92 (explaining how listing 19-11 discloses a movable window object and how listing 19-12 discloses a resizable window object))

and (2) either the Meininger reference or Visual DHTML reference can be combined with the

JavaScript Bible to teach one skilled in the art how to make window objects that can be

minimized independently of other content (discussion *supra* § III.B.2.b.(1).(b) at 49-52), claims

7, 8 and 9 of the '493 Patent are invalid under § 103(a) of the Patent Act as a matter of law.

### (e)        Claim 11 of the '493 Patent Is Invalid

The focus now shifts to claim 11 of the '493 Patent, which covers "[t]he system

according to claim 1, wherein the electronic data network is the Internet."  The only difference

between claims 1 and 11 is that the "web browser client operative to receive" the "software

system and said associated content" in the latter must be specifically configured to receive

content via the Internet (as opposed to ***any*** electronic data network).  This is noteworthy for two

reasons.  First, the Court has already found that the JavaScript Bible teaches the use of the

Internet in implementing its source code listings.  (Anticipation & Obviousness Mem. at 139-40;

JavaScript Bible Claim Chart at 16-17 (17-18 of 86); *see also*, *e.g.*, JavaScript Bible at CA

1085186, 1085200.)  Second, as discussed in the excerpt below, the Visual DHTML reference

***requires*** the use of the Internet in order to implement its content manifestation environment.

> Successfully accessing and viewing "Visual DHTML" requires
> that one be connected to the *Internet*.  A person of ordinary skill in
> the art would know that it was necessary to connect a *web browser
> client* to a *server system* via the *Internet* to access the "Visual
> DHTML" website.  The *Internet* is a global system consisting of
> computers, software, and the physical connections that link them
> all together.

(Visual DHTML Claim Chart at 17-18 (18-19 of 85)).  As such, the record evidence makes clear

that claim 11 of the '493 Patent would be obvious to one skilled in the art in light of a

combination of the Visual DHTML reference and JavaScript Bible.

**(f)      Claim 12 of the '493 Patent Is Invalid**

The Court now turns to claim 12, which covers "[t]he system according to claim 1, wherein said at least one window object is a tiled window object."  Like the Special Master, the Court found that the patents in suit did not disclose window objects capable of remaining tiled without being constrained by other content in the same HTML document.  (Claim Constr. Mem. at 51-56.)  In addition, windows that remain constrained to a tiled/grid format cannot be window objects because their motion is constricted.  (*See generally* Infringement Mem. at 47-48 (reasoning that the source code which makes "portlets snap into a grid alignment" prevents them from being moved independently of other content).)  Accordingly, for claim 12 to be invalidated, the prior art need only disclose window objects that can be positioned next to but not on top of each other.

The record evidence makes clear that claim 12 of the '493 Patent is invalid.  As shown below in **Figure 5,**[40] the Visual DHTML reference teaches window elements that can be placed next to each other so that they do not overlap.

---

[40]**Figure 5** is a screen shot from the 2004 Invalidity Declaration DVD.

67

**Figure 5**



Accordingly a combination of the JavaScript Bible and Visual DHTML reference renders claim

12 of the '493 Patent invalid under § 103(a) of the Patent Act.

**(g)      Claim 13 of the '493 Patent Is Invalid**

The Court's analysis now shifts to claim 13 of the '493 Patent, which covers "[t]he

system according to claim 1, wherein said at least one window object is a ***draggable*** window

object."  '493 Patent Cl. 13 (emphasis added).  Claim 13 is invalidated by a combination of a

combination of the Visual DHTML and/or Meininger reference with the JavaScript Bible and

*vice versa*.  To begin with, the record evidence clearly establishes that the Meininger and Visual

DHTML references disclose ***draggable window elements***.  (*See* discussion *supra* §§

III.B.2.b.(1).(a)-(b) at 45-52.)  Moreover, as it is clear that the ***window elements*** in the Visual

DHTML and Meininger references can be made to act independently, when combined with the JavaScript Bible, those references also render ***draggable window objects*** obvious to one skilled in the art.  (*See* discussion *supra* §§ III.B.2.b.(1).(a)-(b) at 45-52.)  Accordingly claim 13 would be obvious to one skilled in the art.  (*Id.*)

### (2)     Claims 2, 10 and 14 of the '563 Patent Are Invalid

Turning to the '563 Patent, the Court must evaluate the validity of claims 2, 10 and 14. Each will be addressed below *seriatim*, with its associated independent claim.

### (a)     Claim 2 Is Invalid

As claim 2 of the '563 Patent depends from claim 1, they will be discussed together. Claim 1 of the '563 Patent is directed to:

> 1. A network client configured to operate within a data processing system and to receive content from a remote server system to facilitate a windowed content manifestation environment, comprising:
> > **[A]** a content retrieval module configured to receive content from a network server system via an electronic data network; and
> > **[B]** a processing engine coupled to said content retrieval module configured to provide a content manifestation environment within the data processing system,
> > **[C]** to process said content to produce at least one corresponding window object within said content manifestation environment,
> > **[D]** said at least one corresponding window object configured to manifest at least a portion of said content therein without requiring said content manifestation environment to be refreshed,
> > **[E]** said at least one corresponding window object is associated with a controllable attribute,
> > **[F]** said controllable attribute configured to permit said at least one corresponding window object to be controlled as a result of performing at least one of a moving operation, a resizing operation, a minimizing operation, or a maximizing operation within said content manifestation

environment.

'563 Patent Cl. 1 (bracketed text and formatting added to facilitate analysis).  In its Anticipation & Obviousness Memorandum, the Court determined that prior art that renders Claim 1 of the '493 Patent invalid is also capable of invalidating the independent claims of the '563 and '882 Patents.  (*See* Anticipation & Obviousness Mem. at 108-52.)  As the excerpt below indicates, this is because the claims of the patents in suit share many similarities.

> [For example] claims 1 and 6 of the '563 Patent are nearly identical to each other and highly analogous to claim 1 of the '493 Patent.  All these claims are directed to a content manifestation environment featuring at least one window object.  They differ, however, in that Claim 1 of the '493 Patent requires multiple window objects associated with multiple controllable attributes that remain solely contained within their content manifestation environment, while claims 1 and 6 of the '563 Patent only require a window object (elements 1C and 6C) associated with a single controllable attribute (elements 1F and 6E)

Anticipation & Obviousness Mem. at 124; *compare* '563 Patent Cl. 1 *with* '493 Patent Cl. 1.[41]

Accordingly, as the Court has already found that claim 1 of the '563 Patent is anticipated by the JavaScript Bible, it need only determine whether the additional limitation found in claim 2 would also be obvious to one skilled in the art.

Claim 2 of the '563 Patent covers:

> The network client according to claim 1, wherein said processing engine is further configured to process said content to produce a ***control section and a content display section within*** said at least ***one*** corresponding ***window object***, said content display section configured to manifest at least a portion of said content therein, said ***control section including*** a ***set of at least one control***

---

[41] Since web browsers contain content retrieval modules and processing engines, the fact that the '563 Patent claims a network client while the '493 Patent claims a system does not alter the Court's obviousness determination.  (Anticipation & Obviousness Mem. at 109-15, 113 n.46.)

70

> corresponding to a set of attributes which operate to affect
> manifestation of said at least one window object and at least a
> portion of said content within said content display section.

'563 Patent Cl. 2 (emphasis added).  Generally speaking, claim 2 requires the window object/s

referred to in claim 1 have a control section.  The JavaScript Bible did not anticipate claim 2 of

the '563 Patent because, taken alone, it did not disclose a control section.  (Anticipation &

Obviousness Mem. at 139.)  Nevertheless, the Visual DHTML and Meininger references both

disclose control sections.  Accordingly, the JavaScript Bible in combination with Visual

DHTML reference renders claim 2 of the '563 Patent obvious.  (*See id.* at 179-80 (the Meininger

and Visual DHTML references disclose control sections); *see also* discussion *supra* §

III.B.2.b.(1).(b) at 49-52.)

### (b)     Claims 10 and 14 Are Invalid

Due to the fact that claims 10 and 14 of the '563 Patent depend from claim 6, all three

will be discussed together.  To begin with, claim 6 is directed to:

> 6. A network client configured to operate within a data processing
> system and to receive content from a remote server system to
> facilitate a windowed content manifestation environment therein,
> comprising:
>> **[A]** a content retrieval module configured to receive
>> content from a network server system via an electronic data
>> network; and
>> **[B]** a processing engine coupled to said content retrieval
>> module configured to instantiate a content manifestation
>> environment within the data processing system,
>> **[C]** to process said content to produce at least one
>> corresponding window object within said content
>> manifestation environment,
>> **[D]** said at least one corresponding window object
>> associated with a set of at least one controllable attribute
>> and configured to manifest at least a portion of said content
>> therein,
>> **[E] [1]** said set of at least one controllable attribute

71

configured to affect manifestation of said at least one
corresponding window object by the network client within
said content manifestation environment **[2]** by permitting
said at least one corresponding window object to be
controlled as a result of performing at least one of a moving
operation, a resizing operation, a minimizing operation, or
a maximizing operation within said content manifestation
environment **[3]** without requiring said content
manifestation environment to be refreshed.

'563 Patent Cl. 6 (bracketed text and formatting added to facilitate analysis).  The Court has

already determined that, for purposes of a validity determination, "claims 1 and 6 of the '563

Patent are nearly identical to each other and highly analogous to claim 1 of the '493 Patent."

(Anticipation & Obviousness Mem. at 121-25; *id* at 125 ("claims 1 and 6 of the '563 Patent are

equivalent for the purposes of anticipation because they both utilize a web browser to

***provide/instantiate*** a content manifestation environment by processing JavaScript files").)

Having placed independent claim 6 in perspective, the Court turns to its dependent claims.

Claim 10 is directed to:

The network client according to claim 6, wherein said content
includes at least one address of a network content source that is
configured to download information to said data processing system
via said electronic data network, ***said information to be
dynamically and continuously manifested*** within said at least one
corresponding window object within said content manifestation
environment.

'563 Patent, Cl. 10.   For its part, claim 14 is directed to "[t]he network client according to claim

6, wherein said set of controllable attributes associated with said at least one corresponding

window object ***permit said at least one corresponding window object to be minimized*** within

said content manifestation environment."  '563 Patent Cl. 6.  In laymen's terms, claim 10

requires that the network client described in claim 6 have a window object that "***dynamically***

*and continuously manifest*[*s*]" content, while claim 14 requires that the network client described

in claim 6 have a window object capable of being "***minimized***." *Id.* Cls. 10, 14. As the record

evidence establishes, as a matter of law, that a combination of the JavaScript Bible, Meininger

reference, and Visual DHTML reference would render them obvious to one skilled in the art

before January 21, 1999, claims 10 and 14 of the '563 Patent are invalid under § 103(a) of the

Patent Act. (*See* discussion *supra* §§ III.B.2.b at 44-55 (discussing how window objects that can

be minimized and dynamically and continuously manifest content would be obvious to one

skilled in the art), III.B.2.c.(1).(c) at 60-64 (discussing how window objects that can dynamically

and continuously manifest content would be obvious to one skilled in the art).)

### (3)   Claims 2, 6-10 and 12-14 of the '882 Patent Are Invalid

Turning to the '882 Patent, the Court must evaluate the validity of claims 2, 6-10 and 12-

14. Each will be addressed below, with its associated independent claim, *seriatim*.

### (a)   Claim 2 Is Invalid

As claim 2 depends from claim 1 of the '882 Patent, they will be discussed together.

Claim 1 is directed to:

> 1. A network client configured to operate within a data processing
> system and to receive content from a remote server system to
> facilitate a windowed content manifestation environment,
> comprising:
>> **[A]** a content retrieval module configured to receive
>> content from a network server system via an electronic data
>> network; and
>> **[B]** a processing engine coupled to said content retrieval
>> module configured to operate a content manifestation
>> environment within the data processing system,
>> **[C]** to process said content to produce at least one window
>> object within said content manifestation environment,
>> **[D]** said at least one window object configured to manifest
>> at least a portion of said content therein,

> **[E]** said at least one window object corresponding to at least one executable program object and being controlled by said processing engine without requiring said content manifestation environment to be refreshed,
> **[F]** said at least one window object is associated with a controllable attribute,
> **[G]** said controllable attribute configured to permit at least one window object to be controlled as a result of performing at least one of a moving operation, a resizing operation, a minimizing operation, or a maximizing operation within said content manifestation environment.

'882 Patent Cl. 1 (bracketed text and formatting added to facilitate analysis).  Claim 1 of the '563 and '882 Patent are nearly identical and highly analogous to claim 1 of the '493 Patent.  (Anticipation & Obviousness Mem. at 108-21 (describing how claims 1 of the '493, '563, and '882 Patents are very similar and highly analogous for the purposes of determining anticipation.))  Again, for purposes of obviousness, the only meaningful difference between claim 1 of the '493 Patent and claim 1of the '563 and '882 Patents is that the latter claims require a network client with one window object with one controllable attribute, while the '493 Patent requires multiple window objects with multiple controllable attributes.  (*Id.* (describing how claims 1 of the '493, '563, and '882 Patents are very similar and highly analogous for the purposes of determining anticipation; *see* discussion *supra* § III.B.2.c.(2).(a) at 69-71.)

Turning to claim 2 of the '882 Patent, it is directed to:

> The network client according to claim 1, wherein said processing engine being further configured to process said content to ***produce a control section and a content display section within*** said at least ***one window object***, said content display section configured to at least a portion of said content therein, said ***control section including*** a set of controls corresponding to a set of ***attributes*** which operate to ***affect manifestation of*** said at least one ***window object and*** at least a ***portion of said content within*** said content display section.

74

'882 Patent Cl. 2 (emphasis added).  Like claim 2 of the '563 Patent, claim 2 of the '882 Patent

requires that the window object described in claim 1 of the '882 Patent contain a control section.

*Compare* '563 Cl. 2 *with* '882 Patent Cl. 2.  The record evidence clearly establishes that a

combination of the JavaScript Bible, and either of the Visual DHTML or Meininger references

teaches a network client according to claim 2 of the '882 Patent, which features a window object

with a control section.  (Anticipation & Obviousness Mem. at 179-80 (the Meininger and Visual

DHTML references disclose control sections); discussion *supra* §§ III.B.2.b.(1).(b) at 45-52,

III.B.2.c.(2).(a) at 69-71.)  Accordingly, claim 2 of the '882 Patent is invalid under § 103(a) of

the Patent Act.

**(b)     Claims 6-10 and 12-14 Are Invalid**

**i)     Claim 6 Is Invalid**

The Court now addresses the validity of claim 6 of the '882 Patent as well as its

dependent claims, 7-10 and 12-14.  To begin with, Claim 6 of the '882 Patent has been amended

by the Court to correct a typographical error and, as corrected, provides as follows.

(Anticipation & Obviousness Mem. at 126-30.)

> **6**. A network client configured to operate within a data processing
> system and to receive content from a remote server system to
> facilitate a windowed content manifestation environment therein,
> comprising:
>
> > **[A]** a content retrieval module configured to receive
> > content from a network server system via an electronic data
> > network; and
> > **[B]** a processing engine coupled to said content retrieval
> > module configured to instantiate a content manifestation
> > environment within the data processing system,
> > **[C]** to process said content to produce at least one window
> > object within said content manifestation environment,
> > **[D]** said at least one window object associated with a set of

75

controllable attributes and configured to manifest at least a portion of said associated content therein,

**[E]** said controllable attributes configured to affect manifestation of said at least one window object by said the network client within said content manifestation environment,

**[F]** said at least one window object corresponding to at least one executable program object and being controlled by said processing engine without requiring said content manifestation environment to be refreshed,

**[G]** said at least one window object is associated with a [set of] controllable attribute[s],

**[H]** said controllable attribute[s] configured to permit at least one window object to be controlled as a result of performing at least one of a moving operation, a resizing operation, a minimizing operation, or a maximizing operation within said content manifestation environment.

'882 Patent Cl. 6 (bracketed text added to reflect the Court's correction of the typographical errors in the '882 Patent). As the following excerpt demonstrates, prior art that invalidates claim 1 of the '493 and '882 Patents is capable of invalidating claim 6 of the '882 Patent as well as its dependent claims.

[C]laims 1 and 6 of the '882 Patent are similar to each other and analogous to claim 1 of the '493 Patent. All these claims are directed to a content manifestation environment featuring at least one window object. They differ, however, in that claim 1 of the '493 Patent requires multiple window objects associated with multiple controllable attributes while claim 1 of the '882 Patent only requires a single window object (element 1C) associated with a single controllable attribute (element 1F) and claim 6 of the '882 Patent requires a single window object (element 6C) associated with multiple controllable attributes (element 6E). There is only one more minor difference between claims 1 and 6 of the '882 Patent. Element 6B of the '882 Patent requires "a processing engine coupled to said content retrieval module configured to ***instantiate*** a content manifestation environment within the data processing system," while element 1B is directed to "a processing engine coupled to said content retrieval module configured to ***operate*** a content manifestation environment within the data processing system." This difference is inconsequential for

76

> purposes of this anticipation discussion because both claims utilize
> a web browser to ***instantiate/operate*** a content manifestation
> environment.  In other words, both claims require that a web
> browser be used to produce a content manifestation environment
> [featuring at least one window object].

(Anticipation & Obviousness Mem. at 132-33.)  Having placed claim 6 of the '882 Patent in

perspective, the Court finds that it is invalid because there is no question that one skilled in the

art would find the network client described therein to be obvious in light of the Java Script Bible

combined with the Visual DHTML and/or Meininger reference.  (Discussion *supra* § III.B.2.b at

44-55 (describing how CA's prior art references teach content manifestation environments

featuring at least one window object with multiple controllable attributes).)  The remaining

dependent claims at issue from the '882 Patent will be addressed below.

### ii)      Claim 7 Is Invalid

Claim 7 of the '882 Patent is directed to "[t]he network client according to claim 6,

wherein said at least one window object executes within the network client."  In essence, Claim

7 merely adds, to claim 6, the limitation that the window object described therein execute

"within the network client."  As the JavaScript Bible discloses the "executes within" limitation,

it is clear that claim 7 of the '882 Patent is invalid under § 103(a) of the Patent Act.

(Anticipation & Obviousness Mem. at 141-43.)[42]

### iii)     Claim 8 Is Invalid

Proceeding to Claim 8, the Court notes that it merely adds to claim 6 the requirement that

at least one window object in a content manifestation environment be "derived based on

-------------------

[42] It is also noteworthy that claim 7 of the '882 Patent is nearly identical to claim 7 of the '563 Patent, which was anticipated by the JavaScript Bible.  (Anticipation & Obviousness Mem. at 141-43.)

instructions processed by . . . [the] processing engine" mentioned in element 6B.

> 8. The network client according to claim 6, wherein said at least one window object is derived based on instructions processed by said processing engine.

'882 Patent Cl. 8.  Notably, claim 8 of the '882 Patent is very similar to claim 3 of the '493 Patent and claim 8 of the '563 Patent, since: (1) all these claims require that at least one window object be produced when instructions are processed by a web browser or processing engine and (2) the processing engine referred to in the '882 Patent is contained within a web browser/network client.  (*See generally* Anticipation & Obviousness Mem. at 109-15 (discussing how web browsers contain processing engines).)  Additionally, the record evidence establishes, as a matter of law, that the JavaScript Bible in combination with the Visual DHTML and/or Meininger reference discloses window objects that are created when their host network client (web browser) processes the "instructions" in source code files that are either sent over an electronic data network or added to a customized web browser as described in the '563 and '882 Patents.  (*See* discussion *supra* § III.B.2.c.(1).(a) at 56-58.)  Consequently, claim 8 of the '882 Patent is invalid as obvious.  35 U.S.C. § 103(a).  The Court now turns to claim 9.

### iv)      Claim 9 Is Invalid

Claim 9 adds to claim 6 of the '882 Patent the requirement that a window object display content from an address provided as "a network content source."  Claim 9 of the '882 Patent provides:

> The network client according to claim 6, wherein said associated ***content includes at least one address of a network content source*** that is configured ***to download information*** to said data processing system via said electronic data network, ***said information to be manifested within*** said ***at least one window*** within said content manifestation environment.

'882 Patent, Cl. 9.  Claim 9 of the '882 Patent is very similar to claim 4 of the '493 Patent and

claim 9 of the '563 Patent because all three claims require that "*at least one window*" in the

content manifestation environment disclosed therein display content from an external network

content source.  (*See* discussion *supra* § III.B.2.c.(1).(b) at 58-60.)  As discussed above, the

JavaScript Bible, Visual DHTML reference, JavaScript: the Definitive Guide, DHTML Black

Book and '989 Patent all teach one skilled in the art how to display information in the manner

required by claim 9 of the '882 Patent.  (*Id.* at 60-61.)  Accordingly, claim 9 of the '882 Patent

would be obvious to one skilled in the art.

**v)      Claim 10 Is Invalid**

For its part, claim 10 merely adds to claim 9 of the '882 Patent, the requirement that the

content retrieved from a network content source be "dynamically and continuously manifested."

The chart below provides a side by side comparison of the two claims with emphasis added to

highlight their point of distinction.

| Claim 9 | Claim 10 |
|---|---|
| The network client according to claim 6, wherein said associated content includes at least one address of a network content source that is configured to download information to said data processing system via said electronic data network, said information to be manifested within said at least one window within said content manifestation environment. | The network client according to claim 6, wherein said associated content includes at least one address of a network content source that is configured to download information to said data processing system via said electronic data network, said information to be *dynamically and continuously* manifested within said at least one window object within said content manifestation environment. |

'882 Patent Cls. 9, 10.  Notably, claim 10 of the '882 Patent is remarkably similar to claim 5 of

the '493 Patent as well as claim 10 of the '563 Patent and is invalid for the same reasons.  (*See*

discussion *supra* §§ III.B.2.c.(1).(c) at 60-64, III.B.2.c.(2).(b) at 71-73.)  The record evidence

79

clearly establishes that a combination of the JavaScript Bible with the Visual DHTML and/or

Meininger reference teaches a content manifestation environment featuring a window object

with multiple controllable attributes capable of dynamically displaying content.  Hence, claim 10

of the '882 Patent would be obvious to one skilled in the art.  (Discussion *supra* §§

III.B.2.c.(1).(c) at 60-64, III.B.2.c.(2).(b) at 71-73.)  The Court now turns to claims 12 through

14 of the '882 Patent.

**vi)      Claims 12, 13 and 14 are Invalid**

Claims 12, 13 and 14 of the '882 Patent will be addressed together because they are very

similar and all involve a controllable attribute associated with a window object.  '882 Patent Cls.

12-14.  The claim chart below contains versions claims 12, 13 and 14 that have been formatted to

emphasize their points of distinction.

| Claim 12 | Claim 13 | Claim 14 |
|----------|----------|----------|
| The network client according to claim 6, wherein said controllable attributes associated with said at least one window object permit said at least one window object to be ***moved*** within said content manifestation environment. | The network client according to claim 6, wherein said controllable attributes associated with said at least one window object permit said at least one window object to be ***resized*** within said content manifestation environment. | The network client according to claim 6, wherein said controllable attributes associated with said at least one window object permit said at least one window object to be ***minimized*** within said content manifestation environment. |

Notably, claims 12, 13 and 14 of the '882 Patent are very similar to claims 7, 8 and 9 of the '493

Patent and claims 12, 13 and 14 of the '563 Patent.  Just as importantly, prior art which

invalidates claims 7, 8 and 9 of the '493 Patent, will invalidate their counterparts in the '882

Patent.  Accordingly, the Java Script Bible, which teaches one skilled in the art to create a

content manifestation with multiple window objects, one of which is movable and/or resizable

80

and the Meininger reference, which in combination with the JavaScript Bible and Visual

DHTML reference, teaches one skilled in the art how to make a content manifestation

environment featuring movable window objects that can be minimized independently of other

content invalidate claims 12, 13 and 14 of the '882 Patent.  (Discussion *supra* § III.B.2.c.(1).(d)

at 65-66.)

   To summarize, the record evidence clearly establishes that every asserted claim of the

patents in suit is invalid as a matter of law.  It is also clear, ***in this case***, that every claim that was

rendered invalid under § 102 of the Patent Act would be rendered obvious under § 103.  *See*

*generally Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1364 n.2 (Fed. Cir. 2008)

(stating that prior art reference which anticipates a claim does not necessarily render it

obvious).[43]  The Court now turns to Simple's argument that the secondary considerations

prescribed in *Graham*, indicate that the '493, '563, and '882 Patents are not invalid.  383 U.S. at

17-18.

---

[43] The majority opinion in *Cohesive* puts forth the following example as an illustration of
when a claim can be anticipated but not necessarily rendered obvious.

> Consider, for example, a claim directed toward a particular alloy of
> metal.  The claimed metal alloy may have all the hallmarks of a
> nonobvious invention--there was a long felt but unresolved need
> for an alloy with the properties of the claimed alloy, others may
> have tried and failed to produce such an alloy, and, once disclosed,
> the claimed alloy may have received high praise and seen
> commercial success.  Nevertheless, there may be a centuries-old
> alchemy textbook that, while not describing any metal alloys,
> describes a method that, if practiced precisely, actually produces
> the claimed alloy.  While the prior art alchemy textbook inherently
> anticipates the claim under § 102, the claim may not be said to be
> obvious under § 103.

*Cohesive Techs.*, 543 F.3d 1351, 1364 n.2 (Fed. Cir. 2008).

### 3. Secondary Factors

The Court is unpersuaded by Simple's arguments that the *Graham* secondary factors of non-obviousness, which include comparative utility, commercial success, appreciation by contemporaries skilled in the field, and teaching away in the prior art, counsel against a finding of obviousness. Each relevant secondary factor is discussed below.

To begin with, the record evidence clearly points out that the subject matter claimed by the asserted claims did not have a comparative utility that was far greater than the state of the art. Rather, when looking at the claims at issue, it is clear that there was a veritable cornucopia of prior art which could be used to provide a windowed content manifestation environment. Indeed, Jeff Meininger, a college student, created a web page that, when combined with the Visual DHTML reference, which was distributed to approximately 50,000 people, and the JavaScript Bible, which sold over 100,000 copies, would teach one skilled in the art to create the very system and network client claimed by the '493, '563, and '882 Patents. Moreover, listings 19-11 and 19-12 of the JavaScript Bible, which spanned no more than two and three pages of source code respectively, anticipated many of the claims in the '563 and '882 Patents. When combined with a simple boundary checking algorithm,[44] the JavaScript Bible would render most of the claims in the '493, '563, and '882 Patents obvious. In short, the record evidence makes clear that subject matter ***claimed*** in the '493, '563, and '882 Patents did not exhibit a utility far greater than that which was already present in the art. The Court now turns to the "commercial

---

[44] A boundary checking algorithm can be used to ensure that the solely contained within requirement of element 1D of the '493 Patent is met. (*See*, *e.g.*, Second Goodman Supp. Decl. at 19-10 (discussing the boundary checking algorithm in the Visual DHTML reference); 2008 Goodman 103 Decl., ¶¶ 33, 39-40 & n.3; JavaScript: the Definitive Guide at CA 1086434-35 (disclosing another boundary checking algorithm).)

success" factor.

Although Simple points out that portal web pages including CA's accused products enjoyed a great deal of commercial success, they do not acknowledge that a validity determination hinges on the "objective reach of the claim" or claims at issue, not what the patentee may describe as an ideal embodiment of her invention. *KSR*, 127 S.Ct. at 1742. By broadly claiming their invention, Simple employs a double edged sword. While they cast a wider net with which to snare potential infringers, they leave themselves with patents that can be invalidated by a broader range of prior art. *See generally Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987) ("That which would literally infringe if later in time anticipates if earlier than the date of invention."). It is this scenario which makes Simple's use of the "commercial success" factor unavailing. Moreover Simple's argument is further weakened because they cannot rely on the commercial success of CA's products, which do not infringe the patents in suit. *See generally* Chisum on Patents § 5.05 [2][g][i] n. 119 (2007) (citing *Bayer AG v. Sony Electronics, Inc.*, 229 F. Supp.2d 332, 356 (D. Del. 2002) for the proposition that "'given the Court's conclusion of non-infringement, the Court cannot conclude that [the patent owner] has established a nexus between commercial success and the merits of the patented invention'" (bracketed text added by Chisum)) and *Relume Corp. v. Dialight Corp.*, 63 F. Supp. 2d 788, 827 (E.D. Mich. 1999) for the proposition that "'because [the patentee] has failed to defeat defendants' motions for non-infringement . . . , it cannot rely on the well-substantiated success of defendants' accused products to prove the commercial success of its claimed features'" (bracketed text added by Chisum)).

Turning to the "praise of one skilled in the field," Simple points to emails that they argue

are inadmissible hearsay as proof of this secondary factor.  (*See* Simple's 103 Opp'n at 40-41.)

As the Court already noted, those emails were not admissible for the truth of their contents but

rather to indicate awareness.  (Anticipation & Obviousness Mem. at 39-41.)  Moreover, as the

record evidence shows, there were numerous other web pages that also simulated a windowed

content manifestation environment that was at the least, similar to the subject matter claimed by

the patents in suit.  (*See*, *e.g.*, Pasquali Dep. at 139-57.)  Thus, even if the Meininger reference

received a great deal of praise, this does not negate the fact that there were other prior art

references, *i.e.* the JavaScript Bible and Visual DHTML reference, that invalidated the '493,

'563, and '882 Patents.

Simple's argument that the prior art teaches away from the subject matter claimed by the

patents in suit is also unavailing.  Indeed, the prior art and motivation of one skilled in the art

actually teaches towards the patents in suit.  For example, the Visual DHTML reference teaches

the boundary checking functionality pertinent to the solely contained within requirement of

element 1D of the '493 Patent as a result of a ***user's*** interaction with a window element.  (*See*

discussion *supra* § III.B.2.b.(1).(a) at 45-49 (describing how the solely contained within

requirement is anticipated).)  Moreover, although Simple is correct in criticizing some of the

solutions put forth by CA in an attempt to make the window elements in the Meininger and

Visual DHTML references act independently of other content (*see* Simple's 103 Opp'n at 39-

40), they fail to address the fact that one skilled in the art could use other means, that were

obvious to try, in seeking to create content manifestation environments claimed by the patents in

suit (*see* discussion *supra* § III.B.2.b at 44-55).  In sum, the secondary obviousness factors are

insufficient to create a question of fact as to the obviousness of the patents in suit.  *See generally*

*Sud-Chemie, Inc. v. Multisorb Techs.*, 2009 U.S. App. LEXIS 1640, *21 (Fed. Cir. Jan. 30, 2009) ("evidence of . . . secondary considerations will not necessarily overcome a strong prima facie showing of obviousness").  Having addressed the parties' relevant arguments, the Court concludes its discussion.

## CONCLUSION

CA's motion for summary judgment on obviousness is granted.  As every claim at issue has been invalidated as anticipated by the JavaScript Bible or rendered obvious in light of the JavaScript Bible in combination with the Meininger and/or Visual DHTML reference, the Court rules that claims 1, 3-5, 7-9 and 11-13 of the '493 Patent; claims 1, 2, 5-10 and 12-14 of the '563 Patent; and claims 1, 2, 5-10, 12-14 and 16-17 of the '882 Patent are invalid.

**SO ORDERED.**

Dated: Central Islip, New York

March 17, 2009

/s/_____

Denis R. Hurley

Senior District Judge